ACCEPTED
03-16-00510-CV
13915805
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/21/2016 5:37:30 PM
JEFFREY D. KYLE
CLERK

No. 03-16-00510-CV
IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

11/21/2016 5:37:30 PM

JEFFREY D. KYLE
Clerk

STEVE F. MONTOYA, JR., M.D.
WEST TEXAS RENAL CARE
AND WEST TEXAS NEPHROLOGY
Appellants

v.

SAN ANGELO COMMUNITY MEDICAL CENTER
AND KIRK BREWER, M.D.
Appellees.

From the 119th Judicial District Court
Tom Green County, Texas
Cause No. B-15-0285-C

**APPELLANTS BRIEF**

Paul Craig Laird II
SBOT #11795420
Paul Craig Laird II Law Firm, PLLC
800 West Airport Freeway
Suite 800, LB 6015
Irving, Texas 75062
Telephone: (972) 554-0929
Facsimile: (214) 260-4935
pcl880@aim.com
Attorney for Appellants

Paul Smith
SBOT #00791692
800 West Airport Freeway
Suite 860
Irving, Texas 75062
Telephone: (214) 922-0220
Facsimile: (214) 922-0225
paulsmith214@gmail.com
Attorney for Appellants

ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

The following is a complete list of the names and addresses of all parties to the Trial Court's Final Judgment and their counsel of record:

APPELLANTS

1. The Appellants are Steve F. Montoya, Jr., M.D. (an individual); West Texas Renal Care (a Texas Corporation) and West Texas Nephrology (a Texas Corporation)

2. Appellants are represented by the following counsel of record:

   Paul Craig Laird II, Paul Craig Laird II Law Firm, PLLC, 800 West Airport Freeway, Suite 800 Irving, Texas 75062 and Paul Smith, 800 West Airport Freeway, Suite 880, Irving, Texas 75062.

APPELLEES

1. Appellees are San Angelo Community Medical Center (a Delaware Corporation authorized to do business in the State of Texas) and Kirk Brewer, M.D. (an individual).

2. Appellee Kirk Brewer, M.D. is represented by the following counsel of record:

   Robert B. Wagstaff
   McMahon Surovik Suttle, P.C.
   400 Pine Street, Suite 800
   Abilene, Texas 79601

   Appellee San Angelo Community Medical Center is represented by the following counsel of record:

   James J. McGoldrick
   Jones Carr McGoldrick, LLP
   5910 N. Central Expressway, Suite 1700
   Dallas, Texas 75206

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL…………………………………………i

TABLE OF CONTENTS……………………………………………………...…ii

INDEX OF AUTHORITIES………………….…………………..v, v, vi, vii, viii

STATEMENT OF THE CASE..………………………………………….…..1

ISSUES PRESENTED…..…………………………………………………..…..2

1. The trial court erred in granting the Motion to Dismiss per the Texas Citizens Participation Act Tex.Civ.Prac. & Rem. Code §§27.001 et. seq. and the final Order of Dismissal pursuant to Tex.R.Civ.Proc. 91(a) dismissing all causes of action against Kirk Brewer, M.D.

2. The trial court erred in granting San Angelo Community Medical Center a Summary Judgment based on the court's rulings for Kirk Brewer, M.D. when Plaintiffs raised sufficient issues of law and evidentiary facts to deny the Defendants Motion for Summary Judgment.

3. The Defendant Dr. Brewer's Motion to Dismiss under Tex.R.Civ.Proc. 91(a) and Tex.Civ.Prac. & Rem. Code §§27.001 et. seq. was untimely filed and untimely heard by the Court.

STATEMENT OF FACTS……………………………………………………….3

SUMMARY OF ARGUMENT…………………………………………………..5

ARGUMENT……………………………...……………………………..…......7

CONCLUSION AND PRAYER…………………………………………......50

CERTIFICATE OF COMPLIANCE………………………….………………..51

CERTIFICATE OF SERVICE………………………………………………..51

APPENDIX…………………………………………..…………………………52, 53

# INDEX OF AUTHORITIES

CASES                                                                     Page(s)

*Armstrong v. Hixon*,
 206 S.W.3d 175 (Tex. App. Corpus Christi 2006)…………………………...43

*Bank One, Texas, N.A. v. Stewart*,
 967 S.W.2d 419, 430-31 (Tex.App. Houston [14 Dist.] 1998, pet. denied)………………………………………………………………30, 34

*Bart Turner & Assocs. v. Krenke*,
 No. 3:13–CV–2921–L, 2014 WL 1315896……………………………….35

*Better Business Bureau of Metropolitan Dallas, Inc. v. Ward*,
 401 S.W.3d 440, 443 (Tex.App.—Dallas 2013, pet. denied)……………..20

*Bliss v. NRG Industries*,
 162 S.W.3d 434 (Tex. App. Dallas 2005)………………………………..43

*Boudreau v. Fed. Trust Bank,*
 115 SW3d 740, 743 (Tex. App.- Dallas 2003, pet. Denied)……………....45

*Bourland v. State of Texas,*
 528 S.W.2d 350, 354 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.)…….36

*Boyles v. Kerr,*
 855 S.W.2d 593, 601 (Tex.1993)………………………………………….35

*Brownlee v. Brownlee*,
 655 S.W. 2d 111, 112 (Tex. 1984)………………………………..…….46

*Cedyco Corp. v. Whitehead,*
 253 S.W.3d 877 (Tex. App. Beaumont 2008)………………………….....43

*Cheniere Energy, Inc. v. Lotfi,*
 449 S.W.3d 210, 214 (Tex.App.—Houston [1st Dist.] 2014, no pet.)……18

iv

*City of Dallas v. Sanchez,*
 494 S.W.3d 722, 724 (2016)……………………………..……6, 13, 16, 29, 43

*City of Houston v. Clear Creek Basin Auth.,*
 589 SW29 671, 678 n.5 (Tex. 1979) Tex.R.Civ. 166a(a)……………26, 43

*City of Keller v. Wilson,*
 168 SW3d 802, 816 (Tex. 2005)…………………………..……….…..44

*Drake Ins. Co. v. King,*
 606 S.W.2d 812, 817 (Tex.1980)………………………………………39

*Farlow v. Harris Methodist Fort Worth Hosp.,*
 284 S.W.3d 903, 910 (Tex.App. Fort Worth,2009)……………………….30

*G & H Towing Co. v. Magee,*
 347 SW3d 293, 296-97 (Tex.2011)…………………………………….26, 43

*Gibson v. Methodist Hosp.,*……………………………………….…27, 43
 822 SW2d 95, 17 U.C.C. Rep. Serv. 2d 81 (Tex. App.-Houston [1st Dist.}
 1991, writ denied).

*Hicks v. Group & Pension Administrators, Inc.,*
 473 S.W.3d 518, 529 (Tex.App.-Corpus Christi, 2015)…………………..20

*In re E.I. DuPont de Nemours & Co*
 136 S.W.3d 218, 223 (Tex. 2004) (per curiam)…………………..……19

*In Re Estate of Check,*
 438 SW3d at 836……………………………………………….……..48

*In Re Garth,*
 214 S.W.3d 190, 192 (Tex.App. Beaumont, 2007)………….…………32

*In Re Lipsky,*
 460 S.W.3d 579, 591 (Tex. 2015)……..…6, 14, 17, 18, 26, 28, 33, 43, 48, 50

*In Re Memorial Hermann Hospital System,*
 464 S.W. 3d 686 (2015)………………5, 6, 12, 13, 14, 16, 25, 26, 29, 32, 43

*Kirby v. Cruce,*
   688 S.W.2d 161, 164 (Tex.App.—Dallas 1985, writ ref'd n.r.e.)………36

*Lee Homes of Limestone County, Inc. v. First National Bank,*
   2015 WL 5175469, at *2 (Tex.App.-Waco 2015, no pet.)………………39

*Limestone Prods. Distrib., Inc. v. McNamara,*
   71 SW3d 308, 311 (Tex. 2002)……………………………………..…45

*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,*
   289, SW3d 844, 848 (Tex. 2009)……………………………………….43

*Martin v. Commercial Metals Co.,*
   138 S.W.3d 619 (Tex. App. Dallas 2004)……………………………...43

*Means v. ABCABCO, Inc.,*
   315 S.W.3d 209 (Tex. App. Austin 2010)…………………………..…..43

*MMP, Ltd. v. Jones,*
   710 SW2d 59, 60 (Tex. 1986)………………………………………….44

*Montemayor v. Ortiz,*
   208 S.W.3d 627 (Tex. App. Corpus Christi 2006)………………….…43

*Myers v. Southwest Bank,*
   2014 WL 7009956, at *6 (Tex.App.-Fort Worth 2014, pet. denied)…39, 40

*Nixon v. Mr. Prop. Mgmt. Co.,*
   690 SW2d 546, 548 (Tex. 1985)…………………………………..…44

*Pacific Mut. Life Ins. Co. v. Ernst & Young & Co.,*
   10 S.W.3d 798, 809 (Tex.App. Dallas,2000)……………..…………33, 35

*Paulsen v. Yarrell,*
   455 SW3d 192 (Tex.-App.-Houston [1st Dist.] 2014, no pet.)……………..48

*Radio Station KSCS v. Jennings,*
   750 S.W.2d 760 (Tex. 1988)……………………………………….45, 46

*Rhone-Poulenc, Inc. v. Steel,*
      997 SW2d 217, 223 (Tex. 1999)………………………………………….45

*Roark v. Allen,*
      633 S.W.2d 804, 810 (Tex .1982)………………………………………..35

*Serafine v. Blunt*,
      466 S.W.3d 352, 393-94 (Tex.App.-Austin 2015, no pet.)…...…..20, 21, 22

*Sloat v. Rathbun*,
      2015 WL 6830927, at *6-7 (Tex.App.-Austin 2015, pet. filed)……18, 23, 24

*Sosa v. Central Power & Light*,
      909 S.W.2d 893, 895 (Tex. 1995)………………………………………..39

*Spectators' Communication Network Inc. v. Colonial Country Club*,
      253 F.3d 215, 220-221 (5th Cir. 2001)………………………………..29

*State v. Ford Motor Co.*,
      169 S.W.2d 504, 513-14 (Tex.Civ.App. 1943)……………...…………33, 34

*Sw. Elec. Power Co. v. Grant*,
      73 S.W.3d 211, 215 (Tex. 2002)…………………………….……47

*Tello v. Bank One, N.A.*,
      218 S.W.3d 109, 113 (Tex. App.—Houston [14th Dist.] 2007, no pet.……47

*Tervita, LLC v. Sutterfield*,
      482 S.W.3d 280, 286-87 (Tex.App.-Dallas 2015, pet. denied)……....…21, 22

*Transcontinental Gas Pipeline Corp. v. Texaco, Inc.*,
      35 S.W.3d 658, 669 (Tex.App. Houston [1 Dist.] 2000, rev. denied)……31

*Wooley v. Schaffer*,
      447 S.W.3d 71, 76 (Tex.App. Houston [14 Dist.] 2014)……………..34, 35

RULES

Tex.Civ.Prac. & Rem. Code §§27.001 et. seq.
      ………………………………………….1, 2, 3, 6, 14, 16, 19, 20, 47, 48, 49, 50

Tex.R.Civ.Proc. 91(a)………..………………………………….1, 2, 3, 6, 16, 47, 49

Tex.R.Civ. 166a(a)…………………………………….…………27, 30, 43

Texas Rule of Civil Procedure 47(a)………………………..…………35

42 USC 1395cc …………………………………..…………………40

42 USC 1395cc(a)(1)(I)(iii)……………………………………….40, 41, 42

## STATEMENT OF THE CASE

This is an appeal of the final Order of Dismissal per the Texas Citizens Participation Act Tex.Civ.Prac. & Rem. Code §§27.001 et. seq. (CR 194) and the Tex.R.Civ.Proc. 91(a) final Order of Dismissal (CR 196) dismissing all causes of action against Kirk Brewer, M.D.  Both Orders were signed on February 8, 2016. The Order at (CR 196) states that the "Motions are so intertwined as to not allow segregation."  Thus argument of Dr. Montoya is on both Orders.  This is also an appeal of the Summary Judgment (CR 336) that granted San Angelo Community Medical Center a Judgment dismissing all causes of action because of the orders dismissing the claims against Kirk Brewer, M.D.   The Summary Judgment was signed on May 17, 2016 (CR 336) and a Motion for New Trial (CR 344) and an Amended Motion for New Trial were filed by Plaintiffs (CR 349) and were denied (CR 363).

The underlying causes of action in this case are:

1) Tortious Interference with current and prospective business/patient relations; 2) Illegal and anticompetitive actions of the Defendants; 3) Defendants defamation per se; 4) Malice; 5) Business Disparagement against the Plaintiffs; 6) Restraint of Trade- (Monopolization/Attempted Monopolization/Conspiracy to Monopolize); 7) Group Boycott and Conspiracy in Restraint of Trade; 8) Restraint of Trade/Tortious Interference by violating EMTALA (Emergency Medicine

Treatment and Action Labor Act) (CR 160 and 300).

Plaintiffs timely filed a Notice of Appeal (CR 367). Plaintiffs bring this appeal seeking a reversal of the trial courts granting of the Motion to Dismiss and the final Order of Dismissal of all causes of action against Kirk Brewer, M.D. and the Summary Judgment denying all causes of action against San Angelo Community Medical Center.

For ease all Plaintiffs will be referred to as "Dr. Montoya", Defendant Kirk Brewer, M.D. will be referred to as "Dr. Brewer" and San Angelo Community Medical Center will be referred to as "SACMC".

## ISSUES PRESENTED

Appellant's Issues-

1. The trial court erred in granting the Motion to Dismiss per the Texas Citizens Participation Act Tex.Civ.Prac. & Rem. Code §§27.001 et. seq. and the final Order of Dismissal pursuant to Tex.R.Civ.Proc. 91(a) dismissing all causes of action against Kirk Brewer, M.D.

2. The trial court erred in granting San Angelo Community Medical Center a Summary Judgment based on the court's rulings for Kirk Brewer, M.D. when Plaintiffs raised sufficient issues of law and evidentiary facts to deny the Defendants Motion for Summary Judgment.

3.     The Defendant Dr. Brewer's Motion to Dismiss under Tex.R.Civ.Proc. 91(a) and Tex.Civ.Prac. & Rem. Code §§27.001 et. seq. was untimely filed and untimely heard by the Court.

## STATEMENT OF FACTS

Dr. Montoya is a nephrologist in practice at SACMC since 1981. He filed suit against Dr. Brewer (the hospital Chief of Staff) and SACMC for various Anti-Competitive actions on July 6, 2015 (CR 7). Defendant SACMC filed Special Exceptions and an answer on August 14, 2015 (CR 17). The Court granted the Special Exceptions on December 3, 2015 (CR 75). Dr. Montoya filed a Second Amended Petition in response to the Court Order on the Special Exceptions (CR 103). Dr. Brewer filed a Motion to Dismiss pursuant to Tex. R. Civ. Proc. 91(a) and Tex. Civ. Prac. Rem. Code §27.001 et.seq. (CR 76) and then filed an Amended Motion to Dismiss (CR 119). Dr. Montoya filed a response to the Motion to Dismiss (CR 94) and a Supplemental Response to the Motion to Dismiss (CR 177).

Dr. Montoya timely filed before the hearing on the Motion to Dismiss a Fourth Amended Original Petition (CR 160). The Court granted the Motion to Dismiss not distinguishing which rule the Court was using to grant the dismissal (CR 194). The Court specifically said it could not segregate the claims (CR 196).

SACMC filed a untimely Motion to Dismiss (CR 202). SACMC filed a Motion for Leave to file their Motion to Dismiss (CR 216). At the same time as filing the Motion to Dismiss SACMC filed a Motion for Summary Judgment (CR 208) based only on the Court granting Dr. Brewer's Motion to Dismiss. The Court denied leave to file the Motion to Dismiss of SACMC (CR 335).

Dr. Montoya filed a response to SACMC's Motion to Dismiss (CR 331) and a response to the Motion for Summary Judgment (Supp. CR _____). Dr. Montoya timely filed before the Summary Judgment hearing a Sixth Amended Original Petition (CR 300). The Court granted the Motion for Summary Judgment of SACMC based on the ruling of dismissing all claims against Dr. Brewer (CR 336).

Dr. Montoya requested findings of fact and conclusions of law (CR 337) to allow the court to state the facts and law it relied upon since the Court could not segregate its prior Order (CR 196) that is the basis of the Summary Judgment. The court did not file any findings. Dr. Montoya filed a Motion for New Trial (CR 344) and an amended Motion for New Trial (CR 349) and a Motion to Reconsider Dr. Brewer's Motion to Dismiss. The Court signed an Order denying the First Amended Motion for New Trial (CR 363). Dr. Montoya timely filed Notice of Appeal (CR 367).

**Summary of Argument**

Dr. Montoya sued the hospital SACMC and Dr. Brewer based upon causes of action that were approved by the Texas Supreme Court in the case of a doctor suing the hospital where he had a medical practice. The exact same causes of action that were approved by the Texas Supreme Court in *In Re Memorial Hermann Hospital System,* 464 S.W. 3d 686 (2015) are Dr. Montoya's causes of action. The Court in *In Re Memorial Hermann* case stated "We hold that Dr. Gomez's petition presents multiple viable anti-competitive actions" Id at 713. Attached as Exhibit 1 to the response to the Motion to Dismiss (CR 232) is a certified copy of the pleading of Dr. Gomez from the *In Re Memorial Hermann* case that was specifically approved by the Texas Supreme Court as viable causes of action. The causes of action approved by the Texas Supreme Court in *In Re Memorial Hermann* are:

(1)   Business Disparagement
(2)   Defamation
(3)   Tortious Interference with Prospective Business Relations
(4)   Improper Restraint of Trade under the Texas Fire Enterprises and Anti-Trust Act of 1983.

Id. At 695-696

The Petitions (Original through Sixth Amended) (CR 7, 103, 143, 160, 272, 300) of Dr. Montoya followed and alleged the approved Petition of the Texas Supreme Court *In Re Memorial Hermann*. Dr. Montoya is alleging the approved

anti-competitive and defamation causes of action of the Texas Supreme Court, by a physician and his entities in which he practices, suing the hospital where he practices medicine, and Dr. Brewer as Chief of Staff for Anti-Competitive actions. This case is exactly the *In Re Memorial Hermann* case approved by the Texas Supreme Court. The Texas Supreme Court determined *In Re Memorial Hermann* in 2015 allowing Anti-Competitive actions against a hospital and its opinion has not been reversed.

Using the standards set forth in *City of Dallas v. Sanchez* 494 S.W.3d 722, 724 (2016) for dismissal under Tex.R.Civ.Proc. 91(a) Dr. Montoya's pleadings, (CR 7, 103, 143, 160, 272, 300) taken as true, with the inferences reasonably drawn from them entitle Dr. Montoya to the relief sought in his petitions and reasonable people could believe the facts pled.

Using the standard set forth in *In Re Lipsky*, 460 SW3d 579 (Tex.2016) for determination of whether the Texas Anti-Slapp Statute applies Tex.Civ.Prac. & Rem. Code §§27.001 et. seq. Dr. Montoya proved through his pleadings and affidavits attached to the responses to the Motion to Dismiss (CR 94, 225) and Supplemental Response (CR 177) the case is not one seeking to intimidate or silence the public but is a case of economic retaliation and is based upon valid claims that have approved causes of action as set forth in *In Re Memorial Hermann*

## ARGUMENT

**A.  Summary of Factual Allegations by Dr. Montoya in his Fourth Amended Petition (CR 160) for Dr. Brewer.  For SACMC the Sixth Amended Original Petition (CR 300)**

Dr. Montoya has practiced at San Angelo Community Hospital since 1981. Until 2007 Dr. Montoya would receive 10-20 calls from the emergency room per month to treat either new or existing patients at the San Angelo Community Medical Center. Since 2008 Dr. Montoya has only received one call from the emergency room or a hospitalist for consultation as a nephrologist, and one time for treatment of an existing patient that suffered with kidney disease/problems. The lack of referrals caused substantial injury to Dr. Montoya and damaged his ability to compete, because he depended on these referrals and consults to build and keep his practice. A majority of patients who need kidney treatment suffering from kidney disease in a hospital will later need continuing care for their kidneys or related problems; the most common of such continuing treatments is kidney dialysis. A typical kidney dialysis patient will need treatment for an average of 6 years, and each such patient would mean revenue to Dr. Montoya's practice of approximately $100,000 per year. Dr. Montoya estimates that he has lost at least 100 long term kidney dialysis patients from 2007 to the present due to the Defendants' anticompetitive scheme to refuse to give him patient referrals or consults from the emergency room of

SACMC. Dr. Montoya estimates that this lack of referrals has thus cost him $3,000,000 to $6,500,000 over that period of time.

Dr. Montoya in developing, building and keeping his practice, has always taken patients as an on-call staff attending physician from the emergency room/department of SACMC.

In developing and building a practice Dr. Montoya as a nephrologist wanted long term kidney dialysis patients to treat in his practice. Referral from hospitals and area physicians is extremely important to a nephrologist to building and keeping a practice. The ability to obtain referrals from a hospital and area physicians is a primary source of patients with kidney disease. Defendants in this case conspired to deprive Dr. Montoya of referrals needed for his nephrology practice to continue. This case is for the anticompetitive actions of the Defendants posing a danger of monopolization or attempted monopolization of patient choice and causing patients to pay more for medical care and injuring consumer patients.

Dr. Montoya during his 36 year career in San Angelo built his practice including a dialysis unit that can serve 24 patients per shift from referring physician and referrals of patients from the emergency room/department.

Dr. Brewer is an employee and/or owner of a group of hospitalists affiliated with, and possibly created by, SACMC. Dr. Brewer was the chief of staff of SACMC when this case was filed and head of the hospitalist group that practices at SACMC. Dr. Montoya has been denied the referral of patients that come into the emergency room with kidney problems/illness/disease by the hospitalists controlled by Dr. Brewer and SACMC. These patients in need of a nephrologists care are being referred to the hospital affiliated physician group in competition with Dr. Montoya. Even Dr. Montoya's current patients are being referred to the hospitalist/hospital affiliated group.

At all relevant times Dr. Kirk Brewer, himself, as a principal officer of Community Medical Associates, SACMC and Chief of Staff of SACMC and head of the hospitalist system at SACMC and the agents/employees of SACMC working under his control, direction, or in furtherance of unlawful and improper actions was and is employed by and acting in furtherance of the business of (SACMC) and its affiliated medical practice(s).

Dr. Montoya's skill as a nephrologist was, until the hospital created its affiliated medical practice and/or entered into an exclusive contract with the group of hospitalists affiliated and/or managed by Dr. Brewer, a marketing asset for SACMC. Dr. Montoya is the only Spanish speaking nephrologist at SACMC.

Dr. Montoya received his rotating share of referrals as required by Federal Law called EMTALA, of patients with kidney disease/illness/failure until SACMC created its affiliated practice groups and/or entered into an exclusive contract with the group of hospitalists affiliated and/or managed by Dr. Brewer.

One example of Dr. Brewer's actions- On January 25, 2014 at 8:10 a.m. Kirk Brewer, M.D. took over the hospitalist care of a patient being seen by Dr. Montoya in the hospital (SACMC). When Dr. Brewer's rotation as on call hospitalist started he without ever seeing the patient or the chart cancelled Dr. Montoya's consult and treatment ordered by Dr. Montoya and consulted another nephrologist. This removal proves actual anti-competitive action of Dr. Brewer against Dr. Montoya. Dr. Montoya went to the call board at the hospital and witnessed his name on the call board as the nephrologist on call on January 24 and 25, 2014. SACMC is required to have an official EMTALA Medicare call list for on call physicians for the SACMC to take Medicare patients and be paid for the medicare patients.

Dr. Montoya's name was on the call list but he was intentionally ignored. The removal of Dr. Montoya as the patients physicians also violates a patient's right to choose their physician. This list was followed until Dr. Brewer came to SACMC and took charge of hospitalists. The nephrologist he brought in

for consult after removing Dr. Montoya is one that is in a group that Kirk Brewer, M.D. has a contract for paid services with Dr. Brewer. Dr. Brewer did not see the patient when he removed Dr. Montoya as the treating nephrologist; he issued the change via a telephone order. Kirk Brewer, M.D. without seeing the patient, removed Dr. Montoya as the patient's doctor. This change of nephrologist was for Kirk Brewer, M.D.'s economic gain and caused Dr. Montoya economic loss. Attached as Exhibit B (CR 175-176 and 325-326) to the petition is a true and correct copy of the redacted hospital record showing the facts on January 25, 2014 as stated above.

Kirk Brewer, M.D. by his actions of removing Dr. Montoya as the nephrologist published a statement that Dr. Montoya was not a competent nephrologist to treat patients coming to the San Angelo Community Medical Center emergency room. Kirk Brewer, M.D. was aware that his actions would become known to the staff physicians of San Angelo Community Medical Center and that he was by conduct and a whisper campaign saying Dr. Montoya should not be allowed to treat patients at San Angelo Community Medical Center. These remarks caused hospitalists and other doctors at SACMC, as well as doctors and nurses in the SACMC emergency department, to cease and refuse to (a) admit patients to the care of Dr. Montoya, and (b) not to refer patients to Dr. Montoya for nephrology consults.

Attached to the petition as Exhibit C (CR 175) is the true and correct sworn statement that an existing patient of Dr. Montoya, Mrs. Welch tried to see Dr. Montoya in the emergency room of San Angelo Community Medical Center and that the emergency room would not call Dr. Montoya to treat his existing patient. Mrs. Welch is over 90 years of age and Dr. Montoya has treated her for at least 20 years.

Another patient of Dr. Montoya, whose name is withheld per privacy rights, who is also over 90 years of age and has been a Dr. Montoya patient for at least 10 years requested Dr. Montoya when she went to the emergency room and she also was not allowed to see Dr. Montoya her personal physician.

These facts as stated in the Petition (CR 160) prove the defamation claim against Dr. Brewer dismissed under the Anti-Slapp Statute was in error. The "whisper campaign" was only for an economic reason and not made as a truthful statement above Dr. Montoya. The Whisper Campaign was confirmed in Dr. Hunt's affidavit (CR 179). It also proves that Dr. Montoya's claims under *In Re Memorial Hermann* standard are valid claims. They should not have been dismissed under Tex.R.Civ.Proc. 91(a).

The above facts are proven through the pleadings (CR 160 and 272) and the affidavits of Dr. Montoya (CR 96, 180, 250) and Dr. Hunt (CR 179) and the sworn

statement of a patient Mrs. Welch (CR 175).

Causes of Action

Dr. Montoya sued the hospital SACMC and Dr. Brewer based upon causes of action that were approved by the Texas Supreme Court in the case of a doctor suing the hospital where he had a medical practice. The exact same causes of action that were approved by the Texas Supreme Court in *In Re Memorial Hermann Hospital System,* 464 S.W. 3d 686 (2015) are Dr. Montoya's causes of action. The Court in *In Re Memorial Hermann* case stated "We hold that Dr. Gomez's petition presents multiple viable anti-competitive actions" Id at 713. Attached as Exhibit 1 to the response to the Motion to Dismiss (CR 232) is a certified copy of the pleading of Dr. Gomez from the *In Re Memorial Hermann* case that was specifically approved by the Texas Supreme Court as viable causes of action. The causes of action approved by the Texas Supreme Court in *In Re Memorial Hermann* are:

(5) Business Disparagement
(6) Defamation
(7) Tortious Interference with Prospective Business Relations
(8) Improper Restraint of Trade under the Texas Fire Enterprises and Anti-Trust Act of 1983.

Id. At 695-696

Using the standards set forth in *City of Dallas v. Sanchez* 494 S.W.3d 722, 724 (2016) for dismissal under Tex.R.Civ.Proc. 91(a) Dr. Montoya's pleadings,

taken as true, with the inference reasonably drawn from them entitle Dr. Montoya to the relief sought in his petitions and reasonable people could believe the facts pled.

## B.     Approved Causes of Action Under *In Re Memorial Hermann.*

Dr. Montoya's Causes of Action.

The causes of action in this suit are:

1) Tortious Interference with current and prospective business/patient relations; 2) Illegal and anticompetitive actions of the Defendants; 3) Defendants defamation per se; 4) Malice; 5) Business Disparagement against the Plaintiffs; 6) Restraint of Trade- (Monopolization/Attempted Monopolization/Conspiracy to Monopolize); 7) Group Boycott and Conspiracy in Restraint of Trade; 8) Restraint of Trade/Tortious Interference by violating EMTALA (Emergency Medicine Treatment and Action Labor Act) (CR 160 and 300).

**C. The Texas Citizens Participation Act standard setforth in *In Re Lipsky*, 460 S.W.3d 579 (Tex.2016)**

> "As already mentioned, ***HN3*** the Texas Citizens Participation Act or TCPA protects citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern. *See* House Comm. on Judiciary & Civil Jurisprudence, Bill Analysis, Tex. H.B. 2973, 82nd Leg., R.S. (2011). The Act provides a special procedure for the expedited dismissal of such suits. A two-step process is initiated by motion of a defendant who believes that the lawsuit responds to the defendant's valid exercise of First Amendment rights. Under the first step, **[**8]** the burden is initially on the defendant-movant to show "by a preponderance of the evidence" that the plaintiff's claim "is based on, relates to, or is in response to the [movant's] exercise of: (1) the right of free speech;[4] (2) the right to petition;[5] or (3) the right of

association."[6] *[Tex. Civ. Prac. & Rem. Code § 27.005(b)](link)*. If the movant is able to demonstrate that the plaintiff's claim implicates one of these rights, the second step shifts the burden to the plaintiff to "establish[] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id. [§ 27.005(c)](link)*.

**HN7** In determining whether the plaintiff's claim should be dismissed, the court is to consider the pleadings and any supporting and opposing affidavits. *Id. [§ 27.006(a)](link)*. Moreover, the motion to dismiss ordinarily suspends discovery, *id. [§ 27.003(c)](link)*, although the statute leaves the possibility for a court to order limited discovery for "good cause" as it relates to the motion itself, *id. [§ 27.006(b)](link)*. Within defined time limits, the court must then rule on the motion and must dismiss the plaintiff's claim if the defendant's constitutional rights are implicated and the plaintiff has not met the required showing of a prima facie case. *Id. [§ 27.005](link)*. The determination is to be made promptly, ordinarily within 150 days of service of the underlying legal action. *See id. [§§ 27.003(b)](link), [.004(a)](link), [.005(a)](link)*.

In this proceeding, only the second step is at issue—the question being whether the plaintiff has met its burden of "establish[ing] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id. [§ 27.005(c)](link)*. The parties disagree about the evidentiary burden this language imposes. Lipsky argues that the phrase "clear and specific evidence" elevates the evidentiary standard, requiring Range to produce direct evidence as to each element of its claim. Range, on the other hand, argues that circumstantial evidence and rational inferences may be considered by the court in determining whether clear and specific evidence exists and that the TCPA's prima-facie-case requirement does not impose a higher or unique evidentiary standard. The dispute mirrors a similar disagreement among the courts of appeals."
(*In Re Lipsky* at 586-587)

[4] **HN4** The "right of free speech" refers to communications related to "a matter of public concern" which is defined to include an issue related to: "(A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." *Id. [§ 27.001(3)](link), [(7)(A)—(E)](link)*.

[5] **HN5** The "right to petition" refers to a wide range of communications relating to judicial, administrative, or other governmental proceedings. *Id. [§ 27.001(4)](link)*.

[6] **HN6** The "right of association" refers to people "collectively express[ing], promot[ing], pursu[ing], or defend[ing] common interests." *Id. [§ 27.001(2)](link)*.

In this case Dr. Montoya conclusively proved through his factual statements in pleadings (Fourth Amended and Sixth Amended Original Petition (CR 160 and 300) and affidavits attached to his response (CR 94) and Supplemental Response to

the Motion to Dismiss in (CR 177) that there is direct and circumstantial evidence to allow the suit to go forward.

Clear and Convincing Evidence of Dr. Montoya petitions on file and his and Dr. Hunt's affidavits prove that this case should not have been dismissed under Tex.Civ.Proc.91(a) or Tex.Civ.Prac. Remedies Code §27.001 et. seq.

In the response to the Motion to Dismiss (CR 94) Dr. Montoya's Fourth Amended Petition (CR 160) and his affidavit (CR 97) proved that this case is a legitimate lawsuit based upon the *In Re Memorial Hermann* causes of action (see page 19 above). Dr. Montoya in the Fourth Amended Original Petition (CR 160) specifically addressed the factual allegations of how Dr. Brewer and SACMC harmed him by interfering with his ability to obtain new patients out of the emergency room referral and make a living as a nephrologist (see facts starting page 7 above). Dr. Montoya's active pleading at the time of the hearing on the Motion to Dismiss was the Fourth Amended Petition (CR 160). A petition is evidence to keep a Motion to Dismiss from being granted *City of Dallas* at 724-725. In Re Lipksy at 586-587. Then Dr. Montoya's Supplemental Response to the Motion to Dismiss (CR 177) filed an affidavit of an independent physician, John Hunt, M.D. stating specifically he (Dr. Hunt) was aware of the whisper campaign that Dr. Montoya was not to be referred any patients from the emergency room

(CR 179). Also Dr. Montoya filed a Supplemental Affidavit that Dr. Brewer had stolen his patient (CR 180) attached to the affidavit, (redacted patient name for HIPAA privacy requirements), were patient records showing Dr. Montoya had seen a patient referral out of the emergency room as Chief of Staff and Chief Hospitalist Dr. Brewer removed Dr. Montoya as the nephrologist caring for the patient. The Whisper Campaign was economic activity not a free speech activity.

This evidence was clear and convincing and the Court should have denied Dr. Brewer's Motion to Dismiss. Wherefore this Court should reverse the Motion to Dismiss.

### D. Plaintiffs' Business Disparagement and Defamation Claims Should Not Be Dismissed

"The TCPA's purpose is to identify and summarily dispose of lawsuits designed *only* to chill First Amendment rights, not to dismiss meritorious lawsuits." *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) (emphasis added), citing Tex. Civ. Prac. & Rem. Code § 27.002 (balancing "the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law" against "the rights of a person to file meritorious lawsuits for demonstrable injury"). The TCPA is not applicable to this case, as Plaintiff's causes of action are primarily concerned with Defendants' anticompetitive actions, and injury to competition in the relevant

Page **17**

markets of nephrology services and referrals for nephrology services in San Angelo, Texas. As Plaintiff's Fourth Amended Petition makes clear, the conspiracy which Defendants perpetrated to deprive Dr. Montoya of referrals began in 2007. Although Plaintiff details some specific defamations which occurred in 2014, those defamations are merely representative of the anticompetitive scheme to which Dr. Montoya was being subjected. Defendants' group boycott and monopolization/attempted monopolization of the relevant market began much earlier, so even if Plaintiff's pleadings do not set forth a prima facie case of defamation and business disparagement, Plaintiff's antitrust claims should not be dismissed because they are not based on those instances of defamation.

In any event, Plaintiff has set forth a prima facie case of defamation and business disparagement by clear and specific evidence in his affidavit and Fifth Amended Petition. The "clear and specific" evidence which is required to pass a TCPA challenge can be contained in the plaintiff's pleadings or in affidavits. *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015). In determining if the "clear and specific evidence" standard is met, the court must view the pleadings in the light most favorable to the party opposing the TCPA motion. *Sloat v. Rathbun*, 2015 WL 6830927, at *3 (Tex.App.-Austin, 2015) ("we view the pleadings in the light most favorable to [the non-movant]; *i.e.*, favoring the conclusion that her claims are not

predicated on protected expression."); *see also Cheniere Energy, Inc. v. Lotfi,* 449 S.W.3d 210, 214 (Tex.App.—Houston [1st Dist.] 2014, no pet.) (reviewing pleadings and evidence in light most favorable to non-movant)

A prima facie standard generally requires only the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re Li*psky, 460 S.W.3d 579, 590 (Tex. 2015), quoting *In re E.I. DuPont de Nemours & Co.,* 136 S.W.3d 218, 223 (Tex. 2004) (per curiam). "In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss." *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015).

Plaintiff has plainly satisfied this requirement. As shown in Plaintiff's Fourth Amended Petition, Dr. Brewer's defamation was published by conduct when he removed Dr. Montoya from consulting with a patient on January 25, 2014 at 8:10 a.m. The defamation was published to the hospitalist overseeing that patient, and the nephrologists who was eventually called in to consult as a replacement for Dr. Montoya. The defamation was eventually spread to all hospitalists and emergency room doctors at SACMC. Fourth Amended Petition, p. 8, ¶ 7.13 (CR 167). Dr. Montoya has also set forth a detailed calculation and explanation of the damages he has suffered as a result of the Defendants' scheme

to deprive him of nephrology referrals and consults.  With regard to the January 2014 defamation, Plaintiff has established his prima facie case with clear and specific evidence.

**E.    Even if Plaintiff's Defamations Are Dismissed, Plaintiff's Remaining Claims Are Not Subject to the TCPA**

The TCPA is clearly meant to apply to individual claims, not to an entire lawsuit when allegedly defamatory statements are only important to certain claims.  Breach of contract claims, for example, would not ordinarily be dismissed merely because a Plaintiff failed to plead a prima facie defamation case under the TCPA.

The TCPA's definition of "legal action" makes this clear.  The TCPA states that "If a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action."  Tex. Civ. Prac. & Rem. Code § 27.003(a).

The TCPA then defines a "Legal action" as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief."  Tex. Civ. Prac. & Rem. Code § 27.003(a).

The only cases which have interpreted the TCAP's definition of "legal action" have held that the term "is broad and evidences a legislative intent to treat any claim by any party on an individual and separate basis." *Hicks v. Group & Pension Administrators, Inc.*, 473 S.W.3d 518, 529 (Tex.App.-Corpus Christi, 2015), citing *Better Business Bureau of Metropolitan Dallas, Inc. v. Ward,* 401 S.W.3d 440, 443 (Tex.App.—Dallas 2013, pet. denied). In *Hicks*, the court individually examined each of the claims which allegedly violated the TCPA and dismissed two of those claims while refusing to dismiss two other claims because the TCPA challenge to those claims was not timely filed.

Writing a concurrence in the case of *Serafine v. Blunt*, 466 S.W.3d 352, 393-94 (Tex.App.-Austin 2015, no pet.), Justice Pemberton wrote that where a "'legal action' is based on, relates to, or is in response to" (whatever that phrase may mean) both expression protected by the Act and other unprotected activity, the "legal action" is subject to dismissal only to the extent it 'is based on, relates to, or is in response to' the protected conduct, as opposed to being subject to dismissal in its entirety" *Id*. at 394. Justice Pemberton showed that this result finds support in several features of the the TCPA's text, and he explained as follows:

> The first is that the TCPA defines "legal action"—that which is subject to dismissal—both expansively and variously, as previously noted, referring to everything from an entire action or proceeding to particular facts that underlie a claim or cause of action. This nomenclature contemplates the

drawing of distinctions not only between claims, but also between factual theories, as here.

Adding further support to this construction are the dual overarching purposes that the Legislature has declared the TCPA is to serve: "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Neither purpose is advanced by holding that a claim is *wholly* subject to dismissal merely because it *partly* "is based on, relates to, or is in response to" protected expression under the Act. Nor would these purposes be served by the converse holding that the claim is *wholly* beyond the Act merely it "is based on, relates to, or is in response to" some unprotected activity.

*Id*. at 393-394.  The *Serafine* court later noted that "longstanding principles of Texas jurisprudence" counsel against "a construction of the TCPA that would mandate presumptive dismissal of an entire claim merely because its factual underpinnings might include even one allegation that implicates the Act's protections." *Id*. at 394.

Several cases have applied the TCPA as Justice Pemberton interprets it.  For example, in *Tervita, LLC v. Sutterfield*, 482 S.W.3d 280, 286-87 (Tex.App.-Dallas 2015, pet. denied), the court dismissed some of the plaintiff's claims based on conduct that occurred during a TDI-WC hearing, but refused to dismiss other claims because the movant had not shown "by a preponderance of the evidence, that [plaintiff's] allegations were based on [defendant's] exercise of its right to petition or its right of association." *Id*. at 287. The *Tervita* court thus held that the

TCPA did not apply to the plaintiff's "employment discrimination based on (1) creating a hostile work environment, (2) representing that he was 'not entitled to pursue benefits' under the Texas Worker's Compensation Act, and (3) wrongful discharge." *Id.* at 286; *see also Serafine v. Blunt*, 466 S.W.3d 352, 359-60 (Tex.App.-Austin 2015) ("to the extent that the Blunts' tortious-interference counterclaim is based in part on Serafine's alleged threats made outside the context of the lawsuit, Serafine has not satisfied her initial burden to show that these portions of the Blunts' counterclaims are subject to the [TCPA].")

The same result occurred in *Sloat v. Rathbun*, 2015 WL 6830927, at *6-7 (Tex.App.-Austin 2015, pet. filed). In that case, the court rejected the defendants' argument that plaintiff's entire suit was based on conduct protected under the TCPA, when the plaintiff had also plead facts which showed stalking and other tortious conduct. The court rejected application of the TCPA and stated as follows:

> [Plaintiff's claims] are garden-variety tort claims based on specific conduct that the [Defendants] have failed to demonstrate, by a preponderance of the evidence, implicates the exercise of their rights of "free speech," " association," or "to petition."

> *Sloat v. Rathbu*n, 2015 WL 6830927, at *8 (Tex.App.-Austin 2015, review dismissed). The *Sloat* court held that the defendant had failed to demonstrate, by a "preponderance of the evidence," that the plaintiff's causes of action for intentional

infliction of emotional distress, invasion of privacy by intrusion on seclusion and by public disclosure of private facts, and tortious interference with contract were "based on, related to, or in response to" defendants' "exercise of their right of free speech, right to petition, or right of association." *Id*. at *9. The defendants in *Sloat* had thus failed to establish that the TCPA applied to the case. *Id*.

In this case, Dr. Brewer's participation in the conspiracy aimed at depriving Plaintiffs of referrals for nephrology patients is not based on allegedly defamatory statements, but it instead is based on his conduct. The TCPA simply does not apply to such claims, and the court erred when it dismissed *all* of Plaintiffs' claims against Dr. Brewer.

Wherefore the Plaintiffs request the Order dismissing Dr. Brewer be reversed and the Summary Judgment in favor of SACMC be reversed.

## F.    Appellant Has Valid Causes of Action for Antitrust Violations

As noted above, Dr. Montoya's defamation claims are examples of how Defendant enforced its anticompetitive scheme to deprive Dr. Montoya of nephrology referrals, but Plaintiff's antitrust claims are primarily based on the illegal scheme itself and not individual defamatory statements. Plaintiff has plainly set forth valid antitrust claims as they largely mirror the causes of action

which the Supreme Court held to be valid in *In re Memorial Hermann Hospital System*, 464 S.W.3d 686 (Tex. 2015).

The causes of action in this case, along with the underlying facts, are very similar to the causes of action approved by the Supreme Court in *In re Memorial Hermann Hospital*. In both cases a doctor who has privileges at a hospital has alleged that the defendants conspired to prevent him from obtaining patient referrals. *In re Memorial Hermann Hospital* at p. 711*;* Plaintiff's Sixth Amended Petition, paragraphs 6.1, 6.2, 6.5 (CR 301-303). In both cases, the alleged conspirators consist of the hospital itself, a physician practice group, and individual doctors who practice at the hospital. *In re Memorial Hermann Hospital* at p. 695; Plaintiff's Sixth Amended Petition (CR 300). In both cases, the doctors have explained how other doctors how other doctors are a primary source of referrals, and that these referrals are required for a doctor to be able to compete. *In re Memorial Hermann Hospital* at p. 711; Sixth Amended Petition, pp. 6.2, 6.3, 6.8-6.11 (CR 301-305). Both lawsuits allege that the defendants intentionally interfered with the plaintiff's longstanding practice for obtaining referrals from other doctors in the community, and that the defendants' acts constituted a "concerted effort . . . to restrain competition in and monopolize" the relevant market. *In re Memorial Hermann Hospital* at p. 708; Plaintiff's Sixth Amended Petition, paragraphs 6.1, 6.2, 6.5, 7.1, 12.7 (CR 301-302, 309, 314). Both lawsuits

allege that the defendants impugned the reputation of the plaintiff doctors through a covert whisper campaign which convinced other doctors not to refer patients to the plaintiff doctors. *In re Memorial Hermann Hospital* at p. 696; Plaintiff's Sixth Amended Petition, paragraph 6.15-6.17 (CR305-306). Both lawsuits allege that the plaintiff doctor lost a substantial amount of business from referrals due to the anticompetitive conspiracy against them. *In re Memorial Hermann Hospital* at p. 711 (plaintiff alleged that "referral patterns changed" so that he was no longer the "number one" physician, and that following the conduct at issue, another physician received more referrals); Plaintiff's Sixth Amended Petition, paragraph 7.11 and 13.3-13.4 (Dr. Montoya received 10-20 calls per month from the SACMC emergency room to treat new or existing patients before the anticompetitive conspiracy began, but he has only received a single call from emergency room for a new patient since then; all referrals now go to the nephrologists at WTMA). In both this case and in *In re Memorial Hermann Hospital,* the plaintiff doctor alleges that the defendants' acts "constitute illegal monopolization, attempted monopolization, and/or conspiracy to monopolize under Texas law." in *In re Memorial Hermann Hospital;* Plaintiff's Sixth Amended Petition, paragraph 12.7 (CR 314). Plaintiff has plainly stated a valid cause of action under the antitrust laws of Texas which is in no way designed only to chill Defendants' First Amendment rights. "" *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) ("The

TCPA's purpose is to identify and summarily dispose of lawsuits designed *only* to chill First Amendment rights, not to dismiss meritorious lawsuits.") (emphasis added). The trial court's granting of Dr. Brewer's Motion to Dismiss under the TCPA must be reversed with regard to Dr. Montoya's antitrust claims. The trial court's grant of summary judgment to SACMC, which was based on the improper dismissal of Dr. Montoya's antitrust claims, must also be reversed.

## G. Appellant's Petition Clearly Brought Claims Directly Against SACMC for SACMC's Own Conduct

SACMC's Motion for Summary Judgment argued that because the court had previously dismissed Dr. Brewer from the case, SACMC should also be dismissed because "Plaintiff alleges no direct or separate liability claims against SACMC above and apart from the actions of its agent, Brewer." SACMC's Motion for Summary Judgment as a Matter of Law, p. 3 (hereafter "SACMC Motion for Summary Judgment") (CR 208). This statement is absolutely false.

Dr. Montoya's Sixth Amended Petition makes it clear that SACMC was being sued for its own conduct, and not merely for the conduct or statements of Dr. Brewer. For example, Dr. Montoya's Petition stated as follows:

> The Defendants (SACMC) and Dr. Kirk Brewer, along with WTMA and Dr. Brewer's group of hospitalists, acting by and through its agents/employees/ principals/officers, acted together to carry out the improper and illegal actions and therefore are jointly and severally liable for civil conspiracy in carrying out their wrongful activities.

Plaintiff's Sixth Amended Petition, p. 5, ¶ 6.10 (CR 304). The Petition also included allegations against all of the Defendants in each of Plaintiff's causes of action. *See, e.g., Id*., p. 10 ("Defendant's intentionally interfered with Dr. Montoya's longstanding and continuous relationships with patients and referring physicians from the emergency room/department in a concerted effort to restrain competition and monopolize the practice of nephrology . . . in the relevant market.") *Id*., p. 10, , ¶ 7.1 (CR 309). Similar conduct was alleged against SACMC for each of Plaintiff's causes of action against it. As there were only ever two Defendants in the lawsuit, Dr. Montoya's allegations against the plural "Defendants" plainly included SACMC. SACMS's suggestion that there were no "direct . . . liability" claims against it is simply false.

The causes of action against SACMC are all separate and independent of Dr. Brewer. For example, with regard to Dr. Montoya's group boycott claim and claims for monopolization and attempted monopolization, Dr. Montoya has alleged that SACMC, Dr. Brewer, Dr. Brewer's group of hospitalists (who will be named once Defendants have responded to Dr. Montoya's discovery), and West Texas Medical Associates conspired to monopolize the relevant markets defined in Dr. Montoya's pleadings, and to keep Dr. Montoya from competing in those markets by a group boycott. See Plaintiff's Sixth Amended Petition, paragraphs 12-12.8 (CR 313-314) and 13-13.4 (CR 315-317). It is obvious that each member of a

conspiracy is liable for their participation in the conspiracy. A conspirator need not have the same motives as the other conspirators, and need not be at the same market level of the other conspirators to be a participant in a conspiracy that is illegal under the Texas antitrust laws. *See, e.g., Spectators' Communication Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220-221 (5th Cir. 2001) ("Antitrust law has never required identical motives among conspirators, and even reluctant participants have been held liable for conspiracy. For acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one.")

**H.     The Court Improperly Granted a Motion to Dismiss Which Masquerades as a Grant of Summary Judgment**

While styled as an order on a summary judgment motion, the court in fact granted a Motion to Dismiss in favor of SACMC, as the court effectively ruled that Dr. Montoya's pleadings did not state a claim against SACMC. The mere fact that Dr. Brewer was dismissed from the case does not mean that SACMC could not be liable for its own conduct or the conduct of its other agents besides Dr. Brewer. SACMC did not present any evidence in support of its summary judgment motion which showed that it had not engaged in any of the conduct which Dr. Montoya sued it for; SACMC instead relied solely on the fact that Dr. Brewer was dismissed from the case under a Texas procedural rule. This "evidence" was in fact no

evidence at all, and it resulted in the court in effect granting summary judgment to SACMC based on Dr. Montoya's pleadings.

At the hearing on SACMC's summary judgment motion, the court repeatedly stressed its belief that Dr. Montoya was required to plead specific wrongful acts by an agent of SACMC in order to be able to maintain its lawsuit against SACMC. However, there is simply no rule in Texas holding that in order to plead a valid cause of action against a business entity, one must list specific tortious or wrongful actions which company representatives undertook on behalf of the organization. Texas pleading precedent clearly allows a party suing a business entity to merely allege that the business entity itself did something wrongful. *See, e.g., Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 430-31 (Tex.App. Houston [14 Dist.] 1998, pet. denied) (although no specific acts of company representative were plead, court stated that "Although the allegations are broad, both petitions raise a reasonable inference that Bank One and Weyerhaeuser participated in a conspiracy to defraud LRI by inducing Trendmaker to avoid liability on the Midland Note. [Plaintiff's] pleading also gives fair notice of his claim . . . "); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 910 (Tex.App. Fort Worth,2009) ("Under the doctrine of respondeat superior, an employer may be vicariously liable for the negligence of its agent or employee who was acting within the scope of employment *even though the employer did not*

*personally commit a wrong*."). Obviously, a corporate entity itself can commit a wrong. Companies are liable for their own actions or failures to act, and Texas allows companies to be sued directly for those acts. *Transcontinental Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658, 669 (Tex.App. Houston [1 Dist.] 2000, rev. denied) (noting that "in usual business practice," "companies are liable for their own acts.")

For example, if one sues a construction company for failing to build a fence properly, one does not have to name in the pleading the company employees who built the inadequate fence. If one sues a grocery store for selling tainted meat, one does not have to name the individual butcher who packaged it. Such a rule would as a practical matter make most lawsuits impossible, as a plaintiff almost never knows at the pleading stage which employees or agents, if any, were involved in the wrongful acts. Because of this, every jurisdiction in the United States, including Texas, allows a company to be sued for the company's own wrongful acts. So long as the lawsuit gives the company notice of what it is being sued for so that it can prepare a defense, the Texas pleading standards are satisfied. Dr. Montoya's lawsuit against SACMC plainly satisfied the Texas notice pleading standard, and the court's decision to grant summary judgment to SACMC because no specific acts of SACMC's agents were listed in the lawsuit after Dr. Brewer was dismissed was clear error.

## I.      Dr. Montoya's Petition Meets the Texas Notice Pleading Standard

As noted above, the court's grant of summary judgment was actually a dismissal based on the pleadings.  While the Defendants and the court persist in their belief that this case primarily involves defamatory statements, the central basis of Dr. Montoya's lawsuit is that the Defendants, along with WTMA and Dr. Brewer's group of hospitalists, conspired to deprive Dr. Montoya of referrals for nephrology patients.  Dr. Montoya's pleading is nearly identical to the plaintiff's pleading in *In re Memorial Hermann Hospital System*, 464 S.W.3d 686 (Tex. 2015), a case in which the Supreme Court specifically held that that  a physician had stated valid claims against a hospital and its co-conspirators.  Under *Hermann Memorial*, Dr. Montoya's pleading is plainly sufficient under Texas law.

While the court need not look beyond *Hermann Memorial*, cases such as *In re Garth*, 214 S.W.3d 190, 192 (Tex.App. Beaumont, 2007) clearly show that Dr. Montoya's pleadings for his conspiracy-based antitrust claims meet the Texas notice pleading standard.  The court in *Garth* stated as follows:

> At the time the trial court entered its order, Plaintiff's First Amended Petition was the pleading before the court. Although very broad, the First Amended Petition clearly alleges a conspiracy by the individual defendants, asserts that they committed overt acts, and seeks punitive damages against them . . . Because we construe  [Plaintiff's] pleadings in her favor, we hold that her pleadings are sufficient to notify the individual defendants that she sought to hold them liable for punitive damages through a conspiracy theory. . .

*Id*. at 192.  A similar result was reached in *Pacific Mut. Life Ins. Co. v. Ernst &*

*Young & Co*., 10 S.W.3d 798, 809 (Tex.App. Dallas,2000), *rev'd on other*

*grounds*, 51 S.W.3d 573 (Tex.,2001).  In that case, the court stated as follows:

> Although rule 47(a) of the rules of civil procedure requires a pleading to contain "a short statement of the cause of action sufficient to give fair notice of the claim involved," *see* tex.R. Civ. P. 47(a), this does not require that each element of a claim be specifically alleged in a pleading. *See Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex.1993) (op. on reh'g). Rather, it is sufficient if the cause of action can be "reasonably inferred" from the pleading. *See Boyles,* 855 S.W.2d at 601. In this case, Pacific's live pleading alleges that Ernst & Young "conspired with, aided and abetted, associated with, and assisted ... in the dissemination of false and misleading information or omissions of material facts to prospective investors in First Republic backed securities." The petition also alleged that Ernst & Young's participation in the fraud enabled First Republic to make misrepresentations to the public after the merger. We have reviewed this language and, after doing so, we conclude that (1) a claim for conspiracy or "aiding and abetting" may be reasonably inferred from this language, and (2) the language was therefore sufficient to support a conspiracy or "aiding and abetting" claim.

*Pacific Mut. Life Ins. Co. v. Ernst & Young & Co*., 10 S.W.3d 798, 809 (Tex.App.

Dallas,2000), *rev'd on other grounds*, 51 S.W.3d 573 (Tex. 2001).  Importantly,

the court in *Pacific Mutual* held that the pleading was sufficient even though it

only named the corporate defendant as the conspirator, and did not name any

corporate agents who had participated in the conspiracy.  The same result was

reached in *State v. Ford Motor Co*., 169 S.W.2d 504, 513-14 (Tex.Civ.App. 1943),

where the court stated as follows:

> In any event, the pleader was not required to plead the exact agreement and by whom made with respect to the unlawful combination or conspiracy

plead. It is only the facts constituting the cause of action for conspiracy, particularly the acts which constitute the grounds or gravamen of the action, that must be alleged with certainty and particularity. This the petition did. . . We are therefore of the view that the general allegation that a trust, combination, or conspiracy was entered into by Ford and its dealers, together with the allegations of specific instances whereby Ford and its dealers operated so as to limit the territory in which a dealer could resell automobiles and parts purchased from Ford . . . fully comply with the rule that in alleging a combination or conspiracy the facts constituting the conspiracy, or from which it may be inferred, should be clearly and concisely set out. . . [A]s a rule great latitude is allowed in setting out in the petition the particular acts from which the conspiracy may be inferred.

*State v. Ford Motor Co.*, 169 S.W.2d 504, 513-14 (Tex.Civ.App. 1943).

Again, it is important to note that the court in *Ford Motor* held that merely naming the corporate entity, Ford, as a conspirator was sufficient to state a valid claim under the Texas notice pleading standard. The same result was reached in *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 430-31 (Tex.App. Houston [14 Dist. 1998) ("Although the allegations are broad, both petitions raise a reasonable inference that Bank One and Weyerhaeuser participated in a conspiracy to defraud LRI by inducing Trendmaker to avoid liability on the Midland Note."). In *Stewart*, as in the other cases cited above, the court held that the plaintiff had pleaded a valid conspiracy claim where it alleged that the corporate defendants themselves had participated in the conspiracy.

If the court had actually applied Rule 91a, the court would apply the fair notice pleading standard applicable in Texas to determine whether the allegations of the petition are sufficient to allege a cause of action. *Wooley v. Schaffer*, 447

S.W.3d 71, 76 (Tex.App. Houston [14 Dist.] 2014), citing *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex .1982) ("A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim."); *see also Bart Turner & Assocs. v. Krenke,* No. 3:13–CV–2921–L, 2014 WL 1315896, at \*5 (N.D.Tex. Mar. 31, 2014) (applying Texas's fair notice pleading standard to determine whether to grant motion to dismiss under Rule 91a). In conducting its review, the court must construe the pleadings liberally in favor of the plaintiff, look to the pleader's intent, and accept as true the factual allegations in the pleadings to determine if the cause of action has a basis in law or fact. *Id.* at 76. Although Texas Rule of Civil Procedure 47(a) requires "a short statement of the cause of action sufficient to give fair notice of the claim involved," it does not require that each element of the claim be specifically alleged in a pleading. *See Pac. Mut. Life Ins. v. Ernst & Young,* 10 S.W.3d 798, 809 (Tex.App.-Dallas 2000, no pet.) (citing *Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex.1993)). If a cause of action can be "reasonably inferred" from the pleading, the pleading is sufficient. *Pac. Mut.,* 10 S.W.3d at 809. Dr. Montoya's Petition plainly meets this standard.

While the court's decision to grant summary judgment to SACMC cannot withstand review under the Texas notice pleading standard, the court's decision was particularly wrong in light of Dr. Montoyas' antitrust claims, which allege a conspiracy to monopolize the relevant market and a group boycott (*i.e.*, a type of

anticompetitive conspiracy) against Dr. Montoya by SACMC, Dr. Brewer, Dr. Brewer's group of hospitalists, and WTMA. Because of the secretive nature of conspiracies, courts allow plaintiffs to show conspiracy by circumstantial rather than direct evidence. *Kirby v. Cruce,* 688 S.W.2d 161, 164 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). The agreement need not be formal, the understanding may be tacit, and each conspirator need not know the details of the conspiracy. *Id.* at 164; *Bourland v. State of Texas,* 528 S.W.2d 350, 354 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.). Given the law on this subject, it makes no sense to grant a summary judgment in favor of SACMC merely because Dr. Montoya has not pleaded in detail exactly which representatives of SACMC entered into the conspiracy, whom they had conversations and agreements with, and so forth. It is ridiculous to make Dr. Montoya plead such facts before even undertaking discovery in this matter.[1] A conspiracy never needs to be proven with direct evidence if there is sufficient circumstantial evidence, but in dismissing SACMC because Dr. Montoya's pleadings did not show a specific conspiratorial action by an agent of SACMC, the court effectively required Dr. Montoya to provide direct evidence of the antitrust conspiracy *at the pleading stage*. This holding is simply not allowed under the Texas summary judgment rule, and would not even be allowed under Rule 91a motion to dismiss.

---

[1] Plaintiffs did send out Requests for Production and Interrogatories in this matter, but Defendants only tendered objections and refused to provide a single substantive answer. Plaintiff was in the process of filing a Motion to Compel when the court granted SACMC's Motion for Summary Judgment.

**J.    The Trial Court Erred When It Failed to Consider the Allegations in Plaintiff's Sixth Amended Petition**

Plaintiff's Fourth Amended Petition clearly brought claims against SACMC directly, and even under that pleading, a grant of summary judgment to SACMC would have been erroneous.  Plaintiff's Sixth Amended Petition, however, made it clear beyond any doubt that SACMC was being sued for its own conduct, and not merely for Dr. Brewer's actions.  The court thus erred when it failed to consider the new allegations in Plaintiff's Sixth Amended Petition which was filed on May 4, 2016, a week before the summary judgment hearing on May 11, 2016.  This resulted in an erroneous grant of summary judgment to SACMC, as SACMC's Motion for Summary Judgment was based on stale factual allegations which were superseded by the allegations in the Sixth Amended Petition.

SACMC's Motion for Summary Judgment argued that because the court had previously dismissed Dr. Brewer from the case, SACMC should also be dismissed because "Plaintiff alleges no direct or separate liability claims against SACMC above and apart from the actions of its agent, Brewer." SACMC's Motion for Summary Judgment as a Matter of Law, p. 3 (hereafter "SACMC Motion for Summary Judgment").  SACMC based its argument on the statement in Plaintiffs' Fourth Amended Petition that Brewer "was and is employed by and acting in furtherance of the business of [SACMC] and its medical practices" and "at all

times acted for SACMC." *Id.*, p. 3.  SACMC thus contended that "SACMC's only potential liability sounds in the doctrine of respondeat superior." *Id.*

While Dr. Montoya had no need to correct his previous pleading on this issue, as even the Fourth Amended Petition made it clear that Dr. Montoya sought to hold SACMC liable for its own conduct and not merely the conduct of Dr. Brewer[2], Plaintiffs' Sixth Amended Petition showed beyond doubt that SACMC is not being sued only under a respondeat superior theory for Dr. Brewer's actions. Plaintiff's Sixth Amended Petition thus includes the following statements:

> Dr. Brewer is individually liable for his own illegal, improper acts and omissions.  At various times Dr. Brewer acted for himself, (SACMC) and/or his group of hospitalists.

> Each Defendant in this case (i.e., SACMC and Dr. Brewer), and WTMA and Dr. Brewer's group of hospitalists (eventual defendants) are being sued for their individual roles and conduct in the monopolization, attempted monopolization, conspiracy to monopolize, and group boycott/concerted refusal to deal.  While each of these entities may have engaged in the illegal conduct through their agents or representatives, they are being sued for their individual roles and conduct and not simply under a respondeat superior theory of liability due to actions by Dr. Brewer.

Plaintiff's Sixth Amended Petition, p. 4, ¶ 6.6 and p. 14, ¶ 12.2 (CR 39).

After this pleading was filed, the fact that SACMC was being sued for its own conduct became indisputable.  The sole basis of SACMC's Motion for Summary

---

[2] Plaintiff's Fourth Amended Petition repeatedly makes it clear that SACMC was being sued for its own conduct, and not merely for vicarious liability for statements made by Dr. Brewer.  Paragraph 6.1 of Plaintiff's Fourth Amended Petition, for example, clearly stated that "This case is for *the anticompetitive action*s of the Defendants posing a danger of monopolization or attempted monopolization of patient choice and causing patients to pay more for medical care and injuring consumer patients." Plaintiff's Fourth Amended Petition, p. 2, paragraph 6.2

Judgment, that "SACMC's only potential liability sounds in the doctrine of respondeat superior," did not exist even before the Sixth Amended Petition was filed, and it certainly did not exist afterwards.

The Supreme Court's opinion in *Sosa v. Central Power & Light*, 909 S.W.2d 893, 895 (Tex. 1995) shows that the trial court erred when it failed to consider the allegations in Plaintiffs' Sixth Amended Petition. In *Sosa*, the Court stated as follows:

> Because the Sosas timely filed their second amended original petition, it superseded their first amended original petition containing the statements on which the defendants based their motion for summary judgment. Contrary to statements in live pleadings, those contained in superseded pleadings are not conclusive and indisputable judicial admissions. *Drake Ins. Co. v. King,* 606 S.W.2d 812, 817 (Tex.1980). Therefore, the basis for the defendants' motion no longer existed and summary judgment was improper.

*Id*. at 895. *Sosa* has recently been reaffirmed by cases such as *Lee Homes of Limestone County, Inc. v. First National Bank*, 2015 WL 5175469, at *2 (Tex.App.-Waco 2015, no pet.). *Sosa* was also cited in *Myers v. Southwest Bank*, 2014 WL 7009956, at *6 (Tex.App.-Fort Worth 2014, pet. denied). *Myers* summarized the facts and holding from *Sosa* as follows:

> The defendants in *Sosa* attempted to meet their burden by arguing that the plaintiffs' own pleadings established that the plaintiffs' claims were barred by limitations. The plaintiffs then amended their petition to remove the statements on which the defendants had relied in their motion. The defendants' motion, which was based entirely on the plaintiffs pleading themselves out of court, no longer had any basis. Summary judgment was therefore improper.

Id. at *6.  The same is true in this case, as Plaintiffs' Sixth Amended Petition made it clear that the entire basis for SACMC's Motion for Summary Judgment no longer existed after that amended pleading was filed.  The court's grant of summary judgment to SACMC was therefore improper.

**What is EMTALA (The Emergency Medical Treatment and Active Labor Act Cause of Action)?**

The Emergency Medical Treatment and Active Labor Act (hereinafter EMTALA) is Section 1867(a) of the Social Security Act, and is codified within the section of the U.S. Code which governs the Medicare program. (*42 USC 1395cc*) The Healthcare Financing Administration (hereinafter HCFA) is the federal agency that governs Medicare payments and has the statutory authority to issue regulations concerning the implementation of EMTALA.  (*HCFA Interpretive Guidelines V-15*)

EMTALA is a statute which governs when and how a patient must be (1) examined and offered treatment or (2) transferred from one hospital to another when he is in an unstable medical condition (3) the list of doctors on staff that are on call and the fair assignment of patients to doctors.  *42 USC 1395cc(a)(1)(I)(iii), HCFA Interpretive Guidelines V-15*

But in this case it does not involve patient dumping but the refusal to follow the mandatory call list of EMTALA to fairly distribute the paying nephrology patients under Medicare or private insurance.

**L. Maintaining the Call List Requirement**

Medicare –participating hospitals must maintain a list of physicians who are on call to provide emergency care to individuals presenting to the emergency room. *(42 USC 1395cc(a)(1)(I)(iii))* Under EMTALA the hospital and its officers are responsible for maintaining an on-call roster for the emergency department. *(42 USC 1395cc(a)(1)(I)(iii))*

San Angelo Community Medical Center is a Medicare –participating hospital.

**M. All nephrology patients that go on to dialysis are covered under Medicare-thus are paying patients for the doctor and hospital**

The avowed purpose of the statute is to prevent hospitals from rejecting patients, refusing to treat them, or transferring them to "charity hospitals" or "county hospitals" because they are unable to pay or are covered under the Medicare or Medicaid programs and to fairly distribute patients coming to the emergency room between physicians so the physician receives paying and non-

paying patients.  (42 USC 1395cc (a)(1)(I)(iii)), HCFA Interpretive Guidelines V-15.

*This is a key in this case, the patients coming to the emergency room for nephrology care are guaranteed to pay the doctor for services through Medicare.*

*Dr. Brewer wants the paying patients to go to the other nephrologist in the hospital owned group and to not have Dr. Montoya receive his fair share of patients.  Dr. Brewer is paid by the other nephrologist for coverage.*

The purpose of the call list is to allow all physicians to equally receive call and paying and non-paying patients.

A brief to the Trial Court an EMTALA was provided after the Motion to Dismiss hearing (CR 185).  This brief has even more details.

Wherefore the Plaintiffs based upon EMTALA request the Orders dismissing Dr. Brewer be reversed and the Summary Judgment be reversed.

N. Summary Judgment in favor of SACMC

Despite Appellants valid claims under *In Re Memorial Hermann* and the legal arguments and facts proven in the response to the Motion for Summary Judgment (Supp. CR _____) the trial court committed reversible error by granting the Defendant SACMC Summary Judgment (CR 336).  Thus this Court should reverse the granting of the Summary Judgment and render judgment for Appellants denying the Summary Judgment.

Summary Judgment for the Defendant is only proper if, as a matter of law,

the Plaintiff cannot succeed on any theory pled.  See *G & H Towing Co. v. Magee,* 347 SW3d 293, 296-97 (Tex.2011); *see City of Houston v. Clear Creek Basin Auth.,* 589 SW29 671, 678 n.5 (Tex. 1979) Tex.R.Civ. 166a(a); *Gibson v. Methodist Hosp.,* 822 SW2d 95, 17 U.C.C. Rep. Serv. 2d 81 (Tex. App.-Houston [1ˢᵗ Dist.} 1991, writ denied).  The function of summary judgment is not to deprive litigants of their right to a full hearing on the merits of any real issue of fact or their right to trial by jury.  (see Tex.R.Civ.Proc 166 a) Rather, the goal of the procedure is the prompt elimination of patently unmeritorious claims or untenable defenses (See *Means v. ABCABCO*, *Inc.*, 315 S.W.3d 209 (Tex. App. Austin 2010); *Cedyco Corp. v. Whitehead*, 253 S.W.3d 877 (Tex. App. Beaumont 2008); *Montemayor v. Ortiz*, 208 S.W.3d 627 (Tex. App. Corpus Christi 2006); *Armstrong v. Hixon*, 206 S.W.3d 175 (Tex. App. Corpus Christi 2006);  and the summary termination of a case when it clearly appears that only questions of law are involved and that there are no genuine issues of fact. ⁽See *Bliss v. NRG Industries*, 162 S.W.3d 434 (Tex. App. Dallas 2005); *Martin v. Commercial Metals Co.*, 138 S.W.3d 619 (Tex. App. Dallas 2004).  The trial court erred in not finding genuine issue of fact and not following the Texas Supreme Court in *In Re Memorial Hermann* and *In Re Lipsky* and *City of Dallas*.

The Appellant in the response to the Motion for Summary Judgment proved the facts stated on pages 13-18 above through the factual affidavit attached to the

response for Summary Judgment (Supp. CR_____).

The Defendant in their Motion for Summary Judgment did not disprove any element of the Plaintiffs cause of actions of Dr. Montoya's Sixth Amended Petition (CR 300). All the Defendant did was state unsworn statements that are not facts and rely on the Order of Dismissal in favor of Dr. Brewer. The Defendants did not attach any evidentiary affidavits to their Motion for Summary Judgment disputing the facts of the Plaintiff and the independent affidavit of Dr. Hunt (Supp. CR _____) (Supp. CR_____).

Thus the Motion for Summary Judgment should be reversed and denied.

To succeed on a traditional Motion for Summary Judgment, the Defendant must show that there is no genuine issue of material fact and that it is entitled to Summary Judgment as a matter of law. Tex.R.Civ.P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289, SW3d 844, 848 (Tex. 2009); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 SW2d 546, 548 (Tex. 1985). To meet this burden, the Defendant must conclusively prove all essential elements of its claim. *MMP, Ltd. v. Jones,* 710 SW2d 59, 60 (Tex. 1986). A matter is conclusively established if reasonable people could not differ on the conclusion to be drawn from the evidence. *City of Keller v. Wilson,* 168 SW3d 802, 816 (Tex. 2005). If the Defendant establishes its right to summary judgment as a matter of law, the burden shifts to the Plaintiff to present evidence that raises a genuine issue of

material fact. *Boudreau v. Fed. Trust Bank,* 115 SW3d 740, 743 (Tex. App.-Dallas 2003, pet. Denied). In deciding whether to grant Defendant's motion, the court must take as true all competent evidence favorable to the Plaintiff's favor. *Limestone Prods. Distrib., Inc. v. McNamara,* 71 SW3d 308, 311 (Tex. 2002); *Rhone-Poulenc, Inc. v. Steel,* 997 SW2d 217, 223 (Tex. 1999); *Nixon,* 690 SW2d at 548-49.

The Plaintiffs presented proof to deny the Summary Judgment in the factual affidavits of Dr. Montoya (Supp. CR _____) and Dr. Hunt (Supp. CR___).

No Summary Judgment evidence was presented by the Defendant SACMC. Dr. Montoya's response to the Motion for Summary Judgment objected to the Motion because there is no evidence attached to the Motion (Supp. CR_____). The statements in the body of the argument are heresay and Dr. Montoya requested the Court to strike those statements as defective and not meeting the standard for Summary Judgment evidence. The statements in the argument are conclusory and without factual basis as required by the Texas Rules of Civil Procedure (TRCP 166a(c)) (CR 208).

Dr. Montoya further objected to the argument because it did not meet the standard set forth for an affidavit in the Texas Supreme Court *Radio Station KSCS v. Jennings* 750 S.W.2d 760 (Tex. 1988). The Supreme Court held that affidavit for summary judgment failed to establish that it was based on personal knowledge

and was thus inadequate summary judgment proof. The argument in the Motion is not a factual affidavit showing proof.

Dr. Montoya objected to the argument because it was not an affidavit which must state facts and cannot merely recite legal conclusions. *Brownlee v. Brownlee*, 655 S.W. 2d 111, 112 (Tex. 1984). In this case the argument does not meet the *KSCS* or *Brownlee* standards.

## O. SUMMARY-JUDGMENT EVIDENCE PRESENTED BY PLAINTIFF

To support the facts in this response, Dr. Montoya offered the following summary-judgment evidence attached to this response and incorporates the evidence into this response by reference.

Exhibit 1: Certified copy of Pleading approved by the Texas Supreme Court as valid causes of action in *In Re Memorial Hermann* (Supp. CR _____).

Exhibit 2: Is the affidavit of Steve F. Montoya, Jr., M.D. one of the Plaintiffs. In the affidavit he states the facts and refutes the allegations for the dismissal under TRCP 91(a) and the Anti-Slapp allegations (Supp. CR_____).

Exhibit 3: Is the affidavit of Dr. Hunt that confirms the causes of actions and the facts of the Anti-Trust actions of San Angelo Community Medical Center (Supp. CR_____).

**P.     Defendant did not disprove plaintiff's cause of action as a matter of law.**

A defendant is entitled to summary judgment on a plaintiff's cause of action if the defendant can disprove at least one element of the cause of action as a matter of law. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *see Tello v. Bank One, N.A.*, 218 S.W.3d 109, 113 (Tex. App.—Houston [14th Dist.] 2007, no pet.). SACMC has not disproved any of Plaintiffs elements in their causes of action (CR 208).

The Traditional Motion for Summary Judgment by SACMC was nothing more than a thinly vailed attempt to get around the untimely filing of the Motion to Dismiss under 91(a) and the Anti-Slapp Motion Tex.Civ.Prac. & Rem. Code §§27.001 et. seq.

The trial court erred in granting the Summary Judgment because Defendant SACMC did not show there was not genuine issue of material fact and/or Plaintiffs' factual affidavits proved genuine issues of material facts.

The finding of the Court dismissing Dr. Brewer (CR 194 and 196) is not controlling to the causes of action brought against SACMC. The causes of action against SACMC cannot be controlled by the dismissal of Dr. Brewer without valid Summary Judgment evidence, which there is none.

The Defendant SACMC does not even attach a single factual affidavit or any affidavit in support of their Summary Judgment (CR 208). The only thing relied upon is the Court prior Order of Dismissal of Dr. Brewer's claims.

SACMC filed a Motion for Special Exceptions on August 14, 2015 (CR 17) and the court granted the Special Exceptions on December 3, 2015 (CR 75). The Plaintiffs Petition was amended to comply with the Court order. SACMC should have filed a Motion to Dismiss when it filed the Special Exception. The Motion for Summary Judgment is a untimely Motion to Dismiss that has no evidence or proof attached (CR 208).

The purpose of this lawsuit has nothing to do with the Defendants Constitutional Rights to speak freely, associate freely and participate in governmental as permitted by law. These are the requirements to meet in filing a Motion under the Anti-Slapp Statute *Tex.Civ.Prac. & Rem. Code §§27.001 et. seq.* and as set out in *Paulsen v. Yarrell 455 SW3d 192 (Tex.-App.-Houston [1ˢᵗ Dist.] 2014, no pet.*) (quoting *In Re Estate of Check 438 SW3d at 836*).

The Texas Supreme Court agreed that clear and specific evidence under the Texas Anti-Slapp Statute Chapter 27 includes relevant circumstantial evidence. (*In Re Lipsky*). The evidence of the Plaintiff in the Petitions and in his response

affidavits of Dr. Montoya and Dr. Hunt meets the *In Re Lipsky* standard (see CR 300, 94, 177, 331and Supp. CR____ ).

The Defendant SACMC did not even join in Dr. Brewer's Motion to Dismiss under 91(a) or his Anti-Slapp motion (CR 76 and 119). All the actions SACMC were untimely.

**Issue 3**

1.  Pursuant to Tex.Civ.Proc.91(a)3(b) a Motion to Dismiss must be filed at least 21 days before the Motion is heard. The original Motion to Dismiss was filed on July 7, 2016 (CR 119). The hearing was set by the Court for January 12, 2016 (CR 91-93). An amended Notice of Hearing was set on January 29, 2016 (CR 183). The amended Notice of the Motion to Dismiss was sent on January 13, 2016 (CR 184). This notice was less than the 21 days required by Tex.Civ.Proc.91(a)3(b). The amended Motion to Dismiss was filed on January 7, 2016 (CR 119). Dr. Montoya objected to the Amended Motion of Dr. Brewer as not being allowed without restarting the period. The Court erred in allowing the Motion to Dismiss under Tex.Civ.Proc.91(a) to be heard. Dr. Montoya objected to the hearing in his Supplemental Response to the Motion to Dismiss (CR 177). Tex.Civ.Proc. 91(a)5(d) require the hearing to be reset Tex.Civ.Proc.91(a)6. By filing the Amended Motion Dr. Brewer waived the right to be heard.

2. Pursuant to Tex.Civ.Prac. & Rem. Code §§27.001 et. seq. a Motion to Dismiss a legal action under this section must be filed not later than the 60th day after the date of service of the legal action Tex.Civ.Prac.Remedies Code §27.003(b). Dr. Brewer was originally served on October 9, 2015 (Supp. CR_____). Dr. Brewer filed his Motion to Dismiss under Tex.Civ.Prac. & Rem. Code §§27.001 et. seq. on December 8, 2015 which was within the 60 days after the date of service. Dr. Brewer then filed an Amended Motion to Dismiss on June 7, 2015 (CR 119) which is outside the sixty day requirement of Tex.Civ.Prac.Remedies Code §27.003(b). Dr. Montoya objected to the untimely filed affidavits and Amended Motion (CR 177). The Court should strike the affidavits as untimely filed and thus the Motion should be denied as not meeting the first proving of *In Re Lipsky*.

## CONCLUSION AND PRAYER

The Appellants showed in their response to the Motion for Summary Judgment and the factual affidavits in the response to Motion for Summary Judgment that this Court should (1) reverse the granting of the Summary Judgment and (2) remand the case to the trial court for trial. The Appellants showed valid causes of actions and facts and the this court should reverse the Orders of Dismissal for Dr. Brewer and remand the case to the trial court for trial.

Respectfully Submitted,

Paul Craig Laird II Law Firm, PLLC.

/s/ Paul Craig Laird II
By: Paul Craig Laird II
SBOT #11795420
800 West Airport Freeway
Suite 800, LB 6015
Irving, Texas 75062
(972) 554-0929
(214) 260-4935 fax
pcl880@aim.com
ATTORNEY FOR APPELLANTS

## CERTIFICATE OF COMPLIANCE

Based on a word count using Microsoft Word 2007, this Appellant's Brief contains 12,584 words excluding the portions of the brief excluded from the word count under T.P.A.P.94(i)(l).

/s/ Paul Craig Laird II
Paul Craig Laird II

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Appellant's Brief was served on the following by email on the 21st day of November, 2016.

/s/ Paul Craig Laird II
Paul Craig Laird II

Appellee Kirk Brewer, M.D. counsel of record:
Robert B. Wagstaff
McMahon Surovik Suttle, P.C.
400 Pine Street, Suite 800
Abilene, Texas 79601

Appellee San Angelo Community Medical Center counsel of record:
James J. McGoldrick
Jones Carr McGoldrick, LLP
5910 N. Central Expressway, Suite 1700
Dallas, Texas 75206

APPENDIX

(1)     Dr. Montoya's Fourth Amended Original Petition

(2)     Dr. Montoya's Sixth Amended Original Petition

(3)     Defendant Kirk Brewer, M.D.'s Motion to Dismiss and for Recovery of Costs and Attorney's Fees

(4)     Defendant Kirk Brewer, M.D.'s Amended Motion to Dismiss and for Recovery of Costs and Attorney's Fees

(5)     Response to Motion to Dismiss

(6)     Supplemental Response to Motion to Dismiss

(7)     Order on Defendant Kirk Brewer, M.D.'s Motion to Dismiss per the Texas Citizens Participation Act

(8)     Order on Defendant Kirk Brewer, M.D.'s Motion to Dismiss per Rule 91(a) of the Texas Rules of Civil Procedure

(9)     Defendant San Angelo Community Medical Center's Traditional Motion for Summary Judgment

(10)   Plaintiffs Steve F. Montoya, Jr. M.D., West Texas Renal Care and West Texas Nephrology's Response to Defendant San Angelo Community Medical Center's Motion for Summary Judgment and Objection and Request for Continuance

(11)   Order of Defendant San Angelo Community Medical Center's Summary Judgment

(12)   Response to Motion to Dismiss of San Angelo Community Medical Center

(13)   Texas Rule of Civil Procedure 91(a)

(14)   Texas Civil Practice & Remedies Coe §27.001 et.seq.

(15)   *In Re Memorial Hermann Hospital System,* 464 S.W. 3d 686 (2015)

(16)   *In Re Lipsky*, 460 SW3d 579 (Tex.2016)

(17)   *City of Dallas v. Sanchez,* 494 S.W.3d 722, 724 (2016)

# TAB NO. 1

CAUSE NO. B-15-0285-C

| | | |
|---|---|---|
| STEVE F. MONTOYA, JR., M.D. | § | IN THE DISTRICT COURT OF |
| WEST TEXAS RENAL CARE | § | |
| WEST TEXAS NEPHROLOGY | § | |
| | § | |
| VS. | § | 119th JUDICIAL DISTRICT |
| | § | |
| SAN ANGELO COMMUNITY | § | |
| MEDICAL CENTER AND | § | |
| KIRK BREWER, M.D. | § | TOM GREEN COUNTY, TEXAS |

### PLAINTIFF'S FOURTH AMENDED ORIGINAL PETITION

Plaintiff's STEVE F. MONTOYA, JR., M.D., West Texas Renal Care and West Texas Nephrology file this Fourth Amended Original Petition and would show:

1.    This case should be conducted under Discovery Level Two until the Court enters a Level Three Scheduling Order.

2.    Plaintiff STEVE F. MONTOYA, JR., M.D. is an individual residing in Tom Green County, Texas. Plaintiff West Texas Renal Care is a Texas Corporation with its principal place of business in Tom Green County, Texas. Plaintiff West Texas Nephrology is a Texas Professional Association with its principal place of business in Tom Green County, Texas.

3.    Defendant San Angelo Community Medical Center is a Delaware LLC that is registered to do business in the State of Texas and has its principal place of business in San Angelo, Tom Green County, Texas. San Angelo Medical Center can be served by serving its registered agent Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company as its registered address, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

Defendant Kirk Brewer, M.D. is an individual whose principal place of business and residence is in Tom Green County, Texas. Defendant Kirk Brewer, M.D. can be served at his office at San Angelo Medical Center at 3501 Knickerbocker Rd., San Angelo, Texas 76904.

4.    Venue and Jurisdiction

PLAINTIFF'S FOURTH AMENDED ORIGINAL PETITION                                   Page 1 of 13

160

Venue is proper in Tom Green County under Tex.Civ.Prac. & Remedies Code Section 15.002(a) (1) as all or a substantial part of the events or omissions giving rise to this legal action occurred in Tom Green County, Texas.

5.    Dr. Montoya, West Texas Renal Care and West Texas Nephrology, PA have incurred and sues for damages in the maximum amount of $ 6,400,000.00 plus three times for exemplary damages plus attorneys and costs as allowed by law and jurisdiction is proper in this Court.

6.1   Dr. Steve F. Montoya has practiced as a nephrologist since 1979 in San Angelo, Texas. Dr. Montoya has practiced at San Angelo Community Hospital since 1981. Dr. Montoya in developing, building and keeping his practice has always taken patients as an on-call staff attending physician from the emergency room/department of San Angelo Community Medical Center.

6.2   In developing and building a practice Dr. Montoya as a nephrologist wanted long term kidney dialysis patients to treat in his practice. Referral from hospitals and area physicians is extremely important to a nephrologist to building and keeping a practice. The ability to obtain referrals from a hospital and area physicians is a primary source of patients with kidney disease. This case is for the anticompetitive actions of the Defendants posing a danger of monopolization or attempted monopolization of patient choice and causing patients to pay more for medical care and injuring consumer patients.

6.3   Besides word of mouth and patient to patient referral Dr. Montoya built his patient base from referring physicians, from referrals of patients who came to the emergency room/department and hospital patients with kidney disease. A patient who lives in the service area/relevant market of San Angelo Community Medical Center and needs long term care which can include dialysis is one of the primary ways Dr. Montoya and his entities succeed. Dr. Montoya during his 36 year career in San Angelo built his practice including a dialysis unit that can serve 24 patients per shift.

6.4   The service area/relevant market for San Angelo Community Medical Center is Tom Green County and contiguous counties.

6.5   Dr. Brewer is an employee of an entity owned and created by San Angelo Community Medical Center. Dr. Brewer is the chief of staff of the hospital and head of the hospitalist group that practices at San Angelo Community Medical Center. Dr. Montoya has been denied the referral of patients that come into the emergency room with kidney problems/illness/disease. These patients are being referred to the hospital owned group. Even Dr. Montoya's current patients are being referred to hospitalist/hospital owned group. The group owned by the hospital is costing the patient money because the patients have to pay for a hospitalist and are then being referred to a different nephrologist whose group has a contract/agreement with the hospital and its owned entities. The patients are denied the opportunity to save money. The hospitalist group charges the patients at a higher comprehensive rate/code.

6.6   At all relevant times Dr. Kirk Brewer, as a principal officer of Community Medical Associates and Chief of Staff of San Angelo Community Medical Center (SACMC) and head of the hospitalist system at (SACMC) with agents/employees of (SACMC) working under his control, direction, or in furtherance of unlawful and improper actions was and is employed by and acting in furtherance of the business of (SACMC) and its owned medical practice(s). Dr. Brewer is individually liable for his own illegal, improper acts and omissions. Dr. Brewer at all times acted for (SACMC). Dr. Brewer is also liable for the improper acts and omissions as Chief of Staff of (SACMC). Dr. Brewer, as well as the other agents/employees of (SACMC) and/or its owned practices are liable under the doctrine of respondeat superior and vicarious liability.

6.7   The Defendants (SACMC) and Dr. Kirk Brewer, acting by and through its agents/employees/principals/officers acted together to carry out the improper and illegal actions and therefore are jointly and severally liable for civil conspiracy in carrying out their wrongful activities.

6.8   All conditions precedent to Plaintiffs recovery have been performed or have occurred. Dr. Montoya is a hard working member of the San Angelo Medical Community. Dr. Montoya came out of San Antonio, Texas and received a full scholarship for his undergraduate degree at Rice University. After graduating Rice University Dr. Montoya then went on to medical school at The University of Texas Southwestern Medical School

in Dallas, Texas. After Dr. Montoya finished his residency and training he went to in west Texas. Dr. Montoya built a stellar reputation for quality patient care, excellence in the practice of nephrology and dialysis care of the long term illness of kidney failure/disease.

6.9     Dr. Montoya is the only nephrologist in San Angelo that speaks Spanish. Dr. Montoya cares about his patients, his fellow medical professionals, and his community. Dr. Montoya's practice has expanded over the years including with the referral from local physicians, the emergency room/department and hospital consultation because of his well-deserved reputation for quality patient care.

6.10    Dr. Montoya's skill as a nephrologist was until the hospital created its own medical practice, a marketing asset for SACMC. Dr. Montoya received his rotating share of referrals of patients with kidney disease/illness/failure until SACMC created its own practice groups.

6.11    The recommendation and referral through the emergency room/department directly affects the patient's choice of doctor. The doctor in turn decides the patient's course of treatment and what and how the patient is coded for billing on treatment.

6.12    The choice of doctor directly affects the patient's costs and expenses both in the short term and for long term care of kidney disease/illness/failure. Individuals with kidney disease can require care for the rest of their life which may include dialysis.

6.13    Improperly manipulating the doctor a patient receives care from creates a cost to the patient and improperly distorts free and informed patient choice and options for medical care.

6.14    The correct and appropriate way for any health care provider of emergency hospital services and nephrology service is to provide the highest quality of care to the patient. Patients deserve to have lower costs. The illegal and unjust way of treating patients is to manipulate their free choice in the market place. In this case it is to only refer a patient to a hospitalist, in a group owned by the hospital, and to them only refer a patient to a

nephrologist in a hospital owned group and to malign and smear a highly qualified nephrologist in the practice at the same hospital.

6.15 The Defendants decided to then have a covert whisper campaign and not refer any patients to Dr. Montoya.

6.16 The Defendants illegal and anti-competitive acts unfairly and wrongfully have cast Dr. Montoya's stellar reputation under a dark cloud. Also the patients of Dr. Montoya have been refused the services of Dr. Montoya when the patient is in the hospital. The patients are suffering in paying higher costs and expenses for their care.

6.17 Dr. Montoya was brought up on charges of incompetent patient care for misspelled words on a chart. These actions were just taken to discredit Dr. Montoya and his ability to practice medicine in San Angelo and at San Angelo Community Medical Center. None of the actions of the hospital were based on patient care but for retaliation after Dr. Montoya complained about the Defendants anticompetitive actions. The actions also were to hurt the reputation of Dr. Montoya in advanced abilities in nephrology. Dr. Montoya corrected the "misspelled words" and harsh undeserved review of his charts continued. Despite the efforts of Defendants the railroading of Dr. Montoya was not successful.

6.18 The actions of the Defendants have a tendency to reduce or eliminate competition that is not offset by any countervailing procompetitive justification.

Causes of Action

The causes of action are only under the laws of the State of Texas.

7. Tortious Interference with current and prospective business/patient relations

7.1 The actions of the Defendants are tortiously interfering with patient choice and care. The actions are being taken by the Defendants to keep the Plaintiff from having a successful nephrology practice. Defendant's actions are such that they know that their interference will cause the Plaintiff damage in excess of the minimum judicial limits of the Court.

Defendants intentionally interfered with Dr. Montoya's longstanding and continuous relationships with patients and referring physicians from the emergency room/department in a concerted effort to restrain completion and monopolize the practice of nephrology and the treatment of long term kidney disease in the relevant market described in this petition.

7.2     Every contract, combination or competition of the relevant defendants in restraint of trade or commerce is unlawful and is just as it is unlawful for any person to monopolize, attempt to monopolize or conspire to monopolize any part of trade or commerce.

7.3     The Plaintiff pleads a reduction of competition in the relevant market in general to patients. A monopoly in this case is caused by the elimination of Dr. Montoya and is just as harmful as it would be if driving out competition in large groups. Removal of Dr. Montoya from the hospital and its relevant market will adversely affect and unreasonably affect overall competitive conditions and cost patients money. The Defendants through their actions are possessing or trying to possess monopoly power in the relevant market and the willful acquisition or maintenance of that power is distinguished from growth through business acumen.

7.4     The Defendants are engaging anticompetitive conduct with a specific intent to monopolize and a dangerous probability of achieving monopoly power and the defendants' ability to lessen or destroy completion in the relevant market and cost patients money.

7.5     Patients are damaged by the actions of the Defendants by higher cost of care.

Patients have an absolute right under the patients Bill of Rights attached as Exhibit D to "Participate in decisions about your care, including developing your treatment plan, discharge planning and having your family and personal physician promptly notified of your admission. Select providers of goods and services to be received after discharge." The Plaintiffs did not follow the Bill of Rights and violated the patient choice and damaged the Defendants in violating the Bill of Rights.

7.6     The actions of the Defendants are illegal and anticompetitive.

7.7 San Angelo Community Medical Center created its own group of doctors owned by the hospital in both hospitalist groups and in a group named Community Medical Associates. These groups came into existence on or about 2006. Until these groups Dr. Montoya received his share of new patients from the hospital and emergency room. After these groups were formed Dr. Montoya received only one referral since 2007.

Facts for Cause of Action

7.8 Realleges all facts in paragraph 6 above.

7.9 Dr. Montoya was admitted to practice nephrology at San Angelo Community Medical Center in 1981. Dr. Montoya has full staff privileges for the practice of nephrology at San Angelo Community Medical Center. The facts of the case are that Kirk Brewer, M.D. was during his actions an officer and/or Chief of Staff of the medical staff of San Angelo Community Medical Center. Kirk Brewer, M.D. was hired by San Angelo Community Medical Center to run the hospitalist service. As an officer of the staff and Chief of Staff Kirk Brewer, M.D. owed Dr. Montoya as a member of the staff a fiduciary duty to not interfere by direct or indirect action with his practice of nephrology at San Angelo Community Medical Center.

7.10 Kirk Brewer, M.D. came to San Angelo Community Medical Center in 2007. Part of Dr. Montoya and obtaining patients is that the hospital emergency room uses a rotating system of specialists admitted in that practice to see patients in the hospital and emergency room. When you are the named specialist you receive a call from the emergency room physician that a doctor with your specialty is needed for a patient. A big part of Dr. Montoya's practice was obtaining new patients and treating existing patients that came to the emergency room and needed a nephrologist. Since 1981 Dr. Montoya has obtained new patients from the emergency room.

7.11 Until 2007 Dr. Montoya would receive 10-20 calls from the emergency room, per month to treat either new or existing patients at the San Angelo Community Medical Center. Since 2008 Dr. Montoya has only received one call from the emergency room or a hospitalist for consultation as a nephrologist, except for one time for treatment of a new patient or existing patient that suffered with kidney problems.

7.12    The one time for a new patient is described below. On January 24, 2014 Dr. Montoya was called by the San Angelo Community Medical Center emergency room physician on duty and the hospitalist Dr. Bartels. Dr. Bartels and the emergency room physician informed Dr. Montoya that a patient was diagnosed with acute renal failure. Dr. Montoya was informed his name was on the call board in the emergency room as nephrologist on call. Both of the above doctors asked Dr. Montoya to consult concerning treatment for that patient. Dr. Montoya gave an initial consult advice/orders of treatment to both doctors. This consultation call was to Dr. Montoya at 9:38 p.m. Dr. Montoya informed them he would come see the patient and then review the test results and determine any additional treatment for the patient. Attached as Exhibit A is a true and correct copy of the redacted hospital record showing the facts on January 24, 2014.

7.13    On January 25, 2014 at 8:10 a.m. Kirk Brewer, M.D. took over the hospitalists care of the patient as his rotation as the hospitalist started. Then without ever seeing the patient or the chart Kirk Brewer, M.D. cancelled Dr. Montoya consult and treatment by Dr. Montoya and consulted another nephrologist. Dr. Montoya went to the call board and witnessed his name on call as the nephrologist on call on January 24 and 25, 2014. The San Angelo Community Medical Center is required to have an official EMTALA Medicare call list for on call physicians for the San Angelo Community Medical Center to take Medicare patients. This is the list my name was on and was intentionally ignored. This also violates a patient's right to choose their physician. This list was followed until Dr. Brewer came to San Angelo Community Medical Center and took charge of hospitalists. The nephrologist he brought in for consult is one that is in a group that Kirk Brewer, M.D. has a contract for paid services. Dr. Brewer did not see the patient when he removed me as the treating nephrologist he issued the change via a telephone order (see Exhibit B). Kirk Brewer, M.D. without seeing the patient, or chart changed the patient's doctor. This change of nephrologist was for Kirk Brewer, M.D.'s economic gain and caused Dr. Montoya economic loss. Attached as Exhibit B is a true and correct copy of the redacted hospital record showing the facts on January 25, 2014.

7.14 Kirk Brewer, M.D. by his actions of removing Dr. Montoya as the nephrologist published a statement that Dr. Montoya was not a competent nephrologist to treat patients coming to the San Angelo Community Medical Center emergency room. Kirk Brewer, M.D. was aware that his actions would become known to the staff physicians of San Angelo Community Medical Center and that he was by conduct and a whisper campaign saying Dr. Montoya should not be allowed to treat patients at San Angelo Community Medical Center.

7.15 Attached to this petition as Exhibit C is the true and correct sworn statement that an existing patient of Dr. Montoya, Mrs. Welch tried to see Dr. Montoya in the emergency room of San Angelo Community Medical Center and that the emergency room would not call Dr. Montoya to treat his existing patient Mrs. Welch is over 90 years of age and Dr. Montoya has treated her for at least 20 years.

7.16 Another patient of mine, whose name is withheld per privacy rights, who is also over 90 years of age and has been Dr. Montoya patient for at least 10 years requested me when she went to the emergency room and she also was refused to see Dr. Montoya.

7.17 A patient has the absolute right to be treated by their physician. Both of the above happened when Kirk Brewer, M.D. was President of the medical staff or an officer of the medical staff and when he was head of the hospitalist service when the above happened.

7.18 Again by the actions of the hospitalists and emergency room physicians who are controlled by their supervisors or lead physicians Kirk Brewer, M.D. through this actions defamed Dr. Montoya as a qualified physician or staff at San Angelo Community Medical Center.

7.19 Furthermore, Plaintiff is entitled to exemplary damages from the Defendant, because they acted with malice required to support an award of exemplary damages. Defendants have acted with a specific intent to cause injury to the Plaintiff.

7.20 Plaintiff sues under this cause of action for anticompetitive conduct and/or effect.

7.21 The Plaintiff sues for damages that are within the jurisdictional limits of this Court.

8.    Tortious Interference with current and prospective business relations – Exemplary Damage

The Plaintiff will show that these actions, set forth above, of interference are done with malicious intent in interfering with the Plaintiff's right to peaceably conduct his business and are done out of spite and ill will towards Plaintiff. The Plaintiff is entitled to and sues for exemplary damages within the jurisdictional limits of this Court.

Plaintiff sues under this cause of action for anticompetitive conduct and/or effect.

9.    Defamation Per Se

9.1    The statements of the Defendant constitute defamation per se in that they suggest that the Defendant is not a competent nephrologist and should not be referred patients.

9.2    The Defendant has published the above statements on numerous occasions through a whisper campaign and his conduct.

9.3    The defamatory statements are false. Defendant has and is publishing the remarks to individuals and entities to harm the Plaintiff and to remove all competition illegally in an anti-competitive action.

9.4    The statements and actions of Kirk Brewer, M.D. were published by his conduct. The actions were referring to Dr. Montoya as a non-competent nephrologist. The statement(s) were defamatory and caused Dr. Montoya economics loss.

9.5    The total loss is between $1,000,000.00 and $6,500,000.00 from not receiving any referrals from the emergency room or hospitalists.

9.6    The defamatory statements are untrue. Dr. Montoya is a competent and qualified nephrologist to treat patients at San Angelo Community Medical Center.

9.7    The actions of Kirk Brewer, M.D. were intentional or done with negligence when Kirk Brewer, M.D. knew that the statement was false and his actions would lead a reasonable prudent physician or patient knowing/believing of its defamatory potential.

9.8 As officer and as President of the medical staff Kirk Brewer, M.D. must follow the rules at San Angelo Community Medical Center and staff of San Angelo Community Medical Center and have a new patient in the emergency room or hospital that needs a specialist consultation assigned to the name off the rotating consultation list. By Kirk Brewer, M.D. not following this procedure Dr. Montoya did not receive any consultation requests from the emergency room or hospitalist at San Angelo Community Medical Center in 2008-present and one in 2014.

10. Malice

By reference Plaintiff adopts and realleges Paragraphs 6-9 of the Original Petition as if they were set forth herein. For further cause of action, Defendant's conduct amounts to malice under the Texas Civil Practice and Remedies Code § 41.007 and the common law of Texas because Defendant's actions have and are involving an extreme degree of risk considering the probability and magnitude of the potential harm to others. Plaintiff is entitled to exemplary damages and does hereby sue for them.

11. Business Disparagement

The Plaintiffs reallege the allegations and facts set forth above in paragraphs 6-9.

The Defendants published disparaging comments and allegations about Dr. Montoya and his practice. Defendants took the action(s) to harm the Plaintiffs business interests. Defendants knew the disparagement was false and the actions were done with malice.

12. Restraint of trade

12.1 The Plaintiffs reallege the allegations and facts set forth above in paragraphs 6-9.

12.2 Plaintiff makes claim under the Texas Business and Commerce Code Section 15.21 known as the Texas Free Enterprise and Antitrust Act and it recognizes as illegal improper attempts to abuse the patient referral of the emergency room/department and hospital patients, as well as conspiracies to limit patient choices by concerted illegal action as engaged by the Defendants. The Plaintiffs seek relief for this anticompetitive

action(s) solely under the laws established by the State of Texas concerning anticompetitive misconduct affecting Texas citizens and patients.

12.3 In Tom Green County the Plaintiffs are in competition with the Defendants. Defendants have derived or attempted to derive illegal benefit and patient choice and option for care was improperly limited in Tom Green and contiguous counties. The area of service the Defendants are trying to control is Tom Green and contiguous counties. The Defendants are trying to restrain competition in these counties

12.4 Defendants actions are in furtherance of the combination and conspiracy and with the purpose and intent of excluding the Plaintiffs from the patient care market in the relevant market described above and destroying competition from Dr. Montoya and causing a resulting loss and cost to patients. These acts were done with the specific intent to harm both Dr. Montoya and patients in the relevant market. These acts were done with the specific intent to weaken or eliminate completion from the Plaintiffs and injure patients and obtain market dominance in the relevant market.·

12.5 The actions also hurt the patient population in the relevant market by removing or trying to remove completion in the practice of nephrology.

12.6 The concerted actions of the Defendants were flagrant and willful and done for the purpose of harming Dr. Montoya the Plaintiffs and patients and illegally and improperly diverting the patients to the hospital owned practice.

12.7 The acts of the Defendants constitute illegal monopolization, attempted monopolization and /or conspiracy to monopolize under applicable Texas law. This case is for the anticompetitive actions of the Defendants posing a danger of monopolization and injuring consumer patients. The Defendants are hurting patients in the overall competition in the relevant market.

12.8 Plaintiff sues under this cause of action for anticompetitive conduct and/or effect.

13. Damages-

The Plaintiffs sue for actual damages including consequential damages, mental anguish, lost business reputation, attorney's fees as allowed by law and other actual damages in

the maximum amount of $ 6,400,000.00 plus attorney's fees and costs as allowed by law. An amount is also sued for statutorial additional trebling for exemplary damages do to the malicious and egregious conduct of the Defendants.

## Prayer for Relief

For these reasons Plaintiff requests that:

1. Plaintiff prays that citation and notice issue as required by law and that the Court grant the relief requested in this petition.

2. Plaintiff be awarded damages within the jurisdiction limits of this Court.

3. Plaintiff be award exemplary damages within the jurisdictional limits of the Court.

4. Reasonable attorney's fees.

5. Costs of Suit.

6. Such other and farther relief to which Plaintiff may be justly entitled including but not limited to damages within the jurisdictional limits of this Court, pre and post judgment interest as allowed by law.

Respectfully Submitted

Paul Craig Laird II Law Firm, PLLC

/s/ Paul Craig Laird II
By: Paul Craig Laird II
800 W. Airport Freeway
Suite 880 LB 6015
Irving, TX 75062
972-554-0929
214-260-4935- fax
pcl880@aim.com
SBOT 11795420
Attorney for Plaintiff

'IPO'

| ALLERGIES & SENSITIVITIES ☐ No Known Allergies | | WEIGHT [redacted] ☐ lb ☐ kg | HEIGHT [redacted] ☐ in ☐ cm |
|---|---|---|---|
| DRUG | REACTION | DRUG | REACTION |
| 1. | | 4. | |
| 2. | | 5. | |
| 3. | | 6. | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM!

Date: Time: ☒ Admit to Inpatient Status ☐ Place in Observation Status ☐ Place in Outpatient Status

UNIT (check one): ☐ Med/Surg ☐ Med-Telemetry ☐ ICU ☐ OB/L&D ☒ Other PCU

Dr. Bagdels
Stable
1) Acute Renal failure
2) Hyperkalemia
3) [illegible] Anemia
[illegible]
Bed rest
I/O q shift
foley [illegible]
ADA 1800 [illegible] / cardiac diet
IV [illegible]
[illegible] 40 mg IV Q 24
Lovenox 40 mg SC Q 24
BMP ~~Magnesium~~ at 9PM 1/24 / [illegible]
CBC BMP, Magnesium in AM

Consult Dr. Montoya

Dr. Bagdels

Faxed 1/24 [illegible]

Exhibit H

Physician Signature [signature] Date 1/24/14 Time [illegible]

Physician Admission Orders
NS-2701-10HMS 10/10 (Rev. 07/12) Page 1 of 1

Patient Label [redacted]

173

| ALLERGIES & SENSITIVITIES | ☐ No Known Allergies | | WEIGHT:_____ ☐ lb ☐ kg | HEIGHT:_____ ☐ in ☐ cm | |
|---|---|---|---|---|---|
| DRUG | REACTION | | DRUG | REACTION | |
| 1. | | | 4. | | |
| 2. | | | 5. | | |
| 3. | | | 6. | | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

### COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM!

| Date | Time | ☐ Admit to Inpatient Status<br>☐ Place in Observation Status<br>☐ Place in Outpatient Status | UNIT (check one):<br>☐ Med/Surg  ☐ Med-Telemetry  ☐ ICU  ☐ OB/L&D<br>☐ Other _____ |
|---|---|---|---|
| 1/25/14 | 236 | Lovenox 30 mg SC q 24° | _Barely_ |
| | | Faxed + Noted 1/25/14 0240 Per Chancey | |
| 1/25/14 | 0810 | Change Attending to Dr Brewer | |
| | | Consult Dr Stevenson Consulted | |
| | | Kayexelate 30 Gm P.O. x1 Now | |
| | | A Status to PCU | |
| | | TO Read Back Dr Brewer / Ely / Forbner | |
| | | FAXED | |

| | | Physician Signature | | Date | Time |

Exhibit B


SAN ANGELO COMMUNITY MEDICAL CTR

April 17, 2014

I am Karen, Tims, the daughter of Eunice Welch. I am writing to you on her behalf concerning her admission to SACMC on 11/28/2011. When asked by the ER admission staff, we replied that "Dr. Montoya" was her doctor. We were admitted to the hospitalists" service. We do not appreciate the fact that we did not have our physician of choice at the hospital. Please correct this to help maintain quality patient care.

Sincerely,

Karen Tims

State of _____

County of _____

Subscribed and sworn to before me this 17th day of April, 2014

Notary Public

ROSEMARY ANDROS
My Commission Expires
August 19, 2017

Exhibit C   175


*2PROR*

# Notice of Patient Rights and Responsibilities

You have the right to:

- Be treated in a dignified and respectful manner and to receive reasonable responses to reasonable requests for service.

- To effective communication that provides information in a manner you understand, in your preferred language with provisions of interpreting or translation services, at no cost, and in a manner that meets your needs in the event of vision, speech, hearing or cognitive impairments. Information should be provided in easy to understand terms that will allow you to formulate informed consent.

- Respect for your cultural and personal values, beliefs and preferences.

- Personal privacy, privacy of your health information and to receive a notice of the facility's privacy practices.

- Pain management.

- Accommodation for your religious and other spiritual services.

- To access, request amendment to and obtain information on disclosures of your health information in accordance with law and regulation within a reasonable time frame.

- To have a family member, friend or other support individual to be present with you during the course of your stay, unless that person's presence infringes on others' rights, safety or is medically contraindicated.

- Care or services provided without discrimination based on age, race, ethnicity, religion, culture, language, physical or mental disability, socioeconomic status, sex, sexual orientation, and gender identity or expression.

- Participate in decisions about your care, including developing your treatment plan, discharge planning and having your family and personal physician promptly notified of your admission.

- Select providers of goods and services to be received after discharge.

- Refuse care, treatment or services in accordance with law and regulation and to leave the facility against advice of the physician.

- Have a surrogate decision-maker participate in care, treatment and services decisions when you are unable to make your own decisions.

- Receive information about the outcomes of your care, treatment and services, including unanticipated outcomes.

- Give or withhold informed consent when making decisions about your care, treatment and services.

- Receive information about benefits, risks, side effects to proposed care, treatment and services; the likelihood of achieving your goals and any potential problems that might occur during recuperation from proposed care, treatment and service and any reasonable alternatives to the care, treatment and services proposed.

- Give or withhold informed consent to recordings, filming or obtaining images of you for any purpose other than your care.

- Participate in or refuse to participate in research, investigation or clinical trials without jeopardizing your access to care and services unrelated to the research.

- Know the names of the practitioner who has primary responsibility for your care, treatment or services and the names of other practitioners providing your care.

- Formulate advance directives concerning care to be received at end-of-life and to have those advance directives honored to the extent of the facility's ability to do so in accordance with law and regulation. You also have the right to review or revise any advance directives.

- Be free from neglect; exploitation; and verbal, mental, physical and sexual abuse.

- An environment that is safe, preserves dignity and contributes to a positive self-image.

- Be free from any forms of restraint or seclusion used as a means of convenience, discipline, coercion or retaliation; and to have the least restrictive method of restraint or seclusion used only when necessary to ensure patient safety.

- Access protective and advocacy services and to receive a list of such groups upon your request.

Patient Rights and Responsibilities
ADM-1901GHMS-TX
04/11 (Rev. 08/12, 07/13, 03/14, 07/14)
Page 1 of 2

Patient Label

PAT #:                    CHART #:
ADMIT DATE:                        DOB:
SEX:        AGE:
ATT. DR.:

Exhibit D

176

# TAB NO. 2

CAUSE NO. B-15-0285-C

| | | |
|---|---|---|
| STEVE F. MONTOYA, JR., M.D. | § | IN THE DISTRICT COURT OF |
| WEST TEXAS RENAL CARE | § | |
| WEST TEXAS NEPHROLOGY | § | |
| | § | |
| VS. | § | 119ᵗʰ JUDICIAL DISTRICT |
| | § | |
| SAN ANGELO COMMUNITY | § | |
| MEDICAL CENTER AND | § | |
| KIRK BREWER, M.D. | § | TOM GREEN COUNTY, TEXAS |

## PLAINTIFF'S SIXTH AMENDED ORIGINAL PETITION

Plaintiff's STEVE F. MONTOYA, JR., M.D., West Texas Renal Care and West Texas Nephrology file this Sixth Amended Original Petition and would show:

1. This case should be conducted under Discovery Level Two until the Court enters a Level Three Scheduling Order.

2. Plaintiff STEVE F. MONTOYA, JR., M.D. is an individual residing in Tom Green County, Texas. Plaintiff West Texas Renal Care is a Texas Corporation with its principal place of business in Tom Green County, Texas. Plaintiff West Texas Nephrology is a Texas Professional Association with its principal place of business in Tom Green County, Texas.

3. Defendant San Angelo Community Medical Center (SACMC) is a Delaware LLC that is registered to do business in the State of Texas and has its principal place of business in San Angelo, Tom Green County, Texas. San Angelo Medical Center can be served by serving its registered agent Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company as its registered address, 211 E. 7ᵗʰ Street, Suite 620, Austin, Texas 78701.

Defendant Kirk Brewer, M.D. is an individual whose principal place of business and residence is in Tom Green County, Texas. Defendant Kirk Brewer, M.D. can be served at his office at San Angelo Medical Center at 3501 Knickerbocker Rd., San Angelo, Texas 76904.

300

Other participants in the anticompetitive conspiracy against Plaintiffs include Dr. Brewer's group of hospitalists (exact name unknown), West Texas Medical Associates ("WTMA") and groups affiliated with the hospital. These entities and individuals are not defendants at this time.

4.     Venue and Jurisdiction

Venue is proper in Tom Green County under Tex.Civ.Prac. & Remedies Code Section 15.002(a) (1) as all or a substantial part of the events or omissions giving rise to this legal action occurred in Tom Green County, Texas.

5.     Dr. Montoya, West Texas Renal Care and West Texas Nephrology, PA have incurred and sues for damages in the maximum amount of $ 6,400,000.00 plus three times exemplary damages plus attorneys' fees and costs as allowed by law. Until 2007 Dr. Montoya would receive 10-20 calls from the emergency room per month to treat either new or existing patients at the San Angelo Community Medical Center. Since 2008 Dr. Montoya has only received one call from the emergency room or a hospitalist for consultation as a nephrologist, except for one time for treatment of a new or existing patient that suffered with kidney disease/problems. The lack of referrals caused substantial injury to Dr. Montoya and damaged his ability to compete, because he depended on these referrals and consults to build his practice. A majority of patients who need kidney treatment/ suffer from kidney disease in a hospital later need continuing care for their kidneys or related problems; the most common of such continuing treatments is kidney dialysis. A typical kidney dialysis patient will need treatment for average of 6 years, and each such patient would mean revenue to Dr. Montoya's practice of approximately $100,000 per year. Dr. Montoya estimates that he has lost at least 100 long term kidney dialysis patients from 2007 to the present due to the Defendants' anticompetitive scheme to refuse to give him patient referrals or consults. He estimates that this lack of referrals has thus cost him $3,000,000 to $6,500,000 over that period of time.

6.1    Dr. Steve F. Montoya has practiced as a nephrologist since 1979 in San Angelo, Texas. Dr. Montoya has practiced at San Angelo Community Hospital since 1981. Dr. Montoya in developing, building and keeping his practice, has always taken patients as an on-call

staff attending physician from the emergency room/department of San Angelo Community Medical Center.

6.2     In developing and building a practice Dr. Montoya as a nephrologist wanted long term kidney dialysis patients to treat in his practice. Referral from hospitals and area physicians is extremely important to a nephrologist to building and keeping a practice. The ability to obtain referrals from a hospital and area physicians is a primary source of patients with kidney disease. Defendants in this case conspired to deprive Plaintiffs of referrals needed for his nephrology practice. This case is for the anticompetitive actions of the Defendants posing a danger of monopolization or attempted monopolization of patient choice and causing patients to pay more for medical care and injuring consumer patients.

6.3     Besides word of mouth and patient to patient referral Dr. Montoya built his patient base from referring physicians, from referrals of patients who came to the emergency room/department and hospital patients with kidney disease. Dr. Montoya's practice depends on finding a patient who lives in the service area/relevant market of San Angelo Community Medical Center and needs long term care which can include dialysis. Dialysis care is one of the primary ways Dr. Montoya and his entities succeed. Dr. Montoya during his 36 year career in San Angelo built his practice including a dialysis unit that can serve 24 patients per shift.

6.4     The service area/relevant market for San Angelo Community Medical Center is Tom Green County and contiguous counties. The service area/relevant geographic market, for the purposes of all of Plaintiff's claims for antitrust violations and other anticompetitive conduct, is Tom Green County and contiguous counties. Patients needing emergency care for kidney ailments are not likely to travel far from their homes for such treatment, so the relevant geographic market for hospital nephrology services and for nephrology consults and referrals is therefore Tom Green County and contiguous counties. Patients needing longer term nephrology services, such as kidney dialysis, often need repeated and frequent care from a doctor or dialysis clinic near their home or residence. Such care is often required multiple times per week. Because patients are not likely to travel far for such repeated and frequent doctor and clinic visits, doctors and clinics located far from

Tom Green County are not a substitute for nephrology services in the Tom Green County area, and the relevant geographic market is therefore Tom Green County and contiguous counties. Patients needing emergency care for kidney ailments are also not likely to travel far from their homes for such treatment, so the relevant geographic market for hospital nephrology services and for nephrology consults and referrals is therefore Tom Green County and contiguous counties.

6.5 Dr. Brewer is thought be an employee and/or owner of a group of hospitalists affiliated with, and possibly created by, SACMC. Dr. Brewer is the chief of staff of the hospital and head of the hospitalist group that practices at San Angelo Community Medical Center. Dr. Montoya has been denied the referral of patients that come into the emergency room with kidney problems/illness/disease. These patients are being referred to the hospital affiliated group. Even Dr. Montoya's current patients are being referred to the hospitalist/hospital affiliated group. The group affiliated with the hospital is costing the patient money because the patients have to pay for a hospitalist and are then being referred to a different nephrologist whose group has a contract/agreement with the hospital and its affiliated entities. The patients are denied the opportunity to save money. The hospitalist group charges the patients at a higher comprehensive rate/code.

6.6 At all relevant times Dr. Kirk Brewer, himself, as a principal officer of Community Medical Associates, San Angelo Community Medical Center and Chief of Staff of San Angelo Community Medical Center (SACMC) and head of the hospitalist system at (SACMC) with agents/employees of (SACMC) working under his control, direction, or in furtherance of unlawful and improper actions was and is employed by and acting in furtherance of the business of (SACMC) and its affiliated medical practice(s). Dr. Brewer is individually liable for his own illegal, improper acts and omissions. At various times Dr. Brewer acted for himself, (SACMC) and/or his group of hospitalists. Dr. Brewer is also liable for the improper acts and omissions as Chief of Staff of (SACMC). Dr. Brewer, as well as the other agents/employees of (SACMC) and/or its affiliated practices are liable under the doctrine of respondeat superior and vicarious liability.

6.7 The Defendants (SACMC) and Dr. Kirk Brewer, along with WTMA and Dr. Brewers group of hospitalists acting by and through its agents/employees/principals/officers acted

together to carry out the improper and illegal actions and therefore are jointly and severally liable for civil conspiracy in carrying out their wrongful activities.

6.8     All conditions precedent to Plaintiffs recovery have been performed or have occurred.

Dr. Montoya is a hard working member of the San Angelo Medical Community. Dr. Montoya came out of San Antonio, Texas and received a full scholarship for his undergraduate degree at Rice University. After graduating Rice University Dr. Montoya then went on to medical school at The University of Texas Southwestern Medical School in Dallas, Texas. After Dr. Montoya finished his residency and training he went to in west Texas. Dr. Montoya built a stellar reputation for quality patient care, excellence in the practice of nephrology and dialysis care of the long term illness of kidney failure/disease. Dr. Montoya's reputation in the medical community in the San Angelo area/Tom Green County allowed him to regularly obtain referrals for nephrology work from the emergency room at SACMC, as well as consults for nephrology work from other doctors at SACMC. These referrals and consults were and are necessary for Dr. Montoya's continued presence as a competitor in the market for nephrology services in the San Angelo/Tom Green County area. Dr. Montoya relied on these consults and referrals to build his nephrology practice, for once he had consulted on a patient, that patient was likely to remain a patient of Dr. Montoya's if that patient needed continuing kidney care such as dialysis.

6.9     Dr. Montoya is the only nephrologist in San Angelo that speaks Spanish. Dr. Montoya cares about his patients, his fellow medical professionals, and his community. Dr. Montoya's practice has expanded over the years including with the referral from local physicians, the emergency room/department and hospital consultation because of his well-deserved reputation for quality patient care. These referrals are necessary for Dr. Brewer to compete.

6.10    Dr. Montoya's skill as a nephrologist was, until the hospital created its affiliated medical practice or entered into an exclusive contract with the group of hospitalists affiliated and/or managed by Dr. Brewer, a marketing asset for SACMC. Dr. Montoya received his rotating share of referrals of patients with kidney disease/illness/failure until SACMC

created its affiliated practice groups and/or entered into an exclusive contract with the group of hospitalists affiliated and/or managed by Dr. Brewer.

6.11 The recommendation and referral through the emergency room/department directly affects the patient's choice of doctor. The doctor in turn decides the patient's course of treatment and what and how the patient is coded for billing on treatment.

6.12 The choice of doctor directly affects the patient's costs and expenses both in the short term and for long term care of kidney disease/illness/failure. Individuals with kidney disease can require care for the rest of their life which may include dialysis.

6.13 Improperly manipulating the doctor a patient receives care from creates a cost to the patient and improperly distorts free and informed patient choice and options for medical care.

6.14 The correct and appropriate way for any health care provider of emergency hospital services and nephrology service is to provide the highest quality of care to the patient. Patients deserve to have lower costs. The illegal and unjust way of treating patients is to manipulate their free choice in the market place. In this case the Defendants only referred a patient to a hospitalist; in a group affiliated with the hospital, then only refer a patient to a nephrologist in a hospital affiliated group. Defendants also maligned and then smeared a highly qualified nephrologist in practice at the same hospital.

6.15 Starting in 2008 Defendants decided to then have a covert whisper campaign and not refer any patients to Dr. Montoya.

6.16 The Defendants illegal and anti-competitive acts unfairly and wrongfully have cast Dr. Montoya's stellar reputation under a dark cloud. Also the patients of Dr. Montoya have been refused the services of Dr. Montoya when the patient is in the hospital. The patients are suffering in paying higher costs and expenses for their care.

6.17 Dr. Montoya was brought up on charges of incompetent patient care for misspelled words on a chart. These actions were just taken to discredit Dr. Montoya and his ability to practice medicine in San Angelo and at San Angelo Community Medical Center. None

of the actions of the hospital were based on patient care but for retaliation after Dr. Montoya complained about the Defendants anticompetitive actions. The actions also were done to hurt the reputation of Dr. Montoya in advanced abilities in nephrology. Dr. Montoya corrected the "misspelled words" and harsh undeserved review of his charts continued. Despite the efforts of Defendants the railroading of Dr. Montoya was not successful.

6.18    The actions of the Defendants have a tendency to reduce or eliminate competition that is not offset by any countervailing procompetitive justification.

6.19    Dr. Montoya was admitted to practice nephrology at San Angelo Community Medical Center in 1981. Dr. Montoya has full staff privileges for the practice of nephrology at San Angelo Community Medical Center. The facts of the case are that Kirk Brewer, M.D. was during his actions an officer and/or Chief of Staff of the medical staff of San Angelo Community Medical Center. Kirk Brewer, M.D. was hired by San Angelo Community Medical Center to run the hospitalist service. As an officer of the staff and Chief of Staff Kirk Brewer, M.D. owed Dr. Montoya as a member of the staff a fiduciary duty to not interfere by direct or indirect action with his practice of nephrology at San Angelo Community Medical Center.

6.20    Kirk Brewer, M.D. came to San Angelo Community Medical Center in 2007. Dr. Montoya has long relied on obtaining patients is the fact hospital emergency room uses a rotating system of specialists admitted in that practice to see patients in the hospital and emergency room. When you are the named specialist you receive a call from the emergency room physician that a doctor with your specialty is needed for a patient. A big part of Dr. Montoya's practice was obtaining new patients and treating existing patients that came to the emergency room and needed a nephrologist. Since 1981 Dr. Montoya has obtained new patients from the emergency room.

6.21    The one timeDr.Montoya received a consult for a new patient is described below. On January 24, 2014 Dr. Montoya was called by the San Angelo Community Medical Center emergency room physician on duty and the hospitalist Dr. Bartels. Dr. Bartels and the emergency room physician informed Dr. Montoya that a patient was diagnosed with acute

renal failure. Dr. Montoya was informed his name was on the call board in the emergency room as nephrologist on call. Both of the above doctors asked Dr. Montoya to consult concerning treatment for that patient. Dr. Montoya gave initial consult advice/orders of treatment to both doctors. This consultation call was to Dr. Montoya at 9:38 p.m. Dr. Montoya informed them he would come see the patient and then review the test results and determine any additional treatment for the patient. Attached as Exhibit A is a true and correct copy of the redacted hospital record showing the facts on January 24, 2014.

Until 2007 Dr. Montoya would receive 10-20 calls from the emergency room, per month to treat either new or existing patients at the San Angelo Community Medical Center. Since 2008 Dr. Montoya has only received one call from the emergency room or a hospitalist for consultation as a nephrologist, except for one time for treatment of a new patient or existing patient that suffered with kidney problems. The lack of referrals caused substantial injury to Dr. Montoya and damaged his ability to compete, because he depended on these referrals and consults to build his business. Many patients who need kidney treatment in a hospital later need continuing care for their kidneys or related problems; the most common of such continuing treatments is kidney dialysis. A typical kidney dialysis patient will need treatment for four to eight years, and each such patient would mean revenue to Dr. Montoya's practice of approximately $100,000 per year. Dr. Montoya estimates that he has lost 10-12 long term kidney dialysis patients per year from 2008 to the present due to the Defendants' anticompetitive scheme to refuse to give him patient referrals or consults. He estimates that this lack of referrals has thus cost him $3,000,000 to $6,500,000 over that period of time. All referrals now go to the nephrologist at an affiliated group of the hospital. This damage estimate is specifically incorporated by reference into all of Plaintiff's causes of action set forth *infra*.

6.22   On January 25, 2014 at 8:10 a.m. Kirk Brewer, M.D. took over the hospitalists care of the patient as his rotation as the hospitalist started. Then without ever seeing the patient or the chart Kirk Brewer, M.D. cancelled Dr. Montoya's consult and treatment by Dr. Montoya and consulted another nephrologist. Dr. Montoya went to the call board and witnessed his name on call as the nephrologist on call on January 24 and 25, 2014. The San Angelo Community Medical Center is required to have an official EMTALA Medicare call list for on call physicians for the San Angelo Community Medical Center to take Medicare patients.

This is the list my name was on and was intentionally ignored. This also violates a patient's right to choose their physician. This list was followed until Dr. Brewer came to San Angelo Community Medical Center and took charge of hospitalists. The nephrologist he brought in for consult is one that is in a group that Kirk Brewer, M.D. has a contract for paid services. Dr. Brewer did not see the patient when he removed me as the treating nephrologist he issued the change via a telephone order (see Exhibit B). Kirk Brewer, M.D. without seeing the patient, or chart changed the patient's doctor. This change of nephrologist was for Kirk Brewer, M.D.'s economic gain and caused Dr. Montoya economic loss. Attached as Exhibit B is a true and correct copy of the redacted hospital record showing the facts on January 25, 2014.

Kirk Brewer, M.D. by his actions of removing Dr. Montoya as the nephrologist published a statement that Dr. Montoya was not a competent nephrologist to treat patients coming to the San Angelo Community Medical Center emergency room. Kirk Brewer, M.D. was aware that his actions would become known to the staff physicians of San Angelo Community Medical Center and that he was by conduct and a whisper campaign saying Dr. Montoya should not be allowed to treat patients at San Angelo Community Medical Center. These remarks caused hospitalists and other doctors at SACMC, as well as doctors and nurses in the SACMC emergency department, to cease and refuse to (a) admit patients to the care of Dr. Montoya, and (b) refer patients to Dr. Montoya for nephrology consults.

6.23 Attached to this petition as Exhibit C is the true and correct sworn statement that an existing patient of Dr. Montoya, Mrs. Welch tried to see Dr. Montoya in the emergency room of San Angelo Community Medical Center and that the emergency room would not call Dr. Montoya to treat his existing patient Mrs. Welch is over 90 years of age and Dr. Montoya has treated her for at least 20 years.

6.24 Another patient of Dr. Montoya, whose name is withheld per privacy rights, who is also over 90 years of age and has been a Dr. Montoya patient for at least 10 years requested Dr. Montoya when she went to the emergency room and she also was refused to see Dr. Montoya.

6.25    A patient has the absolute right to be treated by their physician. Both of the above happened when Kirk Brewer, M.D. was President of the medical staff or an officer of the medical staff and when he was head of the hospitalist service when the above happened.

6.26    Again by the actions of the hospitalists and emergency room physicians who are controlled by their supervisors or lead physicians Kirk Brewer, M.D. through this actions defamed Dr. Montoya as a qualified physician or staff at San Angelo Community Medical Center.

6.27    Furthermore, Plaintiff is entitled to exemplary damages from the Defendant, because they acted with malice required to support an award of exemplary damages. Defendants have acted with a specific intent to cause injury to the Plaintiff.

6.28    Plaintiff sues under this cause of action for anticompetitive conduct and/or effect. The Plaintiff sues for damages that are within the jurisdictional limits of this Court.

Causes of Action

The causes of action are only under the laws of the State of Texas.

7.      Tortious Interference with current and prospective business/patient relations

7.1     The actions of the Defendants are tortiously interfering with patient choice and care. The actions are being taken by the Defendants to keep the Plaintiff from having a successful nephrology practice. Defendant's actions are such that they know that their interference will cause the Plaintiff damage in excess of the minimum judicial limits of the Court.

Defendants intentionally interfered with Dr. Montoya's longstanding and continuous relationships with patients and referring physicians from the emergency room/department in a concerted effort to restrain completion and monopolize the practice of nephrology and the treatment of long term kidney disease in the relevant market described in this petition.

7.2     Every contract, combination or competition of the relevant defendants in restraint of trade or commerce is unlawful and is just as it is unlawful for any person to monopolize, attempt to monopolize or conspire to monopolize any part of trade or commerce.

7.3     The Plaintiff pleads a reduction of competition in the relevant market in general to patients. A monopoly in this case is caused by the elimination of Dr. Montoya and is just as harmful as it would be if driving out competition in large groups. Removal of Dr. Montoya from the hospital and its relevant market will adversely affect and unreasonably affect overall competitive conditions and cost patients money. The Defendants through their actions are possessing or trying to possess monopoly power in the relevant market and the willful acquisition or maintenance of that power is distinguished from growth through business acumen.

7.4     The Defendants are engaging in anticompetitive conduct with a specific intent to monopolize and a dangerous probability of achieving monopoly power and the defendants' ability to lessen or destroy completion in the relevant market and cost patients money.

7.5     Patients are damaged by the actions of the Defendants by higher costs of care.

        Patients have an absolute right under the patients Bill of Rights attached as Exhibit D to "Participate in decisions about your care, including developing your treatment plan, discharge planning and having your family and personal physician promptly notified of your admission. Select providers of goods and services to be received after discharge." The Plaintiffs did not follow the Bill of Rights and violated the patient choice and damaged the Defendants in violating the Bill of Rights.

7.6     The actions of the Defendants are illegal and anticompetitive.

7.7     San Angelo Community Medical Center created its affiliated group of doctors affiliated with the hospital in both hospitalist groups and in a group named Community Medical Associates. These groups came into existence on or about 2006. Before these groups existed Dr. Montoya received his share of new patients from the hospital and emergency room. After these groups were formed Dr. Montoya received only one referral since 2007.

8.      Tortious Interference with current and prospective business relations – Exemplary Damage

The Plaintiff will show that these actions, set forth above, of interference are done with malicious intent in interfering with the Plaintiff's right to peaceably conduct his business and are done out of spite and ill will towards Plaintiff. The Plaintiff is entitled to and sues for exemplary damages within the jurisdictional limits of this Court.

Plaintiff sues under this cause of action for anticompetitive conduct and/or effect.

9.    Defamation Per Se

9.1    The statements of the Defendants constitute defamation per se in that they suggest that the Plaintiff is not a competent nephrologist and should not be referred patients.

9.2    The Defendants have published the above statements on numerous occasions through a whisper campaign and their conduct.

9.3    The defamatory statements are false. Defendants have and are publishing the remarks to individuals and entities to harm the Plaintiff and to remove all competition illegally in an anti-competitive action.

9.4    The statements and actions of the Defendants were published by their conduct. The actions were referring to Dr. Montoya as a non-competent nephrologist. The statement(s)/ actions were defamatory and caused Dr. Montoya economics loss.

9.5    The total loss is between $3,000,000.00 and $6,500,000.00 from not receiving any referrals from the emergency room or hospitalists. Until 2007 Dr. Montoya would receive 10-20 calls from the emergency room per month to treat either new or existing patients at the San Angelo Community Medical Center. Since 2008 Dr. Montoya has only received one call from the emergency room or a hospitalist for consultation as a nephrologist, except for one time for treatment of a new or existing patient that suffered with kidney disease/problems. The lack of referrals caused substantial injury to Dr. Montoya and damaged his ability to compete, because he depended on these referrals and consults to build his practice. A majority of patients who need kidney treatment/ suffer from kidney disease in a hospital later need continuing care for their kidneys or related problems; the most common of such continuing treatments is kidney dialysis. A typical kidney dialysis patient will need treatment for at least ten years, and each such patient would mean

revenue to Dr. Montoya's practice of approximately $100,000 per year. Dr. Montoya estimates that he has lost at least 100 long term kidney dialysis patients from 2007 to the present due to the Defendants' anticompetitive scheme to refuse to give him patient referrals or consults. He estimates that this lack of referrals has thus cost him $3,000,000 to $6,500,000 over that period of time.

9.6 The defamatory statements are untrue. Dr. Montoya is a competent and qualified nephrologist to treat patients at San Angelo Community Medical Center.

9.7 The actions of the Defendants were intentional or done with negligence when the Defendants knew that the statement was false and his actions would lead a reasonable prudent physician or patient knowing/believing of its defamatory potential.

9.8 All officers and President of the medical staff and the medical staff must follow the rules at San Angelo Community Medical Center and staff of San Angelo Community Medical Center and have a new patient in the emergency room or hospital that needs a specialist consultation assigned to the name off the rotating consultation list. By the Defendants. not following this procedure Dr. Montoya did not receive any consultation requests from the emergency room or hospitalist at San Angelo Community Medical Center in 2008-present and one in 2014.

10. Malice

By reference Plaintiff adopts and realleges the acts stated above as if they were set forth herein. For further cause of action, Defendant's conduct amounts to malice under the Texas Civil Practice and Remedies Code § 41.007 and the common law of Texas because Defendant's actions have and are involving an extreme degree of risk considering the probability and magnitude of the potential harm to others. Plaintiff is entitled to exemplary damages and does hereby sue for them.

11. Business Disparagement

The Plaintiffs reallege the allegations and facts set forth above.

312

The Defendants published disparaging comments and allegations about Dr. Montoya and his practice. Defendants took the action(s) to harm the Plaintiff's business interests. Defendants knew the disparagement was false and the actions were done with malice.

12. Restraint of trade (Monopolization/Attempted Monopolization/ Conspiracy to Monopolize)

12.1 The Plaintiffs reallege and incorporate by reference the allegations and facts set forth above.

12.2 Plaintiff makes claim under the Texas Business and Commerce Code Sections 15.05(b) and 15.21 known as the Texas Free Enterprise and Antitrust Act as it recognizes as illegal improper attempts to abuse the patient referral of the emergency room/department and hospital patients, as well as conspiracies to limit patient choices by concerted illegal action as engaged by the Defendants. The Plaintiffs seek relief for this anticompetitive action(s) solely under the laws established by the State of Texas concerning anticompetitive misconduct affecting Texas citizens and patients. The Defendants (along with WTMA and Dr. Brewer's group of hospitalists) have monopolized and/or attempted to monopolize the relevant markets of nephrology services and/or referrals and consults for nephrology services by conspiring to deprive Plaintiffs of consults and referrals for nephrology services. By conspiring against Dr. Montoya, the Defendants and unindicted co-conspirators are attempting to remove him as a competitor to monopolize the markets for themselves.

12.3 In Tom Green County the Plaintiffs are in competition with the Defendants. Defendants have derived or attempted to derive illegal benefit and patient choice and option for care was improperly limited in Tom Green and contiguous counties. The area of service the Defendants are trying to control is Tom Green and contiguous counties. The Defendants are trying to restrain competition in these counties

12.4 Defendants actions are in furtherance of the combination and conspiracy and with the purpose and intent of excluding the Plaintiffs from the patient care market in the relevant market described above and destroying competition from Dr. Montoya and causing a resulting loss and cost to patients. These acts were done with the specific intent to harm

both Dr. Montoya and patients in the relevant market. These acts were done with the specific intent to weaken or eliminate competition from the Plaintiffs and injure patients and obtain market dominance in the relevant market.

12.5 The actions also hurt the patient population in the relevant market by removing or trying to remove completion in the practice of nephrology.

12.6 The concerted actions of the Defendants were flagrant and willful and done for the purpose of harming Dr. Montoya, the Plaintiffs and patients. Defendants illegally and improperly diverted the patients to the hospital affiliated practice. Each Defendant in this case (i.e., SACMC and Dr. Brewer), and WTMA and Dr. Brewer's group of hospitalists (eventual defendants) are being sued for their individual roles and conduct in the monopolization, attempted monopolization, conspiracy to monopolize, and group boycott/concerted refusal to deal. While each of these entities may have engaged in the illegal conduct through their agents or representatives, they are being sued for their individual roles and conduct and not simply under a respondeat superior theory of liability due to actions of Dr. Brewer.

12.7 The acts of the Defendants constitute illegal monopolization, attempted monopolization and /or conspiracy to monopolize under applicable Texas law. The Defendants have monopolized or have a dangerous chance of monopolizing the relevant product markets of nephrology services and referrals and consults for nephrology services. This case is for the anticompetitive actions of the Defendants posing a danger of monopolization and injuring consumer patients. By restricting competition the Defendants are hurting patients in the relevant market.

12.8 Plaintiff sues under this cause of action for anticompetitive conduct and/or effect. While the Defendants' monopolization and attempted monopolization has harmed Dr. Montoya and his professional practice, it has also harmed consumers and others who pay for nephrology services in the relevant market by increasing the costs of those services. This is demonstrated by the chart attached hereto as Exhibit E. Before Dr. Brewer's group of hospitalists became the attending physicians for all nephrology patients at SACMC, nephrology patients would be referred to Dr. Montoya who would serve as the attending physician for the patient. This arrangement avoided the "middle man" which now exists,

as the hospitalists now usually serve as an additional charging entity between the patient and the nephrology specialist. Even if the hospitalists could do the same work as Dr. Montoya or his partner used to provide, the patient still faces increased cost for the same nephrology work, as the hospitalists charge more for physician services than Dr. Montoya charges. The SACMC hospitalists charge at the "Comprehensive" Medicare allowable rate, which adds up to average charges of $506.85 per day. See Exhibit. E. Dr. Montoya, however, charges at the "Moderate" Medicare allowable rate, which adds up to an average cost of $346.13 per day. The difference between these charges is $160.72 per nephrology patient per average hospital stay. Over the course of a year, consumers/payors for nephrology services have thus paid thousands more for the hospitalists' physician and nephrology services than they would have paid for care from Dr. Montoya who is a physician specialist in nephrology. This is a classic example of an antitrust injury, *i.e.* an injury to competition which the antitrust laws were made to prevent. This antitrust injury arises from the Defendants monopolization and attempted monopolization of the relevant markets for (a) nephrology services in the San Angelo/Tom Green County area, and (b) the market for referrals and consults for nephrology services in the San Angelo/Tom Green County area.

13.     Group Boycott and Conspiracy in Restraint of trade

13.1    SACMC, Dr. Kirk Brewer, Dr. Brewer's group of hospitalists, and West Texas Medical Associates ("WTMA") entered into a contract, combination or conspiracy in restraint of trade in violation of Section 15.05(a) of the Texas Antitrust Act. See Tex.Bus. & Com. Code Ann. § 15.05(a). In furtherance of this conspiracy, the conspirators entered into an agreement by which all new nephrology patients entering the SACMC emergency room would be admitted to a hospitalist working in Dr. Brewer's group of hospitalists. The patients were admitted to these hospitalists even when they were already a patient of Dr. Montoya, and even if they specifically requested Dr. Montoya to be their attending physician. The hospitals would then refer the patients to groups affiliated with the hospital. This combination deprived Dr. Montoya of patient referrals he should have received for (a) new patients entering the hospital through the emergency room, and (b) nephrology consults for patients already in the hospital. By favoring hospitalists over Dr. Montoya, Dr. Brewer increased financial remuneration for himself because these patients were being treated by hospitalists in his own group. Dr. Brewer and his group also

benefited by referring the patients groups affiliated with the hospital for nephrology services, because Dr. Brewer and his hospitalist group receive payments from WTMA for providing "coverage" at the SACMC emergency room for nephrology patients. In return for these payments, Dr. Brewer and his hospitalists insure that all referrals and consults at SACMC for nephrology services are made to groups affiliated with the hospital such as WTMA.

13.2    The combination between SACMC, Dr. Kirk Brewer, Dr. Brewer's group of hospitalists, and WTMA constitutes a concerted refusal to deal with Dr. Montoya which is a per se violation of the Section 15.05(a) of the Texas Antitrust Act. See Tex.Bus. & Com. Code Ann. § 15.05(a). It would also violate the "rule of reason" as it unreasonably restrained trade and commerce in the relevant market of nephrology services in the San Angelo area, as well as in the markets for referrals and consults for nephrology services in the San Angelo area. This anticompetitive conspiracy decreased patient choice and raised the price of care for those needing nephrology services. Each Defendant in this case (i.e., SACMC and Dr. Brewer), and WTMA and Dr. Brewer's group of hospitalists (eventual defendants) are being sued for their individual roles and conduct in the monopolization, attempted monopolization, conspiracy to monopolize, and group boycott/concerted refusal to deal. While each of these entities may have engaged in the illegal conduct through their agents or representatives, they are being sued for their individual roles and conduct and not simply under a respondeat superior theory of liability.

13.3    The conspiracy is a horizontal agreement in restraint of trade, as it involves a direct competitor of Dr. Montoya (WTMA, a *group affiliated with SACMC*) that employs a nephrologist for the provision of nephrology services in the San Angelo geographic market. SACMC (along with Dr. Brewer and his group of hospitalists) has a dominant position and market power in the market for nephrology services in the San Angelo area, and in the market for referrals and consults for nephrology services in the San Angelo area. SACMC, Dr. Brewer and Dr. Brewer's group of hospitalists hold a dominant position in the relevant market, in that these entities control the referral of all nephrology patients from within the SACMC hospital and emergency room to specialists such as Dr. Montoya; these entities thus control access to an element necessary to enable Dr. Montoya to compete. There are no pro-competitive effects from

this arrangement. The hospitalists and emergency room doctors at SACMC have agreed with SACMC, Dr. Brewer, and Dr. Brewer's group of hospitalists to only refer patients to, and ask for consults from, nephrology doctors in groups affiliated with the hospital who are "approved" by Dr. Brewer because they make payments to Dr. Brewer and his group of hospitalists. This course of dealing increases the profits of Dr. Brewer, groups affiliated with the hospital and Dr. Brewer's group of hospitalists at the expense of competitors such as Dr. Montoya and is not intended to enhance overall efficiency or to make markets more competitive. These allegations are sufficient to raise a per se violation claim.

13.4    Each Defendant in this case (i.e., SACMC and Dr. Brewer), and WTMA and Dr. Brewer's group of hospitalists (eventual defendants) are being sued for their individual roles and conduct in the monopolization, attempted monopolization, conspiracy to monopolize, and group boycott/concerted refusal to deal. While each of these entities may have engaged in the illegal conduct through their agents or representatives, they are being sued for their individual roles and conduct and not simply under a respondeat superior theory of liability.

13.5    While the conspirators' concerted refusal to deal has harmed Dr. Montoya and his professional practice, it has also harmed consumers and others who pay for nephrology services in the relevant market by increasing the costs of those services. This is demonstrated by the chart attached hereto as Exhibit E. Before Dr. Brewer's group of hospitalists became the attending physicians for all nephrology patients at SACMC, nephrology patients would be referred to Dr. Montoya who would serve as the attending physician for the patient. This arrangement avoided the "middle man" which now exists, as the hospitalists now usually serve as an additional charging entity between the patient and the nephrology specialist. Even if the hospitalists could do the same work as Dr. Montoya or his partner used to provide, the patient (and/or insurance and taxpayer-funded Medicare/Medicaid) still faces increased cost for the same nephrology work, as the hospitalists charge more for physician services than Dr. Montoya charges. The SACMC hospitalists charge at the "Comprehensive" Medicare allowable rate, which adds up to average charges of $506.85 per day. See Exhibit E. Dr. Montoya, however, charges at the "Moderate" Medicare allowable rate, which adds up to an average cost of $346.13 per day. The difference between these charges is $160.72 per nephrology patient per average

hospital stay. Over the course of a year, consumers/payors for nephrology services have thus paid thousands more for the hospitalists' physician and nephrology services than they would have paid for care from Dr. Montoya who is a physician specialist in nephrology. This is a classic example of an antitrust injury, *i.e.* an injury to competition which the antitrust laws were made to prevent. This antitrust injury arises from the conspirators' group boycott/concerted refusal to deal with Dr. Montoya, as well as with the Defendants' monopolization and attempted monopolization of the relevant market.

14.    Restraint of Trade/ Tortious Interference by Violating EMTALA-

14.1    The Emergency Medical Treatment and Active Labor Act (hereinafter EMTALA) is Section 1867(a) of the Social Security Act, and is codified within the section of the U.S. Code which governs the Medicare program. *(42 USC 1395cc)*    The Healthcare Financing Administration (hereinafter HCFA) is the federal agency that governs Medicare payments and has the statutory authority to issue regulations concerning the implementation of EMTALA. *(HCFA Interpretive Guidelines V-15)*

14.2    EMTALA is a statute which governs when and how a patient must be (1) examined and offered treatment or (2) transferred from one hospital to another when he is in an unstable medical condition <u>(3) the list of doctors on staff that are on call and the fair assignment of patients to doctors.</u> *42 USC 1395cc(a)(1)(I)(iii), HCFA Interpretive Guidelines V-15 , Emergency Dept. Compliance and Reimbursement Insider, May 2000,1-5.*    The statute is sometimes referred to as the anti-patient dumping act.

But in this case it does not involve patient dumping but the refusal to follow the mandatory call list of EMTALA to fairly distribute the paying nephrology patients under Medicare or private insurance.

14.3    San Angelo Community Medical Center is Required to  Maintain the Call List

Medicare –participating hospitals must maintain a list of physicians who are on call to provide emergency care to individuals presenting to the emergency room. *(42 USC 1395cc(a)(1)(I)(iii))*

Under EMTALA the hospital and its officers are responsible for maintaining an on-call roster for the emergency department. *(42 USC 1395cc(a)(1)(I)(iii))*

San Angelo Community Medical Center is a Medicare –participating hospital.

The governing board and staff of the hospital must set standards for on-call services and a call list and require that medical staff bylaws appropriately address the issue of call rotation, the call list, and ensure the staff is properly accountable for the enforcement and compliance with the requirements of EMTALA. *42 USC 1395cc(a)(1)(I)(iii) ,42 CFR 482.11 and 42 CFR 482.22.*

14.4    All nephrology patients that go on to dialysis are covered under Medicare- thus are paying patients for the doctor and hospital

Physicians on staff are required to take all the referrals in their specialty. (HCFA Interpretive Guidelines V-15)

A patient presenting for nephrology care is automatically placed under Medicare after their initial diagnosis and Medicare pays the nephrology care even if the patient is under 65 and would ordinarily be Medicare eligible.  While in a hospital, inpatient hemodialysis is available, which would be covered by Medicare Part A. This coverage by Medicare Part A is temporary and when the patient leaves the hospital the patient is covered by Medicare Part B for hemodialysis in dialysis facilities *(Medicare    Coverage    of    Kidney    Dialysis    and    Transplant    Services":    www.medicare.gov/Publications/Pubs/pdf/10128.pdf)*
<u>Thus all nephrology care is paid for either by private insurance or Medicare and is a financial benefit to the hospital and on call physician.</u>

14.5 EMTALA apply in this case

EMTALA applies to "participating hospitals" under Medicare — i.e., to hospitals which have entered into "provider agreements" under which they will accept payment from the Department of Health and Human Services, Centers for Medicare and Medicaid Services (CMS) under the Medicare program for services provided to beneficiaries of that program. In practical terms, this

means that it applies to virtually all hospitals in the U.S., with the exception of the Shriners' Hospital for Crippled Children and many military hospitals. Its provisions apply to all patients, and not just to Medicare patients. Thus the requirements apply to San Angelo Community Medical Center hospital as a participating hospital under Medicare.

The avowed purpose of the statute is to prevent hospitals from rejecting patients, refusing to treat them, or transferring them to "charity hospitals" or "county hospitals" because they are unable to pay or are covered under the Medicare or Medicaid programs and to fairly distribute patients coming to the emergency room between physicians so the physician receives paying and non-paying patients. (42 USC 1395cc (a)(1)(I)(iii)), HCFA Interpretive Guidelines V-15.

14.6 Does EMTALA apply only to people without insurance?
No. The statute expressly provides that the Act's provisions apply to all patients "whether or not eligible for Medicare benefits". 42 USC 1395dd(a). Thus the facts of this case are subject to the fair distribution of patients to all nephrologists that are on staff.

*Despite the fact that the purpose of the statute is to prevent "patient dumping",* there is no requirement that the patient in fact be unable to pay his bills or that *there be an economic motivation behind the decision to transfer the patient. Cooper v. Gulf Breeze Hospital, 839 F. Supp. 1538 (1993). This is a key in this case, the patients coming to the emergency room for nephrology care are guaranteed to pay the doctor for services through Medicare.*

14.7 San Angelo Community Medical Center *wants the paying patients to go to the other nephrologist in the hospital owned or affiliated group and to not have Dr. Montoya receive his fair share of patients.*

14.8 The purpose of the call list is to allow all physicians to equally receive call and paying and non-paying patients.

In this case the kidney disease patients are all paying patients under the government Medicare program.

14.9 Fair Use of the Call List by the Hospital and Staff

The HCFA (Health Care Financing Administration) is concerned that the call list fairly rotate between the specialty physicians that practice in the hospital. (*HCFA interpretive guidelines V-15*).

Accepting privileges at a Medicare participating hospital, subjects a physician to the mandates and penalties of EMTALA and thus all members of the medical staff become liable under EMTALA. *Inspector General v St. Anthony, DAB docket No C-98-460/Decision No. CR620 (Dept. of HHS Appeals Board, Civil Remedies Division, October 1999) DAB docket No A-2000-12/Decision No DAB1728, June 5, 2000*. Physicians are required to follow EMTALA that have staff privileges in a hospital that is covered by EMTALA. *42 CFR 1003.102 (C)* The demands of a hospital and the staff under EMTALA is to require the distribution of paying and non-insured/paying patients equally. *42 USC 1395dd(1) and 42 USC 1370a-7a*.

In this case the call list was not followed and the requirements of EMTALA were violated individually and as chief of staff by Dr. Brewer and the hospital. Dr. Brewer and the hospital violated EMTALA and interfered with Dr. Montoya receiving patients through the call list as required by EMTALA.

All the actions of both Dr. Brewer and the hospital were for monetary gain to have the hospital affiliated groups prosper and squeeze out the physician Dr. Montoya who is not part of the hospital affiliated group.

14.9 Additional regulatory provisions - the "snitch rule"

The regulations do include a provision which imposes a very significant obligation on receiving hospitals. The regulation, at 42 CFR 489.20(m), obligates a participating hospital "to report to [CMS] or the State survey agency any time it has reason to believe it may have received an individual who has been transferred in an unstable emergency medical condition from another hospital in violation of the requirements of Section 489.24(d)." This regulation became effective on September 29, 1995. Note that it requires reporting only when a patient has been improperly transferred; it does not require reporting other known or suspected violations.

San Angelo Community Medical Center has violated this provision.

14.10 Summary of violations of EMTALA-

San Angelo Community Medical Center has violated EMTALA to the economic harm of the Plaintiff Dr. Montoya.

1. EMTALA requires a fair and rotating call list for all specialists at the hospital.

2. San Angelo Community Medical Center is a Medicare –participating hospital.

3. San Angelo Community Medical Center is under the EMTALA rules and mandates.

4. Dr. Brewer individually and as chief of staff is under the EMTALA rules and mandates.

5. Nephrology patients receive Medicare and thus the hospital and treating physician are guaranteed payment for services thus the call list generates guaranteed fees for the medical services.

6. In this case the call list was not followed and the requirements of EMTALA were violated by San Angelo Community Medical Center. San Angelo Community Medical Center violated EMTALA and kept with Dr. Montoya from receiving patients through the call list as required by EMTALA.

7. In this case the actions of the Defendants in not following the requirements of EMTALA violated the restraint of trade and tortious interfered with existing and potential patient relationships to the detriment of the Plaintiffs causing the Plaintiffs damage.

14.10 Each Defendant in this case (i.e., SACMC and Dr. Brewer), and WTMA and Dr. Brewer's group of hospitalists (eventual defendants) are being sued for their individual roles and conduct in the monopolization, attempted monopolization, conspiracy to monopolize, and group boycott/concerted refusal to deal. While each of these entities may have engaged in the illegal conduct through their agents or representatives, they are being sued for their individual roles and conduct and not simply under a respondeat superior theory of liability.

15. Damages-

The Plaintiffs sue for actual damages including consequential damages, mental anguish, lost business reputation, attorney's fees as allowed by law and other actual damages in the maximum amount of $ 6,400,000.00 plus attorney's fees and costs as allowed by law.

An amount is also sued for statutorial additional trebling for exemplary damages do to the malicious and egregious conduct of the Defendants.

Until 2007 Dr. Montoya would receive 10-20 calls from the emergency room per month to treat either new or existing patients at the San Angelo Community Medical Center. Since 2008 Dr. Montoya has only received one call from the emergency room or a hospitalist for consultation as a nephrologist, except for one time for treatment of a new or existing patient that suffered with kidney disease/problems. The lack of referrals caused substantial injury to Dr. Montoya and damaged his ability to compete, because he depended on these referrals and consults to build his practice. A majority of patients who need kidney treatment/ suffer from kidney disease in a hospital later need continuing care for their kidneys or related problems; the most common of such continuing treatments is kidney dialysis. A typical kidney dialysis patient will need treatment for at least six years, and each such patient would mean revenue to Dr. Montoya's practice of approximately $100,000 per year. Dr. Montoya estimates that he has lost at least 100 long term kidney dialysis patients from 2007 to the present due to the Defendants' anticompetitive scheme to refuse to give him patient referrals or consults. He estimates that this lack of referrals has thus cost him $1,000,000 to $6,500,000 over that period of time.

<div align="center">Prayer for Relief</div>

For these reasons Plaintiff requests that:

1.  Plaintiff prays that citation and notice issue as required by law and that the Court grant the relief requested in this petition.

2.  Plaintiff be awarded damages within the jurisdiction limits of this Court.

3.  Plaintiff be award exemplary damages within the jurisdictional limits of the Court.

4.  Reasonable attorney's fees.

5.  Costs of Suit.

6.   Such other and farther relief to which Plaintiff may be justly entitled including but not limited to damages within the jurisdictional limits of this Court, pre and post judgment interest as allowed by law.

Respectfully Submitted

Paul Craig Laird II Law Firm, PLLC

/s/ Paul Craig Laird II
By: Paul Craig Laird II
800 W. Airport Freeway
Suite 880 LB 6015
Irving, TX 75062
972-554-0929
214-260-4935- fax
pcl880@aim.com
SBOT 11795420
Attorney for Plaintiff

Exhibit H

ALLERGIES & SENSITIVITIES  ☐ No Known Allergies   WEIGHT _____ ☐ lb ☐ kg   HEIGHT _____ ☐ in ☐ cm
DRUG                          REACTION                  DRUG                    REACTION

| 1. | | | 4. | | 1 |
| 2. | | | 5. | | |
| 3. | | | 6. | | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM!

| Date | Time | ☒ Admit to Inpatient Status | UNIT (check one): |
| | | ☐ Place in Observation Status | ☐ Med/Surg  ☐ Med-Telemetry  ☐ ICU  ☐ OB/L&D |
| | | ☐ Place in Outpatient Status | ☒ Other _____ PCU |

Dr. Bartels
Stable
1) Acute Renal Failure
2) Hyperkalemia
3) y Anemia
vital q ... 
bed rest
I/O q shift
daily ...
ADA 1800 kcal / cardiac diet
IV heplock
Protonix 40mg IV Q 24h
Lovenox 40mg SQ Q 24h
BMP Magnesium at 9PM 1/24/11 ½ report to P.
CBS BMP, Magnesium in AM

Consult Dr. Montoya

Dr. M. Bartels

Faxed 1/24 2058

Physician Signature _____  Date 1/24/11  Time 7:30

Physician Admission Orders
NS-2701-10HMS    10/10 (Rev. 07/12)    Page 1 of 1

'IPO'

| ALLERGIES & SENSITIVITIES | ☐ No Known Allergies | WEIGHT:_____ ☐ lb ☐ kg | HEIGHT:_____ ☐ In ☐ cm | |
|---|---|---|---|---|
| DRUG | REACTION | DRUG | | REACTION |
| 1. | | 4. | | |
| 2. | | 5. | | |
| 3. | | 6. | | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

| | | COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM! | |
|---|---|---|---|
| Date | Time | ☐ Admit to Inpatient Status<br>☐ Place in Observation Status<br>☐ Place in Outpatient Status | UNIT (check one):<br>☐ Med/Surg ☐ Med-Telemetry ☐ ICU ☐ OB/L&D<br>☐ Other _____ |

| Date | Time | |
|---|---|---|
| 1/25/14 | .36 | Lovenox 30 mg SC q24° |
| | | [signature] Bartely |
| | | [illegible] noted 1/25/14 0240 Per Chan [illegible] |
| 1/25/14 | 0810 | Change Attending to Dr Brewer |
| | | Consult Dr Stevenson Consult called |
| | | Kayexelate 30 Gm P.O x1 Now |
| | | A Status to PCU |
| | | TO ī Read Back Dr Brewer / [illegible] / [illegible] |

FAXED

| Physician Signature | | Date | Time |
|---|---|---|---|

Exhibit B

SAN ANGELO COMMUNITY MEDICAL CTR

326

April 17, 2014

I am Karen, Tims, the daughter of Eunice Welch. I am writing to you on her behalf concerning her admission to SACMC on 11/28/2011. When asked by the ER admission staff, we replied that "Dr. Montoya" was her doctor. We were admitted to the hospitalists' service. We do not appreciate the fact that we did not have our physician of choice at the hospital. Please correct this to help maintain quality patient care.

Sincerely,

Karen Tims

*Karen Tims*

State of _Texas_

County of _Tom Green_

Subscribed and sworn to before me this _17th_ day of _April_, _2014_

*Rosemary Andros*

ROSEMARY ANDROS
My Commission Expires
August 19, 2017

Notary Public

*Exhibit C*

327



# Notice of Patient Rights and Responsibilities

## You have the right to:

- Be treated in a dignified and respectful manner and to receive reasonable responses to reasonable requests for service.

- To effective communication that provides information in a manner you understand, in your preferred language with provisions of interpreting or translation services, at no cost, and in a manner that meets your needs in the event of vision, speech, hearing or cognitive impairments. Information should be provided in easy to understand terms that will allow you to formulate informed consent.

- Respect for your cultural and personal values, beliefs and preferences.

- Personal privacy, privacy of your health information and to receive a notice of the facility's privacy practices.

- Pain management.

- Accommodation for your religious and other spiritual services.

- To access, request amendment to and obtain information on disclosures of your health information in accordance with law and regulation within a reasonable time frame.

- To have a family member, friend or other support individual to be present with you during the course of your stay, unless that person's presence infringes on others' rights, safety or is medically contraindicated.

- Care or services provided without discrimination based on age, race, ethnicity, religion, culture, language, physical or mental disability, socioeconomic status, sex, sexual orientation, and gender identity or expression.

- Participate in decisions about your care, including developing your treatment plan, discharge planning and having your family and personal physician promptly notified of your admission.

- Select providers of goods and services to be received after discharge.

- Refuse care, treatment or services in accordance with law and regulation and to leave the facility against advice of the physician.

- Have a surrogate decision-maker participate in care, treatment and services decisions when you are unable to make your own decisions.

- Receive information about the outcomes of your care, treatment and services, including unanticipated outcomes.

- Give or withhold informed consent when making decisions about your care, treatment and services.

- Receive information about benefits, risks, side effects to proposed care, treatment and services; the likelihood of achieving your goals and any potential problems that might occur during recuperation from proposed care, treatment and service and any reasonable alternatives to the care, treatment and services proposed.

- Give or withhold informed consent to recordings, filming or obtaining images of you for any purpose other than your care.

- Participate in or refuse to participate in research, investigation or clinical trials without jeopardizing your access to care and services unrelated to the research.

- Know the names of the practitioner who has primary responsibility for your care, treatment or services and the names of other practitioners providing your care.

- Formulate advance directives concerning care to be received at end-of-life and to have those advance directives honored to the extent of the facility's ability to do so in accordance with law and regulation. You also have the right to review or revise any advance directives.

- Be free from neglect; exploitation; and verbal, mental, physical and sexual abuse.

- An environment that is safe, preserves dignity and contributes to a positive self-image.

- Be free from any forms of restraint or seclusion used as a means of convenience, discipline, coercion or retaliation; and to have the least restrictive method of restraint or seclusion used only when necessary to ensure patient safety.

- Access protective and advocacy services and to receive a list of such groups upon your request.

Patient Rights and Responsibilities
ADM-1901GHMS-TX          Page 1 of 2
04/11 (Rev. 08/12, 07/13, 03/14, 07/14)

Patient Label

PAT #:                    CHART #:
ADMIT DATE:                        DOB:
SEX:        AGE:
ATT. DR.:

| DR MONTOYA'S CHARGES MODERATE | | | |
|---|---|---|---|
| DESCRIPTION | REQUIREMENTS | CPT | MEDICARE ALLOWABLE RATE |
| INPATIENT ADMISSION MODERATE | 1. A comprehensive history 2. A comprehensive exam 3. Medical Decision making of moderate complexity | 99222 | $ 134.03 |
| INPATIENT FOLLOW UP MODERATE | 1. An expanded problem focused interval history 2. An expanded problem focused examination 3. Medical decision making of moderate complexity | 99232 | $ 70.76 |
| INPATIENT FOLLOW UP MODERATE | 1. An expanded problem focused interval history 2. An expanded problem focused examination 3. Medical decision making of moderate complexity | 99232 | $ 70.76 |
| INPATIENT DISCHARGE less than 30 min | 1. Final Exam 2. Discussion of hospital stay 3. Instructions for continuing care to all relevant caregivers 4. preparation of discharge records 5. Presciptions and Referral forms | 99238 | $ 70.58 |
| | | | $ 346.13 |
| HOSPITALIST CHARGES COMPREHENSIVE | | | |
| DESCRIPTION | | CPT | MEDICARE ALLOWABLE RATE |
| INPATIENT ADMISSION COMPREHENSIVE | 1. A comprehensive history 2. A comprehensive exam 3. Medical Decision making of high complexity | 99223 | $ 198.47 |
| INPATIENT FOLLOW UP COMPREHENSIVE | 1. A detailed interval history 2. A detailed examination 3. Medical decision making of high complexity | 99233 | $ 101.94 |
| INPATIENT FOLLOW UP COMPREHENSIVE | 1. A detailed interval history 2. A detailed examination 3. Medical decision making of high complexity | 99233 | $ 101.94 |
| INPATIENT DISCHARGE more than 30 min | 1. Final Exam 2. Discussion of hospital stay 3. Instructions for continuing care to all relevant caregivers 4. preparation of discharge records 5. Presciptions and Referral forms | 99239 | $ 104.50 |
| | | | $ 506.85 |
| TOTAL DIFFERENCE | | | $ (160.72) |

Exhibit E
Page 1 of 7

| | | |
|---|---|---|
| Difference between Dr. Montoya, Independent physician billing and hospital stay for average of 4 days for an In-patient at SACMC with Dr. Montoya, billing medicine at the moderate level compared to Dr. Brewer and the Hospitalist billing comprehensive. | $ | 100 |
| Multiply average admissions per day – 4 | $ | 400 |
| Multiply for one year | $ | 146,000 |
| Multiply for total number of Independent physicians affected by Hospitalists' pattern of restraint – 10% (10) | $ | 1,460,000 |
| Multiply by number of years – 8 for one hospital | $ | 11,680,000 |
| Multiply by 200 Hospitals | $ 235,600,000 | |

Exhibit E

Page 2 of 2

# TAB NO. 3

Filed for Record
12/8/2015 3:47:43 PM
Sheri Woodfin, District Clerk
Tom Green County, Texas

CAUSE NO. B-150,285-C

| | | |
|---|---|---|
| STEVE F. MONTOYA, M.D., | § | IN THE 119TH DISTRICT COURT |
| WEST TEXAS RENAL CARE, and | § | |
| WEST TEXAS NEPHROLOGY, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| VS. | § | OF |
| | § | |
| SAN ANGELO COMMUNITY MEDICAL | § | |
| CENTER and KIRK BREWER, M.D. | § | |
| | § | |
| *Defendants.* | § | TOM GREEN COUNTY, TEXAS |

## <u>DEFENDANT KIRK BREWER, M.D.'S MOTION TO DISMISS AND FOR RECOVERY OF COSTS AND ATTORNEY'S FEES</u>

TO THE HONORABLE COURT:

COMES NOW Defendant, Kirk Brewer, M.D., (hereinafter "Brewer") and respectfully moves the Court to dismiss the following causes of action asserted against Brewer pursuant to Tex. Civ. Prac. & Rem. Code §§ 27.001 *et. seq.* on the grounds that Plaintiff's causes of action violate the Texas Citizens Participation Act, and pursuant to Rule 91a, Tex. R. Civ. Proc. on the grounds that Plaintiff's causes of action have no basis in law or fact as demonstrated below.

### I. Motion Timely Filed

Section 27.003, Tex. Civ. Prac. & Rem. Code and Rule 91a.3, Tex. R. Civ. P. requires this motion to be filed within 60 days after the first pleading containing the challenged cause of action is served on the movant. The petition in this case was served upon Defendant Brewer on October 9, 2015. Accordingly, this motion is timely filed.

## II. Causes of Action Asserted Against Brewer

The causes of action alleged in the Plaintiffs' Petition are:

     (1)    Tortious Interference with Current and Prospective Business/Patient Relations (pp. 5-6);

     (2)    Tortious Interference with Current and Prospective Business/Patient Relations- Exemplary Damages (p. 7);

     (3)    Defamation Per Se (p. 7);

     (4)    Malice (p. 7);

     (5)    Business Disparagement (pp. 7-8)

     (6)    Restraint of Trade (Texas Free Enterprise and Antitrust Act) (p. 8-9).

As demonstrated below, none of the causes of action pleaded have any basis in law or in fact against Brewer.

## III. No Legal Basis for Claims

**A.**    **The Court should dismiss Plaintiff's claim pursuant to the Texas Citizens Participation Act.**

This Court should dismiss Plaintiff's claims pursuant to the Texas Citizens Participation Act ("TCPA") because his claims are based on, relate to, or are in response to Defendant's exercise of his right to free speech. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b) ("[A] court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech . . . ."). To avoid dismissal, a plaintiff must establish "by clear and specific evidence a prima facie case for each essential element of [its claims]." *Id.* at § 27.005(c). If a plaintiff fails to meet this burden, the court must dismiss the action and award attorneys' fees to the moving party. *Id.* at § 27.009. Plaintiff cannot meet this demanding burden; dismissal of his claims is therefore warranted.

### 1. Plaintiffs' Claims Arise Out of Defendant's Exercise of His Right to Free Speech

Plaintiff's claims are premised on Defendant's communications regarding a matter of public concern. Such statements are squarely within the TCPA. Plaintiff's claims should therefore be dismissed with prejudice. The TCPA defines "[e]xercise of the right of free speech [as] communication made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code Ann. at § 27.001(3). A "'matter of public concern' includes an issue related to: (A) health or safety; [or] (B) environmental, economic, or community well-being." *Id.* at § 27.0001(7).

Specifically, Plaintiff alleges that Defendant: 1) engaged in a covert whisper campaign and decided not to refer any patients to Plaintiff and 2) brought charges against Plaintiff relating to incompetent patient care. Importantly, Plaintiff does not identify any actual statements in which Defendant ever disparaged Plaintiff, or suggested that any entity should refrain from doing business with Plaintiff. In fact, the only specific action alleged to have harmed Plaintiff – the charges brought against Plaintiff relating to incompetent patient care – is statutorily protected conduct pursuant to the medical committee privileges and immunities provided by the Texas Occupations Code, §§160.001 *et seq.*, 160.010 (and especially subsection (c) of that section), and 161.001 *et seq.*, the Texas Health & Safety Code, §161.001 *et seq.* and 161.033, and the Federal Health Care Quality Improvement Act, 42 U.SC., §11101 *et seq.*

Furthermore, these charges relating to Plaintiff's patient care constitute free speech under the TCPA because it fits within TCPA's definition of "communication[s] made in connection with a matter of public concern," including: "health or safety" (Plaintiff is a:physician); "community well-being" (Plaintiff practices medicine in the community in which Defendants work and live); or "service in the marketplace" (Plaintiff provides medical services to the

community in which Defendant works and lives). *See* Tex. Civ. Prac. & Rem. Code Ann. at § 27.001(7); *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509-10 (Tex. 2015) (holding that e-mails sent by administrators at medical facility containing disparaging comments about certified registered nurse anesthetist were communications made in connection with a matter of public concern and were protected by the Texas Citizens Participation Act (TCPA); e-mails related to whether nurse anesthetist properly provided medical services to patients, and included allegations that nurse anesthetist failed to provide adequate coverage for pediatric cases, administered a different narcotic than was ordered, falsified records, and violated facility's sterile protocol policy); *see also Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 81 (Tex. App.--Houston [1st Dist.] 2013, no. pet. h.) (holding that articles relating to the plaintiff's obligation to meet the licensing requirements and standards for operating an assisted living facility were made in connection with a matter of public concern and related to the exercise of free speech).

Additionally, Plaintiff's pleadings fail to present a prima facie case on each of Plaintiff's causes of action, because Plaintiff's pleadings are not clear and specific. "Pleadings that might suffice in a case that does not implicate the TCPA may not be sufficient to satisfy the TCPA's 'clear and specific evidence' requirement." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) "[A] plaintiff must provide enough detail to show the factual basis for its claim," including how the "defendants damaged the plaintiff." *Id.* at 591. "[G]eneral allegations that merely recite the elements of a cause of action ... will not suffice." *Id.* at 590. Additionally, "[b]are, baseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA." *Id.* at 592. Without more, allegations stating that a plaintiff suffered "direct economic losses and 'lost profits,'" are

only conclusory and do not constitute evidence. *Id.*; *see Coastal Transp. Co. v. Crown Cent. Petroleum,* 136 S.W.3d 227, 232 (Tex. 2004); *Ryland Grp., Inc. v. Hood,* 924 S.W.2d 120, 122 (Tex. 1996) (per curiam); *Wholesale TV & Radio Adver., LLC v. Better Bus. Bureau of Metro. Dallas, Inc.,* No. 05–11–01337–CV, 2013 WL 3024692, at *4 (Tex. App.—Dallas Jun. 14, 2013, no pet.) (mem.op.) (finding conclusory statements insufficient evidence of essential element in TCPA case); *Zanfardino v. Jeffus,* 117 S.W.3d 495, 497–98 (Tex. App.—Texarkana 2003, no pet.).

Plaintiff's entire petition is based on, relates to, or is in response to Defendant's exercise of his right to speak freely on issues relating to public health and safety. Therefore, Plaintiff's causes of action should be dismissed pursuant to the TCPA.

**B.    Plaintiff's Claims Have No Basis in Law**

Rule 91a, Tex. R. Civ. Proc., provides:

> **"(A) party may move to dismiss a cause of action on the grounds that it has no basis in law or in fact. A cause of action has no basis in law if the allegations, taken as true, together with the inferences reasonably drawn from them, do not entitle the claimant to the relief sought."**

**1. Tortious Interference with Existing and Prospective Patients and Exemplary Damages**

The elements of tortious interference with an existing business relationship "are (1) the existence of a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damages, and (4) actual damage or loss occurred." *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991); *see Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 926 (Tex.1993).

"To establish ... tortious interference with prospective business relationships, a plaintiff must show that (1) there was a reasonable probability that the parties would have entered into a

business relationship; (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Plotkin v. Joekel*, 304 S.W.3d 455, 487 (Tex. App.— Houston [1st Dist.] 2009, pet. denied) (quoting *Richardson–Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)); *see Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). Independently tortious means "conduct that would violate some other recognized tort duty." *Sturges*, 52 S.W.3d at 713. A plaintiff can recover exemplary damages if he can show the interference was malicious. *Seelbach v. Clubb*, 7 S.W.3d 749, 757 (Tex. App.—Texarkana 1999, pet. denied).

All of Plaintiff's allegations regarding his claim for tortious interference with existing business and prospective patients, if taken as true, do not entitle Plaintiff to the relief he seeks because as to Brewer, Plaintiff fails to allege, and there are no facts which support: 1) the existence of a contract which is subject to interference; 2) that there was a reasonable probability that the Plaintiff and these prospective patients would have entered into a doctor-patient relationship; or 3) that Brewer committed an independently tortious or unlawful act that prevented the doctor-patient relationship from occurring. Plaintiff alleges generally that Defendants interfered with Plaintiff's relationships with patients and referring physicians; however, Plaintiff alleges no specific tortious or unlawful conduct against Brewer which, if true, constitutes tortious interference with Plaintiff's ability to enter into a relationship with patients and referring physicians, nor does Plaintiff allege that he is under a current contract with any patients or physicians with which Brewer could interfere, nor has Plaintiff alleged any facts

which support a finding that there was a *reasonable probability* that Plaintiff would have entered into said relationships, but for Brewer's conduct. Because Plaintiff cannot establish elements essential to his claim for tortious interference with existing and prospective patient relations, Plaintiffs claims for the same should be dismissed; further, without proof of tortious interference, Plaintiff's claim for exemplary damages must be denied as well.

Alternatively, Plaintiff's claim should be dismissed because a hospital, through its agents, has a duty to engage in peer review of its physicians. *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 347 (5th Cir. 2002). Thus, any contractual interference caused by Brewer/s exercise of this right with respect to Plaintiff was justified. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex.1996) ("A party is justified in interfering with another's contract if it exercises (1) its own legal rights or (2) a good faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken."); *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 347 (5th Cir. 2002).

## 2. Defamation Per Se

Defamation is a false statement about a plaintiff published to a third person without legal excuse which damages the plaintiffs reputation. *Doe v. Mobile Video Tapes, Inc.*, 43 S.W.3d 40, 48 (Tex. App.-Corpus Christi 2001, no pet.); *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.) To be considered defamation per se, the statement must (1) impute the commission of a crime; (2) impute contraction of a loathsome disease; (3) cause injury to a person's office, business, profession, or calling; or (4) impute sexual misconduct. Goodman, 50 S.W.3d at 140. Whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court. *Musser v. Smith Protective Serv., Inc.*, 723 S.W.2d 653, 654–55 (Tex.1987); *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.).

If particular language alleged to be defamatory may, or may not, be so, according to other facts or circumstances, then an innuendo is required in order to tender as an issue the fact that the words conveyed to hearers the defamatory meaning. *Montgomery Ward & Co. v. Peaster*, 178 S.W.2d 302, 305 (Tex. Civ. App.—Eastland 1944, no writ). Consequently, innuendo should never be considered when interpreting *defamation per se*. The very definition of *"per se,"* "in and of itself," precludes the use of innuendo. *Moore v. Waldrop*, 166 S.W.3d 380, 386 (Tex. App.—Waco 2005, no pet.) If the statement, taken by itself and as a whole, is defamatory, it will require no extrinsic evidence to clarify its meaning; it will stand alone. *Burnaman v. J.C. Penney Co.*, 181 F.Supp. 633, 636–37 (S.D.Tex.1960); *Moore v. Waldrop*, 166 S.W.3d 380, 386 (Tex. App.—Waco 2005, no pet.).

Plaintiff's Original Petition fails to allege what, if any, defamatory statement Brewer made against Plaintiff, and in what context, and to whom those statements were made. Without establishing what the defamatory statement was that allegedly defamed Plaintiff, innuendo is required to determine whether it is in fact defamatory, preventing Plaintiff from prevailing on his claim for defamation *per se*. Plaintiff's defamation *per se* claim should be dismissed accordingly.

### 3. Malice

Plaintiff claims that he is entitled to exemplary damages for his claims for tortious interference and defamation *per se* under Tex. Civ. Prac. & Rem. Code § 41.007 because Brewer's conduct involved an "extreme degree of risk considering the probability and magnitude of the potential harm to others." *Pl. Pet. p. 7*. Tex. Civ. Prac. & Rem. Code §41.007 does not entitle Plaintiff to exemplary damages, as § 41.007 only provides that "[p]rejudgment interest

may not be assessed or recovered on an award of exemplary damages." Therefore, taking all Plaintiff's allegations as true, Plaintiff is not entitled to exemplary damages under § 41.007, Tex. Civ. Prac. & Rem. Code.

Moreover, even if the Court allows Plaintiff to correct, what may be a typographical error in the statute cited, Plaintiff's claim for exemplary damages for *Malice* fails because Plaintiff does not allege that Brewer acted with malice, which means "a specific intent by the defendant to cause substantial injury or harm to the claimant;" rather, Plaintiff alleges that Brewer acted with an extreme degree of risk, considering the probability and magnitude of the potential harm to others, which is an element of gross negligence. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998) ("Gross negligence includes ... viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others.") However, Plaintiff does not allege that Brewer was grossly negligent, and cannot establish that he is entitled to exemplary damages for malice based on the allegations contained in Plaintiff's Original Petition. Accordingly, Plaintiff's claim for exemplary damages should be dismissed.

## 4. Business Disparagement

To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex.1987); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003). Actual malice is not ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 328 (1974). "Reckless disregard" is defined as a high degree of awareness of probable

test

falsity, for proof of which the plaintiff must present "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, (1968). An error in judgment is not enough. *See Time, Inc. v. Pape*, 401 U.S. 279, 290, (1971); *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989). Furthermore, a plaintiff cannot rely on a statement of opinion to support its business disparagement claim because such statements are constitutionally protected. *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989).

Plaintiff's pleadings, even if taken as true, do not entitle Plaintiff to the relief sought for business disparagement. As addressed above, Plaintiff makes no specific allegations that Brewer published any false, defamatory statement regarding Plaintiff's business. Plaintiff's allegations that Brewer brought him up on charges of incompetent patient care, and started a whisper campaign to not refer business to Plaintiff does not support a claim for business disparagement. A whisper campaign not to refer patients to Plaintiff, taken as true, does not imply that false statements were made about Plaintiff in the alleged "whisper campaign," and any charges Brewer brought against Plaintiff were brought as part of a medical peer review process which is protected under the TCPA, and the privileges and immunities as set forth in the Texas Occupations Code, §§160.001 *et seq.*, 160.010(and especially subsection (c) of that section), and 161.001 *et seq.*, the Texas Health & Safety Code, §161.001 *et seq.*, and 161.033, and the Federal Health Care Quality Improvement Act, 42 U.S.C., §11101 *et seq.* Furthermore, Plaintiff fails to allege or establish that Brewer's statements caused Plaintiff special damages. Proof of special damages is an essential part of the plaintiffs' cause of action for business disparagement. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987). The requirement goes to the cause of action itself and requires that plaintiff "establish pecuniary loss that has been realized or

liquidated as in the case of specific lost sales." W. Keeton, Prosser and Keeton on the Law of Torts, § 128 at 971 (5th Ed.1984); *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987). Plaintiff generally alleges that Defendants took the action(s) to harm Plaintiff's business interests; this is insufficient to establish special damages under a claim for business disparagement. Accordingly, Plaintiff's claim for business disparagement should be dismissed.

Additionally, Plaintiff's claim for business dispargement must be dismissed because the Texas Medical Practice Act ("TMPA") affords immunity from civil liability to peer-review participants when they act "without malice and in the reasonable belief that the action or recommendation is warranted by the facts known to that person." Tex. Occ. Code § 160.010(a)(2). Plaintiff's allegations against Brewer concern his actions as a peer-review participant, and peer-review participants are always presumed to have acted without malice. *Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 545 (5th Cir. 2009). To overcome the presumption, a plaintiff bears the burden of proving the contrary by clear and convincing evidence. *Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 545 (5th Cir. 2009). Plaintiff's conclusory allegation that Defendants acted with malice falls far short of the clear and convicning evidence standard required to establish this element and no facts alleged support his allegation of malice. Accordingly, Brewer should be found immune from Plaintiff's business disparagement claim, and it should be dismissed.

## 5. Restraint of Trade

Initially, Brewer would re-assert its argument that Plaintiff's claims must be dismissed because the Texas Medical Practice Act ("TMPA") affords immunity from civil liability to peer-review participants when they act "without malice and in the reasonable belief that the action or recommendation is warranted by the facts known to that person." Tex. Occ. Code §

160.010(a)(2). Plaintiff's allegations against Brewer concern his actions as a peer-review participant, and peer-review participants are always presumed to have acted without malice. *Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 545 (5th Cir. 2009). To overcome the presumption, a plaintiff bears the burden of proving the contrary by clear and convincing evidence. *Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 545 (5th Cir. 2009). As discussed above, Plaintiff's Petition fails to allege facts sufficient to entitle him to a finding of malice against Brewer. Accordingly, Brewer is immune from Plaintiff's Restraint of Trade claim, and it should be dismissed.

Alternatively, Plaintiff's bald allegations that Defendants referred patients to a hospital-owned practice to obtain market dominance in the nephrology practice in Tom Green and contiguous counties, coupled with Plaintiff's failure to allege that he suffered an antitrust injury do no entitle Plaintiff to relief under a Texas Antitrust Act.

The Texas Antitrust Act provides, in relevant part, that "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful," and that "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." Tex. Bus. & Com.Code Ann. § 15.05(a), (b) (Vernon 2002). To establish that a defendant contracted, combined, or conspired in restraint of trade in violation of the Texas Antitrust Act, a plaintiff must show that the alleged contract, combination, or conspiracy is unreasonable and has an adverse effect on competition in the relevant market. *See Winston v. Am. Med. Int'l*, 930 S.W.2d 945, 951–52 (Tex.App.-Houston [1st Dist.] 1996, writ denied). The Texas Antitrust Act does not prohibit all restraints of trade; instead, it prohibits only those that restrain trade unreasonably. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex.1990).

Courts have generally been reluctant to hold that a group of physicians who decide that they do not want to refer patients to a particular physician, because they doubt his qualifications, have committed a per se violation of the Sherman Act. Because actions on the part of hospitals and physicians, which might resemble group boycotts, may well be mandated by an ethically grounded concern for patients' well-being ... such behavior, in the medical service industry, should be analyzed in terms of the rule of reason. *Marlin v. Robertson*, 307 S.W.3d 418, 428-29 (Tex. App.—San Antonio 2009, no pet.) *Pontius v. Children's Hosp.*, 552 F.Supp. 1352, 1370 (W.D.Pa.1982); *see also Jackson v. Radcliffe*, 795 F.Supp. 197, 205 (S.D.Tex.1992) (applying rule of reason to physician's contention that termination of his contract with hospital was illegal restraint of trade); *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 708-09 (4th Cir.1991) (analyzing denial or revocation of medical staff privileges under rule of reason); *Marin v. Citizens Mem'l Hosp.*, 700 F.Supp. 354, 360 (S.D.Tex.1988) (applying rule of reason to physician's claim that hospital for which he worked and its medical staff formed group boycott to reduce or eliminate his competitive potential).

Furthermore, a plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic injury. *Oksanen*, 945 F.2d at 708. For example, the fact that a hospital's decision caused a disappointed physician to practice medicine elsewhere does not of itself constitute an antitrust injury. *Id.* "If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action." *Id.* "To keep the antitrust laws from becoming so trivialized, the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Id.* The fact that a competitor's income may have been reduced by someone's conduct, does not mean that competition was impermissibly restrained in the relevant market. *Rea v. Hosp. Corp. of Am.*, 892

F. Supp. 821, 834 (N.D. Tex. 1993) *aff'd in part, rev'd in part sub nom. Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383 (5th Cir. 1996). To meet its burden, a plaintiff must prove what market it contends was restrained and that the defendants played a significant role in the relevant market. *Id.* at 709. Absent this market power, any restraint on trade created by the defendants' actions is unlikely to implicate Texas Antitrust Act section 15.05(a). *See_Marlin v. Robertson*, 307 S.W.3d 418, 429 (Tex. App.—San Antonio 2009, no pet.) "There must be evidence of 'demonstrable economic effect' not just an inference of possible effect." *Coca–Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 689 (Tex.2006).

Plaintiff's allegations, even if taken as true, do not entitle him to a relief under the Texas Antitrust Act, as his allegations do not demonstrate that Brewer' s actions play a significant role in the nephrology market in Tom Green and contiguous counties or that Plaintiff suffered an antitrust injury from Brewer's actions. In fact, Plaintiff's allegations demonstrate that Plaintiff maintains his own medical practice with a dialysis unit capable of serving 24 patients per shift. (Pl. Pet. p. 2). Any patient who wishes to use Plaintiff is still able to seek out his services. *See Nafrawi v. Hendrick Med. Ctr.*, 676 F. Supp. 770, 774-75 (N.D. Tex. 1987) (holding that there was no antitrust violation by a hospital that denied a doctor staff privileges when the doctor maintained full privileges at a comparable facility, any patient who wishes to use his services could still seek out his services, and even if he no longer practiced medicine at all, patients in the relevant market could still obtain services identical to those he provided.) Therefore, Plaintiff's claim for restraint of trade should be dismissed.

## IV. Conclusion and Prayer for Relief

WHEREFORE, premises considered, there being no legal and no factual bases for the causes of action pleaded against Brewer, this Defendant respectfully prays that its motion be

granted, that the causes of action asserted against Brewer be dismissed and for costs and reasonable and necessary attorney's fees, all as provided under Rule 91a, Tex. R. Civ. Proc. and Tex. Civ. Prac. & Rem. Code §§ 27.001, *et. seq.*

Further, Brewer respectfully prays that (1) this motion be set for hearing not less than 21 days after the date of filing, and (2) that the motion be granted within 45 days after the date of its filing, all as required by Rule 91a.3, Tex. R. Civ. Proc.

Respectfully submitted,

MCMAHON SUROVIK SUTTLE, P.C.
400 Pine Street, Suite 800
Abilene, Texas 79601-5140
(325) 676-9183 (Phone)
(325) 676-8836 (Fax)


By: /s/ Robert B. Wagstaff
      Robert B. Wagstaff
      State Bar No. 20665000
      rwagstatff@mcmahonlawtx.com

ATTORNEYS FOR DEFENDANT
KIRK BREWER, M.D.


## CERTIFICATE OF SERVICE

This hereby certifies that a true and correct copy of the foregoing instrument was forwarded, via e-service and e-mail, to all counsel of record on the 8th day of December, 2015.


/s/ Robert B. Wagstaff
ROBERT B. WAGSTAFF

TAB NO. 4

CAUSE NO. B-150,285-C

| | | |
|---|---|---|
| STEVE F. MONTOYA, M.D., | § | IN THE 119TH DISTRICT COURT |
| WEST TEXAS RENAL CARE, and | § | |
| WEST TEXAS NEPHROLOGY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | OF |
| | § | |
| SAN ANGELO COMMUNITY MEDICAL | § | |
| CENTER and KIRK BREWER, M.D. | § | |
| | § | |
| Defendants. | § | TOM GREEN COUNTY, TEXAS |

## DEFENDANT KIRK BREWER, M.D.'S AMENDED MOTION TO DISMISS AND FOR RECOVERY OF COSTS AND ATTORNEY'S FEES

TO THE HONORABLE COURT:

COMES NOW Defendant, Kirk Brewer, M.D., (hereinafter "Brewer") and respectfully moves the Court to dismiss the following causes of action asserted against Brewer pursuant to Tex. Civ. Prac. & Rem. Code §§ 27.001 *et. seq.* on the grounds that Plaintiff's causes of action violate the Texas Citizens Participation Act, and pursuant to Rule 91a, Tex. R. Civ. Proc. on the grounds that Plaintiff's causes of action have no basis in law or fact as demonstrated below.

### I. Amended Motion Timely Filed

Section 27.003, Tex. Civ. Prac. & Rem. Code and Rule 91a.3, Tex. R. Civ. P. requires a motion to dismiss be filed within 60 days after the first pleading containing the challenged cause of action is served on the movant. The first pleading in this case was served upon Defendant Brewer on October 9, 2015, a first amended pleading was filed November 12, 2015, and Defendant Brewer originally filed his motion to dismiss on December 8, 2015, and set it for hearing on January 12, 2016. On January 4, 2016, the Plaintiffs filed a Second Amended

119

Original Petition, with additional allegations, but no additional claims. Further, Plaintiffs filed a response to the motion to dismiss on January 4, 2016, as well. Pursuant to TRCP 91a.5, this amended motion responsive to the latest pleading is timely filed.

Further, in support of this motion, attached hereto as Exhibit "1" is the affidavit of Defendant Kirk Brewer, M.D. Attached hereto as Exhibit "2" is the affidavit of Robert Wagstaff in support of attorneys' fees.

## II. Causes of Action Asserted Against Brewer

The causes of action alleged in each of the Plaintiffs' Petitions, including the Second Amended Original Petition are:

(1)     Tortious Interference with Current and Prospective Business/Patient Relations (pp. 5-6);

(2)     Tortious Interference with Current and Prospective Business/Patient Relations- Exemplary Damages (p. 7);

(3)     Defamation Per Se (p. 7-10);

(4)     Malice (p. 10);

(5)     Business Disparagement (pp. 11);

(6)     Restraint of Trade (Texas Free Enterprise and Antitrust Act) (p. 11-12);

(7)     Cause of action thrown in with the factual dissertation - civil conspiracy and joint and several liability (p.3).

Despite Plaintiff's attempts to somehow plead around the Defendant's motion to dismiss, as demonstrated below, none of the causes of action pled have sufficient basis in law or in fact against Brewer.

## III. No Legal Basis for Claims

**A.     The Court should dismiss Plaintiff's claim pursuant to the Texas Citizens Participation Act.**

This Court should dismiss Plaintiff's claims pursuant to the Texas Citizens Participation Act ("TCPA") because his claims are based on, relate to, or are in response to Defendant's exercise of his right to free speech. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b) ("[A]

court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech . . . ."). To avoid dismissal, a plaintiff must establish "by clear and specific evidence a prima facie case for each essential element of [its claims]." *Id.* at § 27.005(c). If a plaintiff fails to meet this burden, the court must dismiss the action and award attorneys' fees to the moving party. *Id.* at § 27.009. Plaintiff cannot meet this demanding burden and dismissal of his claims is therefore warranted.

### *Plaintiffs' Claims Arise Out of Defendant's Exercise of His Right to Free Speech*

Plaintiff's claims are premised on Defendant's communications regarding a matter of public concern. Plaintiff notes in his latest pleading on page 3 that "Dr. Brewer at all times acted for (SACMC)." Further, in Defendant Brewer's attached affidavit, he states that "[F]urther, any discussions I have had concerning Dr. Montoya, regardless of the context, have been within the hospital, and either directly concerning patient care and/or associated with the peer review process." As such, any claimed statements are squarely within the TCPA. Plaintiff's claims should therefore be dismissed with prejudice. The TCPA defines "[e]xercise of the right of free speech [as] communication made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code Ann. at § 27.001(3). A "'matter of public concern' includes an issue related to: (A) health or safety; [or] (B) environmental, economic, or community well-being." *Id.* at § 27.0001(7).

Specifically, Plaintiff alleges that Defendant: 1) engaged in a covert whisper campaign and decided not to refer any patients to Plaintiff and 2) brought charges against Plaintiff relating to incompetent patient care. Importantly, Plaintiff does not identify any actual statements in which Defendant ever disparaged Plaintiff, or suggested that any entity should refrain from doing

business with Plaintiff. In fact, one action alleged to have harmed Plaintiff – the charges brought against Plaintiff relating to incompetent patient care – is statutorily protected conduct pursuant to the medical committee privileges and immunities provided by the Texas Occupations Code, §§160.001 *et seq.*, 160.010 (and especially subsection (c) of that section), and 161.001 *et seq.*, the Texas Health & Safety Code, §161.001 *et seq.* and 161.033, and the Federal Health Care Quality Improvement Act, 42 U.SC., §11101 *et seq.* The other harm is centered on the defamation per se claim which is discussed in more detail below.

Furthermore, these charges relating to Plaintiff's patient care constitute free speech under the TCPA because it fits within TCPA's definition of "communication[s] made in connection with a matter of public concern," including: "health or safety" (Plaintiff is a physician); "community well-being" (Plaintiff practices medicine in the community in which Defendants work and live); or "service in the marketplace" (Plaintiff provides medical services to the community in which Defendant works and lives). *See* Tex. Civ. Prac. & Rem. Code Ann. at § 27.001(7); *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509-10 (Tex. 2015) (holding that e-mails sent by administrators at medical facility containing disparaging comments about certified registered nurse anesthetist were communications made in connection with a matter of public concern and were protected by the Texas Citizens Participation Act (TCPA); e-mails related to whether nurse anesthetist properly provided medical services to patients, and included allegations that nurse anesthetist failed to provide adequate coverage for pediatric cases, administered a different narcotic than was ordered, falsified records, and violated facility's sterile protocol policy); *see also Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 81 (Tex. App.--Houston [1st Dist.] 2013, no. pet. h.) (holding that articles relating to the plaintiff's obligation to meet the licensing requirements and standards for operating an

assisted living facility were made in connection with a matter of public concern and related to the exercise of free speech).

Additionally, Plaintiff's pleadings fail to present a prima facie case on each of Plaintiff's causes of action, because Plaintiff's pleadings are not clear and specific. "Pleadings that might suffice in a case that does not implicate the TCPA may not be sufficient to satisfy the TCPA's 'clear and specific evidence' requirement." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) "[A] plaintiff must provide enough detail to show the factual basis for its claim," including how the "defendants damaged the plaintiff." *Id.* at 591. "[G]eneral allegations that merely recite the elements of a cause of action ... will not suffice." *Id.* at 590. Additionally, "[b]are, baseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA." *Id.* at 592. Without more, allegations stating that a plaintiff suffered "direct economic losses and 'lost profits,'" are only conclusory and do not constitute evidence. *Id.; see Coastal Transp. Co. v. Crown Cent. Petroleum*, 136 S.W.3d 227, 232 (Tex. 2004); *Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (per curiam); *Wholesale TV & Radio Adver., LLC v. Better Bus. Bureau of Metro. Dallas, Inc.*, No. 05-11-01337-CV, 2013 WL 3024692, at *4 (Tex. App.—Dallas Jun. 14, 2013, no pet.) (mem. op.) (finding conclusory statements insufficient evidence of essential element in TCPA case); *Zanfardino v. Jeffus*, 117 S.W.3d 495, 497–98 (Tex. App.—Texarkana 2003, no pet.).

In truth, Plaintiff's entire petition is based on, relates to, or is in response to Defendant's exercise of his right to speak freely on issues relating to public health and safety. Therefore, Plaintiff's causes of action should be dismissed pursuant to the TCPA.

**B.     Plaintiff's Claims Have No Basis in Law and the Factual pleadings are Conclusory in Nature**

Rule 91a, Tex. R. Civ. Proc., provides:

> **"(A) party may move to dismiss a cause of action on the grounds that it has no basis in law or in fact. A cause of action has no basis in law if the allegations, taken as true, together with the inferences reasonably drawn from them, do not entitle the claimant to the relief sought."**

**1. Tortious Interference with Existing and Prospective Patients and Exemplary Damages**

The elements of tortious interference with an existing business relationship "are (1) the existence of a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damages, and (4) actual damage or loss occurred." *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 939 (Tex.1991); *see Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex.1993).

"To establish ... tortious interference with prospective business relationships, a plaintiff must show that (1) there was a reasonable probability that the parties would have entered into a business relationship; (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Plotkin v. Joekel*, 304 S.W.3d 455, 487 (Tex. App.-Houston [1st Dist.] 2009, pet. denied) (quoting *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)); *see Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). Independently tortious means "conduct that would violate some other recognized tort duty." *Sturges*, 52 S.W.3d at 713.

All of Plaintiff's allegations regarding his claim for tortious interference with existing business and prospective patients, if taken as true, do not entitle Plaintiff to the relief he seeks because as to Brewer, Plaintiff fails to allege, and there are no facts which support: 1) the existence of a contract which is subject to interference; 2) that there was a reasonable probability that the Plaintiff and these prospective patients would have entered into a doctor-patient relationship; or 3) that Brewer committed an independently tortious or unlawful act that prevented the doctor-patient relationship from occurring. Plaintiff alleges generally that Defendants interfered with Plaintiff's relationships with patients and referring physicians; however, Plaintiff alleges no specific tortious or unlawful conduct against Brewer which, if true, constitutes tortious interference with Plaintiff's ability to enter into a relationship with patients and referring physicians, nor does Plaintiff allege that he is under a current contract with any patients or physicians with which Brewer could interfere, nor has Plaintiff alleged any facts which support a finding that there was a *reasonable probability* that Plaintiff would have entered into said relationships, but for Brewer's conduct. Because Plaintiff cannot establish elements essential to his claim for tortious interference with existing and prospective patient relations, Plaintiffs claims for the same should be dismissed; further, without proof of tortious interference, Plaintiff's claim for exemplary damages must be denied as well.

Alternatively, Plaintiff's claim should be dismissed because a hospital, through its agents, has a duty to engage in peer review of its physicians. *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 347 (5th Cir. 2002). Thus, any contractual interference caused by Brewer/s exercise of this right with respect to Plaintiff was justified. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex.1996) ("A party is justified in interfering with another's contract if it exercises (1) its own legal rights or (2) a good faith claim to a colorable

legal right, even though that claim ultimately proves to be mistaken."); *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 347 (5th Cir. 2002).

## 2. Defamation Per Se

Defamation is a false statement about a plaintiff published to a third person without legal excuse which damages the plaintiff's reputation. *Doe v. Mobile Video Tapes, Inc.*, 43 S.W.3d 40, 48 (Tex. App.-Corpus Christi 2001, no pet.); *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.) To be considered defamation per se, the statement must (1) impute the commission of a crime; (2) impute contraction of a loathsome disease; (3) cause injury to a person's office, business, profession, or calling; or (4) impute sexual misconduct. Goodman, 50 S.W.3d at 140. Whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court. *Musser v. Smith Protective Serv., Inc.*, 723 S.W.2d 653, 654–55 (Tex.1987); *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.).

If particular language alleged to be defamatory may, or may not, be so, according to other facts or circumstances, then an innuendo is required in order to tender as an issue the fact that the words conveyed to hearers the defamatory meaning. *Montgomery Ward & Co. v. Peaster*, 178 S.W.2d 302, 305 (Tex. Civ. App.—Eastland 1944, no writ). Consequently, innuendo should never be considered when interpreting *defamation per se*. The very definition of "*per se*," "in and of itself," precludes the use of innuendo. *Moore v. Waldrop*, 166 S.W.3d 380, 386 (Tex. App.—Waco 2005, no pet.) If the statement, taken by itself and as a whole, is defamatory, it will require no extrinsic evidence to clarify its meaning; it will stand alone. *Burnaman v. J.C. Penney Co.*, 181 F.Supp. 633, 636–37 (S.D.Tex.1960); *Moore v. Waldrop*, 166 S.W.3d 380, 386 (Tex. App.—Waco 2005, no pet.).

Plaintiff's Second Amended Original Petition now alleges that the so-called defamatory statement Brewer made against Plaintiff was actually not a statement at all concerning Plaintiff, but innuendo, an order calling for a change in attending physician to Defendant Brewer followed by the words "Consult Dr. Stevenson." Allegedly, by publishing this is one patient's medical record, this was tantamount to a defamatory per se statement against the Plaintiff. Clearly, this is nothing but innuendo and is certainly not a particular statement against the Plaintiff. Again, when innuendo is required to determine whether a particular statement is in fact defamatory, then the Plaintiff is prevented from prevailing on his claim for defamation *per se*. Plaintiff's defamation *per se* claim should be dismissed accordingly.

### 3. Malice

Plaintiff claims that he is entitled to exemplary damages for his claims for tortious interference and defamation *per se* under Tex. Civ. Prac. & Rem. Code § 41.007 because Brewer's conduct involved an "extreme degree of risk considering the probability and magnitude of the potential harm to others." *Pl. Pet. p. 7*. Tex. Civ. Prac. & Rem. Code §41.007 does not entitle Plaintiff to exemplary damages, as § 41.007 only provides that "[p]rejudgment interest may not be assessed or recovered on an award of exemplary damages." Therefore, taking all Plaintiff's allegations as true, Plaintiff is not entitled to exemplary damages under § 41.007, Tex. Civ. Prac. & Rem. Code.

Moreover, even if the Court allows Plaintiff to correct, what may be a typographical error in the statute cited, Plaintiff's claim for exemplary damages for *Malice* fails because Plaintiff does not allege that Brewer acted with malice, which means "a specific intent by the defendant to cause substantial injury or harm to the claimant;" rather, Plaintiff alleges that Brewer acted with an extreme degree of risk, considering the probability and magnitude of the potential harm to

others, which is an element of gross negligence. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998) ("Gross negligence includes ... viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others.") However, Plaintiff does not allege that Brewer was grossly negligent, and cannot establish that he is entitled to exemplary damages for malice based on the allegations contained in Plaintiff's Original Petition. Accordingly, Plaintiff's claim for exemplary damages should be dismissed.

**4. Business Disparagement**

To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex.1987); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003). Actual malice is not ill will; it is the making of a statement with specific intent/knowledge that it is false, or with reckless disregard of whether it is true. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 328 (1974). "Reckless disregard" is defined as a high degree of awareness of probable falsity, for proof of which the plaintiff must present "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, (1968). An error in judgment is not enough. *See Time, Inc. v. Pape*, 401 U.S. 279, 290, (1971); *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989). Furthermore, a plaintiff cannot rely on a statement of opinion to support its business disparagement claim because such statements are constitutionally protected. *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989).

Plaintiff's pleadings, even if taken as true, do not entitle Plaintiff to the relief sought for business disparagement. As addressed above, Plaintiff makes no specific allegations that Brewer published any false, defamatory statement regarding Plaintiff's business. Plaintiff's conclusory allegations that Brewer made charges of incompetent patient care, evidently by innuendo, and started a whisper campaign without any supporting facts to not refer business to Plaintiff does not support a claim for business disparagement. A whisper campaign not to refer patients to Plaintiff, taken as true, does not imply that false statements were made about Plaintiff in the alleged "whisper campaign," and to the extent any charges were brought by Brewer against Plaintiff were brought as part of a medical peer review process which is protected under the TCPA, and the privileges and immunities as set forth in the Texas Occupations Code, §§160.001 et seq., 160.010(and especially subsection (c) of that section), and 161.001 et seq., the Texas Health & Safety Code, §161.001 et seq., and 161.033, and the Federal Health Care Quality Improvement Act, 42 U.S.C., §11101 et seq. Furthermore, Plaintiff fails to allege or establish that Brewer's statements caused Plaintiff special damages. Proof of special damages is an essential part of the plaintiffs' cause of action for business disparagement. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987). The requirement goes to the cause of action itself and requires that plaintiff "establish pecuniary loss that has been realized or liquidated as in the case of specific lost sales." W. Keeton, Prosser and Keeton on the Law of Torts, § 128 at 971 (5th Ed.1984); *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987). While Plaintiff generally alleges that Defendants took the action(s) to harm Plaintiff's business interests and the alleged Defamation per se caused between $1,000,000.00 and $6,500,000.00 in damages; this is insufficient to establish special damages under a claim for business disparagement as such a claim is still wholly conclusory, not supported by any facts as to the number of patients,

estimated or otherwise, and the amount lost per patient. Plaintiff claims this goes back to 2007 or 2008, which would mean, even if true, most of these claim would be barred by limitations and improper anyway. Regardless, Plaintiff's claim for business disparagement should be dismissed.

Additionally, Plaintiff's claim for business disparagement must be dismissed because the Texas Medical Practice Act ("TMPA") affords immunity from civil liability to peer-review participants when they act "without malice and in the reasonable belief that the action or recommendation is warranted by the facts known to that person." Tex. Occ. Code § 160.010(a)(2). Plaintiff's allegations against Brewer concern his actions as a peer-review participant, and peer-review participants are always presumed to have acted without malice. Benson v. St. Joseph Reg'l Health Ctr., 575 F.3d 542, 545 (5th Cir. 2009). To overcome the presumption, a plaintiff bears the burden of proving the contrary by clear and convincing evidence. *Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 545 (5th Cir. 2009). Plaintiff's conclusory allegation that Defendants acted with malice falls far short of the clear and convincing evidence standard required to establish this element and no facts alleged support his allegation of malice. Accordingly, Brewer should be found immune from Plaintiff's business disparagement claim, and it should be dismissed.

## 5. Restraint of Trade

Initially, Brewer would re-assert its argument that Plaintiff's claims must be dismissed because the Texas Medical Practice Act ("TMPA") affords immunity from civil liability to peer-review participants when they act "without malice and in the reasonable belief that the action or recommendation is warranted by the facts known to that person." Tex. Occ. Code § 160.010(a)(2). Plaintiff's allegations against Brewer concern his actions as a peer-review participant, and peer-review participants are always presumed to have acted without malice.

*Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 545 (5th Cir. 2009). To overcome the presumption, a plaintiff bears the burden of proving the contrary by clear and convincing evidence. *Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 545 (5th Cir. 2009). As discussed above, Plaintiff's Petition fails to allege facts sufficient to entitle him to a finding of malice against Brewer, much less evidence of the clear and convincing burden. The Plaintiff has attached his own affidavit in response to the Defendant's Motion to Dismiss. As is noted below, the affidavit is conclusory in nature and legally insufficient to defeat this motion. Accordingly, Brewer is immune from Plaintiff's Restraint of Trade claim, and it should be dismissed.

Further, Plaintiff's conclusory allegations that Defendants referred patients to a hospital-owned practice to obtain market dominance in the nephrology practice in Tom Green and contiguous counties, coupled with Plaintiff's failure to allege that he suffered an antitrust injury do not entitle Plaintiff to relief under a Texas Antitrust Act.

The Texas Antitrust Act provides, in relevant part, that "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful," and that "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." Tex. Bus. & Com. Code Ann. § 15.05(a), (b) (Vernon 2002). To establish that a defendant contracted, combined, or conspired in restraint of trade in violation of the Texas Antitrust Act, a plaintiff must show that the alleged contract, combination, or conspiracy is unreasonable and has an adverse effect on competition in the relevant market. *See Winston v. Am. Med. Int'l*, 930 S.W.2d 945, 951–52 (Tex. App.-Houston [1st Dist.] 1996, writ denied). The Texas Antitrust Act does not prohibit all restraints of trade; instead, it prohibits only those that restrain trade unreasonably. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex.1990).

Courts have generally been reluctant to hold that a group of physicians who decide that they do not want to refer patients to a particular physician, because they doubt his qualifications, have committed a violation of the Sherman Act (the Federal equivalent of the Texas Act). Because actions on the part of hospitals and physicians, which might resemble group boycotts, may well be mandated by an ethically grounded concern for patients' well-being ... such behavior, in the medical service industry, should be analyzed in terms of the rule of reason. *Marlin v. Robertson*, 307 S.W.3d 418, 428-29 (Tex. App.—San Antonio 2009, no pet.) *Pontius v. Children's Hosp.*, 552 F.Supp. 1352, 1370 (W.D.Pa.1982); *see also Jackson v. Radcliffe*, 795 F.Supp. 197, 205 (S.D.Tex.1992) (applying rule of reason to physician's contention that termination of his contract with hospital was illegal restraint of trade); *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 708-09 (4th Cir.1991) (analyzing denial or revocation of medical staff privileges under rule of reason); *Marin v. Citizens Mem'l Hosp.*, 700 F.Supp. 354, 360 (S.D.Tex.1988) (applying rule of reason to physician's claim that hospital for which he worked and its medical staff formed group boycott to reduce or eliminate his competitive potential).

Furthermore, a plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic injury. *Oksanen*, 945 F.2d at 708. For example, the fact that a hospital's decision caused a disappointed physician to practice medicine elsewhere does not of itself constitute an antitrust injury. *Id.* "If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action." *Id.* "To keep the antitrust laws from becoming so trivialized, the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Id.* The fact that a competitor's income may have been reduced by someone's conduct, does not mean that

competition was impermissibly restrained in the relevant market. *Rea v. Hosp. Corp. of Am.*, 892 F. Supp. 821, 834 (N.D. Tex. 1993) *aff'd in part, rev'd in part sub nom. Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383 (5th Cir. 1996). To meet its burden, a plaintiff must prove what market it contends was restrained and how the defendants played a significant role in the relevant market. *Id.* at 709. Absent this market power, any restraint on trade created by the defendants' actions is unlikely to implicate Texas Antitrust Act section 15.05(a). *See Marlin v. Robertson*, 307 S.W.3d 418, 429 (Tex. App.—San Antonio 2009, no pet.) "There must be evidence of 'demonstrable economic effect' not just an inference of possible effect." *Coca–Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 689 (Tex.2006).

Plaintiff's allegations, even if taken as true, do not entitle him to a relief under the Texas Antitrust Act, as his conclusory allegations without factual support do not demonstrate that Brewer's actions played a significant role in the affectation of the nephrology market in Tom Green and contiguous counties or that Plaintiff suffered an antitrust injury from Brewer's actions. In fact, Plaintiff's allegations demonstrate that Plaintiff maintains his own medical practice with a dialysis unit capable of serving 24 patients per shift. (Pl. Sec. Amd. Orig. Pet. p. 2). Any patient who wishes to use Plaintiff is still able to seek out his services. *See Nafrawi v. Hendrick Med. Ctr.*, 676 F. Supp. 770, 774-75 (N.D. Tex. 1987) (holding that there was no antitrust violation by a hospital that denied a doctor staff privileges when the doctor maintained full privileges at a comparable facility, any patient who wishes to use his services could still seek out his services, and even if he no longer practiced medicine at all, patients in the relevant market could still obtain services identical to those he provided.) Therefore, Plaintiff's claim for restraint of trade should be dismissed.

## 6. Civil Conspiracy

The Plaintiff has alleged, again only with conclusory statements, that the Defendants are jointly and severally liable for the Plaintiff's damages as their actions were a civil conspiracy. Again, these claims are without legal or factual basis. Legally, an entity cannot conspire with itself. *Fojtik v First Nat'l Bank of Beeville*, 752 S.W.2d 669 (Tex. App. – Corpus Christi 1988, writ denied) and *Heafner & Assoc. v. Koecher*, No. 01-91-01075-CV, 1994 WL 389030, (Tex. App. – Houston[1st] July 28, 1994, writ denied) (unpublished). In *Fojtik*, the court held that "a corporation cannot conspire with itself, no matter how many of its agents may participate in the corporate action." *Id.* at 673. The Koecher court, citing Fojtik, supra, stated that "[W]here all the people involved in an alleged conspiracy are employees of the corporation and acting in that capacity and within the scope of their authority, as a matter of law, there is no conspiracy, because a corporation cannot conspire with itself." *Id.* at *6. See also Tex-Ohio Gas, Inc. v. Mecom, 28 S.W.3d 129, 138 (Tex. App.- Texarkana 2000, no pet.) (An entity cannot conspire with itself).

Here, the only allegation is that the entity Defendant, San Angelo Community Medical Center, conspired with its Chief of Staff, Defendant Brewer, to carry out improper and illegal acts. They do not allege that Defendant Brewer was acting in any other capacity and even if not Chief-of Staff, he was still a staff physician at all times relevant to the Plaintiff's claims. Notwithstanding the wholly conclusory allegations devoid of factual basis, as a matter of law there can be no conspiracy. Such claims should be in all things dismissed.

### IV. Objections to Affidavit of Plaintiff Montoya

Attached to the Plaintiff's response to the motion to dismiss is the Plaintiff's affidavit. The Defendant objects to the affidavit both generally and specifically.

**General Objection** – The Defendant generally objects to the affidavit of Dr. Montoya as it is wholly conclusory both legally and factually, clearly not based on personal knowledge in a number of instances, assumes a number of facts beyond his personal knowledge and is simply a sworn repetition of the allegations in the pleadings. See *Brookshire Katy Drainage Dist. v. Lily Gardens, LLC*, 333 S.W.3d 301, 308 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). (An affidavit that is nothing more than a sworn repetition of the allegations in the pleadings is conclusory and has no probative force). "Affidavits consisting only of conclusions are insufficient to raise an issue of fact." *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984). To avoid being conclusory, statements need factual specificity such as time, place, and the exact nature of the alleged facts. *Id.*

**Specific Objections** – The Defendant specifically objects as follows:

Paragraph No. 1 – The Defendant objects as it improperly sets out conclusory legal opinions concerning what the case is not about and about fiduciary duties owed.

Paragraph No. 3 – The Defendant objects to Paragraph 3 in its entirety as Dr. Montoya signed the affidavit on January 4, 2016, yet sent a letter on December 10, 2015, to Defendant Brewer, which is attached hereto as Exhibit "A" to the Brewer affidavit which controverts this paragraph and is therefore, unreliable.

Paragraph No. 5 – The Defendant objects as it includes conclusory statements as to what Defendant Brewer did or did not do and contains further conclusory statements.

Paragraph No. 6 – The Defendant objects as wholly conclusory, both factually and as to the legal effect of the supposed change of consult. The Plaintiff's claims as to what Defendant Brewer was aware of or knew, is speculative and conclusory and self-serving. The claim of a

whisper campaign is vague and indefinite and unclear of just what is meant, besides being devoid of fact and simply conclusory.

Paragraph No. 8 – Defendant objects as this is conclusory without any factual basis.

Paragraph No. 9 – Defendant objects as this is conclusory and self-serving.

Paragraph No. 10 – The Defendant objects as wholly conclusory, both factually and as to the legal effect of the supposed change of consult. The Plaintiff's claims as to what Defendant Brewer was aware of or knew, is speculative and conclusory and self-serving.

Paragraph No. 11 – The Defendant objects as wholly conclusory, both factually and as to the legal effect of what Defendant Brewer must or must not do and that somehow it was Dr. Brewer who was legally responsible for any loss of patient referral.

Paragraph No. 12 – The Defendant objects as hearsay without exception under TRE 803. Simply because it is in a vague affidavit form does not excuse it from hearsay.

Paragraph No. 13 – The Defendant objects as hearsay without exception.

Paragraph No. 14 – The Defendant objects as wholly conclusory, both factually and as to the legal rights of a patient.

Paragraph last, no number – The Defendant objects as wholly conclusory, both factually and as to the legal effect of alleged supervision and control of Dr. Brewer and the defamatory legal effect of their alleged actions.

## V. Conclusion and Prayer for Relief

WHEREFORE, premises considered, there being no legal and no factual bases for the causes of action pleaded against Brewer, this Defendant respectfully prays that his amended motion be granted, that all the causes of action asserted against Brewer be dismissed and for costs and reasonable and necessary attorney's fees, all as provided under Rule 91a, Tex. R. Civ.

Proc. and Tex. Civ. Prac. & Rem. Code §§ 27.001, *et. seq.* Alternatively, Defendant requests that the court dismiss such causes of action that the court finds proper and award such fees and costs as appropriate for each cause of action dismissed. Attached hereto as Exhibit "2" is the affidavit of Robert Wagstaff on the attorneys' fees issue.

Further, Brewer respectfully prays that the motion be granted within 45 days after the date of the filing of his original motion to dismiss, as required by Rule 91a.3, Tex. R. Civ. Proc.

Respectfully submitted,

MCMAHON SUROVIK SUTTLE, P.C.
400 Pine Street, Suite 800
Abilene, Texas 79601-5140
(325) 676-9183 (Phone)
(325) 676-8836 (Fax)


By: /s/ Robert B. Wagstaff
Robert B. Wagstaff
State Bar No. 20665000
rwagstatff@mcmahonlawtx.com

ATTORNEYS FOR DEFENDANT
KIRK BREWER, M.D.

## CERTIFICATE OF SERVICE

This hereby certifies that a true and correct copy of the foregoing instrument was forwarded, via e-service and e-mail, to all counsel of record on the 7th day of January, 2016.


/s/ Robert B. Wagstaff
ROBERT B. WAGSTAFF

CAUSE NO. B-150,285-C

| | | |
|---|---|---|
| STEVE F. MONTOYA, M.D., | § | IN THE 119TH DISTRICT COURT |
| WEST TEXAS RENAL CARE, and | § | |
| WEST TEXAS NEPHROLOGY, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| VS. | § | OF |
| | § | |
| SAN ANGELO COMMUNITY MEDICAL | § | |
| CENTER and KIRK BREWER, M.D. | § | |
| | § | |
| *Defendants.* | § | TOM GREEN COUNTY, TEXAS |

## AFFIDAVIT OF KIRK BREWER, M.D.

STATE OF TEXAS        §

COUNTY OF TOM GREEN        §

BEFORE ME, the undersigned authority, personally appeared Kirk Brewer, M.D., who, after being duly sworn upon his oath stated as follows:

"My name is Kirk Brewer, M.D. I am over the age of eighteen (18) years, have never been convicted of a crime, and I am otherwise qualified to make this affidavit. I am a Defendant in the above-styled cause and as such, I have personal knowledge of the following and it is true and correct.

Since 2004, I have been on staff as a physician with San Angelo Community Medical Center. I have served as Chief of Staff from January of 2013 to December of 2014. I am employed by Community Medical Associates and have been since 2004. I have reviewed Plaintiffs' Second Amended Original Petition and the Plaintiff's Response to the Motion to Dismiss, along with the attached Affidavit of Dr. Montoya.

While it is unclear what is meant by a so-called "whisper campaign," such claims are simply false. Further, any discussions I have had concerning Dr. Montoya, regardless of the context, have been within the hospital, and either directly concerning patient care and/or associated with the peer review process. While I was Chief of Staff, generally Dr. Hardwicke would have been the doctor overseeing direct peer review issues, if any, of Dr. Montoya.

EXHIBIT 1

**Dr. Brewer Affidavit — Page 2 — January 7, 2016**

Under the hospital by-laws, an emergency room physician is not required to call the on-call physician, nor is there a rotating share of referrals as claimed by Dr. Montoya. There is simply a rotating list of doctors who are required to be available for emergency consult. There has certainly been no covert or overt attempt to reduce or even eliminate referrals to Dr. Montoya.

Finally, attached hereto as Exhibit "A" to my affidavit, is a true and correct copy of a letter I received from Dr. Montoya dated December 10, 2015, concerning recent referrals of patients to him."

Further Affiant Saith Not.

Kirk Brewer, M.D.

SWORN TO AND SUBSCRIBED TO BEFORE me on this ⁊ day of January, 2016.

Notary Public, State of Texas

Joe Huerta
Notary Public, State of Texas
My Commission Expires 06-21-2019

139

## WEST TEXAS NEPHROLOGY ASSOCIATES
### STEVE F. MONTOYA, JR., M.D.

136 East Concho
San Angelo, Texas 76903-5947

3501 Executive Drive
San Angelo, Texas 76904-6683

December 10, 2015

Dear Dr. Kirk Brewer,

As a staff physician at SACMC, I have noticed that my referral of patients from the ER and consults from the hospitalist service has increased. I therefore would like to address the following questions to the MEC:

1. Has there been a change in the admission policies in the ER.
2. Has there been a change in the referral patters of the hospitalist.
3. Is the hospital going to adopt the same policy as the CMA clinic of "not tolerating anti-competitive behavior".

Respectfully,

Steve F. Montoya, Jr., M.D.

P (325) 653.6773    F(325) 653-3849    e sfm2000@wtkidney.net

p.2                326-942-0513                                    Microsoft        Jan 06 16 03:26p

## EXHIBIT A

CAUSE NO. B-150,285-C

| | | |
|---|---|---|
| STEVE F. MONTOYA, M.D., | § | IN THE 119TH DISTRICT COURT |
| WEST TEXAS RENAL CARE, and | § | |
| WEST TEXAS NEPHROLOGY, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| VS. | § | OF |
| | § | |
| SAN ANGELO COMMUNITY MEDICAL | § | |
| CENTER and KIRK BREWER, M.D. | § | |
| | § | |
| *Defendants.* | § | TOM GREEN COUNTY, TEXAS |

## AFFIDAVIT OF ROBERT B. WAGSTAFF

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF TAYLOR | § |

BEFORE ME, the undersigned authority, personally appeared Robert B. Wagstaff, who, after being duly sworn upon his oath stated as follows:

"My name is Robert B. Wagstaff. I am over the age of eighteen (18) years, have never been convicted of a crime, and I am otherwise qualified to make this affidavit. I am the attorney of record for Defendant Kirk Brewer, M.D. in the above-styled cause and as such, I have personal knowledge of the following and it is true and correct.

I am a 1989 graduate of Texas Tech School of Law and have been licensed to practice in Texas since November of 1989. I am also licensed to practice in all four U.S. District Courts in Texas and before the Fifth Circuit Court of Appeals. I have handled civil litigation cases in Tom Green County since 1996. I am board certified in Personal Injury Trial Law by the Texas Board of Legal Specialization (since 1995) and as a Civil Trial Advocate by the National Board of Trial Advocacy (since 2001). As such, I am familiar with the prosecution and defense of cases such as this and what is reasonable and necessary for attorneys' fees and expenses. Further, I am familiar with the case law and Texas Disciplinary Rules of Professional Conduct concerning reasonable and necessary attorneys' fees and expenses. In reaching my opinions, I considered the various factors as required in making my determination, including the complexity of the

EXHIBIT 2

matter, the amount of damages claimed, all lawyers involved on all sides, the time and skill required, my ability and reputation, and also the experience of my partner, Jessica Haile, who has assisted in the case. I believe that a reasonable and necessary hourly rate for this type of work in a civil defamation/business interruption case in Tom Green County is no less than $250.00 per hour. We have expended a total of 26.8 hours in this case through the filing of the amended motion to dismiss. It is anticipated that an additional 5 hours will be spent traveling to and from San Angelo and arguing the motion to dismiss, plus reasonable and necessary expenses. Accordingly, it is my opinion that the reasonable and necessary attorneys' fees and expenses for Defendant Brewer through January 7, 2016, are $6700.00 and likely an additional $1250.00 through the hearing plus $89.64 in expenses.

Finally, the work on each cause of action has been so intertwined as to be difficult to separate one cause from the other. As such, it is my opinion that the entire fees should be awarded if one or more causes of action are dismissed."

Further Affiant Saith Not.

Robert B. Wagstaff

SWORN TO AND SUBSCRIBED TO BEFORE me on this 7th day of January, 2016.

Notary Public, State of Texas

AMANDA LIVEZEY
Notary Public, State of Texas
NOTARY ID # 10240410
My Commission Exp 07-15-19

142

# TAB NO. 5

Filed for Record
1/4/2016 3:52:21 PM
Sheri Woodfin, District Clerk
Tom Green County, Texas

CAUSE NO. B-15-0285-C

| | | |
|---|---|---|
| STEVE F. MONTOYA, JR., M.D. | § | IN THE DISTRICT COURT OF |
| WEST TEXAS RENAL CARE | § | |
| WEST TEXAS NEPHROLOGY | § | |
| | § | |
| VS. | § | 119th JUDICIAL DISTRICT |
| | § | |
| SAN ANGELO COMMUNITY | § | |
| MEDICAL CENTER AND | § | |
| KIRK BREWER, M.D. | § | TOM GREEN COUNTY, TEXAS |

## RESPONSE TO MOTION TO DISMISS

COMES NOW, Dr. Montoya, Plaintiff and responds to the Motion to Dismiss by Defendant Kirk Brewer, M.D.

1. The Motion to Dismiss is based upon Texas Anti-Slapp Statute, Chapter 27 Actions invoking the exercise of certain Constitutional Rights.

2. No affidavits are attached to the Motion.

3. Attached hereto is the affidavit of Dr. Montoya as evidence in support of his response.

4. The purpose of this lawsuit has nothing to do with the Defendants Constitutional Rights to speak freely, associate freely and participate in governmental as permitted by law. These are the requirements to meet in filing a Motion under the Anti-Slapp Statute *Tex.C.P.R.C.§27.005(b)* and as set out in *Paulsen v. Yarrell 455 SW3d 192 (Tex.-App.-Houston [1st Dist.] 2014, no pet.)* (quoting *In Re Estate of Check 438 SW3d at 836*).

5. The evidence presented by Dr. Montoya is that this case deals with the same standard as setforth in the recent Texas Supreme Court of *In Re Memorial Herman Hospital et al 464 SW3d 686 2015.* This case is on concerning anti-trust, business damages and a campaign to stop competition by Dr. Montoya at San Angelo Community Medical Center.

6. The Texas Supreme Court agreed that clear and specific evidence under the Texas Statute includes relevant circumstantial evidence. *(In Re Lipsky, 2015 WL1870073).* This evidence of Dr. Montoya meets the standard.

7. In this case the evidence is both direct, actual and circumstantial. The pleadings and affidavit of Dr. Montoya prove that his case is real and not a continually protected case.

94

8. The remaining part of the Motion under TRCP 91a is really a Special Exception. These have been answered by Plaintiff's Amended Petition filed pursuant to the Order on Special Exceptions.

Plaintiff requests attorney fees and costs be awarded for having to respond to this frivolous motion.

Respectfully Submitted

Paul Craig Laird II Law Firm, PLLC

/s/ Paul Craig Laird II
By: Paul Craig Laird II
800 W. Airport Freeway
Suite 880 LB 6015
Irving, TX 75062
972-554-0929
214-260-4935- fax
pcl880@aim.com
SBOT 11795420
Attorney for Plaintiff

STATE OF TEXAS　　　　§
　　　　　　　　　　　§　　　　AFFIDAVIT
COUNTY OF TOM GREEN §

　　　　BEFORE ME the undersigned authority appeared Steve F. Montoya, Jr. M.D. and after being duly sworn under oath stated.

　　　　"My name is Steve F. Montoya, Jr. M.D. I am the Plaintiff in this case. I have knowledge of all the facts of this affidavit as Plaintiff and all facts are within my personal knowledge true and correct and that I was involved with facts stated.

　　　　I have not used any patient name, except where authorized by the patient or their agent, to avoid any HIPAA or privacy violation.

1. I was admitted to practice nephrology at San Angelo Community Medical Center in 1981. I have full staff privileges for the practice of nephrology at San Angelo Community Medical Center. This case does not involve the rights of Defendant Kirk Brewer, M.D. to speak freely, associate freely, and participate in government as permitted by law. The facts of the case are that Kirk Brewer, M.D. was during his actions an officer and/or Chief of Staff of the medical staff of San Angelo Community Medical Center. Kirk Brewer, M.D. was hired by San Angelo Community Medical Center to run the hospitalist service. As an officer of the staff and Chief of Staff Kirk Brewer, M.D. owed me a member of the staff a fiduciary duty to not interfere by direct or indirect action with my practice of nephrology at San Angelo Community Medical Center.

2. Kirk Brewer, M.D. came to San Angelo Community Medical Center in 2007. Part of my practice and obtaining patients is that the hospital emergency room uses a rotating system of specialists admitted in that practice to see patients in the hospital and emergency room. When you are the named specialist you receive a call from the emergency room physician that a doctor with your specialty is needed for a patient. A big part of my practice was obtaining new patients and treating existing patients that came to the emergency room and needed a nephrologist. Since 1981 I have gotten new patients from the emergency room.

3. Until 2007 I would receive 10-20 calls from the emergency room, per month to treat either new or existing patients at the San Angelo Community Medical Center. Since 2008 I have received only one call from the emergency room or a hospitalist for consultation as a nephrologist, except for one time for treatment of a new patient or existing patient that suffered with kidney problems.

4. The one time for a new patient is described below. On January 24, 2014 I was called by the San Angelo Community Medical Center emergency room physician on duty and the hospitalist Dr. Bartels. Dr. Bartels and the emergency room physician informed me that a patient was diagnosed with acute renal failure. I was informed my name was on the call board in the emergency room as nephrologist on call. Both of the above doctors asked me to consult concerning treatment for that patient. I gave my initial consult advice/orders of treatment to both doctors. This consultation call was to me at 9:38 p.m. I informed them I would come see the patient and then review the test results and determine any additional treatment for the patient. Attached as Exhibit A is a true and correct copy of the redacted hospital record showing the facts on January 24, 2014.

5. On January 25, 2014 at 8:10 a.m. Kirk Brewer, M.D. took over the hospitalists care of the patient as his rotation as the hospitalist started. Then without ever seeing the patient or the chart Kirk Brewer, M.D. cancelled my consult and treatment by me and consulted another nephrologist. The nephrologist he brought in for consult is one that is in a group that Kirk Brewer, M.D. has a contract for paid services. Kirk Brewer, M.D. without seeing the patient, or chart changed the patient's doctor. This change of nephrologist was for Kirk Brewer, M.D.'s economic gain and caused me economic loss. Attached as Exhibit B is a true and correct copy of the redacted hospital record showing the facts on January 25, 2014.

6. Kirk Brewer, M.D. by his actions of removing me as the nephrologist published a statement that I was not a competent nephrologist to treat patients coming to the San Angelo Community Medical Center emergency room. Kirk Brewer, M.D. was aware that his actions would become known to the staff physicians of San Angelo

97

Community Medical Center and that he was by conduct and a whisper campaign saying I should not be allowed to treat patients at San Angelo Community Medical Center.

7. The statements and actions of Kirk Brewer, M.D. were published by his conduct. The actions were referring to me as a non-competent nephrologist. The statement(s) were defamatory and caused me economics loss.

8. The total loss is between $1,000,000.00 and $6,500,000.00 from not receiving any referrals from the emergency room or hospitalists.

9. The defamatory statements are untrue. I am a competent and qualified nephrologist to treat patients at San Angelo Community Medical Center.

10. The actions of Kirk Brewer, M.D. were intentional or done with negligence when Kirk Brewer, M.D. knew that the statement was false and his actions would lead a reasonable prudent physician or patient knowing/believing of its defamatory potential.

11. As officer and as President of the medical staff Kirk Brewer, M.D. must follow the rules at San Angelo Community Medical Center and staff of San Angelo Community Medical Center and have a new patient in the emergency room or hospital that needs a specialist consultation assigned to the name off the rotating consultation list. By Kirk Brewer, M.D. not following this procedure I did not receive any consultation requests from the emergency room or hospitalist at San Angelo Community Medical Center in 2008-present and one in 2014.

12. Attached to this affidavit as Exhibit C is the true and correct sworn statement that an existing patient of mine Mrs. Welch tried to see me in the emergency room of San Angelo Community Medical Center and that the emergency room would not call me to treat my existing patient Mrs. Welch is over 90 years of age and I have treated her for at least 20 years.

98

13. Another patient of mine, whose name is withheld per privacy rights, who is also over 90 years of age and has been my patient for at least 10 years requested me when she went to the emergency room and she also was refused to see me.

14. A patient has the absolute right to be treated by their physician. Both of the above happened when Kirk Brewer, M.D. was President of the medical staff or an officer of the medical staff and when he was head of the hospitalist service when the above happened.

Again by the actions of the hospitalists and emergency room physicians who are controlled by their supervisors or lead physicians Kirk Brewer, M.D. through this actions defamed me as a qualified physician or staff at San Angelo Community Medical Center.

Further affiant saith not.".

Signed this 4th day of January, 2016.



Steve F. Montoya, Jr., M.D.

Subscribed and sworn to me the undersigned notary by Steve F. Montoya, Jr., M.D. on the 4th day of January, 2016.

Notary Public

DALILA CRUZ
MY COMMISSION EXPIRES
May 15, 2018

Exhibit 4

| ALLERGIES & SENSITIVITIES | ☐ No Known Allergies | WEIGHT | ☐ lb ☐ kg | HEIGHT | ☐ in ☐ cm |
|---|---|---|---|---|---|
| DRUG | REACTION | DRUG | | REACTION | |

| 1. | | 4. | |
| 2. | | 5. | |
| 3. | | 6. | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

### COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM!

| Date | Time | ☒ Admit to Inpatient Status | UNIT (check one): |
|---|---|---|---|
| | | ☐ Place in Observation Status | ☐ Med/Surg ☐ Med-Telemetry ☐ ICU ☐ OB/L&D |
| | | ☐ Place in Outpatient Status | ☒ Other _____ |

Dr. Bartels

Stable

1) Acute Renal Failure

2) Hypertensive Malaria

3) — yo Anemia

vi John g yo

bed rest

I/o q shift

foley to gravity

ABA 1800 Kcal / cardiac diet

IV heplock

Protonix 40 mg IV Q 24°

Lasix 40 mg 5 mg Q 24°

BMP Magnesium at 9PM 1/24 / 13 report to P.

CBS BMP, Magnesium in AM

Consult Dr. Montoya

Faxed
1/24 1958

√ do Dr. Bartels

1/24/14   7:20 PM

Physician Signature ___ Date ___ Time ___



| ALLERGIES & SENSITIVITIES | ☐ No Known Allergies | WEIGHT:_____ ☐ lb ☐ kg | HEIGHT:_____ ☐ in ☐ cm |
|---|---|---|---|
| **DRUG** | **REACTION** | **DRUG** | **REACTION** |
| 1. | | 4. | |
| 2. | | 5. | |
| 3. | | 6. | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

| Date | Time | COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM! | |
|---|---|---|---|
| | | ☐ Admit to Inpatient Status<br>☐ Place in Observation Status<br>☐ Place in Outpatient Status | UNIT *(check one):*<br>☐ Med/Surg  ☐ Med-Telemetry  ☐ ICU  ☐ OB/L&D<br>☐ Other _____ |

1/25/14 236  Lovenox 30 mg SC q 24°

Barely

faxed + noted 1/25/14 0240 Per Chan...

1/25/14 0810 Change Attending to Dr Brewer
Consult Dr Stevenson Consult called
Kayexelate 30 Gm PO x 1 Now
A Status to PCU
TO c Read Back Dr Brewer / ... / Rowland R...

FAXED

Physician Signature _____   Date _____   Time _____

Physician Admission Orders
NS-2701-10HMS    10/10  (Rev. 07/12)    Page 1 of 1

SAN ANGELO COMMUNITY MEDICAL CTR


Exhibit B

April 17, 2014

I am Karen, Tims, the daughter of Eunice Welch. I am writing to you on her behalf concerning her admission to SACMC on 11/28/2011. When asked by the ER admission staff, we replied that "Dr. Montoya" was her doctor. We were admitted to the hospitalists' service. We do not appreciate the fact that we did not have our physician of choice at the hospital. Please correct this to help maintain quality patient care.

Sincerely,

Karen Tims

*Karen Tims*

State of _____Texas_____

County of ___Tom Green___

Subscribed and sworn to before me this __17th__ day of __April__, __2014__

*Rosemary Andros*

ROSEMARY ANDROS
My Commission Expires
August 19, 2017

Notary Public

Exhibit C 102

# TAB NO. 6

Filed for Record
1/11/2016 4:15:34 PM
Sheri Woodfin, District Clerk
Tom Green County, Texas

CAUSE NO. B-15-0285-C

| | | |
|---|---|---|
| STEVE F. MONTOYA, JR., M.D. | § | IN THE DISTRICT COURT OF |
| WEST TEXAS RENAL CARE | § | |
| WEST TEXAS NEPHROLOGY | § | |
| | § | |
| VS. | § | 119th JUDICIAL DISTRICT |
| | § | |
| SAN ANGELO COMMUNITY | § | |
| MEDICAL CENTER AND | § | |
| KIRK BREWER, M.D. | § | TOM GREEN COUNTY, TEXAS |

SUPPLEMENTAL RESPONSE TO MOTION TO DISMISS

COMES NOW, Stephen F. Montoya, Jr., M.D., Plaintiff and files this Supplemental Response to the Amended Motion to Dismiss.

1. Pursuant to T.R.C.P. 91(a)3(b) a Motion to Dismiss must be filed at least 21 days before the Motion is heard. Respondent objects to Amended Motion as not allowed without restarting the period of T.R.C.P.91(a). (T.R.C.P.91(a).5(d)) and requires the hearing be reset T.R.C.P.91(a)6. By filing the Amended Motion the Movant has waived the right to be heard.

2. Pursuant to T.C.R.C.P. Chapter 27 a Motion to Dismiss a legal action under this section must be filed not later than the 60th day after the date of service of the legal action T.C.P.R.C.§27.003(b). Respondent objects to the untimely filed affidavits and Amended Motion. The Court should strike the affidavits as untimely filed.

3. Attached to this Motion is the affidavits of John Hunt, M.D. (Exhibit 1) attached hereto as if setforth at length and a second affidavit of Plaintiff Stephen F. Montoya, M.D. (Exhibit 2) attached hereto as if setforth at length that prove the whisper campaign and that the call list is a requirement of Medicare rules and that the actions of Dr. Brewer were to hurt Dr. Montoya economically and professionally.

Prayer

The Respondent prays the Court deny the Motion to Dismiss.

177

Respectfully Submitted

Paul Craig Laird II Law Firm, PLLC

/s/ Paul Craig Laird II
By: Paul Craig Laird II
800 W. Airport Freeway
Suite 880 LB 6015
Irving, TX 75062
972-554-0929
214-260-4935- fax
pcl880@aim.com
SBOT 11795420
Attorney for Plaintiff

CERTIFICATE OF SERVICE

This is to certify that this Supplemental Response was serviced via the e-filing system on the 11th day of January, 2016.

/s/ Paul Craig Laird II

178

STATE OF TEXAS      §
                    §           AFFIDAVIT
COUNTY OF TOM GREEN §

BEFORE ME the undersigned authority appeared John Hunt, M.D. and after being duly sworn under oath stated.

"My name is John Hunt, M.D. I have knowledge of all the facts of this affidavit and all facts are within my personal knowledge true and correct and that I was involved with facts stated.

"I was on the staff of San Angelo Community Medical Center when Dr. Brewer was brought in to head up the hospitalist service and emergency room of San Angelo Community Medical Center. San Angelo Community Medical Center had a call list in the emergency room that listed on-call physicians to be referred patients. This list was kept pursuant to Medicare regulations. The list was to be followed pursuant to the Medicare regulations unless the patient requested a different physician. I learned of the whisper campaign against Dr. Montoya that he was not to be referred patients by the emergency room and hospitalist. Dr. Montoya is an independent physician. Until Dr. Brewer came to San Angelo Community Medical Center the independent physicians would receive referrals from hospitalists. Dr. Brewer lead a campaign to not use independent physicians. Independent physicians are physicians that do work for or are affiliated with the hospital owned groups.

Further affiant saith not."

Signed this 11th day of January, 2016.

_____
John Hunt, M.D.

Subscribed and sworn to me the undersigned notary by John Hunt, M.D. on the 11th day of January, 2016.

_____
Notary Public

JAMIE L. SANCHEZ
Notary Public, State of Texas
My Commission Expires
July 26, 2016

Exhibit I
179

STATE OF TEXAS §
§           AFFIDAVIT
COUNTY OF TOM GREEN §

      BEFORE ME the undersigned authority appeared Steve F. Montoya, Jr. M.D. and after being duly sworn under oath stated.

      "My name is Steve F. Montoya, Jr. M.D. I am the Plaintiff in this case. I have knowledge of all the facts of this affidavit as Plaintiff and all facts are within my personal knowledge true and correct and that I was involved with facts stated.

      I have not used any patient name, except where authorized by the patient or their agent, to avoid any HIPAA or privacy violation.

      "On January 25, 2014 at 8:10 a.m. Kirk Brewer, M.D. took over the hospitalists care of the patient referred in Exhibits A and B as his rotation as the hospitalist started. Then without ever seeing the patient or the chart Kirk Brewer, M.D. cancelled my consult and treatment and consulted another nephrologist. I went to the call board and witnessed my name on call as the nephrologist on call on January 24 and 25, 2014. The San Angelo Community Medical Center is required to have an official EMTALA Medicare call list for on call physicians for the San Angelo Community Medical Center to take Medicare patients. This is the list my name was on and was intentionally ignored. This also violates a patient's right to choose their physician. This list was followed until Dr. Brewer came to San Angelo Community Medical Center and took charge of hospitalists. The nephrologist he brought in for consult is one that is in a group that Kirk Brewer, M.D. has a contract for paid services. Dr. Brewer did not see the patient when he removed me as the treating nephrologist he issued the change via a telephone order (see Exhibit B). Kirk Brewer, M.D. without seeing the patient, or chart changed the patient's doctor. This change of nephrologist was for Kirk Brewer, M.D.'s economic gain and caused me economic loss.

      Again by the actions of the hospitalists and emergency room physicians who are controlled by their supervisors or lead physicians Kirk Brewer, M.D. through this actions defamed me as a qualified physician or staff at San Angelo Community Medical Center.

      Further affiant saith not."

Signed this 11th day of January, 2016.

                             _____
                             Steve F. Montoya, Jr., M.D.

      Subscribed and sworn to me the undersigned notary by Steve F. Montoya, Jr., M.D. on the 11th day of January, 2016.

                            _____
                            Notary Public

DALILA CRUZ
MY COMMISSION EXPIRES
May 15, 2016

180 Exhibit 2

EXHIBIT

| ALLERGIES & SENSITIVITIES | ☐ No Known Allergies | | WEIGHT ▓▓ ☐ lb ☐ kg | | HEIGHT ▓▓ | ☐ in ☐ cm |
|---|---|---|---|---|---|---|
| DRUG | REACTION | | DRUG | | REACTION | |
| 1. | | | 4. | | | / |
| 2. | | | 5. | | | |
| 3. | | | 6. | | | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

### COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM!

| Date | Time | ☑ Admit to Inpatient Status | UNIT (check one): |
|---|---|---|---|
| | | ☐ Place in Observation Status | ☐ Med/Surg   ☐ Med-Telemetry   ☐ ICU   ☐ OB/L&D |
| | | ☐ Place in Outpatient Status | ☑ Other ___ |

Dr. Bartels
Stable
1) Acute Renal Failure
2/3) Hypertension
3) Anemia

bed rest
I/O q shift
telemetry
ADA 1800 Kcal / cardiac diet
IV fluids
____ 40mg IV q 24°
____ 40mg SL q 24°
BMP ____ at 9PM 1/31/13 & repeat to A.
CBS, BMP, Magnesium in AM

Consult Dr. Montoya

Dr. Bartels

_____  1/31/13  7:30
Physician Signature                Date      Time

Faxed
4/14 @2:58

Physician Admission Orders
NS-2701-10EIMS   10/10   (Rev. 07/12)   Page 1 of 1

EXHIBIT

____ MEDICAL CENTER

ALLERGIES & SENSITIVITIES    ☐ No Known Allergies

| ALLERGIES & SENSITIVITIES | ☐ No Known Allergies | WEIGHT: _____ ☐ lb ☐ kg | HEIGHT: _____ ☐ In ☐ cm | |
|---|---|---|---|---|
| DRUG | REACTION | DRUG | | REACTION |
| 1. | | 4. | | |
| 2. | | 5. | | |
| 3. | | 6. | | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

| Date | Time | COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM! | |
|---|---|---|---|
| | | ☐ Admit to Inpatient Status | UNIT (check one): |
| | | ☐ Place in Observation Status | ☐ Med/Surg   ☐ Med-Telemetry   ☐ ICU   ☐ OB/L&D |
| | | ☐ Place in Outpatient Status | ☐ Other _____ |

1/15/4 236    Lovenox 30 mg   SC q24°

Barely

faxed & noted 1/25/14 0240 Per Chan ____

1/25/14 0810 Change Attending to Dr Brewer
Consult Dr Stevenson Consult Called
Kayexelate 30 Gm P.O x 1 Now
A Status to PCU
TO c Read Back Dr Brewer / Chy / Forland ___

FAXED

Physician Signature _____    Date _____    Time _____

Physician Admission Orders
NS-2701-10HMS    10/10   (Rev. 07/12)    Page 1 of 1

Exhibit B

SAN ANGELO COMMUNITY MEDICAL CTR    Patient Label

# TAB NO. 7

CAUSE NO. B-150,285-C

| STEVE F. MONTOYA, M.D., | § | IN THE 119TH DISTRICT COURT |
|---|---|---|
| WEST TEXAS RENAL CARE, and | § | |
| WEST TEXAS NEPHROLOGY, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| VS. | § | OF |
| | § | |
| SAN ANGELO COMMUNITY MEDICAL | § | |
| CENTER and KIRK BREWER, M.D. | § | |
| | § | |
| *Defendants.* | § | TOM GREEN COUNTY, TEXAS |

## <u>ORDER ON DEFENDANT KIRK BREWER, M.D.'S MOTION TO DISMISS PER THE TEXAS CITIZENS PARTICIPATION ACT</u>

On the 12th day of January, 2016, came on to be heard Defendant Kirk Brewer, M.D.'s Motion to Dismiss and for Recovery of Costs and Attorney's Fees per the Texas Citizens Participation Act, and the Court having considered same, is of the opinion that said motion is well taken and should be granted.

IT IS, THEREFORE, ORDERED, ADJUDGED and DECREED that Plaintiff's claims for tortious interference with current and prospective patient relations, defamation per se, malice, business disparagement, restraint of trade, and conspiracy be dismissed.

IT IS, FURTHER ORDERED, ADJUDGED, and DECREED that Defendant Kirk Brewer,

$7,950 + $89.64 Expenses

M.D. be awarded his reasonable and necessary attorney's fees in the amount of $_____ as well as costs of court ~~in the amount of $_____~~.

IT IS, THEREFORE, ORDERED, ADJUDGED and DECREED by the Court that Kirk Brewer, M.D.'s motion to dismiss per the Texas Citizens Participation Act is GRANTED, that

194

Defendant Kirk Brewer, M.D. is hereby dismissed from this cause as there are no remaining claims against him, and costs and attorney's fees are to be paid as set forth above.

SIGNED this _____ day of February 8, 2016 _____, 2016.

_Ben Woodward_
JUDGE PRESIDING

# TAB NO. 8

CAUSE NO. B-150,285-C

| | | |
|---|---|---|
| STEVE F. MONTOYA, M.D., | § | IN THE 119TH DISTRICT COURT |
| WEST TEXAS RENAL CARE, and | § | |
| WEST TEXAS NEPHROLOGY, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| VS. | § | OF |
| | § | |
| SAN ANGELO COMMUNITY MEDICAL | § | |
| CENTER and KIRK BREWER, M.D. | § | |
| | § | |
| *Defendants.* | § | TOM GREEN COUNTY, TEXAS |

## ORDER ON DEFENDANT KIRK BREWER, M.D.'S MOTION TO DISMISS PER RULE 91(a) OF THE TEXAS RULES OF CIVIL PROCEDURE

On the 29th day of January, 2016, came on to be heard Defendant Kirk Brewer, M.D.'s Motion to Dismiss and for Recovery of Costs and Attorney's Fees per Rule 91(a) of the Texas Rules of Civil Procedure, and the Court having considered same, is of the opinion that said motion is well taken and should be granted as follows:

IT IS, THEREFORE, ORDERED, ADJUDGED and DECREED that Plaintiff's claims for tortious interference with current and prospective patient relations, defamation per se, malice, business disparagement, restraint of trade, and conspiracy be dismissed.

IT IS, FURTHER ORDERED, ADJUDGED, and DECREED that Defendant Kirk Brewer,

$7,950.00 + $89.64 Expenses

M.D. be awarded his reasonable and necessary attorney's fees in the amount of $_____ as

well as costs of court in the amount of $_____ ; provided however that Defendant may recover these amounts only one time and not under both this Order and the Order graniting the Chapter 27 Motion; provided the Court finds that the claims are so intertwined that segregation of fees between the 2 motions is not possible.

IT IS, THEREFORE, ORDERED, ADJUDGED and DECREED by the Court that Kirk Brewer, M.D.'s motion to dismiss per Rule 91(a) of the Texas Rules of Civil Procedure is

GRANTED, that Defendant Kirk Brewer, M.D. is hereby dismissed from this cause as there are no

remaining claims against him, and costs and attorney's fees are to be paid as set forth above.

SIGNED this _____ day of February 8, 2016 _____, 2016.

_Ben Woodward_
JUDGE PRESIDING

ORDER ON DEFENDANT KIRK BREWER, M.D.'S MOTION TO DISMISS                    Page 2 of 2
PER RULE 91(a) OF THE TEXAS RULES OF CIVIL PROCEDURE

197

# TAB NO. 9

Filed for Record
4/1/2016 4:11:24 PM
Sheri Woodfin, District Clerk
Tom Green County, Texas

CAUSE NO. B150285C

| | | |
|---|---|---|
| STEVE F. MONTOYA, M.D. | § | IN THE DISTRICT COURT OF |
| WEST TEXAS RENAL CARE | § | |
| WEST TEXAS NEPHROLOGY | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 119th JUDICIAL DISTRICT |
| | § | |
| SAN ANGELO COMMUNITY | § | |
| MEDICAL CENTER | § | |
| | § | |
| | § | |
| Defendants. | § | TOM GREEN COUNTY, TEXAS |

---

## DEFENDANT SAN ANGELO COMMUNITY MEDICAL CENTER'S TRADITIONAL MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant San Angelo Community Medical Center (hereinafter "Defendant") and files this Traditional Motion for Summary Judgment, and respectfully shows the Court as follows[1]:

### I. BACKGROUND & SUMMARY OF THE ARGUMENT

Plaintiff originally filed this lawsuit in July of 2015 against Dr. Kirk Brewer ("Brewer") and the moving defendant, San Angelo Community Medical Center ("SACMC"), alleging numerous causes of action related to supposed ill-treatment of Plaintiff and his medical practice's reputation.[2] After a several amendments to his Original Petition, this Court granted Brewer's Motion to Dismiss and ordered the case against Brewer to be dismissed under Texas Rules of Civil Procedure rule 91(a) and the Texas Citizens Participation Act on February 8,

---

[1] For judicial economy, this Motion is concurrently filed with Defendant's *Motion to Dismiss* and *Motion for Leave to File Its Motion to Dismiss.*
[2] *See* Plaintiff's Original Petition.

---

2016.[3] As explained more fully below, because *all* of Plaintiff's claims of liability against SACMC derive from Brewer's alleged bad acts and Brewer has been dismissed from this case, SACMC now moves this Court to dismiss all claims for relief, with prejudice.

## ARGUMENT

### A. STANDARD OF REVIEW

Traditional summary judgment under Texas Rule of Civil Procedure 166a(c) is proper when a movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Gary E. Patterson & Assocs., P.C. v. Holub,* 264 S.W.3d 180, 190 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (citing *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995) and Tex.R. Civ. P. 166a(c)). "A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action or if it conclusively establishes all elements of an affirmative defense." *Id.*

### B. SACMC IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF PLAINTIFFS' CLAIMS BECAUSE PLAINTIFF'S CLAIMS AGAINST BREWER HAVE BEEN DISMISSED.

As best SACMC can glean, Plaintiff's Fourth Amended Petition, his current live pleading, alleges six causes of action:

1) Tortious Interference with current and prospective business/patient relations (Pl.'s 4th Am. Pet. ¶¶ 7-7.7);
2) Tortious Interference with current and prospective business/patient relations – Exemplary Damage (*Id.* at ¶ 8);
3) Defamation Per Se (*Id.* at ¶¶ 9-9.8);
4) Malice (*Id.* at ¶ 10);
5) Business Disparagement (*Id.* at ¶ 11); and
6) Restraint of trade (*Id.* at ¶ 12-12.8).

---

[3] *See* Order On Defendant Kirk Brewer, M.D.'s Motion to Dismiss Per The Texas Citizens Participation Act, attached as Exhibit A.

---

The gravamen of Plaintiff's allegations concern Brewer's supposed "whisper campaign" to "wrongly . . . cast Dr. Montoya's stellar reputation under a dark cloud" and the bringing up of Plaintiff on charges of improper care "to discredit Dr. Montoya and his ability to practice medicine in San Angelo and at San Angelo Community Medical Center." *Id.* at ¶¶ 6.15-17. Plaintiff further alleges that Brewer "was and is employed by and acting in furtherance of the business of (SACMC) and its medical practices" and "at all times acted for (SACMC)." *Id.* at ¶ 6.6. Aside from Brewer, Plaintiff does not specifically allege in his live pleading any other individuals who took part in the alleged various defamatory and conspiratorial schemes Brewer supposedly perpetrated. Further, Plaintiff alleges no direct or separate liability claims against SACMC above and apart from the actions of its agent, Brewer. Instead, SACMC's only potential liability sounds in the doctrine of respondeat superior.

Under Texas law, a master can only be held liable for the servant's misdeeds *if the servant committed misdeeds.* The Texas Supreme Court has repeatedly made this clear. *See Knutson v. Morton Foods, Inc.,* 603 S.W.2d 805, 807 n. 2 (Tex.1980) (noting "that where the employer's liability rests solely on respondeat superior, an adjudication acquitting the employee of negligence will [bar] a subsequent suit against the employer"); *see also Johnson v. Ram,* 01-13-00404-CV, 2014 WL 3697881, at *8 (Tex. App.—Houston [1st Dist.] July 24, 2014) (refusing to reverse summary judgment dismissing doctor for vicarious liability because plaintiffs couldn't recover against nurses as a matter of law.)

In *G & H Towing Co. v. Magee,* 347 S.W.3d 293 (Tex. 2011), the plaintiffs filed a negligent entrustment suit against an employee and a suit against his employer. *Id.* at 294-95. After the employee obtained summary judgment in his favor, the trial court granted summary judgment in favor of the employer even though the employer had not specifically sought it. *Id.*

at 295-296. Finding that "an employer cannot be vicariously liable in tort when its agent or employee has not engaged in tortious conduct," the Texas Supreme Court held that even where summary judgment is not specifically sought and but nonetheless granted, "the error is harmless when the omitted cause of action is precluded as a matter of law by other grounds raised in the case." *Id.* at 298.

This Court has already dismissed Brewer from this case under Texas Rules of Civil Procedure rule 91(a) and the Texas Citizens Participation Act. As such, it has held that Brewer's actions or omissions were 1) constitutionally protected and/or 2) had "no basis in law or in fact." In other words, Brewer, like the employee in *G & H Towing*, committed no tortious act. Therefore, under plain and settled Texas law, SACMC cannot be held liable for Plaintiff's claims as a matter of law.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendant SACMC respectfully requests that this grant this Motion for Summary Judgment and that judgment be entered dismissing all of Plaintiff's claims against Defendant with prejudice, and for such other and further relief at law or in equity as may be shown that Defendant is justly entitled to receive.

Respectfully submitted,

JONES CARR MCGOLDRICK, LLP

_(signature)_

JAMES J. M<sup>c</sup> GOLDRICK
State Bar No. 00797044
**JEFFREY F. WOOD**
State Bar No. 24025725
**J. CHEVES LIGON**
State Bar No. 24070147
5910 N. Central Expy., Ste. 1700
Premier Place
Dallas, Texas 75206
(214) 828-9200
(214) 828-9229 (Facsimile)

**ATTORNEYS FOR DEFENDANT
SAN ANGELO COMMUNITY MEDICAL
CENTER**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing pleading has been forwarded to all counsel of record on this the 1st day of April, 2016, as follows:

_Via TexFile_
Paul Craig Laird II
800 W. Airport Freeway
Suite 880 LB 6015
Irving, TX 75062

_(signature)_

JEFFREY F. WOOD

# EXHIBIT "A"

# TAB NO. 10

CAUSE NO. B-15-0285-C

| | | |
|---|---|---|
| STEVE F. MONTOYA, JR., M.D. | § | IN THE DISTRICT COURT OF |
| WEST TEXAS RENAL CARE | § | |
| WEST TEXAS NEPHROLOGY | § | |
| | § | |
| VS. | § | 119th JUDICIAL DISTRICT |
| | § | |
| SAN ANGELO COMMUNITY | § | |
| MEDICAL CENTER AND | § | |
| KIRK BREWER, M.D. | § | TOM GREEN COUNTY, TEXAS |

PLAINTIFFS STEVE F. MONTOYA, JR., M.D., WEST TEXAS RENAL CARE AND
WEST TEXAS NEPHROLOGY'S RESPONSE TO
DEFENDANT SAN ANGELO COMMUNITY MEDICAL CENTER'S
MOTION FOR SUMMARY JUDGMENT AND OBJECTION AND
REQUEST FOR CONTINUANCE

Plaintiffs, STEVE F. MONTOYA, JR., M.D., WEST TEXAS RENAL CARE AND
WEST TEXAS NEPHROLOGY ask the Court to deny Defendant SAN ANGELO
COMMUNITY MEDICAL CENTER'S Motion for Summary Judgment.

INTRODUCTION

1. The Plaintiffs are Steve F. Montoya, Jr., M.D., West Texas Renal Care and West Texas
Nephrology. The Plaintiffs sued the hospital based upon causes of action that were approved by
the Texas Supreme Court in a case of a doctor suing the hospital where he had a medical
practice. The exact same causes of action were approved by the Texas Supreme Court in *In Re
Memorial Hermann Hospital System*, 464 S.W. 3d 686 (2015). The justices in Memorial
Hermann case stated "We hold that Dr. Gomez's petition presents multiple viable anti-competent
actions" Id at 713. Attached as Exhibit 1 is a certified copy of the pleading of Dr. Gomez from
the Memorial Hermann case that was specifically approved by as viable the Texas Supreme
Court causes of action. The causes of action approved by the Texas Supreme Court in Memorial
Hermann are:

(1) Business Disparagement
(2) Defamation
(3) Tortious Interference with Prospective Business Relations
(4) Improper Restraint of Trade under the Texas Fire Enterprises and Anti-Trust Act
of 1983.

Id. At 695-696

The Petition of the Plaintiffs followed the approved Petition of Dr. Gomez.

PLAINTIFFS RESPONSE TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT-
PAGE 1 OF 4

The Plaintiffs ask the Court to take judicial notice of the Original Petition of the Plaintiffs and the Amended Petitions on file to verify that the Plaintiffs are alleging the approved causes of action of the Texas Supreme Court, by a physician and his entities in which he practices suing the hospital where he practices medicine. This case is exactly the Memorial Hermann case approved by the Texas Supreme Court. The Texas Supreme Court determined Memorial Hermann in 2015 and has not changed its opinion in the year following the ruling.

This Traditional Motion for Summary is nothing more than a thinly vailed attempt to get around the untimely filing of the Motion to Dismiss under 91(a) and the Anti-Slapp Motion.

The finding of the Court concerning Dr. Brewer has no relevance to the causes of action brought against San Angelo Community Medical Center. The causes of action against San Angelo Community Medical Center are all separate and independent of Dr. Brewer.

The Defendant San Angelo Community Medical Center does not even attach a single factual affidavit or any affidavit in support of the Summary Judgment.

The Motion for Summary Judgment is a untimely Motion to Dismiss that has no evidence or proof attached.

San Angelo Community Medical Center filed a Motion for Special Exceptions on August 14, 2015 the court granted the Special Exceptions on December 3, 2015. The Plaintiffs Petition was amended to comply with the Court order.

Since the Order of Dismissal of Defendant Dr. Brewer hearing the Plaintiffs have added Anti-Trust violations concerning group boycott and violations of the EMTALA standards against San Angelo Community Medical Center.

The purpose of this lawsuit has nothing to do with the Defendants Constitutional Rights to speak freely, associate freely and participate in governmental as permitted by law. These are the requirements to meet in filing a Motion under the Anti-Slapp Statute *Tex.C.P.R.C.§27.005(b)* and as set out in *Paulsen v. Yarrell 455 SW3d 192 (Tex.-App.-Houston [1ˢᵗ Dist.] 2014, no pet.)* (quoting *In Re Estate of Check 438 SW3d at 836*).

The Texas Supreme Court agreed that clear and specific evidence under the Texas Anti-Slapp Statute Chapter 27 includes relevant circumstantial evidence. (*In Re Lipsky, 2015 WL1870073*). The evidence of the Plaintiff meets the standard.

The Defendant San Angelo Community Medical Center did not even join in Dr. Brewer's Motion to Dismiss under 91(a) or his Anti-Slapp motion.

Request to Strike/Objection

No Summary Judgment evidence is presented by the Defendant San Angelo Community Medical Center. Respondents to the Motion for Summary Judgment object to the Motion because there is no evidence attached to the Motion. The statements in the body of the argument

are heresay and Respondents request the Court to strike those statements as defective and not meeting the standard for Summary Judgment evidence. The statements in the argument are conclusory and without factual basis as required by the Texas Rules of Civil Procedure (TRCP 166a(c)).

The Respondents further object to the argument because it does not meet the standard set forth for an affidavit in the Texas Supreme Court *Radio Station KSCS v. Jennings* 750 S.W.2d 760 (Tex. 1988). The Supreme Court held that affidavit for summary judgment failed to establish that it was based on personal knowledge and was thus inadequate summary judgment proof. The argument in the Motion is not a factual affidavit showing proof.

The Plaintiff objects to the argument because it is not an affidavit which must state facts and cannot merely recite legal conclusions. *Brownlee v. Brownlee*, 655 S.W. 2d 111, 112 (Tex. 1984). In this case the argument does not meet the *KSCS* or *Brownlee* standards.

## SUMMARY-JUDGMENT EVIDENCE PRESENTED BY PLAINTIFF

2.    To support the facts in this response, Plaintiffs offer the following summary-judgment evidence attached to this response and incorporates the evidence into this response by reference.

Exhibit 1: Certified copy of Pleading approved by the Texas Supreme Court as valid causes of action in Memorial Hermann Hospital System.

Exhibit 2: Is the affidavit of Steve F. Montoya, Jr., M.D. one of the Plaintiffs. In the affidavit he states the facts and refutes the allegations for the dismissal under TRCP 91(a) and the Anti-Slapp allegations.

Exhibit 3: Is the affidavit of Dr. Hunt that confirms the causes of actions and the facts of the Anti-Trust actions of San Angelo Community Medical Center.

**A.    Defendant did not disprove plaintiff's cause of action as a matter of law.**

3.    A defendant is entitled to summary judgment on a plaintiff's cause of action if the defendant can disprove at least one element of the cause of action as a matter of law. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *see Tello v. Bank One, N.A.*, 218 S.W.3d 109, 113 (Tex. App.—Houston [14th Dist.] 2007, no pet.). The Defendant has not disproved any of Plaintiffs elements in their causes of action.

## PRAYER

4.    For these reasons, Plaintiffs ask the Court to deny Defendant's Motion for Summary Judgment. Plaintiffs ask the Court to grant Plaintiffs objections so they will be preserved for appeal.

Respectfully Submitted

Paul Craig Laird II Law Firm, PLLC

/s/ Paul Craig Laird II
By: Paul Craig Laird II
800 W. Airport Freeway
Suite 880 LB 6015
Irving, TX 75062
972-554-0929
214-260-4935- fax
pcl880@aim.com
SBOT 11795420
Attorney for Plaintiffs

CERTIFICATE OF SERVICE

This is to certify that this Response was serviced via the e-filing system on the 4th day of May, 2016.

/s/ Paul Craig Laird II

Filed 12 December 26 A9:19
Chris Daniel - District Clerk
Harris County
FAX15376415

Cause No. 2012-53962

| | | |
|---|---|---|
| MIGUEL A. GOMEZ, III, M.D. and | § | IN THE DISTRICT COURT OF |
| MIGUEL A. GOMEZ, M.D., P.A., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| MEMORIAL HERMANN HOSPITAL | § | |
| SYSTEM; MEMORIAL HERMANN | § | |
| PHYSICIAN NETWORK; MICHAEL P. | § | |
| MACRIS, M.D.; MICHAEL P. MACRIS, | § | |
| M.D., P.A.; and KEITH ALEXANDER, | § | |
| | § | |
| *Defendants.* | § | 333rd JUDICIAL DISTRICT |

## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION AND JURY DEMAND

To the Honorable Judge Halbach & Our Jury of Harris County Citizens:

Plaintiffs Miguel A. Gomez, III, M.D. and Miguel A. Gomez, M.D., P.A. (together, "Dr. Gomez") file this First Amended Original Petition and Jury Demand against Defendants Memorial Hermann Hospital System ("Memorial Hermann"); Memorial Hermann Physician Network ("MHMD"); Michael P. Macris, M.D.; Michael P. Macris, M.D., P.A. (both together, "Dr. Macris"); and Keith Alexander (all together, "Defendants"), and would respectfully state:

### DISCOVERY CONTROL PLAN

1.1     Dr. Gomez intends to conduct discovery under Level 2 of Texas Rule of Civil Procedure 190.

Certified Document Number: 54275000 - Page 1 of 17

*Exhibit 1*

## PARTIES

2.1    Miguel A. Gomez, III, M.D. ("Dr. Miguel Gomez) is a resident and citizen of Harris County, Texas.

2.2    Miguel A. Gomez, M.D., P.A. ("Dr. Gomez P.A.") is a professional association organized under the laws of the State of Texas.

2.3    Memorial Hermann Hospital System is a business entity organized under the laws of the State of Texas that controls and manages a number of hospitals, out-patient facilities, and other health care service centers throughout the Houston Metropolitan area, including Memorial Hermann Memorial City Medical Center. Memorial Hermann has appeared and answered herein.

2.4    MHMD a/k/a Memorial Hermann Physician Network is a business entity organized under the laws of the State of Texas that acts to deliver medical services on behalf of Memorial Hermann, and has appeared and answered herein.

2.5    Michael P. Macris, M.D. ("Dr. Michael Macris") is a natural person residing in Harris County, Texas, and has appeared and answered herein.

2.6    Michael P. Macris, M.D., P.A. ("Dr. Macris P.A.") is a professional association organized under the laws of the State of Texas and has appeared and answered herein.

2.7    Keith Alexander ("Mr. Alexander") is a natural person employed at all relevant times as the Chief Executive Officer for Memorial Hermann Memorial City Medical Center, and has appeared and answered herein.

-2-

Certified Document Number: 54275000 - Page 2 of 17

## VENUE & JURISDICTION

3.1 Venue is proper in Harris County under Tex. Civ. Prac. & Rem. Code Section 15.002(a)(1), as all or a substantial part of the events or omissions giving rise to this legal action occurred in Harris County, Texas, and Defendants all reside in Harris County, Texas.

3.2 Dr. Gomez has incurred and sues for damages well in excess of $125,000, and jurisdiction is proper in this Court.

## RESPONDEAT SUPERIOR / VICARIOUS LIABILITY / CIVIL CONSPIRACY

3.3 At all relevant times, Keith Alexander, as a principal officer of Memorial Hermann, and other agents/employees of Memorial Hermann and MHMD working under his direction or in furtherance of unlawful and improper actions, was employed by and acting in furtherance of the business of Memorial Hermann and/MHMD. Keith Alexander is individually liable for his own illegal and improper actions. Memorial Hermann is also liable for the improper acts and omissions of its principal officer, Keith Alexander, as well as the other agents/employees of Memorial Hermann, under the legal doctrines of respondeat superior and vicarious liability. MHMD is also liable for the improper acts and omissions of its agents/employees of MHMD, under the legal doctrines of respondeat superior and vicarious liability.

3.4 At all relevant times, Dr. Macris, as a principal officer of Dr. Macris P.A., and other agents/employees of Dr. Macris P.A. working under his direction or in furtherance of his unlawful and improper actions, was employed by and acting in furtherance of the business of Dr. Macris P.A.. Dr. Macris is individually liable for his

own illegal and improper actions. Dr. Macris P.A. is also liable for the improper acts and omissions of its principal officer, Dr. Macris , as well as the other agents/employees of Dr. Macris, under the legal doctrines of respondeat superior and vicarious liability.

3.5 Defendants Memorial Hermann (acting by and through its agents/employees/principal officers); MHMD (acting by and through its agents/employees/principal officers) and Dr. Macris (acting by and through his agents/employees/principal officer) acted together to carry out the improper and illegal actions, and are therefore jointly and severally liable for civil conspiracy in carrying out their wrongful activities.

## CONDITIONS PRECEDENT & INAPPLICABILITY OF AFFIRMATIVE DEFENSES

4.1 All conditions precedent to Dr. Gomez' right to recover have been performed or have occurred.

4.2 To the extent necessary, Plaintiffs rely on and plead the discovery rule to any statute of limitations defense asserted by Defendants, including fraudulent concealment.

## FACTUAL BACKGROUND

5.1 Since returning after advanced training to practice medicine in his hometown of Houston, Texas, Dr. Gomez worked hard to build a stellar reputation for quality patient care, technical excellence, and outstanding professionalism in cardiothoracic and general surgery in the West Houston and Katy community. Dr. Gomez cares about his patients, his fellow medical professionals, and his community, and his practice expanded over a number of years with continuing referrals from medical professionals

-4-

aware of his well-deserved reputation for outstanding patient care.

5.2    Dr. Gomez's skills and specialized abilities for patients requiring cardio-thoracic and general surgeries, from "basic" open heart surgery to advanced robotic-assisted surgical procedures, were actively promoted for many years by Memorial Hermann as part of its own marketing efforts in the West Houston and Katy medical community. Dr. Gomez's practice was further enhanced by his pioneering implementation of "off the pump" surgery and robotic-assisted cardiothoracic procedures in the Houston medical community. "Off the pump surgery" eliminates the need for the use of a heart-lung machine by-pass during surgery and greatly enhanced patient care and outcomes. Robotic-assisted surgery, which typically eliminates the need to crack open the patient's sternum in favor of much smaller entry ports for the robotic surgical tools, likewise led to better outcomes and quicker recoveries for patients fortunate enough to come under Dr. Gomez' care.

5.3    The recommendation of the referring physicians to the patient directly impacts the choice of the specific surgeon entrusted with patient care. The surgeon in turn determines, based upon the quality of the surgical and post-surgical equipment, staff, and facilities, the hospital in which the surgical care is delivered. The surgeon's decisions as to where to perform his or her surgeries directly impact the profitability of the hospitals in the specific community (in the West Houston and Katy community, the surgical market is primarily at Memorial Hermann Memorial City Medical Center and The Methodist West Houston Hospital). As a result, the ability to fairly compare the reputations of surgeons in a medical market community such as West Houston and

-5-

Certified Document Number: 54275000 - Page 5 of 17

Katy affects patient choice and the continued availability of the highest quality patient care. Improperly manipulating comparative information and reputations of surgeons in a medical market such as West Houston and Katy creates an improper distortion of free and informed patient choice and options for medical care.

5.4 The appropriate way for any health care provider to attract patients in a competitive market is by actually providing and being known for providing the highest quality of care. The illegal and unjust way (putting patients and their free choice in the market in jeopardy) is to malign, spread untrue or misleading information, or otherwise smear the reputation of a highly qualified surgeon in the same medical community.

5.5 With new management and operational changes at Memorial City Memorial Hermann, including the arrival of Mr. Alexander as CEO, Dr. Gomez became increasingly concerned about a decline in the quality of patient care at the hospital. The decline in patient care arose from the understaffing of qualified nurses in the hospital's intensive care unit (ICU), general care units and the emergency room; the lack of consistent procedural safeguards for monitoring patients; and the failure to update critical equipment. Memorial Hermann also began deliberate efforts to restrict surgical care for the most critically ill patients, pushing for abandonment of "salvage" cases (for example, emergency surgery on patients in active cardiac arrest, able to be saved in some but not all circumstances by a qualified surgeon). What this meant to patients most in need of a surgeon with Dr. Gomez' unique qualifications was the elimination of patient choice and potentially life-saving procedures in favor of potentially higher statistical ranking for Memorial Hermann as calculated by U. S. News and World

-6-

Certified Document Number: 54275000 - Page 6 of 17

Report.

5.6 In response to Dr. Gomez repeatedly speaking out about these concerns, as well as the likelihood Dr. Gomez would move his surgeries to The Methodist Hospital—West Houston as the staffing and equipment dysfunctions continued, Dr. Macris and Mr. Alexander, and others, joined in a calculated and deliberate scheme to destroy Dr. Gomez' reputation and ability to practice medicine in the West Houston and Katy community. Dr. Macris wanted to disadvantage a skilled competitor, and Memorial Hermann needed to avoid losing patients by working with Dr. Macris in capturing the patients that would have otherwise been treated by Dr. Gomez at another facility.

5.7 Quality patient care is the most important goal of any legitimate health care provider. Under both federal and state law, hospitals and their medical staff are required to follow strict standards for peer review evaluation and monitoring. These peer review standards rely upon a consistent and well-developed process to ensure that favoritism, improper motives, and manipulation for unjust purposes play no role. Memorial Hermann had such a process in place at all relevant times, but Defendants acted to evade and avoid its safeguards while manipulating the rules for peer review and utilization review for their own wrongful purposes.

5.8 In order to discredit Dr. Gomez and crush his ability to practice medicine in the West Houston and Katy community, Dr. Macris and Memorial Hermann began compiling (and distorting) statistical data related to the mortality rates of Dr. Gomez's patients. The manipulated data, which was reported using neither the generally accepted methodologies for proper peer review comparison nor basic scientific

-7-

Certified Document Number: 54275000 - Page 7 of 17

principles, was intended to create the appearance that patients were more likely to die in Dr. Gomez's care as compared to other surgeons at Memorial Hermann. At bottom, the statistical information compiled and manipulated by Dr. Macris and Memorial Hermann was geared to demonstrating a falsehood: that Dr. Gomez was an incompetent physician underserving of his reputation and the trust his hard work had earned in the West Houston and Katy medical community.

5.9     Rather than comply with the medical peer review process and its safeguards against improper influence, Defendants attempted to evade these well-established protocols and the standing medical peer review committee at the hospital. Defendants then set up an emergency "meeting" and presented Dr. Gomez with the option of either immediately suspending his practice or agreeing to active interventional monitoring under Defendants' supervision. Both "options" would have effectively destroyed Dr. Gomez' reputation in the medical community, severely curtailing patient choice, as well as the opportunity for these and future patients to benefit from Dr. Gomez' advanced abilities in cardiothoracic and surgical procedures.

5.10    At the time Dr. Gomez was presented with these "options" by Defendants, he was also told that he would not be able to review at any meaningful level the alleged data supporting the emergency action outside the usual peer review process (the data that ultimately proved to be improperly manipulated and without a basic medical and scientific grounding). Defendants also refused Dr. Gomez the opportunity to meet with or present any information to Defendants and those acting with Defendants, and instead insisted that Dr. Gomez' quality of care could not be evaluated by the

-8-

Certified Document Number: 54275000 - Page 8 of 17

established medical peer review committee.

5.11 Fortuitously, and despite Defendants' best efforts to continue the railroading of Dr. Gomez, the actual peer review committee at Memorial Hermann intervened to require Defendants to present their data, and other alleged reasons for attempting to block Dr. Gomez' continued practice at Memorial Hermann, to the peer review process. Notwithstanding Defendants' presentation of the manipulated patient data, the evaluation of the peer review committee exonerated Dr. Gomez. During the process, Defendants were provided with clear and convincing evidence that the manipulated data used to "compare" Dr. Gomez could not be relied upon for any legitimate purpose.

5.12 After completing its comprehensive evaluation, including comparison with Dr. Macris' own patient care outcome statistics, the peer review committee's rejection of Defendants' anti-competitive and unlawful abuse of the peer review process should have deterred Defendants from their continued misconduct. Unfortunately, Defendants elected to instead continue a whisper campaign of selective and improper dissemination of both the manipulated data and other misinformation within the medical community. The first indication Dr. Gomez received that Defendants' smear campaign had continued unabated was when the same type of manipulated and misleading data was presented by Dr. Macris on November 1, 2011 at a non-peer review meeting organized by MHMD in a publicly displayed "comparison", readily identifiable with Dr. Gomez and intended to be seen as such. The circumstances and details of this public defamation are set forth in greater detail in Paragraph 7.3 below, based on the information available at this time.

-9-

5.13 Mark Twain once noted that, "A lie can travel around the world before the truth can even finish putting on its pants." Defendants' illegal and anti-competitive acts unfairly cast Dr. Gomez' stellar reputation under a dark cloud. As could be anticipated, if not intended, Defendants' calculated wrongdoing also imposed substantial economic, emotional, and physical impacts upon Dr. Gomez. Facing continuing harassment and improper attempts to interfere with his practice at Memorial Hermann, Dr. Gomez resigned his privileges at Memorial Hermann in May 2012. However, the loss to the community, and Dr. Gomez, from Defendants' misconduct remains ongoing and unremedied.

## CAUSES OF ACTION

### FIRST COUNT – BUSINESS DISPARAGEMENT

6.1 Dr. Gomez re-alleges and incorporates each allegation contained in Paragraphs 1-5.13 of this Petition as if fully set forth herein.

6.2 Defendants published disparaging words about Dr. Gomez' business and economic interests. As set forth in Paragraph 7.3 below, and at other times to be further detailed upon necessary discovery, Defendants did and intended to harm Dr. Gomez' business interests.

6.3 Defendants published these disparaging words knowing they were false and with malice.

6.4 Defendants published these disparaging words without privilege

### SECOND COUNT – DEFAMATION

7.1 Plaintiffs re-allege and incorporate each allegation contained in Paragraphs 1-6.4 of

-10-

Certified Document Number: 54275000 - Page 10 of 17

this Petition as if fully set forth herein.

7.2 Both lies and half-truths presented in a misleading manner are equally false. Defendants' statements and misstatements, including alleged comparative data, were in proper context wholly false, libelous, and slanderous. Defendants knowingly, recklessly, and maliciously spread falsehoods about Dr. Gomez, and Defendants had no right, privilege, or justification to make the statements.

7.3 Specifically, at a Cardiovascular and Thoracic CPC Meeting arranged by MHMD on November 1, 2011, which is open and outside the peer review process,, Dr. Macris, individually and on behalf of MHMD, Memorial Hermann, and Alexander, displayed and communicated libelous statements and false data including, but not limited to, false data and statements regarding Dr. Gomez's practice and mortality rates of his patients, to an entire room filled with Dr. Gomez's professional colleagues, intending that it be thereafter widely disseminated. Among those colleagues believed to be present at the meeting where Dr. Macris disseminated the false data and statements were the following:

- Lee Colosimo, MD

- Anthony Estrera, MD

- Donald Gibson, MD

- Kourosh Keyhani, MD

- Kamal Khalil, MD

- Javier Lafuente, MD

- Robert McKowen, MD

-11-

Certified Document Number: 54275000 - Page 11 of 17

- Imran Mohiuddin, MD

- Jaime Roman-Pavajeau, MD

- Patti Peymann

- Ann Guercio

- Tim Bevelacqua

- Byron Auzenne

- Richard Alexander, MD

- Michael Shabot, MD

These people in attendance at the November 1, 2011, meeting had the false, libelous, and slanderous material directly communicated to them by Dr. Macris, with the full intent of Defendants that it be further shared to attempt to harm Dr. Gomez' practice.

7.4    As described above, the statements and representations were defaming to Dr. Gomez, both personally and in the conduct of his medical practice. Furthermore, the statements and representations by Defendants were so egregious and obviously hurtful as to constitute libel and slander *per se*.

### THIRD COUNT — TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

8.1    Plaintiffs re-allege and incorporate each allegation contained in Paragraphs 1-7.3 of this Petition as if fully set forth herein.

8.2.    Dr. Gomez had longstanding and continuous relationships with referring physicians in the West Houston and Katy medical community, and these relationships directly led to patient referrals for surgical procedures. Due to these longstanding and

-12-

continuous relationships, there was a reasonable probability that Dr. Gomez would have been selected to perform surgical procedures for these patients. In addition, there is a reasonable probability that Dr. Gomez would have entered into various other business relationships with third persons or entities, but for Defendants' improper acts and omissions, as set forth herein.

8.3    Defendants intentionally interfered with the relationships between Defendants and these persons and entities. This interference impacted and caused economic loss in the past and future to Dr. Gomez.

### FOURTH COUNT – IMPROPER RESTRAINT OF TRADE

9.1    Plaintiffs re-allege and incorporate each allegation contained in Paragraphs 1-8.3 of this Petition as if fully set forth herein.

9.2    Section 15.21 of the Texas Business and Commerce Code, also known as the Texas Free Enterprise and Antitrust Act of 1983, recognizes as illegal improper attempts to abuse the peer review process, as well as conspiracies to limit patient choice by concerted illegal action such as engaged in by Defendants. Dr. Gomez therefore seeks relief for this anti-competitive solely under the laws established by the State of Texas for this anti-competitive misconduct affecting Texas' citizens residing in the West Houston and Katy communities.

9.3    In the West Houston and Katy communities, Dr. Gomez was in competition with Dr. Macris, while Memorial Hermann was in competition with other surgical facilities, primarily including The Methodist Hospital West Houston. Defendants both derived

-13-

Certified Document Number: 54275000 - Page 13 of 17

illegal benefit, and patient choice was improperly limited in the West Houston and Katy community, by the concerted effort of Defendants to restrain competition in and monopolize surgical procedures in the West Houston and Katy communities.

9.4    In furtherance of the combination and conspiracy, and with the purpose and intent of excluding Dr. Gomez from the patient care market and destroying competition from Dr. Gomez (and resulting loss of patients at Memorial Hermann), Defendants not only attempted to curtail or limit Dr. Gomez' surgical procedures, but also defamed Dr. Gomez' skill and qualifications as a surgeon in the West Houston and Katy community. These acts were done with the specific intent to weaken or eliminate competition from Dr. Gomez, and because of the market dominance that would result had a dangerous probability of success.

9.5    Defendants' willful actions have also harmed and threatened the general public by interfering with the orderly practice of medicine in the community, by reducing the number of surgeons actively practicing in cardiothoracic and general surgery in the community, and by depriving patients of the highest quality of medical care they would have been able to receive but for Defendants' concerted actions against Defendants.

9.4    This concerted conduct was flagrant and willful, and was done for the specific purpose of harming Dr. Gomez, illegally and improperly taking Dr. Gomez' practice, and diverting it to Dr. Macris and others practicing solely at Memorial Hermann.

9.5    The acts of Defendants constitute illegal monopolization, attempted monopolization, and/or conspiracy to monopolize under applicable Texas law.

-14-

Certified Document Number: 54275000 - Page 14 of 17

## RESULTING LEGAL DAMAGES

10.1    Dr. Gomez is entitled to the actual damages resulting from Defendants' violations of the law. These damages include the consequential damages to Dr. Gomez' economic welfare; the mental anguish and physical suffering resulting from Defendants' conduct and the continued impact on Dr. Gomez; lost business reputation; attorneys' fees as allowed by law; and the other actual damages permitted by law.

10.2    Dr. Gomez trusts the jury to evaluate the evidence — including documentation and expert and lay witness testimony — and to properly assess the damages sustained by Dr. Gomez. The law permits Defendants to demand that Plaintiff state the maximum amount of damages that Plaintiff will seek, and only in response to that demand, Plaintiff states that he expects to request the jury to award a maximum amount of $15,000,000.00 in compensation for the damages asserted based on the most current available information. As additional information of the amount of the harm inflicted by Defendants becomes available, and as permitted by law, Dr. Gomez will amend this determination to as best possible provide a fair estimate for our juror's consideration.

10.3    Defendants are also liable for statutory additional trebling and exemplary damages warranted by Defendants' malicious and egregious conduct.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Dr. Gomez respectfully requests judgment against Defendants for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law,

-15-

Certified Document Number: 54275000 - Page 15 of 17

costs of suit, and all other relief, at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

DOYLE RAIZNER LLP

MICHAEL PATRICK DOYLE
State Bar. No. 06095650
LyondellBassell Tower
1221 McKinney, Suite 4100
Houston, Texas 77010
Phone: 713.571.1146
Fax: 713.571.1148
mdoyle@doyleraizner.com

**ATTORNEYS FOR PLAINTIFFS**

**JURY DEMAND**

Dr. Gomez hereby demands a trial by jury, a right enshrined in the Constitutions of the United States of America and the State of Texas and preserved by the sacrifices of many. The necessary jury fee has been paid.

MICHAEL PATRICK DOYLE

-16-

Certified Document Number: 54275000 - Page 16 of 17

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this the 26th day of December, 2012 via hand delivery, overnight courier, U.S. Mail, certified mail, return receipt request, and/or facsimile, pursuant to the Texas Rules of Civil Procedure:

Robert Swift
Jesse Coleman
Fulbright & Jaworski
1301 McKinney, Suite 5100
Houston, TX 77010

**ATTORNEYS FOR DEFENDANTS**

_____
**MICHAEL PATRICK DOYLE**

Certified Document Number: 54275000 - Page 17 of 17

-17-



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 3, 2016

Certified Document Number:        54275000 Total Pages:  17

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

STATE OF TEXAS       §

                           §         AFFIDAVIT

COUNTY OF TOM GREEN §

BEFORE ME the undersigned authority appeared Steve F. Montoya, Jr. M.D. and after being duly sworn under oath stated.

"My name is Steve F. Montoya, Jr. M.D. I am the Plaintiff in this case. I have knowledge of all the facts of this affidavit as Plaintiff and all facts are within my personal knowledge true and correct and that I was involved with facts stated.

I have not used any patient name, except where authorized by the patient or their agent, to avoid any HIPAA or privacy violation.

1. I was admitted to practice nephrology at San Angelo Community Medical Center in 1981. I have full staff privileges for the practice of nephrology at San Angelo Community Medical Center. This case does not involve the rights of Defendant San Angelo Community Medical Center to speak freely, associate freely, and participate in government as permitted by law. The facts of the case are that I have full staff privileges to practice nephrology medicine at San Angelo Community Medical Center

2. Part of my practice and obtaining patients is that the hospital emergency room uses a rotating system of specialists admitted in that practice to see patients in the hospital and emergency room pursuant to the EMTALA Medicare call list. When you are the named specialist you receive a call from the emergency room physician that a doctor with your specialty is needed for a patient. A big part of my practice was obtaining new patients and treating existing patients that came to the emergency room that needed a nephrologist. Since 1981 I have gotten new patients from the emergency room.

3. Until 2007 I would receive 10-20 calls from the emergency room, per month to treat either new or existing patients for nephrology care at the San Angelo Community Medical Center. Since 2008 I have received only one call from the emergency room or a hospitalist for consultation as a nephrologist. A nephrologist treats patients with kidney problems and or disease. The one call I received was for treatment of a new patient or existing patient that suffered with kidney problems.

Exhibit 2

4. The one time call for a new patient is described below. On January 24, 2014 I was called by the San Angelo Community Medical Center emergency room physician on duty and the hospitalist Dr. Bartels. Dr. Bartels and the emergency room physician informed me that a patient was diagnosed with acute renal failure. I was informed my name was on the call board in the emergency room as nephrologist on call. Both of the above doctors asked me to consult concerning treatment for that patient. I gave my initial consult advice/orders of treatment to both doctors. This consultation call was to me at 9:38 p.m. I informed them I would come see the patient and then review the test results and determine any additional treatment for the patient. Attached as Exhibit A is a true and correct copy of the redacted hospital record, removing the name of the patient for HIPPA privacy, showing the facts on January 24, 2014.

5. On January 25, 2014 at 8:10 a.m. Kirk Brewer, M.D. took over the hospitalists care of the patient as his rotation as the hospitalist started. Then without ever seeing the patient or the chart Kirk Brewer, M.D. cancelled my consult and treatment by me and consulted another nephrologist. The nephrologist he brought in for consult is one that is in a group that Kirk Brewer, M.D. has a contract for paid services. Kirk Brewer, M.D. without seeing the patient, or chart changed the patient's doctor. This change of nephrologist was for Kirk Brewer, M.D.'s economic gain and caused me economic loss. Attached as Exhibit B is a true and correct copy of the redacted hospital record showing the facts on January 25, 2014.

6. In removing me as the nephrologist the hospital published a statement that I was not a competent nephrologist to treat patients coming to the San Angelo Community Medical Center emergency room. San Angelo Community Medical Center through its agents and representatives was aware that its actions would become known to the staff physicians of San Angelo Community Medical Center and that there was by conduct and a whisper campaign saying I (Steve F. Montoya, Jr. M.D.) should not be allowed to treat patients at San Angelo Community Medical Center.

7. The statements and actions of San Angelo Community Medical Center by and through its agents and representatives were published by conduct. The actions were referring to keep from treating my own patients and any new patient coming to the San Angelo Community Medical Center emergency room. The statement(s) and actions were defamatory and caused me economic loss.

8. Until 2007 I would receive 10-20 calls from the emergency room per month to treat either new or existing patients at the San Angelo Community Medical Center. Since 2008 I have only received one call from the emergency room or a hospitalist for consultation as a nephrologist, except for one time for treatment of a new or existing patient that suffered with kidney disease/problems. The lack of referrals caused substantial injury to the Plaintiffs and damaged their ability to compete, because the Plaintiffs depend on these referrals and consults to build and maintain the nephrology practice. A majority of patients who need kidney treatment/ suffer from kidney disease in a hospital later need continuing care for their kidneys or related problems; the most common of such continuing treatments is kidney dialysis. A typical kidney dialysis patient will need treatment for six years, and each such patient would mean revenue to the Plaintiffs practice of approximately $100,000 per year. I estimates that the Plaintiffs have lost at least 100 long term kidney dialysis patients from 2007 to the present due to the Defendants' anticompetitive scheme to refuse to give me patient referrals or consults. I estimate that this lack of referrals has thus cost Plaintiffs $1,000,000 to $6,500,000 over that period of time.

9. The defamatory statements and actions are untrue. I am a competent and qualified nephrologist to treat patients at San Angelo Community Medical Center. If I were not a competent and qualified nephrologist I would have been removed from the staff of the hospital.

10. The actions of San Angelo Community Medical Center by and through its agents and representatives were intentional or done with negligence when San Angelo Community Medical Center knew that the statement was false and the actions would lead a reasonable prudent physician or patient knowing/believing of its defamatory

potential. The actions interred with my ability to make a living as a nephrologist on staff at San Angelo Community Medical Center.

11. The rules at San Angelo Community Medical Center and of the staff of San Angelo Community Medical Center are to have a new patient in the emergency room or hospital that needs a specialist consultation assigned to the name off the rotating consultation list. The consultation list is kept by San Angelo Community Medical Center by and through its agents and representatives. By San Angelo Community Medical Center not following this procedure I did not receive any consultation requests from the emergency room or hospitalist at San Angelo Community Medical Center in 2008-present and one in 2014.

12. Attached to this affidavit as Exhibit C is the true and correct sworn statement that an existing patient of mine Mrs. Welch tried to see me in the emergency room of San Angelo Community Medical Center and that the emergency room would not call me to treat my existing patient Mrs. Welch is over 90 years of age and I have treated her for at least 20 years. These actions interfered with my right to treat my patient and to the patient's rights to pick her physician and to her rights under the patients' bill of rights (see attached Exhibit D) and the patients' dialysis bill of rights (see attached Exhibit E)

13. Another patient of mine, whose name is withheld per privacy rights, who is also over 90 years of age and has been my patient for at least 10 years requested me when she went to the emergency room and she also was refused to see me. This action interfered with my right to treat my patient and to the patient's rights to pick her physician and to her rights under the patients' bill of rights (see attached Exhibit D) and the patients' dialysis bill of rights (see attached exhibit E)

14. A patient has the absolute right to be treated by their physician. Attached as Exhibit F is a true and correct copy of the patient bill of rights posted at the San Angelo

Community Medical Center. Attached as Exhibit E a true and correct copy of the dialysis patient bill of rights concerning care of a dialysis patient. Both of these patient bills of rights were violated by San Angelo Community Medical Center.

15. On January 25, 2014 at 8:10 a.m. Kirk Brewer, M.D. took over the hospitalists care of the patient referred in Exhibits A and B as his rotation as the hospitalist started. Then without ever seeing the patient or the chart Kirk Brewer, M.D. cancelled my consult and treatment and consulted another nephrologist. I went to the call board and witnessed my name on call as the nephrologist on call on January 24 and 25, 2014. The San Angelo Community Medical Center is required to have an official EMTALA Medicare call list for on call physicians for the San Angelo Community Medical Center to take Medicare patients. This is the list my name was on and was intentionally ignored. This also violates a patient's right to choose their physician. This list was followed until Dr. Brewer came to San Angelo Community Medical Center and took charge of hospitalists. The nephrologist he brought in for consult is one that is in a group that Kirk Brewer, M.D. has a contract for paid services. Dr. Brewer did not see the patient when he removed me as the treating nephrologist he issued the change via a telephone order (see Exhibit B). Kirk Brewer, M.D. without seeing the patient, or chart changed the patient's doctor. This change of nephrologist was for Kirk Brewer, M.D.'s economic gain and caused me economic loss.

16. By the actions of the hospitalists and emergency room physicians who are controlled by their supervisor or lead physician Kirk Brewer, M.D. through the above actions intentionally interfered with my practice of medicine at San Angelo Community Medical Center to keep me from receiving patients as required by the EMTALA Medicare call list.

17. The Defendants' anticompetitive conduct has harmed consumers and others who pay for nephrology services in the relevant market by increasing the costs of those services. This is demonstrated by the chart attached hereto as Exhibit G. Before Dr. Brewer's group of hospitalists became the attending physicians for all nephrology

patients at SACMC, nephrology patients would be referred to me (Dr. Montoya) who would serve as the attending physician for the patient. This arrangement avoided the "middle man" which now exists, as the hospitalists now usually serve as an additional charging entity between the patient and the nephrology specialist. Even if the hospitalists could do the same work as me or my partner used to provide, the patient (and/or insurance and taxpayer-funded Medicare/Medicaid) still faces increased cost for the same nephrology work, as the hospitalists charge more for physician services than I charge. The SACMC hospitalists charge at the "Comprehensive" Medicare allowable rate, which adds up to average charges of $506.85 per day. See Exhibit G. **In approximately 2010, at the SACMC emergency room, Dr. Brewer explicitly told me that he and his group of hospitalists will always charge at the comprehensive rate, regardless of medical necessity, because those charges maximize revenue for Dr. Brewer and his group of hospitalists.** I, however, charge at the "Moderate" Medicare allowable rate, which adds up to an average cost of $346.13 per day. The difference between these charges is $160.72 per nephrology patient per average hospital stay. Over the course of a year, consumers/payors for nephrology services have thus paid thousands more for the hospitalists' physician and nephrology services than they would have paid for care from me who is a physician specialist in nephrology.

All of the actions described in this affidavit are done by or for the Defendant San Angelo Community Medical Center.

Further affiant saith not."

Signed this 4th day of May, 2016.

Steve F. Montoya, Jr., M.D.

Subscribed and sworn to me the undersigned notary by Steve F. Montoya, Jr., M.D. on the 4th day of May, 2016.

Notary Public



DALILA CRUZ
MY COMMISSION EXPIRES
May 15, 2018

ALLERGIES & SENSITIVITIES ☐ No Known Allergies WEIGHT [redacted] ☐ lb ☐ kg HEIGHT [redacted] ☐ in ☐ cm

| DRUG | REACTION | DRUG | REACTION |
|---|---|---|---|
| 1. | | 4. | |
| 2. | | 5. | |
| 3. | | 6. | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM!

Date Time ☒ Admit to Inpatient Status ☐ Place in Observation Status ☐ Place in Outpatient Status

UNIT *(check one)*: ☐ Med/Surg ☐ Med-Telemetry ☐ ICU ☐ OB/L&D ☒ Other PCU

Dr. Bayyeb
Stable
1) Acute Renal failure
2) Hyperkalemia
3) Anemia
vitals q 4h
bed rest
I/O q shift
foley [illegible]
ADA 1800 Kcal / cardiac diet
IV [illegible]
Protonix 40 mg IV Q24h
Lovenox 40 mg SC Q24h
~~BMP, Magnesium at~~ 9PM 1/24 // 3 [illegible]
CBC, BMP, Magnesium in AM
Consult Dr. Montoya

Faxed 1/24/14 2053

V.O. Dr. Bayyeb [illegible] MD

Physician Signature Date 1/24/14 Time 7:20 PM

Exhibit #4

Physician Admission Orders
NS-2701-10HMS 10/10 (Rev. 07/12) Page 1 of 1

Patient Label [redacted] ...NITY MEDICAL CENTE... [redacted]



## ALLERGIES & SENSITIVITIES ☐ No Known Allergies

| WEIGHT: ___ ☐ lb ☐ kg | HEIGHT: ___ ☐ in ☐ cm |

| DRUG | REACTION | DRUG | REACTION |
|------|----------|------|----------|
| 1. | | 4. | |
| 2. | | 5. | |
| 3. | | 6. | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

| Date | Time | COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM! |
|------|------|------|
| | | ☐ Admit to Inpatient Status  ☐ Place in Observation Status  ☐ Place in Outpatient Status | UNIT *(check one):*  ☐ Med/Surg  ☐ Med-Telemetry  ☐ ICU  ☐ OB/L&D  ☐ Other ____ |

| 1/25/14 2:36 | Lovenox 30 mg SC q 24° _Bartley_ |

faxed - noted 1/25/14 0240 Ron Chancer

1/25/14 0810 Change Attending to Dr Brewer
Consult Dr Stevenson Consult Called
Kayexelat 30 Gm PO x1 Now
A Status to PCU
TO c Read Back Dr Brewer / Clay / Forland RN

~~FAXED~~

| | | Date | Time |

Physician Signature

**Physician Admission Orders**
NS-2701-10HMS    10/10  (Rev. 07/12)    Page 1 of 1



SAN ANGELO COMMUNITY MEDICAL CTR

April 17, 2014

I am Karen, Tims, the daughter of Eunice Welch. I am writing to you on her behalf concerning her admission to SACMC on 11/28/2011. When asked by the ER admission staff, we replied that "Dr. Montoya" was her doctor. We were admitted to the hospitalists' service. We do not appreciate the fact that we did not have our physician of choice at the hospital. Please correct this to help maintain quality patient care.

Sincerely,

Karen Tims



State of _____

County of _____

Subscribed and sworn to before me this ___ day of _____, ____

ROSEMARY ANDROS
My Commission Expires
August 19, 2017

Notary Public

# Know Your Rights and Responsibilities.

**You have the right to:**

- Be treated in a dignified and respectful manner and to receive reasonable responses to reasonable requests for service.
- To effective communication that provides information in a manner you understand, in your preferred language with provisions of interpreting or translation services, at no cost, and in a manner that meets your needs in the event of vision, speech, hearing or cognitive impairments. Information should be provided in easy to understand terms that will allow you to formulate informed consent.
- Respect for your cultural and personal values, beliefs and preferences.
- Personal privacy, privacy of your health information and to receive a notice of the facility's privacy practices.
- Pain management.
- Accommodation for your religious and other spiritual services.
- To access, request amendment to and obtain information on disclosures of your health information in accordance with law and regulation within a reasonable time frame.
- To have a family member, friend or other support individual to be present with you during the course of your stay, unless that person's presence infringes on others' rights, safety or is medically contraindicated.
- Care or services provided without discrimination based on age, race, ethnicity, religion, culture, language, physical or mental disability, socioeconomic status, sex, sexual orientation, and gender identity or expression.
- Participate in decisions about your care, including developing your treatment plan, discharge planning and having your family and personal physician promptly notified of your admission.
- Select providers of goods and services to be received after discharge.
- Refuse care, treatment or services in accordance with law and regulation and to leave the facility against advice of the physician.
- Have a surrogate decision-maker participate in care, treatment and services decisions when you are unable to make your own decisions.
- Receive information about the outcomes of your care, treatment and services, including unanticipated outcomes.
- Give or withhold informed consent when making decisions about your care, treatment and services.
- Receive information about benefits, risks, side effects to proposed care, treatment and services; the likelihood of achieving your goals and any potential problems that might occur during recuperation from proposed care, treatment and service and any reasonable alternatives to the care, treatment and services proposed.
- Give or withhold informed consent to recordings, filming or obtaining images of you for any purpose other than your care.
- Participate in or refuse to participate in research, investigation or clinical trials without jeopardizing your access to care and services unrelated to the research.
- Know the names of the practitioner who has primary responsibility for your care, treatment or services and the names of other practitioners providing your care.
- Formulate advance directives concerning care to be received at end-of-life and to have those advance directives honored to the extent of the facility's ability to do so in accordance with law and regulation. You also have the right to review or revise any advance directives.
- Be free from neglect; exploitation; and verbal, mental, physical and sexual abuse.
- An environment that is safe, preserves dignity and contributes to a positive self-image.
- Be free from any forms of restraint or seclusion used as a means of convenience, discipline, coercion or retaliation; and to have the least restrictive method of restraint or seclusion used only when necessary to ensure patient safety.
- Access protective and advocacy services and to receive a list of such groups upon your request.



- Receive the visitors whom you designate, including but not limited to a spouse, a domestic partner (including same-sex domestic partner), another family member, or a friend. You may deny or withdraw your consent to receive any visitor at any time. To the extent this facility places limitations or restrictions on visitation; you have the right to set any preference of order or priority for your visitors to satisfy those limitations or restrictions.
- Examine and receive an explanation of the bill for services, regardless of the source of payment.

**You have the responsibility to:**

- Provide accurate and complete information concerning your present medical condition, past illnesses or hospitalization and any other matters concerning your health.
- Tell your caregivers if you do not completely understand your plan of care.
- Follow the caregivers' instructions.
- Follow all medical center policies and procedures while being considerate of the rights of other patients, medical center employees and medical center properties.

**You also have the right to:**

Lodge a concern with the state, whether you have used the hospital's grievance process or not. If you have concerns regarding the quality of your care, coverage decisions or want to appeal a premature discharge, contact the State Quality Improvement Organization (QIO).

Quality Improvement Organization
Phone: (216) 447-9604
Toll Free: (844) 430-9504
Fax: (844) 878-7921
Mail: KEPRO
5700 Lombardo Center Dr.
Suite 100
Seven Hills, OH 44131

If you have a Medicare complaint you may contact:

Texas Department of State Health Services
Phone: (512) 834-6700
Mail: Texas Department of State Health Services
P.O. Box 149347
Austin, TX 78714-9347

**Regarding problem resolution, you have the right to:**

Express your concerns about patient care and safety to facility personnel and/or management without being subject to coercion, discrimination, reprisal or unreasonable interruption of care; and to be informed of the resolution process for your concerns. If your concerns and questions cannot be resolved at this level, contact the accrediting agency indicated below:

The Joint Commission
Phone: (800) 994-6610 Fax: (630) 792-5636
Email: COMPLAINT@JOINTCOMMISSION.ORG
Mail: Office of Quality Monitoring/the Joint Commission
One Renaissance Boulevard
Oakbrook Terrace, IL 60181



More than 20 million Americans—one in nine adults—have chronic kidney disease, and most don't even know it. More than 20 million others are at increased risk. The National Kidney Foundation, a major voluntary health organization, seeks to prevent kidney and urinary tract diseases, improve the health and well-being of individuals and families affected by these diseases, and increase the availability of all organs for transplantation. Through its 47 affiliates nationwide, the foundation conducts programs in research, professional education, patient and community services, public education and organ donation. The work of the National Kidney Foundation is funded by public donations.

The Patient & Family Council (PFC), founded in 1995, is the largest patient group dedicated to supporting, serving and advocating for people with kidney disease. Providing a strong voice in the community and in Congress, the advocacy efforts of the PFC help improve the lives of thousands of people affected by kidney disease.

## Kidney Learning Systems (KLS)™



### A Curriculum for CKD Risk Reduction and Care

| | Public Education | | | |
|---|---|---|---|---|
| | At ↑ Risk | | | |
| STAGE 1 Kidney Damage with Normal or ↑ Kidney Function | STAGE 2 Kidney Damage with Mild ↓ Kidney Function | STAGE 3 Moderate ↓ Kidney Function | STAGE 4 Severe ↓ Kidney Function | STAGE 5 Kidney Failure |

GFR 130      90      60      30      15      0

Light-shaded boxes indicate the scope of content in this KLS resource.
GFR = Glomerular Filtration Rate; T = Kidney Transplant; D = Dialysis



National Kidney Foundation
30 East 33rd Street
New York, NY 10016
800.622.9010

# www.kidney.org

© 2003 National Kidney Foundation, Inc.
2006 Edition. All rights reserved.

11-65-1639



## National Kidney Foundation™

# Dialysis Patients' Bill of Rights and Responsibilities



Exhibit E

## PATIENTS' Rights

- Quality Care
- Information
- Individual Treatment
- Privacy and Confidentiality
- Services Without Discrimination
- Treatment Options
- Kidney Transplantation
- Home Care
- Self-Care Treatment
- Emergency Care
- Dietary Counseling
- Social Work Services
- Facility Management
- Formal Complaint Process
- Refusal and Advance Directives
- Medical Consultation
- Research Programs
- Treatment Costs

## PATIENTS' Responsibilities

- Be Informed
- Plan and Follow a Treatment Program
- Be on Time
- Follow Facility Policies
- Be Considerate
- Fulfill Financial Obligations



## Your Rights

### 1. Quality Care
You have the right to:

- Receive high-quality health care that meets recognized professional goals.

- Be part of the health care team, along with a social worker, nurse, doctor and dietitian.

- Expect that staff members in training will be directly supervised.

### 2. Information
You have the right to:

- Receive information from your nephrologist (kidney doctor) in words that you can understand. This should include information about your medical conditions, treatment choices, test results and possible problems. If this information cannot be given to you directly, the doctor should speak to your family or the person acting on your behalf.

- Be informed about current dialysis treatments for kidney disease.

- Be informed of the process of dialyzer re-use and your options.

- Receive a complete review of any test results and treatment by your doctor or a member of the health care team.

- Be informed of any possible side effects of medications you are taking.

### 3. Individual Treatment
You have the right to:

- Be treated with dignity, respect and consideration.

- Suggest a change in the type of treatment.

- Expect your kidney doctor and other members of your health care team to listen to you when you suggest changes in your dialysis treatment.

- Expect that treatment will be tailored to your individual health needs.

- Expect that the patient-to-staff ratio at your facility conforms to state regulations.

### 4. Privacy and Confidentiality
You have the right to:

- Expect privacy when receiving medical care.

- Expect examinations and discussions about your care to be held in private.

- Expect that your personal medical information will be kept confidential.

### 5. Services Without Discrimination
You have the right to:

- Expect medical care without regard to your race, color, gender, sexual preference, religion or national origin.



### 6. Treatment Options
You have the right to:

- Receive a full explanation of all treatment options for kidney disease, including their advantages and disadvantages.

### 7. Kidney Transplantation
You have the right to:

- Receive a full explanation of the kidney transplant process including all transplant options.

- Select the transplant center at which you desire to have a transplant evaluation after consultation with the nephrologist.

### 8. Home Care
You have the right to:

- Be informed of new advances in home care and have the opportunity to make a change to that treatment option.

- Receive educational materials about new procedures.

- Suggest changes in your home care treatment.

- Receive follow-up care by dietary, social work and nursing services.

## 9. Self-Care Treatment

You have the right to:

- Receive information about dialysis facilities that offer self-care.

## 10. Emergency Care

You have the right to:

- Receive emergency medical care without unnecessary delay.

- Be informed by the dialysis facility about their emergency plan in case of a disaster (e.g., snow storm, fire, loss of power).

- Be informed of the facility's plan of action in case of medical emergencies.



## 11. Dietary Counseling

You have the right to:

- Receive counseling from a qualified dietitian according to federal and state law.

- Receive nutritional educational material and instruction.

- Receive care and counseling on a regular basis.

## 12. Social Work Services

You have the right to:

- Receive counseling from a qualified social worker according to federal and state law.

- Receive an evaluation and follow-up care, including a vocational rehabilitation review.

- Receive referrals to community services when needed.

## 13. Facility Management

You have the right to:

- Expect the dialysis facility to employ skilled staff and provide safe, clean, comfortable and professional surroundings.

- Expect the facility to make every effort to make you comfortable and give you your treatment on time, according to a schedule that meets special needs whenever possible.

- Expect the facility to monitor the quality of treatment and equipment according to regulations.

## 14. Formal Complaint Process

You have the right to:

- Make a complaint to your facility management and request that they try to resolve a problem.

- Ask and be instructed on your dialysis facility's grievance process.

- File a complaint with the End-Stage Renal Disease Network in the region, and/or your state health department in an attempt to resolve a problem.

## 5. Refusal, Advance Directives and End-of-Life Care

You have the right to:

- Make decisions about your health care based on information given to you by your kidney doctor.

- Complete an advance directive stating your wishes.

- Be informed by your kidney doctor of the possible results of refusing drugs, treatments or procedures.

- Be informed of how the facility cares for those regarding end-of-life needs.

- Refuse any drugs, treatments or procedures offered to you.

- Indicate your refusal in writing.

- Accept full responsibility for the medical outcomes of your refusal.

## 16. Medical Consultation

You have the right to:

- Request consultation with another doctor for any kidney- or non-kidney-related medical problem.

- Know that payment for consultation may not be covered under Medicare or other health care coverage, and you may be responsible for payment.

## 17. Research Programs

You have the right to:

- Receive a full explanation of any research program in which you may be able to participate.

- Know that the study will not be conducted without your informed consent or that of the person acting on your behalf.

- Refuse or withdraw from the research study at any time.

## 18. Treatment Costs

You have the right to:

- Receive a full explanation of all charges by the facility and doctor.

- Be informed about your financial responsibilities after Medicare or Medicaid and/or other health care insurance coverage.

- Obtain assistance with completing insurance forms.

- Get information about how you can pay your bill and about programs available to help you.

## Your Responsibilities

### 1. Be Informed

It is your responsibility to:

- Learn as much as you can about your kidney disease and how it is treated.

- Talk to your health care team about your concerns regarding your treatment.



### 2. Plan and Follow a Treatment Program

It is your responsibility to:

- Supply all information about your health needed to plan and carry out a treatment program that will give you the best results.

- Find out about the other services and referrals that are recommended by your health care team.

### 3. Be On Time

It is your responsibility to:

- Make every effort to be on time for your scheduled dialysis.

- Tell the dialysis facility ahead of time if you are unable to attend your next treatment date.

- Understand that your treatment time may be shortened if you arrive late.

### 4. Follow Facility Policies

It is your responsibility to:

- Follow the facility policies and procedures that have been developed to provide safety and quality of care to all patients.

### 5. Be Considerate

It is your responsibility to:

- Treat other patients and staff members with respect, dignity and consideration.

- Never threaten others, act in a violent manner or cause any physical harm.

### 6. Fulfill Financial Obligations

It is your responsibility to:

- Make every effort to pay your bills for care from the dialysis facility and doctor(s).

- Obtain Medicare Part B coverage or co-insurance through a private carrier.

- Inform the facility business office of all health insurance programs and policies from which you receive direct payment for services in the treatment of kidney disease.

- Pay the dialysis facility and doctor when you receive payments from your health insurance company or medical policies.

**Many thanks to the following organizations for their role in assisting with the development of the Dialysis Patients' Bill of Rights and Responsibilities**

American Society of Transplantation
Centers for Medicare & Medicaid Services
ESRD Network 4
ESRD Network 7
ESRD Network 8
ESRD Network 13
ESRD Network 18
NKF Council of Nephrology Social Workers

NKF Council on Renal Nutrition
NKF Council of Nephrology Nurses and Technicians
NKF Patient & Family Council Executive Committee
National Renal Administrators Association
Renal Physicians Association
TransPacific Renal Network

# Patient Bill of Rights

## & Responsibilities

Exhibit F
page 1 of 2

# Notice Concerning Complaints

Complaints about physicians, as well as other licensees
and registrants of the Texas State Board of Medical
Examiners, including physician assistants and
acupuncturists, may be reported for investigation at the
following address:

    Texas State Board of Medical Examiners

    Attention: Investigations

    333 Guadalupe, Tower 3, Suite 610

    P.O. Box 2018, MC-263

    Austin, Texas 78768-2018

Exhibit F
Page 2 of 2

## DR MONTOYA'S CHARGES MODERATE

| DESCRIPTION | REQUIREMENTS | CPT | MEDICARE ALLOWABLE RATE |
|---|---|---|---|
| INPATIENT ADMISSION MODERATE | 1. A comprehensive history 2. A comprehensive exam 3. Medical Decision making of moderate complexity | 99222 | $ 134.03 |
| INPATIENT FOLLOW UP MODERATE | 1. An expanded problem focused interval history 2. An expanded problem focused examination 3. Medical decision making of moderate complexity | 99232 | $ 70.76 |
| INPATIENT FOLLOW UP MODERATE | 1. An expanded problem focused interval history 2. An expanded problem focused examination 3. Medical decision making of moderate complexity | 99232 | $ 70.76 |
| INPATIENT DISCHARGE less than 30 min | 1. Final Exam 2. Discussion of hospital stay 3. Instructions for continuing care to all relevant caregivers 4. preparation of discharge records 5. Presciptions and Referral forms | 99238 | $ 70.58 |
| | | | $ 346.13 |

## HOSPITALIST CHARGES COMPREHENSIVE

| DESCRIPTION | | CPT | MEDICARE ALLOWABLE RATE |
|---|---|---|---|
| INPATIENT ADMISSION COMPREHENSIVE | 1. A comprehensive history 2. A comprehensive exam 3. Medical Decision making of high complexity | 99223 | $ 198.47 |
| INPATIENT FOLLOW UP COMPREHENSIVE | 1. A detailed interval history 2. A detailed examination 3. Medical decision making of high complexity | 99233 | $ 101.94 |
| INPATIENT FOLLOW UP COMPREHENSIVE | 1. A detailed interval history 2. A detailed examination 3. Medical decision making of high complexity | 99233 | $ 101.94 |
| INPATIENT DISCHARGE more than 30 min | 1. Final Exam 2. Discussion of hospital stay 3. Instructions for continuing care to all relevant caregivers 4. preparation of discharge records 5. Presciptions and Referral forms | 99239 | $ 104.50 |
| | | | $ 506.85 |
| | | | |
| TOTAL DIFFERENCE | | | $ (160.72) |

Exhibit G
P 2 of 2

| | | |
|---|---|---|
| Difference between Dr. Montoya, Independent physician billing and hospital stay for average of 4 days for an In-patient at SACMC with Dr. Montoya, billing medicine at the moderate level compared to Dr. Brewer and the Hospitalist billing comprehensive. | $ | 100 |
| Multiply average admissions per day – 4 | $ | 400 |
| Multiply for one year | $ | 146,000 |
| Multiply for total number of Independent physicians affected by Hospitalists' pattern of restraint – 10% (10) | $ | 1,460,000 |
| Multiply by number of years – 8 for one hospital | $ | 11,680,000 |
| Multiply by 200 Hospitals | | $ 235,600,000 |

STATE OF TEXAS          §
                       §          AFFIDAVIT
COUNTY OF TOM GREEN §

      BEFORE ME the undersigned authority appeared John Hunt, M.D. and after being duly sworn under oath stated.

      "My name is John Hunt, M.D. I have knowledge of all the facts of this affidavit and all facts are within my personal knowledge true and correct and that I was involved with facts stated.

      "I was on the staff of San Angelo Community Medical Center when Dr. Brewer was brought in to head up the hospitalist service and emergency room of San Angelo Community Medical Center. San Angelo Community Medical Center had a call list in the emergency room that listed on-call physicians to be referred patients. This list was kept pursuant to Medicare regulations. The list was to be followed pursuant to the Medicare regulations unless the patient requested a different physician. I learned of the whisper campaign against Dr. Montoya that he was not to be referred patients by the emergency room and hospitalist. Dr. Montoya is an independent physician. Until Dr. Brewer came to San Angelo Community Medical Center the independent physicians would receive referrals from hospitalists. Dr. Brewer lead a campaign to not use independent physicians. Independent physicians are physicians that do work for or are affiliated with the hospital owned groups.

      Further affiant saith not."

Signed this 11th day of January, 2016.

<div style="text-align:right">

_____
John Hunt, M.D.
</div>

      Subscribed and sworn to me the undersigned notary by John Hunt, M.D. on the 11th day of January, 2016.

<div style="text-align:right">

_____
Notary Public
</div>



JAMIE L. SANCHEZ
Notary Public, State of Texas
My Commission Expires
July 26, 2016

Exhibit 3

Print this page

# Case # B150285C - STEVE F. MONTOYA, MD,WEST TEXAS RENAL CARE,WEST TEXAS NEPHROLOGY vs. SAN ANGELO COMMUNITY MEDICAL CENTER,KIRK BREWER, MD (Woodward, Ben)

## Case Information

| | |
|---|---|
| Location | Tom Green County - 119th District Court |
| Date Filed | 05/04/2016 10:49:17 AM |
| Case Number | B150285C |
| Case Description | STEVE F. MONTOYA, MD,WEST TEXAS RENAL CARE,WEST TEXAS NEPHROLOGY vs. SAN ANGELO COMMUNITY MEDICAL CENTER,KIRK BREWER, MD |
| Assigned to Judge | Woodward, Ben |
| Attorney | PAUL LAIRD II |
| Firm Name | Paul Craig Laird II Law Firm, PLLC |
| Filed By | PAUL LAIRD II |
| Filer Type | Not Applicable |

## Fees

| | |
|---|---|
| Convenience Fee | $0.00 |
| Total Court Case Fees | $0.00 |
| Total Court Party Fees | $0.00 |
| Total Court Filing Fees | $0.00 |
| Total Court Service Fees | $0.00 |
| Total Filing & Service Fees | $0.00 |
| Total Service Tax Fees | $0.00 |
| Total Provider Service Fees | $0.00 |
| Total Provider Tax Fees | $0.00 |
| Grand Total | $0.00 |

## Payment

| | |
|---|---|
| Account Name | Paul C. Laird |
| Transaction Amount | $0.00 |
| Transaction Response | |
| Transaction ID | 16869047 |
| Order # | 010449256-0 |

---

## Answer/Response

| | |
|---|---|
| Filing Type | EFileAndServe |
| Filing Code | Answer/Response |

Filing Description                     response to motion for summary judggment
Reference Number                b-15-0285-c
Comments
Status                                 Submitting

**Fees**

Court Fee                           $0.00
Service Fee                      $0.00

**Documents**

*Lead Document*              Response to Defendants Motion for Summary      [Original]
Judgment..pdf

**eService Details**

| Name/Email | Firm | Service Type | Status | Served | Date/Time Opened |
|---|---|---|---|---|---|
| Paul Craig Laird II<br>pcl880@aim.com | | EServe | Not Sent | No | Not Opened |
| Paul Craig Laird II<br>pcl880@aim.com | Ashley & Laird, L.C. | EServe | Not Sent | No | Not Opened |
| James J McGoldrick<br>james.mcgoldrick@jcmfirm.com | Jones Carr McGoldrick, LLP | EServe | Not Sent | No | Not Opened |
| Jeffrey F Wood<br>jeff.wood@jcmfirm.com | Jones Carr McGoldrick, LLP | EServe | Not Sent | No | Not Opened |
| Cheves Ligon<br>cheves.ligon@jcmfirm.com | Jones Carr McGoldrick | EServe | Not Sent | No | Not Opened |
| Robert B Wagstaff<br>rwagstaff@mcmahonlawtx.com | McMahon Surovik Suttle, PC | EServe | Not Sent | No | Not Opened |
| Amanda Livezey<br>alivezey@mcmahonlawtx.com | McMahon Surovik Suttle, P.C. | EServe | Not Sent | No | Not Opened |

# TAB NO. 11

| | | |
|---|---|---|
| STEVE F. MONTOYA, M.D. | § | IN THE DISTRICT COURT OF |
| WEST TEXAS RENAL CARE and | § | |
| WEST TEXAS NEPHROLOGY | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 119th JUDICIAL DISTRICT |
| | § | |
| SAN ANGELO COMMUNITY | § | |
| MEDICAL CENTER and KIRK | § | |
| BREWER, M.D. | § | |
| Defendants. | § | TOM GREEN COUNTY, TEXAS |

## ORDER ON DEFENDANT SAN ANGELO COMMUNITY MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

On this __17th__ day of __May__, 2016, came on to be heard Defendant San Angelo Community Medical Center's Motion For Summary Judgment, and the Court having considered same, is of the opinion that said motion is well taken and should be granted.

IT IS, THEREFORE, ORDERED, ADJUDGED, and DECREED that Plaintiffs' claims in their entirety be dismissed *with prejudice*.

SIGNED ~~this~~ _____ ~~day of~~ May 17, 2016 ~~, 2016.~~

_Ben Woodward_
JUDGE PRESIDING

TAB NO. 12

CAUSE NO. B-15-0285-C

| | | |
|---|---|---|
| STEVE F. MONTOYA, JR., M.D. | § | IN THE DISTRICT COURT OF |
| WEST TEXAS RENAL CARE | § | |
| WEST TEXAS NEPHROLOGY | § | |
| | § | |
| VS. | § | 119th JUDICIAL DISTRICT |
| | § | |
| SAN ANGELO COMMUNITY | § | |
| MEDICAL CENTER AND | § | |
| KIRK BREWER, M.D. | § | TOM GREEN COUNTY, TEXAS |

## RESPONSE TO MOTION TO DISMISS OF
## SAN ANGELO COMMUNITY MEDICAL CENTER

COMES NOW, Dr. Montoya, Plaintiff and responds to the Motion to Dismiss by Defendant San Angelo Community Medical Center.

1. The Motion to Dismiss is based upon Texas Anti-Slapp Statute, Chapter 27 Actions invoking the exercise of certain Constitutional Rights.

2. No affidavits are attached to the Motion.

3. Attached as Exhibit 2 hereto is the affidavit of Dr. Montoya as evidence in support of his response.

4. The purpose of this lawsuit has nothing to do with the Defendants Constitutional Rights to speak freely, associate freely and participate in governmental as permitted by law. These are the requirements to meet in filing a Motion under the Anti-Slapp Statute *Tex.C.P.R.C.§27.005(b)* and as set out in *Paulsen v. Yarrell 455 SW3d 192 (Tex.-App.-Houston [1st Dist.] 2014, no pet.)* (quoting *In Re Estate of Check 438 SW3d at 836*).

5. The evidence presented by Dr. Montoya is that this case deals with the same standard as setforth in the recent Texas Supreme Court of *In Re Memorial Herman Hospital et al 464 SW3d 686, 695-696 2015.* This case is on concerning anti-trust, business damages and a campaign to stop competition by Dr. Montoya at San Angelo Community Medical Center. Attached as Exhibit 1 is a certified copy of the pleading approved by the Texas Supreme Court.

6. The Texas Supreme Court agreed that clear and specific evidence under the Texas Statute includes relevant circumstantial evidence. *(In Re Lipsky, 2015 WL1870073)*. This evidence of Dr. Montoya meets the standard.

RESPONSE TO MOTION TO DISMISS OF SAN ANGELO COMMUNITY MEDICAL CENTER-
PAGE 1 OF 7

225

7. In this case the evidence is both direct, actual and circumstantial. The pleadings and affidavit of Dr. Montoya prove that his case is real and not a continually protected case.

8. Attached to this Response is the affidavit of John Hunt, M.D. (Exhibit 3) attached hereto as if setforth at length that proves the whisper campaign and that the call list is a requirement of Medicare rules and that the actions of San Angelo Community Medical Center were to hurt Dr. Montoya economically and professionally.

9. **Plaintiff's Business Disparagement and Defamation Claims Should Not Be Dismissed**

"The TCPA's purpose is to identify and summarily dispose of lawsuits designed *only* to chill First Amendment rights, not to dismiss meritorious lawsuits." *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) (emphasis added), citing Tex. Civ. Prac. & Rem. Code § 27.002 (balancing "the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law" against "the rights of a person to file meritorious lawsuits for demonstrable injury"). The TCPA is not applicable to this case, as Plaintiff's causes of action are primarly concerned with Defendants' anticompetitive actions, and injury to competition in the relevant markets of nephrology services and referrals for nephrology services in San Angelo, Texas. As Plaintiff's Fifth Amended Petition makes clear, the conspiracy which Defendants perpetrated to deprive Dr. Montoya of referrals began in 2007. Although Plaintiff details some specific defamations which occurred in 2014, those defamations are merely representative of the anticompetitive scheme to which Dr. Montoya was being subjected. Defendants' group boycott and monopolization/attempted monopolization of the relevant market began much earlier, so even if Plaintiff's pleadings do not set forth a prima facie case of defamation and business disparagement, Plaintiff's antitrust claims should not be dismissed because they are not based on those instances of defamation.

In any event, Plaintiff has set forth a prima facie case of defamation and business disparagement by clear and specific evidence in his affidavit and Fifth Amended Petition. The "clear and specific" evidence which is required to pass a TCPA challenge can be contained in the plaintiff's pleadings or in affidavits. *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015). In determining if the "clear and specific evidence" standard is met, the court must view the pleadings in the light most favorable to the party opposing the TCPA motion. *Sloat v. Rathbun*, 2015 WL 6830927, at *3 (Tex.App.-Austin, 2015) ("we view the pleadings in the light most favorable to [the non-movant]; *i.e.*, favoring the conclusion that her claims are not predicated on protected expression."); *see also Cheniere Energy, Inc. v. Lotfi*, 449 S.W.3d 210, 214 (Tex.App.—Houston [1st Dist.] 2014, no pet.) (reviewing pleadings and evidence in light most favorable to non-movant)

A prima facie standard generally requires only the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015), quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam). "In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss." *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015).

Plaintiff has plainly satisfied this requirement. As shown in Plaintiff's Fifth Amended Petition, Dr. Brewer's defamation was published by conduct when he removed Dr. Montoya from consulting with a patient on January 25, 2014 at 8:10 a.m. The defamation was published to the hospitalist overseeing that patient, and the nephrologists who was eventually called in to consult as a replacement for Dr. Montoya. The defamation was eventually spread to all hospitalists and emergency room doctors at SACMC. Dr. Montoya has also set forth a detailed calculation and explanation of the damages he has suffered as a result of the Defendants' scheme to deprive him of nephrology referrals and consults. See Plaintiff's Fifth Amended Petition, paragraph 5. With regard to the January 2014 defamation, Plaintiff has established his prima facie case with clear and specific evidence.

10.     **Even if Plaintiff's Defamations Are Dismissed, Plaintiff's Remaining Claims Are Not Subject to the TCPA**

The TCPA is clearly meant to apply to individual claims, not to an entire lawsuit when allegedly defamatory lawsuits are only important to certain claims. Breach of contract claims, for example, would not ordinarily be dismissed merely because a Plaintiff failed to plead a prima facie defamation case under the TCPA.

The TCPA's definition of "legal action" makes this clear. The TCPA states that "If a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action." Tex. Civ. Prac. & Rem. Code § 27.003(a).

The TCPA then defines a "Legal action" as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." Tex. Civ. Prac. & Rem. Code § 27.003(a).

The only cases which have interpreted the TCAP's definition of "legal action" have held that the term "is broad and evidences a legislative intent to treat any claim by any party on an individual and separate basis." *Hicks v. Group & Pension Administrators, Inc.*, 473 S.W.3d 518, 529 (Tex.App.-Corpus Christi, 2015), citing *Better Business Bureau of Metropolitan Dallas, Inc. v. Ward*, 401 S.W.3d 440, 443 (Tex.App.—Dallas 2013, pet. denied). In *Hicks*, the court individually examined each of the claims which allegedly violated the TCPA and dismissed two

of those claims while refusing to dismiss two other claims because the TCPA challenge to those claims was not timely filed.

Writing a concurrence in the case of *Serafine v. Blunt*, 466 S.W.3d 352, 393-94 (Tex.App.-Austin 2015, no pet.), Justice Pemberton wrote that where a "'legal action' is based on, relates to, or is in response to" (whatever that phrase may mean) both expression protected by the Act and other unprotected activity, the "legal action" is subject to dismissal only to the extent it 'is based on, relates to, or is in response to' the protected conduct, as opposed to being subject to dismissal in its entirety" *Id.* at 394. Justice Pemberton then pointed to this result finds support in several features of the the TCPA's text, and he explained as follows:

> The first is that the TCPA defines "legal action"—that which is subject to dismissal—both expansively and variously, as previously noted, referring to everything from an entire action or proceeding to particular facts that underlie a claim or cause of action. This nomenclature contemplates the drawing of distinctions not only between claims, but also between factual theories, as here.

> Adding further support to this construction are the dual overarching purposes that the Legislature has declared the TCPA is to serve: "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Neither purpose is advanced by holding that a claim is *wholly* subject to dismissal merely because it *partly* "is based on, relates to, or is in response to" protected expression under the Act. Nor would these purposes be served by the converse holding that the claim is *wholly* beyond the Act merely it "is based on, relates to, or is in response to" some unprotected activity.

*Id.* at 393-394. The *Serafine* court later cited to "longstanding principles of Texas jurisprudence" counsel against "a construction of the TCPA that would mandate presumptive dismissal of an entire claim merely because its factual underpinnings might include even one allegation that implicates the Act's protections." *Id.* at 394.

Several cases have applied the TCPA as Justice Pemberton interprets it. For example, in *Tervita, LLC v. Sutterfield*, 482 S.W.3d 280, 286-87 (Tex.App.-Dallas 2015, pet. denied), the court dismissed some of the plaintiff's claims based on conduct that occurred during a TDI-WC hearing, but refused to dismiss other claims because the movant had not shown "by a preponderance of the evidence, that [plaintiff's] allegations were based on [defendant's] exercise of its right to petition or its right of association." *Id.* at 287. The Tervita court thus held that the TCPA did not apply to the plaintiff's "employment discrimination based on (1) creating a hostile work environment, (2) representing that he was "not entitled to pursue benefits" under the Texas Worker's Compensation Act, and (3) wrongful discharge." *Id.* at 286; *see also Serafine v. Blunt,*

466 S.W.3d 352, 359-60 (Tex.App.-Austin 2015) ("to the extent that the Blunts' tortious-interference counterclaim is based in part on Serafine's alleged threats made outside the context of the lawsuit, Serafine has not satisfied her initial burden to show that these portions of the Blunts' counterclaims are subject to the [TCPA].")

The same result occurred in *Sloat v. Rathbun*, 2015 WL 6830927, at *6-7 (Tex.App.-Austin 2015, pet. filed). In that case, the court rejected the defendants' argument that plaintiff's entire suit was based on conduct protected under the TCPA, when the plaintiff had also plead facts which showed stalking and other tortious conduct. The court rejected application of the TCPA and stated as follows:

> [Plaintiff's claims] are garden-variety tort claims based on specific conduct that the [Defendants] have failed to demonstrate, by a preponderance of the evidence, implicates the exercise of their rights of "free speech," " association," or "to petition."

*Sloat v. Rathbun*, 2015 WL 6830927, at *8 (Tex.App.-Austin 2015, pet. filed). The Sloat court held that the defendant had failed to demonstrate, by a "preponderance of the evidence," that the plaintiff's causes of action for intentional infliction of emotional distress, invasion of privacy by intrusion on seclusion and by public disclosure of private facts, and tortious interference with contract were "based on, related to, or in response to" defendants' "exercise of their right of free speech, right to petition, or right of association." *Id.* at *9. The defendants in Sloat had thus failed to establish that the TCPA applied to the case. *Id.*

## 11. Plaintiff Has Valid Causes of Action for Antitrust Violations

As noted above, Plaintiff's defamation claims are examples of how Defendant enforced its anticompetitive scheme to deprive Dr. Montoya of nephrology referrals, but Plaintiff's antitrust claims are primarily based on the illegal scheme itself and not individual defamatory statements. Plaintiff has plainly set forth valid antitrust claims as they largely mirror the causes of action which the Supreme Court held to be valid in *In re Memorial Hermann Hospital System*, 464 S.W.3d 686 (Tex. 2015).

The causes of action in this case, along with the underlying facts, are very similar to the causes of action approved by the Supreme Court in *In re Memorial Hermann Hospital*. In both cases a doctor who has privileges at a hospital has alleged that the defendants conspired to prevent him from obtaining patient referrals. *In re Memorial Hermann Hospital* at p. 711; Plaintiff 's Fifth Amended Petition, paragraphs 6.1, 6.2, 6.5. In both cases, the alleged conspirators consist of the hospital itself, a physician practice group, and individual doctors who practice at the hospital. *In re Memorial Hermann Hospital* at p. 695; Plaintiff's Fifth Amended Petition. In both cases, the doctors have explained how other doctors how other doctors are a primary source of referrals, and that these referrals are required for a doctor to be able to compete. *In re Memorial Hermann Hospital* at p. 711; Fifth Amended Petition, pp. 6.2, 6.3, 6.8-

6.11.   Both lawsuits allege that the defendants intentionally interfered with the plaintiff's longstanding practice for obtaining referrals from other doctors in the community, and that the defendants' acts constituted a "concerted effort . . . to restrain competition in and monopolize" the relevant market. *In re Memorial Hermann Hospital* at p. 708; Plaintiff's Fifth Amended Petition, paragraphs 6.1, 6.2, 6.5, 7.1, 12.7. Both lawsuits allege that the defendants impugned the reputation of the plaintiff doctors through a covert whisper campaign which convinced other doctors not to refer patients to the plaintiff doctors. *In re Memorial Hermann Hospital* at p. 696; Plaintiff's Fifth Amended Petition, paragraph 6.15-6.17. Both lawsuits allege that the plaintiff doctor lost a substantial amount of business from referrals due to the anticompetitive conspiracy against them. *In re Memorial Hermann Hospital* at p. 711 (plaintiff alleged that "referral patterns changed" so that he was no longer the "number one" physician, and that following the conduct at issue, another physician received more referrals); Plaintiff's Fifth Amended Petition, paragraph 7.11 and 13.3-13.4 (Dr. Montoya received 10-20 calls per month from the SACMC emergency room to treat new or existing patients before the anticompetitive conspiracy began, but he has only received a single call from emergency room for a new patient since then; all referrals now go to the nephrologists at WTMA). In both this case and in *In re Memorial Hermann Hospital,* the plaintiff doctor alleges that the defendants' acts "constitute illegal monopolization, attempted monopolization, and/or conspiracy to monopolize under Texas law." in *In re Memorial Hermann Hospital, ;* Plaintiff's Fifth Amended Petition, paragraph 12.7. Plaintiff has plainly stated a valid cause of action under the antitrust laws of Texas which is in no way designed only to chill Defendants' First Amendment rights. "" *In re Lipsky,* 460 S.W.3d 579, 589 (Tex. 2015) ("The TCPA's purpose is to identify and summarily dispose of lawsuits designed *only* to chill First Amendment rights, not to dismiss meritorious lawsuits.") (emphasis added). Defendant's Motion to Dismiss under the TCPA must accordingly be denied.

Plaintiff requests attorney fees and costs be awarded for having to respond to this frivolous motion.

Respectfully Submitted

Paul Craig Laird II Law Firm, PLLC

/s/ Paul Craig Laird II
By: Paul Craig Laird II
800 W. Airport Freeway
Suite 880 LB 6015
Irving, TX 75062
972-554-0929
214-260-4935- fax
pcl880@aim.com
SBOT 11795420
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

This is to certify that this Response was serviced via the e-filing system on the 4th day of May, 2016.

/s/ Paul Craig Laird II

Filed 12 December 26 A9:19
Chris Daniel - District Clerk
Harris County
FAX15376415

Cause No. 2012-53962

| | | |
|---|---|---|
| MIGUEL A. GOMEZ, III, M.D. and MIGUEL A. GOMEZ, M.D., P.A., | § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § § | |
| V. | § § | HARRIS COUNTY, TEXAS |
| MEMORIAL HERMANN HOSPITAL SYSTEM; MEMORIAL HERMANN PHYSICIAN NETWORK; MICHAEL P. MACRIS, M.D.; MICHAEL P. MACRIS, M.D., P.A.; and KEITH ALEXANDER, | § § § § § § § | |
| *Defendants.* | § | 333rd JUDICIAL DISTRICT |

## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION AND JURY DEMAND

To the Honorable Judge Halbach & Our Jury of Harris County Citizens:

Plaintiffs Miguel A. Gomez, III, M.D. and Miguel A. Gomez, M.D., P.A. (together, "Dr. Gomez") file this First Amended Original Petition and Jury Demand against Defendants Memorial Hermann Hospital System ("Memorial Hermann"); Memorial Hermann Physician Network ("MHMD"); Michael P. Macris, M.D.; Michael P. Macris, M.D., P.A. (both together, "Dr. Macris"); and Keith Alexander (all together, "Defendants"), and would respectfully state:

### DISCOVERY CONTROL PLAN

1.1    Dr. Gomez intends to conduct discovery under Level 2 of Texas Rule of Civil Procedure 190.

Certified Document Number: 54275000 - Page 1 of 17

*Exhibit I* 232

## PARTIES

2.1 Miguel A. Gomez, III, M.D. ("Dr. Miguel Gomez) is a resident and citizen of Harris County, Texas.

2.2 Miguel A. Gomez, M.D., P.A. ("Dr. Gomez P.A.") is a professional association organized under the laws of the State of Texas.

2.3 Memorial Hermann Hospital System is a business entity organized under the laws of the State of Texas that controls and manages a number of hospitals, out-patient facilities, and other health care service centers throughout the Houston Metropolitan area, including Memorial Hermann Memorial City Medical Center. Memorial Hermann has appeared and answered herein.

2.4 MHMD a/k/a Memorial Hermann Physician Network is a business entity organized under the laws of the State of Texas that acts to deliver medical services on behalf of Memorial Hermann, and has appeared and answered herein.

2.5 Michael P. Macris, M.D. ("Dr. Michael Macris") is a natural person residing in Harris County, Texas, and has appeared and answered herein.

2.6 Michael P. Macris, M.D., P.A. ("Dr. Macris P.A.") is a professional association organized under the laws of the State of Texas and has appeared and answered herein.

2.7 Keith Alexander ("Mr. Alexander") is a natural person employed at all relevant times as the Chief Executive Officer for Memorial Hermann Memorial City Medical Center, and has appeared and answered herein.

-2-

Certified Document Number: 54275000 - Page 2 of 17

## VENUE & JURISDICTION

3.1    Venue is proper in Harris County under Tex. Civ. Prac. & Rem. Code Section 15.002(a)(1), as all or a substantial part of the events or omissions giving rise to this legal action occurred in Harris County, Texas, and Defendants all reside in Harris County, Texas.

3.2    Dr. Gomez has incurred and sues for damages well in excess of $125,000, and jurisdiction is proper in this Court.

## RESPONDEAT SUPERIOR / VICARIOUS LIABILITY / CIVIL CONSPIRACY

3.3    At all relevant times, Keith Alexander, as a principal officer of Memorial Hermann, and other agents/employees of Memorial Hermann and MHMD working under his direction or in furtherance of unlawful and improper actions, was employed by and acting in furtherance of the business of Memorial Hermann and/MHMD. Keith Alexander is individually liable for his own illegal and improper actions. Memorial Hermann is also liable for the improper acts and omissions of its principal officer, Keith Alexander, as well as the other agents/employees of Memorial Hermann, under the legal doctrines of respondeat superior and vicarious liability. MHMD is also liable for the improper acts and omissions of its agents/employees of MHMD, under the legal doctrines of respondeat superior and vicarious liability.

3.4    At all relevant times, Dr. Macris, as a principal officer of Dr. Macris P.A., and other agents/employees of Dr. Macris P.A. working under his direction or in furtherance of his unlawful and improper actions, was employed by and acting in furtherance of the business of Dr. Macris P.A.. Dr. Macris is individually liable for his

-3-

own illegal and improper actions. Dr. Macris P.A. is also liable for the improper acts and omissions of its principal officer, Dr. Macris , as well as the other agents/employees of Dr. Macris, under the legal doctrines of respondeat superior and vicarious liability.

3.5 Defendants Memorial Hermann (acting by and through its agents/employees/principal officers); MHMD (acting by and through its agents/employees/principal officers) and Dr. Macris (acting by and through his agents/employees/principal officer) acted together to carry out the improper and illegal actions, and are therefore jointly and severally liable for civil conspiracy in carrying out their wrongful activities.

### CONDITIONS PRECEDENT & INAPPLICABILITY OF AFFIRMATIVE DEFENSES

4.1 All conditions precedent to Dr. Gomez' right to recover have been performed or have occurred.

4.2 To the extent necessary, Plaintiffs rely on and plead the discovery rule to any statute of limitations defense asserted by Defendants, including fraudulent concealment.

### FACTUAL BACKGROUND

5.1 Since returning after advanced training to practice medicine in his hometown of Houston, Texas, Dr. Gomez worked hard to build a stellar reputation for quality patient care, technical excellence, and outstanding professionalism in cardiothoracic and general surgery in the West Houston and Katy community. Dr. Gomez cares about his patients, his fellow medical professionals, and his community, and his practice expanded over a number of years with continuing referrals from medical professionals

-4-

Certified Document Number: 54275000 - Page 4 of 17

aware of his well-deserved reputation for outstanding patient care.

5.2    Dr. Gomez's skills and specialized abilities for patients requiring cardio-thoracic and general surgeries, from "basic" open heart surgery to advanced robotic-assisted surgical procedures, were actively promoted for many years by Memorial Hermann as part of its own marketing efforts in the West Houston and Katy medical community. Dr. Gomez's practice was further enhanced by his pioneering implementation of "off the pump" surgery and robotic-assisted cardiothoracic procedures in the Houston medical community. "Off the pump surgery" eliminates the need for the use of a heart-lung machine by-pass during surgery and greatly enhanced patient care and outcomes. Robotic-assisted surgery, which typically eliminates the need to crack open the patient's sternum in favor of much smaller entry ports for the robotic surgical tools, likewise led to better outcomes and quicker recoveries for patients fortunate enough to come under Dr. Gomez' care.

5.3    The recommendation of the referring physicians to the patient directly impacts the choice of the specific surgeon entrusted with patient care. The surgeon in turn determines, based upon the quality of the surgical and post-surgical equipment, staff, and facilities, the hospital in which the surgical care is delivered. The surgeon's decisions as to where to perform his or her surgeries directly impact the profitability of the hospitals in the specific community (in the West Houston and Katy community, the surgical market is primarily at Memorial Hermann Memorial City Medical Center and The Methodist West Houston Hospital). As a result, the ability to fairly compare the reputations of surgeons in a medical market community such as West Houston and

Certified Document Number: 54275000 - Page 5 of 17

-5-

236

Katy affects patient choice and the continued availability of the highest quality patient care. Improperly manipulating comparative information and reputations of surgeons in a medical market such as West Houston and Katy creates an improper distortion of free and informed patient choice and options for medical care.

5.4     The appropriate way for any health care provider to attract patients in a competitive market is by actually providing and being known for providing the highest quality of care. The illegal and unjust way (putting patients and their free choice in the market in jeopardy) is to malign, spread untrue or misleading information, or otherwise smear the reputation of a highly qualified surgeon in the same medical community.

5.5     With new management and operational changes at Memorial City Memorial Hermann, including the arrival of Mr. Alexander as CEO, Dr. Gomez became increasingly concerned about a decline in the quality of patient care at the hospital. The decline in patient care arose from the understaffing of qualified nurses in the hospital's intensive care unit (ICU), general care units and the emergency room; the lack of consistent procedural safeguards for monitoring patients; and the failure to update critical equipment. Memorial Hermann also began deliberate efforts to restrict surgical care for the most critically ill patients, pushing for abandonment of "salvage" cases (for example, emergency surgery on patients in active cardiac arrest, able to be saved in some but not all circumstances by a qualified surgeon). What this meant to patients most in need of a surgeon with Dr. Gomez' unique qualifications was the elimination of patient choice and potentially life-saving procedures in favor of potentially higher statistical ranking for Memorial Hermann as calculated by U. S. News and World

-6-

Certified Document Number: 54275000 - Page 6 of 17

Report.

5.6    In response to Dr. Gomez repeatedly speaking out about these concerns, as well as the likelihood Dr. Gomez would move his surgeries to The Methodist Hospital—West Houston as the staffing and equipment dysfunctions continued, Dr. Macris and Mr. Alexander, and others, joined in a calculated and deliberate scheme to destroy Dr. Gomez' reputation and ability to practice medicine in the West Houston and Katy community. Dr. Macris wanted to disadvantage a skilled competitor, and Memorial Hermann needed to avoid losing patients by working with Dr. Macris in capturing the patients that would have otherwise been treated by Dr. Gomez at another facility.

5.7    Quality patient care is the most important goal of any legitimate health care provider. Under both federal and state law, hospitals and their medical staff are required to follow strict standards for peer review evaluation and monitoring. These peer review standards rely upon a consistent and well-developed process to ensure that favoritism, improper motives, and manipulation for unjust purposes play no role. Memorial Hermann had such a process in place at all relevant times, but Defendants acted to evade and avoid its safeguards while manipulating the rules for peer review and utilization review for their own wrongful purposes.

5.8    In order to discredit Dr. Gomez and crush his ability to practice medicine in the West Houston and Katy community, Dr. Macris and Memorial Hermann began compiling (and distorting) statistical data related to the mortality rates of Dr. Gomez's patients. The manipulated data, which was reported using neither the generally accepted methodologies for proper peer review comparison nor basic scientific

Certified Document Number: 54275000 - Page 7 of 17

-7-

principles, was intended to create the appearance that patients were more likely to die in Dr. Gomez's care as compared to other surgeons at Memorial Hermann. At bottom, the statistical information compiled and manipulated by Dr. Macris and Memorial Hermann was geared to demonstrating a falsehood: that Dr. Gomez was an incompetent physician underserving of his reputation and the trust his hard work had earned in the West Houston and Katy medical community.

5.9 Rather than comply with the medical peer review process and its safeguards against improper influence, Defendants attempted to evade these well-established protocols and the standing medical peer review committee at the hospital. Defendants then set up an emergency "meeting" and presented Dr. Gomez with the option of either immediately suspending his practice or agreeing to active interventional monitoring under Defendants' supervision. Both "options" would have effectively destroyed Dr. Gomez' reputation in the medical community, severely curtailing patient choice, as well as the opportunity for these and future patients to benefit from Dr. Gomez' advanced abilities in cardiothoracic and surgical procedures.

5.10 At the time Dr. Gomez was presented with these "options" by Defendants, he was also told that he would not be able to review at any meaningful level the alleged data supporting the emergency action outside the usual peer review process (the data that ultimately proved to be improperly manipulated and without a basic medical and scientific grounding). Defendants also refused Dr. Gomez the opportunity to meet with or present any information to Defendants and those acting with Defendants, and instead insisted that Dr. Gomez' quality of care could not be evaluated by the

-8-

Certified Document Number: 54275000 - Page 8 of 17

established medical peer review committee.

5.11 Fortuitously, and despite Defendants' best efforts to continue the railroading of Dr. Gomez, the actual peer review committee at Memorial Hermann intervened to require Defendants to present their data, and other alleged reasons for attempting to block Dr. Gomez' continued practice at Memorial Hermann, to the peer review process. Notwithstanding Defendants' presentation of the manipulated patient data, the evaluation of the peer review committee exonerated Dr. Gomez. During the process, Defendants were provided with clear and convincing evidence that the manipulated data used to "compare" Dr. Gomez could not be relied upon for any legitimate purpose.

5.12 After completing its comprehensive evaluation, including comparison with Dr. Macris' own patient care outcome statistics, the peer review committee's rejection of Defendants' anti-competitive and unlawful abuse of the peer review process should have deterred Defendants from their continued misconduct. Unfortunately, Defendants elected to instead continue a whisper campaign of selective and improper dissemination of both the manipulated data and other misinformation within the medical community. The first indication Dr. Gomez received that Defendants' smear campaign had continued unabated was when the same type of manipulated and misleading data was presented by Dr. Macris on November 1, 2011 at a non-peer review meeting organized by MHMD in a publicly displayed "comparison", readily identifiable with Dr. Gomez and intended to be seen as such. The circumstances and details of this public defamation are set forth in greater detail in Paragraph 7.3 below, based on the information available at this time.

-9-

240

5.13 Mark Twain once noted that, "A lie can travel around the world before the truth can even finish putting on its pants." Defendants' illegal and anti-competitive acts unfairly cast Dr. Gomez' stellar reputation under a dark cloud. As could be anticipated, if not intended, Defendants' calculated wrongdoing also imposed substantial economic, emotional, and physical impacts upon Dr. Gomez. Facing continuing harassment and improper attempts to interfere with his practice at Memorial Hermann, Dr. Gomez resigned his privileges at Memorial Hermann in May 2012. However, the loss to the community, and Dr. Gomez, from Defendants' misconduct remains ongoing and unremedied.

## CAUSES OF ACTION

### FIRST COUNT — BUSINESS DISPARAGEMENT

6.1 Dr. Gomez re-alleges and incorporates each allegation contained in Paragraphs 1-5.13 of this Petition as if fully set forth herein.

6.2 Defendants published disparaging words about Dr. Gomez' business and economic interests. As set forth in Paragraph 7.3 below, and at other times to be further detailed upon necessary discovery, Defendants did and intended to harm Dr. Gomez' business interests.

6.3 Defendants published these disparaging words knowing they were false and with malice.

6.4 Defendants published these disparaging words without privilege

### SECOND COUNT — DEFAMATION

7.1 Plaintiffs re-allege and incorporate each allegation contained in Paragraphs 1-6.4 of

-10-

241

Certified Document Number: 54275000 - Page 10 of 17

this Petition as if fully set forth herein.

7.2    Both lies and half-truths presented in a misleading manner are equally false. Defendants' statements and misstatements, including alleged comparative data, were in proper context wholly false, libelous, and slanderous. Defendants knowingly, recklessly, and maliciously spread falsehoods about Dr. Gomez, and Defendants had no right, privilege, or justification to make the statements.

7.3    Specifically, at a Cardiovascular and Thoracic CPC Meeting arranged by MHMD on November 1, 2011, which is open and outside the peer review process,, Dr. Macris, individually and on behalf of MHMD, Memorial Hermann, and Alexander, displayed and communicated libelous statements and false data including, but not limited to, false data and statements regarding Dr. Gomez's practice and mortality rates of his patients, to an entire room filled with Dr. Gomez's professional colleagues, intending that it be thereafter widely disseminated. Among those colleagues believed to be present at the meeting where Dr. Macris disseminated the false data and statements were the following:

- Lee Colosimo, MD

- Anthony Estrera, MD

- Donald Gibson, MD

- Kourosh Keyhani, MD

- Kamal Khalil, MD

- Javier Lafuente, MD

- Robert McKowen, MD

Certified Document Number: 54275000 - Page 11 of 17

-11-

242

- Imran Mohiuddin, MD

- Jaime Roman-Pavajeau, MD

- Patti Peymann

- Ann Guercio

- Tim Bevelacqua

- Byron Auzenne

- Richard Alexander, MD

- Michael Shabot, MD

These people in attendance at the November 1, 2011, meeting had the false, libelous, and slanderous material directly communicated to them by Dr. Macris, with the full intent of Defendants that it be further shared to attempt to harm Dr. Gomez' practice.

7.4     As described above, the statements and representations were defaming to Dr. Gomez, both personally and in the conduct of his medical practice. Furthermore, the statements and representations by Defendants were so egregious and obviously hurtful as to constitute libel and slander *per se*.

### THIRD COUNT – TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

8.1     Plaintiffs re-allege and incorporate each allegation contained in Paragraphs 1-7.3 of this Petition as if fully set forth herein.

8.2.     Dr. Gomez had longstanding and continuous relationships with referring physicians in the West Houston and Katy medical community, and these relationships directly led to patient referrals for surgical procedures. Due to these longstanding and

-12-

243

Certified Document Number: 54275000 - Page 12 of 17

continuous relationships, there was a reasonable probability that Dr. Gomez would have been selected to perform surgical procedures for these patients. In addition, there is a reasonable probability that Dr. Gomez would have entered into various other business relationships with third persons or entities, but for Defendants' improper acts and omissions, as set forth herein.

8.3    Defendants intentionally interfered with the relationships between Defendants and these persons and entities. This interference impacted and caused economic loss in the past and future to Dr. Gomez.

### FOURTH COUNT – IMPROPER RESTRAINT OF TRADE

9.1    Plaintiffs re-allege and incorporate each allegation contained in Paragraphs 1-8.3 of this Petition as if fully set forth herein.

9.2    Section 15.21 of the Texas Business and Commerce Code, also known as the Texas Free Enterprise and Antitrust Act of 1983, recognizes as illegal improper attempts to abuse the peer review process, as well as conspiracies to limit patient choice by concerted illegal action such as engaged in by Defendants. Dr. Gomez therefore seeks relief for this anti-competitive solely under the laws established by the State of Texas for this anti-competitive misconduct affecting Texas' citizens residing in the West Houston and Katy communities.

9.3    In the West Houston and Katy communities, Dr. Gomez was in competition with Dr. Macris, while Memorial Hermann was in competition with other surgical facilities, primarily including The Methodist Hospital West Houston. Defendants both derived

-13-

244

illegal benefit, and patient choice was improperly limited in the West Houston and Katy community, by the concerted effort of Defendants to restrain competition in and monopolize surgical procedures in the West Houston and Katy communities.

9.4    In furtherance of the combination and conspiracy, and with the purpose and intent of excluding Dr. Gomez from the patient care market and destroying competition from Dr. Gomez (and resulting loss of patients at Memorial Hermann), Defendants not only attempted to curtail or limit Dr. Gomez' surgical procedures, but also defamed Dr. Gomez' skill and qualifications as a surgeon in the West Houston and Katy community. These acts were done with the specific intent to weaken or eliminate competition from Dr. Gomez, and because of the market dominance that would result had a dangerous probability of success.

9.5    Defendants' willful actions have also harmed and threatened the general public by interfering with the orderly practice of medicine in the community, by reducing the number of surgeons actively practicing in cardiothoracic and general surgery in the community, and by depriving patients of the highest quality of medical care they would have been able to receive but for Defendants' concerted actions against Defendants.

9.4    This concerted conduct was flagrant and willful, and was done for the specific purpose of harming Dr. Gomez, illegally and improperly taking Dr. Gomez' practice, and diverting it to Dr. Macris and others practicing solely at Memorial Hermann.

9.5    The acts of Defendants constitute illegal monopolization, attempted monopolization, and/or conspiracy to monopolize under applicable Texas law.

-14-

245

Certified Document Number: 54275000 - Page 14 of 17

## RESULTING LEGAL DAMAGES

10.1 Dr. Gomez is entitled to the actual damages resulting from Defendants' violations of the law. These damages include the consequential damages to Dr. Gomez' economic welfare; the mental anguish and physical suffering resulting from Defendants' conduct and the continued impact on Dr. Gomez; lost business reputation; attorneys' fees as allowed by law; and the other actual damages permitted by law.

10.2 Dr. Gomez trusts the jury to evaluate the evidence—including documentation and expert and lay witness testimony—and to properly assess the damages sustained by Dr. Gomez. The law permits Defendants to demand that Plaintiff state the maximum amount of damages that Plaintiff will seek, and only in response to that demand, Plaintiff states that he expects to request the jury to award a maximum amount of $15,000,000.00 in compensation for the damages asserted based on the most current available information. As additional information of the amount of the harm inflicted by Defendants becomes available, and as permitted by law, Dr. Gomez will amend this determination to as best possible provide a fair estimate for our juror's consideration.

10.3 Defendants are also liable for statutory additional trebling and exemplary damages warranted by Defendants' malicious and egregious conduct.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Dr. Gomez respectfully requests judgment against Defendants for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law,

-15-

246

Certified Document Number: 54275000 - Page 15 of 17

costs of suit, and all other relief, at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

DOYLE RAIZNER LLP

MICHAEL PATRICK DOYLE
State Bar. No. 06095650
LyondellBassell Tower
1221 McKinney, Suite 4100
Houston, Texas 77010
Phone: 713.571.1146
Fax: 713.571.1148
mdoyle@doyleraizner.com

**ATTORNEYS FOR PLAINTIFFS**

**JURY DEMAND**

*Dr. Gomez hereby demands a trial by jury, a right enshrined in the Constitutions of the United States of America and the State of Texas and preserved by the sacrifices of many. The necessary jury fee has been paid.*

MICHAEL PATRICK DOYLE

Certified Document Number: 54275000 - Page 16 of 17

-16-

247

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this the 26th day of December, 2012 via hand delivery, overnight courier, U.S. Mail, certified mail, return receipt request, and/or facsimile, pursuant to the Texas Rules of Civil Procedure:

Robert Swift
Jesse Coleman
Fulbright & Jaworski
1301 McKinney, Suite 5100
Houston, TX 77010

**ATTORNEYS FOR DEFENDANTS**

_____
**MICHAEL PATRICK DOYLE**

Certified Document Number: 54275000 - Page 17 of 17



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   May 3, 2016

Certified Document Number:        54275000 Total Pages:  17

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com

STATE OF TEXAS             §
                          §           AFFIDAVIT
COUNTY OF TOM GREEN §

BEFORE ME the undersigned authority appeared Steve F. Montoya, Jr. M.D. and after being duly sworn under oath stated.

"My name is Steve F. Montoya, Jr. M.D. I am the Plaintiff in this case. I have knowledge of all the facts of this affidavit as Plaintiff and all facts are within my personal knowledge true and correct and that I was involved with facts stated.

I have not used any patient name, except where authorized by the patient or their agent, to avoid any HIPAA or privacy violation.

1. I was admitted to practice nephrology at San Angelo Community Medical Center in 1981. I have full staff privileges for the practice of nephrology at San Angelo Community Medical Center. This case does not involve the rights of Defendant San Angelo Community Medical Center to speak freely, associate freely, and participate in government as permitted by law. The facts of the case are that I have full staff privileges to practice nephrology medicine at San Angelo Community Medical Center

2. Part of my practice and obtaining patients is that the hospital emergency room uses a rotating system of specialists admitted in that practice to see patients in the hospital and emergency room pursuant to the EMTALA Medicare call list. When you are the named specialist you receive a call from the emergency room physician that a doctor with your specialty is needed for a patient. A big part of my practice was obtaining new patients and treating existing patients that came to the emergency room that needed a nephrologist. Since 1981 I have gotten new patients from the emergency room.

3. Until 2007 I would receive 10-20 calls from the emergency room, per month to treat either new or existing patients for nephrology care at the San Angelo Community Medical Center. Since 2008 I have received only one call from the emergency room or a hospitalist for consultation as a nephrologist. A nephrologist treats patients with kidney problems and or disease. The one call I received was for treatment of a new patient or existing patient that suffered with kidney problems.

Exhibit 2 250

4. The one time call for a new patient is described below. On January 24, 2014 I was called by the San Angelo Community Medical Center emergency room physician on duty and the hospitalist Dr. Bartels. Dr. Bartels and the emergency room physician informed me that a patient was diagnosed with acute renal failure. I was informed my name was on the call board in the emergency room as nephrologist on call. Both of the above doctors asked me to consult concerning treatment for that patient. I gave my initial consult advice/orders of treatment to both doctors. This consultation call was to me at 9:38 p.m. I informed them I would come see the patient and then review the test results and determine any additional treatment for the patient. Attached as Exhibit A is a true and correct copy of the redacted hospital record, removing the name of the patient for HIPPA privacy, showing the facts on January 24, 2014.

5. On January 25, 2014 at 8:10 a.m. Kirk Brewer, M.D. took over the hospitalists care of the patient as his rotation as the hospitalist started. Then without ever seeing the patient or the chart Kirk Brewer, M.D. cancelled my consult and treatment by me and consulted another nephrologist. The nephrologist he brought in for consult is one that is in a group that Kirk Brewer, M.D. has a contract for paid services. Kirk Brewer, M.D. without seeing the patient, or chart changed the patient's doctor. This change of nephrologist was for Kirk Brewer, M.D.'s economic gain and caused me economic loss. Attached as Exhibit B is a true and correct copy of the redacted hospital record showing the facts on January 25, 2014.

6. In removing me as the nephrologist the hospital published a statement that I was not a competent nephrologist to treat patients coming to the San Angelo Community Medical Center emergency room. San Angelo Community Medical Center through its agents and representatives was aware that its actions would become known to the staff physicians of San Angelo Community Medical Center and that there was by conduct and a whisper campaign saying I (Steve F. Montoya, Jr. M.D.) should not be allowed to treat patients at San Angelo Community Medical Center.

251

7. The statements and actions of San Angelo Community Medical Center by and through its agents and representatives were published by conduct. The actions were referring to keep from treating my own patients and any new patient coming to the San Angelo Community Medical Center emergency room. The statement(s) and actions were defamatory and caused me economic loss.

8. Until 2007 I would receive 10-20 calls from the emergency room per month to treat either new or existing patients at the San Angelo Community Medical Center. Since 2008 I have only received one call from the emergency room or a hospitalist for consultation as a nephrologist, except for one time for treatment of a new or existing patient that suffered with kidney disease/problems. The lack of referrals caused substantial injury to the Plaintiffs and damaged their ability to compete, because the Plaintiffs depend on these referrals and consults to build and maintain the nephrology practice. A majority of patients who need kidney treatment/ suffer from kidney disease in a hospital later need continuing care for their kidneys or related problems; the most common of such continuing treatments is kidney dialysis. A typical kidney dialysis patient will need treatment for six years, and each such patient would mean revenue to the Plaintiffs practice of approximately $100,000 per year. I estimates that the Plaintiffs have lost at least 100 long term kidney dialysis patients from 2007 to the present due to the Defendants' anticompetitive scheme to refuse to give me patient referrals or consults. I estimate that this lack of referrals has thus cost Plaintiffs $1,000,000 to $6,500,000 over that period of time.

9. The defamatory statements and actions are untrue. I am a competent and qualified nephrologist to treat patients at San Angelo Community Medical Center. If I were not a competent and qualified nephrologist I would have been removed from the staff of the hospital.

10. The actions of San Angelo Community Medical Center by and through its agents and representatives were intentional or done with negligence when San Angelo Community Medical Center knew that the statement was false and the actions would lead a reasonable prudent physician or patient knowing/believing of its defamatory

252

potential. The actions interred with my ability to make a living as a nephrologist on staff at San Angelo Community Medical Center.

11. The rules at San Angelo Community Medical Center and of the staff of San Angelo Community Medical Center are to have a new patient in the emergency room or hospital that needs a specialist consultation assigned to the name off the rotating consultation list. The consultation list is kept by San Angelo Community Medical Center by and through its agents and representatives. By San Angelo Community Medical Center not following this procedure I did not receive any consultation requests from the emergency room or hospitalist at San Angelo Community Medical Center in 2008-present and one in 2014.

12. Attached to this affidavit as Exhibit C is the true and correct sworn statement that an existing patient of mine Mrs. Welch tried to see me in the emergency room of San Angelo Community Medical Center and that the emergency room would not call me to treat my existing patient Mrs. Welch is over 90 years of age and I have treated her for at least 20 years. These actions interfered with my right to treat my patient and to the patient's rights to pick her physician and to her rights under the patients' bill of rights (see attached Exhibit D) and the patients' dialysis bill of rights (see attached Exhibit E)

13. Another patient of mine, whose name is withheld per privacy rights, who is also over 90 years of age and has been my patient for at least 10 years requested me when she went to the emergency room and she also was refused to see me. This action interfered with my right to treat my patient and to the patient's rights to pick her physician and to her rights under the patients' bill of rights (see attached Exhibit D) and the patients' dialysis bill of rights (see attached exhibit E)

14. A patient has the absolute right to be treated by their physician. Attached as Exhibit F is a true and correct copy of the patient bill of rights posted at the San Angelo

253

Community Medical Center. Attached as Exhibit E a true and correct copy of the dialysis patient bill of rights concerning care of a dialysis patient. Both of these patient bills of rights were violated by San Angelo Community Medical Center.

15. On January 25, 2014 at 8:10 a.m. Kirk Brewer, M.D. took over the hospitalists care of the patient referred in Exhibits A and B as his rotation as the hospitalist started. Then without ever seeing the patient or the chart Kirk Brewer, M.D. cancelled my consult and treatment and consulted another nephrologist. I went to the call board and witnessed my name on call as the nephrologist on call on January 24 and 25, 2014. The San Angelo Community Medical Center is required to have an official EMTALA Medicare call list for on call physicians for the San Angelo Community Medical Center to take Medicare patients. This is the list my name was on and was intentionally ignored. This also violates a patient's right to choose their physician. This list was followed until Dr. Brewer came to San Angelo Community Medical Center and took charge of hospitalists. The nephrologist he brought in for consult is one that is in a group that Kirk Brewer, M.D. has a contract for paid services. Dr. Brewer did not see the patient when he removed me as the treating nephrologist he issued the change via a telephone order (see Exhibit B). Kirk Brewer, M.D. without seeing the patient, or chart changed the patient's doctor. This change of nephrologist was for Kirk Brewer, M.D.'s economic gain and caused me economic loss.

16. By the actions of the hospitalists and emergency room physicians who are controlled by their supervisor or lead physician Kirk Brewer, M.D. through the above actions intentionally interfered with my practice of medicine at San Angelo Community Medical Center to keep me from receiving patients as required by the EMTALA Medicare call list.

17. The Defendants' anticompetitive conduct has harmed consumers and others who pay for nephrology services in the relevant market by increasing the costs of those services. This is demonstrated by the chart attached hereto as Exhibit G. Before Dr. Brewer's group of hospitalists became the attending physicians for all nephrology

254

patients at SACMC, nephrology patients would be referred to me (Dr. Montoya) who would serve as the attending physician for the patient. This arrangement avoided the "middle man" which now exists, as the hospitalists now usually serve as an additional charging entity between the patient and the nephrology specialist. Even if the hospitalists could do the same work as me or my partner used to provide, the patient (and/or insurance and taxpayer-funded Medicare/Medicaid) still faces increased cost for the same nephrology work, as the hospitalists charge more for physician services than I charge. The SACMC hospitalists charge at the "Comprehensive" Medicare allowable rate, which adds up to average charges of $506.85 per day. See Exhibit G. In approximately 2010, at the SACMC emergency room, Dr. Brewer **explicitly told me that he and his group of hospitalists will always charge at the comprehensive rate, regardless of medical necessity, because those charges maximize revenue for Dr. Brewer and his group of hospitalists.** I, however, charge at the "Moderate" Medicare allowable rate, which adds up to an average cost of $346.13 per day. The difference between these charges is $160.72 per nephrology patient per average hospital stay. Over the course of a year, consumers/payors for nephrology services have thus paid thousands more for the hospitalists' physician and nephrology services than they would have paid for care from me who is a physician specialist in nephrology.

All of the actions described in this affidavit are done by or for the Defendant San Angelo Community Medical Center.

Further affiant saith not."

Signed this 4th day of May, 2016.



Steve F. Montoya, Jr., M.D.

Subscribed and sworn to me the undersigned notary by Steve F. Montoya, Jr., M.D. on the 4th day of May, 2016.

Notary Public

DALILA CRUZ
MY COMMISSION EXPIRES
May 15, 2018

'IPO'

ALLERGIES & SENSITIVITIES ☐ No Known Allergies WEIGHT [redacted] ☐ lb ☐ kg HEIGHT [redacted] ☐ in ☐ cm

| DRUG | REACTION | DRUG | REACTION |
|---|---|---|---|
| 1. | | 4. | |
| 2. | | 5. | |
| 3. | | 6. | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM!

Date Time

☒ Admit to Inpatient Status
☒ Place in Observation Status
☐ Place in Outpatient Status

UNIT (check one):
☐ Med/Surg ☐ Med-Telemetry ☐ ICU ☐ OB/L&D
☒ Other PCU

Dr. Bartels
Stable
1) Acute Renal Failure
2) Hyperkalemia
3) Anemia
VS q 4°
bed rest
I/O q shift
foley to gravity
ADA 1800 Kcal / cardiac diet
IV heplock
Protonix 40mg IV Q 24°
Lovenox 40mg SC Q 24°
~~BMP Magnesium at~~ 9PM 1/24 // 3 Repeat & P.
CBC BMP, Magnesium in AM

Consult Dr. Montoya

Faxed 1/24/13 2:58

V.O. Dr. Bartels

[illegible] MD

Physician Signature 1/24/13 Date 7:20 Time

Physician Admission Orders
NS-2701-10HMS 10/10 (Rev. 07/12) Page 1 of 1

Patient Label 256[redacted]



| ALLERGIES & SENSITIVITIES | ☐ No Known Allergies | WEIGHT: _____ ☐ lb ☐ kg | HEIGHT: _____ ☐ in ☐ cm |
|---|---|---|---|
| DRUG | REACTION | DRUG | REACTION |
| 1. | | 4. | |
| 2. | | 5. | |
| 3. | | 6. | |

[ ] Another brand of drug identical in form and content may be dispensed unless checked

### COMPLETE THIS SECTION FOR PATIENTS WHO WILL BE SENT TO A PATIENT ROOM!

| Date | Time | ☐ Admit to Inpatient Status<br>☐ Place in Observation Status<br>☐ Place in Outpatient Status | UNIT *(check one)*:<br>☐ Med/Surg  ☐ Med-Telemetry  ☐ ICU  ☐ OB/L&D<br>☐ Other _____ |
|---|---|---|---|
| 1/25/14 | 236 | Lovenox 30 mg SC q 24° | Barclay |
| | | faxed & noted 1/25/14 0240 Per Chancey | |
| 1/25/14 | 0810 | Change Attending to Dr Brewer<br>Consult Dr Stevenson Consult Called<br>Kayexelate 30 Gm P.O. x1 Now<br>A Status to PCU<br>TO c̄ Read Back Dr Brewer / Ely/ Forland R. | |

FAXED

| Physician Signature | Date | Time |
|---|---|---|


SAN ANGELO COMMUNITY MEDICAL CTR

April 17, 2014

I am Karen, Tims, the daughter of Eunice Welch. I am writing to you on her behalf concerning her admission to SACMC on 11/28/2011. When asked by the ER admission staff, we replied that "Dr. Montoya" was her doctor. We were admitted to the hospitalists' service. We do not appreciate the fact that we did not have our physician of choice at the hospital. Please correct this to help maintain quality patient care.

Sincerely,

Karen Tims

State of _Texas_

County of _Tom Green_

Subscribed and sworn to before me this _17th_ day of _April_, _2014_

ROSEMARY ANDROS
My Commission Expires
August 19, 2017

Notary Public

258

# Know Your Rights and Responsibilities.

You have the right to:

- Be treated in a dignified and respectful manner and to receive reasonable responses to reasonable requests for service.
- To effective communication that provides information in a manner you understand, in your preferred language with provisions of interpreting or translation services, at no cost, and in a manner that meets your needs in the event of vision, speech, hearing or cognitive impairments. Information should be provided in easy to understand terms that will allow you to formulate informed consent.
- Respect for your cultural and personal values, beliefs and preferences.
- Personal privacy, privacy of your health information and to receive a notice of the facility's privacy practices.
- Pain management.
- Accommodation for your religious and other spiritual services.
- To access, request amendment to and obtain information on disclosures of your health information in accordance with law and regulation within a reasonable time frame.
- To have a family member, friend or other support individual to be present with you during the course of your stay, unless that person's presence infringes on others' rights, safety or is medically contraindicated.
- Care or services provided without discrimination based on age, race, ethnicity, religion, culture, language, physical or mental disability, socioeconomic status, sex, sexual orientation, and gender identity or expression.
- Participate in decisions about your care, including developing your treatment plan, discharge planning and having your family and personal physician promptly notified of your admission.
- Select providers of goods and services to be received after discharge.
- Refuse care, treatment or services in accordance with law and regulation and to leave the facility against advice of the physician.
- Have a surrogate decision-maker participate in care, treatment and services decisions when you are unable to make your own decisions.
- Receive information about the outcomes of your care, treatment and services, including unanticipated outcomes.
- Give or withhold informed consent when making decisions about your care, treatment and services.
- Receive information about benefits, risks, side effects to proposed care, treatment and services; the likelihood of achieving your goals and any potential problems that might occur during recuperation from proposed care, treatment and service and any reasonable alternatives to the care, treatment and services proposed.
- Give or withhold informed consent to recordings, filming or obtaining images of you for any purpose other than your care.
- Participate in or refuse to participate in research, investigation or clinical trials without jeopardizing your access to care and services unrelated to the research.
- Know the names of the practitioner who has primary responsibility for your care, treatment or services and the names of other practitioners providing your care.
- Formulate advance directives concerning care to be received at end-of-life and to have those advance directives honored to the extent of the facility's ability to do so in accordance with law and regulation. You also have the right to review or revise any advance directives.
- Be free from neglect; exploitation; and verbal, mental, physical and sexual abuse.
- An environment that is safe, preserves dignity and contributes to a positive self-image.
- Be free from any forms of restraint or seclusion used as a means of convenience, discipline, coercion or retaliation; and to have the least restrictive method of restraint or seclusion used only when necessary to ensure patient safety.
- Access protective and advocacy services and to receive a list of such groups upon your request.



- Receive the visitors whom you designate, including but not limited to a spouse, a domestic partner (including same-sex domestic partner), another family member, or a friend. You may deny or withdraw your consent to receive any visitor at any time. To the extent this facility places limitations or restrictions on visitation; you have the right to set any preference of order or priority for your visitors to satisfy those limitations or restrictions.
- Examine and receive an explanation of the bill for services, regardless of the source of payment.

**You have the responsibility to:**

- Provide accurate and complete information concerning your present medical condition, past illnesses or hospitalization and any other matters concerning your health.
- Tell your caregivers if you do not completely understand your plan of care.
- Follow the caregivers' instructions.
- Follow all medical center policies and procedures while being considerate of the rights of other patients, medical center employees and medical center properties.

**You also have the right to:**

Lodge a concern with the state, whether you have used the hospital's grievance process or not. If you have concerns regarding the quality of your care, coverage decisions or want to appeal a premature discharge, contact the State Quality Improvement Organization (QIO).

**Quality Improvement Organization**
Phone: (216) 447-9604
Toll Free: (844) 430-9504
Fax: (844) 878-7921
Mail: KEPRO
5700 Lombardo Center Dr.
Suite 100
Seven Hills, OH 44131

If you have a Medicare complaint you may contact:

**Texas Department of State Health Services**
Phone: (512) 834-6700
Mail: Texas Department of State Health Services
P.O. Box 149347
Austin, TX 78714-9347

**Regarding problem resolution, you have the right to:**

Express your concerns about patient care and safety to facility personnel and/or management without being subject to coercion, discrimination, reprisal or unreasonable interruption of care; and to be informed of the resolution process for your concerns. If your concerns and questions cannot be resolved at this level, contact the accrediting agency indicated below:

**The Joint Commission**
Phone: (800) 994-6610 Fax: (630) 792-5636
Email: COMPLAINT@JOINTCOMMISSION.ORG
Mail: Office of Quality Monitoring/the Joint Commission
One Renaissance Boulevard
Oakbrook Terrace, IL 60181



More than 20 million Americans—one in nine adults—have chronic kidney disease, and most don't even know it. More than 20 million others are at increased risk. The National Kidney Foundation, a major voluntary health organization, seeks to prevent kidney and urinary tract diseases, improve the health and well-being of individuals and families affected by these diseases, and increase the availability of all organs for transplantation. Through its 47 affiliates nationwide, the foundation conducts programs in research, professional education, patient and community services, public education and organ donation. The work of the National Kidney Foundation is funded by public donations.

The Patient & Family Council (PFC), founded in 1995, is the largest patient group dedicated to supporting, serving and advocating for people with kidney disease. Providing a strong voice in the community and in Congress, the advocacy efforts of the PFC help improve the lives of thousands of people affected by kidney disease.

## Kidney Learning Systems (KLS)™

### A Curriculum for CKD Risk Reduction and Care

| Public Education | | | | |
|---|---|---|---|---|
| At 1 Risk | | | | |
| STAGE 1 Kidney Damage with Normal or ↑ Kidney Function | STAGE 2 Kidney Damage with Mild ↓ Kidney Function | STAGE 3 Moderate ↓ Kidney Function | STAGE 4 Severe ↓ Kidney Function | STAGE 5 Kidney Failure |

GFR 130        90        60        30        15        0

Light-shaded boxes indicate the scope of content in this KLS resource.
GFR = Glomerular Filtration Rate; T = Kidney Transplant; D = Dialysis



National Kidney Foundation
30 East 33rd Street
New York, NY 10016
800.622.9010

# www.kidney.org

© 2003 National Kidney Foundation, Inc.
2006 Edition. All rights reserved.

11-65-1639



## National Kidney Foundation™

Exhibit E



# Dialysis Patients' Bill of Rights and Responsibilities



## PATIENTS' Rights
- Quality Care
- Information
- Individual Treatment
- Privacy and Confidentiality
- Services Without Discrimination
- Treatment Options
- Kidney Transplantation
- Home Care
- Self-Care Treatment
- Emergency Care
- Dietary Counseling
- Social Work Services
- Facility Management
- Formal Complaint Process
- Refusal and Advance Directives
- Medical Consultation
- Research Programs
- Treatment Costs

## PATIENTS' Responsibilities
- Be Informed
- Plan and Follow a Treatment Program
- Be on Time
- Follow Facility Policies
- Be Considerate
- Fulfill Financial Obligations



## Your Rights

1. Quality Care
You have the right to:

- Receive high-quality health care that meets recognized professional goals.

- Be part of the health care team, along with a social worker, nurse, doctor and dietitian.

- Expect that staff members in training will be directly supervised.

2. Information
You have the right to:

- Receive information from your nephrologist (kidney doctor) in words that you can understand. This should include information about your medical conditions, treatment choices, test results and possible problems. If this information cannot be given to you directly, the doctor should speak to your family or the person acting on your behalf.

- Be informed about current dialysis treatments for kidney disease.

- Be informed of the process of dialyzer re-use and your options.

- Receive a complete review of any test results and treatment by your doctor or a member of the health care team.

- Be informed of any possible side effects of medications you are taking.

### 3. Individual Treatment

You have the right to:

- Be treated with dignity, respect and consideration.

- Suggest a change in the type of treatment.

- Expect your kidney doctor and other members of your health care team to listen to you when you suggest changes in your dialysis treatment.

- Expect that treatment will be tailored to your individual health needs.

- Expect that the patient-to-staff ratio at your facility conforms to state regulations.

### 4. Privacy and Confidentiality

You have the right to:

- Expect privacy when receiving medical care.

- Expect examinations and discussions about your care to be held in private.

- Expect that your personal medical information will be kept confidential.

### 5. Services Without Discrimination

You have the right to:

- Expect medical care without regard to your race, color, gender, sexual preference, religion or national origin.



### 6. Treatment Options

You have the right to:

- Receive a full explanation of all treatment options for kidney disease, including their advantages and disadvantages.

### 7. Kidney Transplantation

You have the right to:

- Receive a full explanation of the kidney transplant process including all transplant options.

- Select the transplant center at which you desire to have a transplant evaluation after consultation with the nephrologist.

### 8. Home Care

You have the right to:

- Be informed of new advances in home care and have the opportunity to make a change to that treatment option.

- Receive educational materials about new procedures.

- Suggest changes in your home care treatment.

- Receive follow-up care by dietary, social work and nursing services.

## 9. Self-Care Treatment

You have the right to:

- Receive information about dialysis facilities that offer self-care.

## 10. Emergency Care

You have the right to:

- Receive emergency medical care without unnecessary delay.

- Be informed by the dialysis facility about their emergency plan in case of a disaster (e.g., snow storm, fire, loss of power).

- Be informed of the facility's plan of action in case of medical emergencies.



## 11. Dietary Counseling

You have the right to:

- Receive counseling from a qualified dietitian according to federal and state law.

- Receive nutritional educational material and instruction.

- Receive care and counseling on a regular basis.

## 12. Social Work Services

You have the right to:

- Receive counseling from a qualified social worker according to federal and state law.

- Receive an evaluation and follow-up care, including a vocational rehabilitation review.

- Receive referrals to community services when needed.

## 13. Facility Management

You have the right to:

- Expect the dialysis facility to employ skilled staff and provide safe, clean, comfortable and professional surroundings.

- Expect the facility to make every effort to make you comfortable and give you your treatment on time, according to a schedule that meets special needs whenever possible.

- Expect the facility to monitor the quality of treatment and equipment according to regulations.

## 14. Formal Complaint Process

You have the right to:

- Make a complaint to your facility management and request that they try to resolve a problem.

- Ask and be instructed on your dialysis facility's grievance process.

- File a complaint with the End-Stage Renal Disease Network in the region, and/or your state health department in an attempt to resolve a problem.

## 15. Refusal, Advance Directives and End-of-Life Care

You have the right to:

- Make decisions about your health care based on information given to you by your kidney doctor.

- Complete an advance directive stating your wishes.

- Be informed by your kidney doctor of the possible results of refusing drugs, treatments or procedures.

- Be informed of how the facility cares for those regarding end-of-life needs.

- Refuse any drugs, treatments or procedures offered to you.

- Indicate your refusal in writing.

- Accept full responsibility for the medical outcomes of your refusal.

## 16. Medical Consultation

You have the right to:

- Request consultation with another doctor for any kidney- or non-kidney-related medical problem.

- Know that payment for consultation may not be covered under Medicare or other health care coverage, and you may be responsible for payment.

## 17. Research Programs

You have the right to:

- Receive a full explanation of any research program in which you may be able to participate.

- Know that the study will not be conducted without your informed consent or that of the person acting on your behalf.

- Refuse or withdraw from the research study at any time.

## 18. Treatment Costs

You have the right to:

- Receive a full explanation of all charges by the facility and doctor.

- Be informed about your financial responsibilities after Medicare or Medicaid and/or other health care insurance coverage.

- Obtain assistance with completing insurance forms.

- Get information about how you can pay your bill and about programs available to help you.

## Your Responsibilities

### 1. Be Informed

It is your responsibility to:

- Learn as much as you can about your kidney disease and how it is treated.

- Talk to your health care team about your concerns regarding your treatment.



### 2. Plan and Follow a Treatment Program

It is your responsibility to:

- Supply all information about your health needed to plan and carry out a treatment program that will give you the best results.

- Find out about the other services and referrals that are recommended by your health care team.

### 3. Be On Time

It is your responsibility to:

- Make every effort to be on time for your scheduled dialysis.

- Tell the dialysis facility ahead of time if you are unable to attend your next treatment date.

■ Understand that your treatment time may be shortened if you arrive late.

## 4. Follow Facility Policies

It is your responsibility to:

■ Follow the facility policies and procedures that have been developed to provide safety and quality of care to all patients.

## 5. Be Considerate

It is your responsibility to:

■ Treat other patients and staff members with respect, dignity and consideration.

■ Never threaten others, act in a violent manner or cause any physical harm.

## 6. Fulfill Financial Obligations

It is your responsibility to:

■ Make every effort to pay your bills for care from the dialysis facility and doctor(s).

■ Obtain Medicare Part B coverage or co-insurance through a private carrier.

■ Inform the facility business office of all health insurance programs and policies from which you receive direct payment for services in the treatment of kidney disease.

■ Pay the dialysis facility and doctor when you receive payments from your health insurance company or medical policies.

**Many thanks to the following organizations for their role in assisting with the development of the Dialysis Patients' Bill of Rights and Responsibilities**

| | |
|---|---|
| American Society of Transplantation | NKF Council on Renal Nutrition |
| Centers for Medicare & Medicaid Services | NKF Council of Nephrology Nurses and Technicians |
| ESRD Network 4 | NKF Patient & Family Council Executive Committee |
| ESRD Network 7 | National Renal Administrators Association |
| ESRD Network 8 | Renal Physicians Association |
| ESRD Network 13 | TransPacific Renal Network |
| ESRD Network 18 | |
| NKF Council of Nephrology Social Workers | |

Exhibit 267
page 1 of 3

# Notice Concerning Complaints

Complaints about physicians, as well as other licensees and registrants of the Texas State Board of Medical Examiners, including physician assistants, acupuncturists, and surgical assistants may be reported for investigation at the following address:

Texas State Board of Medical Examiners
Attention: Investigation, MC-263
333 Guadalupe, Tower 3, Suite 610
PO Box 2018, MC-263
Austin, Texas 78768-2018

Assistance in filing a complaint is available by calling the

| DR MONTOYA'S CHARGES MODERATE | | | |
|---|---|---|---|
| DESCRIPTION | REQUIREMENTS | CPT | MEDICARE ALLOWABLE RATE |
| INPATIENT ADMISSION MODERATE | 1. A comprehensive history 2. A comprehensive exam 3. Medical Decision making of moderate complexity | 99222 | $ 134.03 |
| INPATIENT FOLLOW UP MODERATE | 1. An expanded problem focused interval history 2. An expanded problem focused examination 3. Medical decision making of moderate complexity | 99232 | $ 70.76 |
| INPATIENT FOLLOW UP MODERATE | 1. An expanded problem focused interval history 2. An expanded problem focused examination 3. Medical decision making of moderate complexity | 99232 | $ 70.76 |
| INPATIENT DISCHARGE less than 30 min | 1. Final Exam 2. Discussion of hospital stay 3. Instructions for continuing care to all relevant caregivers 4. preparation of discharge records 5. Presciptions and Referral forms | 99238 | $ 70.58 |
| | | | $ 346.13 |
| HOSPITALIST CHARGES COMPREHENSIVE | | | |
| DESCRIPTION | | CPT | MEDICARE ALLOWABLE RATE |
| INPATIENT ADMISSION COMPREHENSIVE | 1. A comprehensive history 2. A comprehensive exam 3. Medical Decision making of high complexity | 99223 | $ 198.47 |
| INPATIENT FOLLOW UP COMPREHENSIVE | 1. A detailed interval history 2. A detailed examination 3. Medical decision making of high complexity | 99233 | $ 101.94 |
| INPATIENT FOLLOW UP COMPREHENSIVE | 1. A detailed interval history 2. A detailed examination 3. Medical decision making of high complexity | 99233 | $ 101.94 |
| INPATIENT DISCHARGE more than 30 min | 1. Final Exam 2. Discussion of hospital stay 3. Instructions for continuing care to all relevant caregivers 4. preparation of discharge records 5. Presciptions and Referral forms | 99239 | $ 104.50 |
| | | | $ 506.85 |
| | TOTAL DIFFERENCE | | $ (160.72) |

Exhibit G
Pg of 2

269

| | | |
|---|---|---|
| Difference between Dr. Montoya, Independent physician billing and hospital stay for average of 4 days for an In-patient at SACMC with Dr. Montoya, billing medicine at the moderate level compared to Dr. Brewer and the Hospitalist billing comprehensive. | $ | 100 |
| Multiply average admissions per day – 4 | $ | 400 |
| Multiply for one year | $ | 146,000 |
| Multiply for total number of Independent physicians affected by Hospitalists' pattern of restraint – 10% (10) | $ | 1,460,000 |
| Multiply by number of years – 8 for one hospital | $ | 11,680,000 |
| Multiply by 200 Hospitals | $ | 235,600,000 |

STATE OF TEXAS §
§            AFFIDAVIT
COUNTY OF TOM GREEN §

BEFORE ME the undersigned authority appeared John Hunt, M.D. and after being duly sworn under oath stated.

"My name is John Hunt, M.D. I have knowledge of all the facts of this affidavit and all facts are within my personal knowledge true and correct and that I was involved with facts stated.

"I was on the staff of San Angelo Community Medical Center when Dr. Brewer was brought in to head up the hospitalist service and emergency room of San Angelo Community Medical Center. San Angelo Community Medical Center had a call list in the emergency room that listed on-call physicians to be referred patients. This list was kept pursuant to Medicare regulations. The list was to be followed pursuant to the Medicare regulations unless the patient requested a different physician. I learned of the whisper campaign against Dr. Montoya that he was not to be referred patients by the emergency room and hospitalist. Dr. Montoya is an independent physician. Until Dr. Brewer came to San Angelo Community Medical Center the independent physicians would receive referrals from hospitalists. Dr. Brewer lead a campaign to not use independent physicians. Independent physicians are physicians that do work for or are affiliated with the hospital owned groups.

Further affiant saith not."

Signed this 11th day of January, 2016.

_____
John Hunt, M.D.

Subscribed and sworn to me the undersigned notary by John Hunt, M.D. on the 11th day of January, 2016.

_____
Notary Public

JAMIE L. SANCHEZ
Notary Public, State of Texas
My Commission Expires
July 26, 2016

Exhibit 3 271

TAB NO. 13

*Texas Court Rules* > *STATE RULES* > *TEXAS RULES OF CIVIL PROCEDURE* > *PART II. RULES OF PRACTICE IN DISTRICT AND COUNTY COURTS* > *SECTION 4. Pleading* > *C. PLEADINGS OF DEFENDANT*

## Rule *91a* Dismissal of Baseless Causes of Action

*and Grounds.* --Except in a case brought under the Family Code or a case governed by Chapter 14 of the Texas Civil Practice and Remedies Code, a party may *move to dismiss* a cause of action on the grounds that it has no basis in law or fact. A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought. A cause of action has no basis in fact if no reasonable person could believe the facts pleaded.

. --A *motion to dismiss* must state that it is made pursuant to this rule, must identify each cause of action to which it is addressed, and must state specifically the reasons the cause of action has no basis in law, no basis in fact, or both.

*and Ruling.* --A *motion to dismiss* must be:

(a) filed within 60 days after the first pleading containing the challenged cause of action is served on the movant;

(b) filed at least 21 days before the *motion* is heard; and

(c) granted or denied within 45 days after the *motion* is filed.

*Time for Response.* --Any response to the *motion* must be filed no later than 7 days before the date of the hearing.

. t; Withdrawal of

(a) The court may not rule on a *motion to dismiss* if, at least 3 days before the date of the hearing, the respondent files a nonsuit of the challenged cause of action, or the movant files a withdrawal of the *motion*.

(b) If the respondent amends the challenged cause of action at least 3 days before the date of the hearing, the movant may, before the date of the hearing, file a withdrawal of the *motion* or an amended *motion* directed to the amended cause of action.

(c) Except by agreement of the parties, the court must rule on a *motion* unless it has been withdrawn or the cause of action has been non suited in accordance with (a) or (b). In ruling on the *motion*, the court must not consider a nonsuit or amendment not filed as permitted by paragraphs (a) or (b).

(d) An amended *motion* filed in accordance with (b) restarts the time periods in this rule.

*Hearing; No Evidence Considered.* --Each party is entitled to at least 14 days' notice of the hearing on the *motion to dismiss*. The court may, but is not required to, conduct an oral hearing on the *motion*. Except as required by *91a*.7, the court may not consider evidence in ruling on the *motion* and must decide the *motion* based solely on the pleading of the cause of action, together with any pleading exhibits permitted by Rule 59.

*Award of Costs and Attorney Fees* Required.--Except in an action by or against a governmental entity or a public official acting in his or her official capacity or under color of law, the court must award the prevailing

party on the *__motion__* all costs and reasonable and necessary attorney fees incurred with respect to the challenged cause of action in the trial court. The court must consider evidence regarding costs and fees in determining the award.

*Effect on Venue and Personal* **Jurisdiction.**--This rule is not an exception to the pleading requirements of Rules 86 and 120a, but a party does not, by filing a *__motion to dismiss__* pursuant to this rule or obtaining a ruling on it, waive a special appearance or a *__motion__* to transfer venue. By filing a *__motion to dismiss__*, a party submits to the court's jurisdiction in proceedings on the *__motion__* and is bound by the court's ruling, including an award of attorney fees and costs against the party.

*Dismissal Procedure Cumulative.*--This rule is in addition to, and does not supersede or affect, other procedures that authorize dismissal.

# History

Added by Texas Supreme Court, Misc. Docket No. 13-9022, effective March 1, 2013.

**EDITOR'S NOTE. --**

Texas Supreme Court Misc. Docket No. 13-9022 provides: "*Rule of Civil Procedure 91a* and *Rule of Evidence 902(10)(c)* apply to all cases, including those pending on March 1, 2013."
Comment to 2013 change by G.O. 13-9022 Rule *__91a__* is a new rule implementing *section 22.004(g) of the Texas Government Code*, which was added in 2011 and calls for rules to provide for the dismissal of causes of action that have no basis in law or fact on *__motion__* and without evidence. A *__motion to dismiss__* filed under this rule must be ruled on by the court within 45 days unless the *__motion__*, pleading, or cause of action is withdrawn, amended, or non suited as specified in 91a.5. If an amended *__motion__* is filed in response to an amended cause of action in accordance with *__91a__*.5(b), the court must rule on the *__motion__* within 45 days of the filing of the amended *__motion__* and the respondent must be given an opportunity to respond to the amended *__motion__*. The term "hearing" in the rule includes both submission and an oral hearing. Attorney fees awarded under *__91a__*.7 are limited to those associated with challenged cause of action, including fees for preparing or responding to the *__motion to dismiss__*.

# TAB NO. 14

**Texas Statutes**
**Civil Practice and Remedies Code**
**Title 2. Trial, Judgment, And Appeal**
**Subtitle B. Trial Matters**
**Chapter 27. Actions Involving The Exercise Of Certain Constitutional Rights**
*Current with legislation passed during the 2015 Regular Session effective through 1/1/2016*

Browse this section

## § 27.001. Definitions

In this chapter:

(1) "Communication" includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic.

(2) "Exercise of the right of association" means a communication between individuals who join together to collectively express, promote, pursue, or defend common interests.

(3) "Exercise of the right of free speech" means a communication made in connection with a matter of public concern.

(4) "Exercise of the right to petition" means any of the following:
  (A) a communication in or pertaining to:
    (i) a judicial proceeding;
    (ii) an official proceeding, other than a judicial proceeding, to administer the law;
    (iii) an executive or other proceeding before a department of the state or federal government or a subdivision of the state or federal government;
    (iv) a legislative proceeding, including a proceeding of a legislative committee;
    (v) a proceeding before an entity that requires by rule that public notice be given before proceedings of that entity;
    (vi) a proceeding in or before a managing board of an educational or eleemosynary institution supported directly or indirectly from public

revenue;

    (vii)  a proceeding of the governing body of any political subdivision of this state;

    (viii)  a report of or debate and statements made in a proceeding described by Subparagraph (iii), (iv), (v), (vi), or (vii); or

    (ix)  a public meeting dealing with a public purpose, including statements and discussions at the meeting or other matters of public concern occurring at the meeting;

(B)  a communication in connection with an issue under consideration or review by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding;

(C)  a communication that is reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding;

(D)  a communication reasonably likely to enlist public participation in an effort to effect consideration of an issue by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding; and

(E)  any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state.

(5) "Governmental proceeding" means a proceeding, other than a judicial proceeding, by an officer, official, or body of this state or a political subdivision of this state, including a board or commission, or by an officer, official, or body of the federal government.

(6) "Legal action" means a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief.

(7) "Matter of public concern" includes an issue related to:

  (A)  health or safety;

  (B)  environmental, economic, or community well-being;

(C) the government;

(D) a public official or public figure; or

(E) a good, product, or service in the marketplace.

(8) "Official proceeding" means any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant.

(9) "Public servant" means a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if the person has not yet qualified for office or assumed the person's duties:

(A) an officer, employee, or agent of government;

(B) a juror;

(C) an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy;

(D) an attorney or notary public when participating in the performance of a governmental function; or

(E) a person who is performing a governmental function under a claim of right but is not legally qualified to do so.

## Cite as Tex. Civ. Prac. and Rem. Code § 27.001

**History.** Added by Acts 2011, 82nd Leg., R.S., Ch. 341, Sec. 2, eff. June 17, 2011.

---

Browse this section | Top
## § 27.002. Purpose

The purpose of this chapter is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury.

**Cite as Tex. Civ. Prac. and Rem. Code § 27.002**

History. Added by Acts 2011, 82nd Leg., R.S., Ch. 341, Sec. 2, eff. June 17, 2011.

---

Browse this section | Top
## § 27.003. Motion To Dismiss

(a) If a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action.

(b) A motion to dismiss a legal action under this section must be filed not later than the 60th day after the date of service of the legal action. The court may extend the time to file a motion under this section on a showing of good cause.

(c) Except as provided by Section 27.006(b), on the filing of a motion under this section, all discovery in the legal action is suspended until the court has ruled on the motion to dismiss.

**Cite as Tex. Civ. Prac. and Rem. Code § 27.003**

History. Added by Acts 2011, 82nd Leg., R.S., Ch. 341, Sec. 2, eff. June 17, 2011.

---

Browse this section | Top
## § 27.004. Hearing

(a) A hearing on a motion under Section 27.003 must be set not later than the 60th day after the date of service of the motion unless the docket conditions of the court require a later hearing, upon a showing of good cause, or by agreement of the parties, but in no event shall the hearing occur more than 90 days after service of the motion under Section 27.003, except as provided by Subsection (c).

(b) In the event that the court cannot hold a hearing in the time required by Subsection (a), the court may take judicial notice that the court's docket conditions required a hearing at a later date, but in no event shall the hearing occur more than 90 days after service of the motion under Section 27.003, except as provided by Subsection (c).

(c) If the court allows discovery under Section 27.006(b), the court may extend the hearing date to allow discovery under that subsection, but in no event shall the hearing occur more than 120 days after the service of the motion under Section 27.003.

**Cite as Tex. Civ. Prac. and Rem. Code § 27.004**

**History.** Amended by **Acts 2013, 83rd Leg. - Regular Session, ch. 1042, Sec. 1,** eff. 6/14/2013.

Added by **Acts 2011, 82nd Leg., R.S., Ch. 341, Sec. 2,** eff. June 17, 2011.

---

Browse this section | Top
## § 27.005. Ruling

(a) The court must rule on a motion under Section 27.003 not later than the 30th day following the date of the hearing on the motion.

(b) Except as provided by Subsection (c), on the motion of a party under Section 27.003, a court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of:

    (1) the right of free speech;

    (2) the right to petition; or

    (3) the right of association.

(c) The court may not dismiss a legal action under this section if the party

bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question.

(d) Notwithstanding the provisions of Subsection (c), the court shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim.

**Cite as Tex. Civ. Prac. and Rem. Code § 27.005**

History. Amended by Acts 2013, 83rd Leg. - Regular Session, ch. 1042, Sec. 2, eff. 6/14/2013.

Added by Acts 2011, 82nd Leg., R.S., Ch. 341, Sec. 2, eff. June 17, 2011.

---

Browse this section | Top
## § 27.006. Evidence

(a) In determining whether a legal action should be dismissed under this chapter, the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based.

(b) On a motion by a party or on the court's own motion and on a showing of good cause, the court may allow specified and limited discovery relevant to the motion.

**Cite as Tex. Civ. Prac. and Rem. Code § 27.006**

History. Added by Acts 2011, 82nd Leg., R.S., Ch. 341, Sec. 2, eff. June 17, 2011.

---

Browse this section | Top
## § 27.007. Additional Findings

(a) At the request of a party making a motion under Section 27.003, the court shall issue findings regarding whether the legal action was brought to deter or prevent the moving party from exercising constitutional rights and is brought for an improper purpose, including to harass or to cause unnecessary delay or to increase the cost of litigation.

(b) The court must issue findings under Subsection (a) not later than the 30th day after the date a request under that subsection is made.

**Cite as Tex. Civ. Prac. and Rem. Code § 27.007**

History. Added by Acts 2011, 82nd Leg., R.S., Ch. 341, Sec. 2, eff. June 17, 2011.

---

Browse this section | Top
## § 27.008. Appeal

(a) If a court does not rule on a motion to dismiss under Section 27.003 in the time prescribed by Section 27.005, the motion is considered to have been denied by operation of law and the moving party may appeal.

(b) An appellate court shall expedite an appeal or other writ, whether interlocutory or not, from a trial court order on a motion to dismiss a legal action under Section 27.003 or from a trial court's failure to rule on that motion in the time prescribed by Section 27.005.

(c) An appeal or other writ under this section must be filed on or before the 60th day after the date the trial court's order is signed or the time prescribed by Section 27.005 expires, as applicable.

**Cite as Tex. Civ. Prac. and Rem. Code § 27.008**

History. Amended by Acts 2013, 83rd Leg. - Regular Session, ch. 1042, Sec. 5, eff. 6/14/2013.

Added by Acts 2011, 82nd Leg., R.S., Ch. 341, Sec. 2, eff. June 17, 2011.

## § 27.009. Damages And Costs

(a) If the court orders dismissal of a legal action under this chapter, the court shall award to the moving party:

    (1) court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require; and

    (2) sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter.

(b) If the court finds that a motion to dismiss filed under this chapter is frivolous or solely intended to delay, the court may award court costs and reasonable attorney's fees to the responding party.

**Cite as Tex. Civ. Prac. and Rem. Code § 27.009**

History. Added by Acts 2011, 82nd Leg., R.S., Ch. 341, Sec. 2, eff. June 17, 2011.

---

## § 27.010. Exemptions

(a) This chapter does not apply to an enforcement action that is brought in the name of this state or a political subdivision of this state by the attorney general, a district attorney, a criminal district attorney, or a county attorney.

(b) This chapter does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer.

(c) This chapter does not apply to a legal action seeking recovery for bodily

injury, wrongful death, or survival or to statements made regarding that legal action.

(d) This chapter does not apply to a legal action brought under the Insurance Code or arising out of an insurance contract.

**Cite as Tex. Civ. Prac. and Rem. Code § 27.010**

**History.** Amended by **Acts 2013, 83rd Leg. - Regular Session, ch. 1042, Sec. 3,** eff. 6/14/2013.

Added by **Acts 2011, 82nd Leg., R.S., Ch. 341, Sec. 2,** eff. June 17, 2011.

---

Browse this section | Top
## § 27.011. Construction

(a) This chapter does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case, or common law or rule provisions.

(b) This chapter shall be construed liberally to effectuate its purpose and intent fully.

**Cite as Tex. Civ. Prac. and Rem. Code § 27.011**

**History.** Added by **Acts 2011, 82nd Leg., R.S., Ch. 341, Sec. 2,** eff. June 17, 2011.

# TAB NO. 15

2015 WL 2438752

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Texas.

In re Memorial Hermann Hospital System; Memorial Hermann Physician Network; Michael Macris, M.D.; Michael Macris, M.D., P.A.; and Keith Alexander, Relators

NO. 14–0171 | Argued February 25, 2015 | OPINION DELIVERED: May 22, 2015

ON PETITION FOR WRIT OF MANDAMUS.

**Attorneys and Law Firms**

Donald P. Wilcox, Attorney, Texas Medical Association, 401 West 15th Street, 10th Floor, Austin TX 78701–1632, for Amicus Curiae Texas Medical Association.

Kimberly Rae Daspit Goodling, Doyle Raizner LLP, 1221 McKinney, Suite 4100, One Houston Center, Houston TX 77010, Michael P. Doyle, Doyle Raizner LLP, 2402 Dunlavy Street, Houston TX 77006, Peter M. Kelly, Kelly, Durham & Pittard, L.L.P., 1005 Heights Boulevard, Houston TX 77008, Attorneys, for Real Party in Interest Miguel A. Gomez, III, M.D. and Miguel A. Gomez, M.D., P.A.

Jesse Coleman, Robert J. Swift, Warren Szutse Huang, Fulbright & Jaworski LLP, 1301 McKinney, Suite 5100, Houston TX 77010–3095, Attorneys, for Relator Memorial Hermann Hospital System, Memorial Hermann Physician Network; Michael Macris, M.D.; Michael Macris, M.D., P.A.; and Keith Alexander.

**Opinion**

Justice Willett delivered the opinion of the Court.

**\*1** A decade ago, we observed: "While the medical privileges are important in promoting free discussion in the evaluation of health care professionals and health services, the right to evidence is also important, and therefore privileges must be strictly construed."[1] In this original proceeding—

involving a heart surgeon who claims his former hospital retaliated against him for joining a competing hospital— we must determine whether either the medical committee privilege or the medical peer review committee privilege protects certain documents from disclosure. The trial court concluded the documents sought were discoverable, and the court of appeals denied relief, prompting the parties resisting production to seek mandamus relief here. We hold that some of the documents are protected, and we conditionally grant mandamus relief as to them. But we are unconvinced that the remainder of the documents are confidential under either privilege.

## BACKGROUND

Plaintiffs Miguel A. Gomez, III, M.D. and Miguel A. Gomez, M.D., P.A. (collectively, "Dr. Gomez") filed suit against defendants Memorial Hermann Hospital System,[2] Memorial Hermann Physician Network, Michael P. Macris, M.D., Michael P. Macris, M.D., P.A.,[3] and Keith Alexander[4] (collectively, "defendants" or "Memorial Hermann") on September 17, 2012. Dr. Gomez's original petition asserted causes of action for business disparagement, defamation, tortious interference with prospective business relations, and improper restraint of trade under the Texas Free Enterprise and Antitrust Act of 1983 ("TFEAA").

Dr. Gomez is a cardiothoracic surgeon who practiced at Memorial Hermann Memorial City Medical Center ("Memorial City")[5] from 1998 until 2012 when he resigned his privileges with Memorial City.[6] During his years of practice at Memorial City, Dr. Gomez built a reputation in the "West Houston and Katy community" for "quality patient care, technical excellence, and outstanding professionalism in heart and general surgery."

Dr. Gomez's "skills and specialized abilities" for patients who require heart and general surgeries range from " 'basic' open heart surgery to advanced robotic-assisted surgical procedures." Robotic heart surgery "eliminates the need to mechanically crack open a patient's chest." Robotic heart surgery always involves significantly less recovery time than its non-robotic surgical analogue, and depending on the particular procedure, can spare the patient up to six days of recovery time in the hospital. Robotic heart surgery therefore has the potential to save an individual patient $50,000 or more in medical expenses.

*2 In the Houston medical community, Dr. Gomez "pioneer[ed] implementation of 'off-pump' surgery and robotic-assisted heart surgeries." Memorial City heavily promoted robotic heart surgery as well as Dr. Gomez himself —the only heart surgeon at Memorial City who was capable of performing robotic heart surgeries. The hospital invested in a million dollar "DA VINCI" machine, and spent significant advertising dollars promoting the robotic-assisted surgical procedures.

Referrals from other physicians are extremely important to surgeons and specialists. The primary means for a physician "to build his practice is ... actually going out on his own to doctor's offices, meeting the doctors, [and] developing relationships" in order to get referrals from physicians. The success of a surgeon's practice depends on his ability to attract referrals, and cardiologists are a cardiovascular surgeon's primary referral source. In turn, the surgeon's decision to perform his surgeries at one hospital over another directly impacts the profitability of the hospitals.

In 2009, another hospital—Methodist West Houston Hospital —was in the process of opening, which caused a change in the atmosphere at Memorial City. There was a growing fear at Memorial City that staff would leave to go to Methodist West. Around this time, the then-CEO of Memorial City and the Chief of Staff[7] met with at least one of Memorial City's physicians, Dr. Jo Pollack, in order to express disapproval of Dr. Pollack's pattern of referring her patients to non-affiliated facilities and physicians. According to Dr. Pollack's affidavit, she was told she would be "committing political suicide" and her practice "could be in jeopardy" if she did not refer her patients to the Memorial City affiliated medical oncologists, radiation oncologists and imaging. Memorial City also began holding "Town Hall" meetings in order to "gain information about who wanted to leave and to attempt to persuade people to stay at Memorial City."

Of the heart surgeons who practiced at Memorial City, Dr. Gomez was the first to agree to practice at Methodist West. Dr. Gomez asserts that, because of his complaints about staffing and equipment dysfunctions as well as Memorial City's priorities regarding patient care, Memorial City knew he would perform his surgeries at Methodist West in the future. Consequently, despite having invested heavily in promoting robotic-assisted heart surgery, Memorial City would no longer be the sole Houston hospital offering robotic-assisted heart surgeries. Memorial City faced sharing, or worse, losing that distinction to Methodist West.

When the defendants learned that Dr. Gomez was willing to associate himself with Methodist West, the defendants began conducting a "whisper campaign" against Dr. Gomez. According to Dr. Gomez, the purpose of the campaign was "to cast doubt on robotic heart surgery procedures," throughout the entire city of Houston and "evaporate" the "robotic heart surgery market." If the campaign was successful, it would inoculate Memorial City from the advantage Methodist West would otherwise gain from the ability to offer the superior procedure.

Rumors began spreading across the Memorial City campus that Dr. Gomez was "having problems" with his mortality rate, and the marketing director at Memorial City did an "about-face" regarding Dr. Gomez. Portia Willis, who was then employed in Memorial City's marketing department, had scheduled speaking engagements and other promotional engagements for Dr. Gomez on behalf of Memorial City. But amidst the rumors, Ms. Willis was told not to push forward with any type of marketing or promotion of Dr. Gomez indefinitely. Although the reasons for the marketing hiatus were not explained, Ms. Willis had the impression that the move was related to the rumors that Dr. Gomez was "a crappy surgeon." By this point, rumors had become "rampant" that Dr. Gomez "wasn't the surgeon that [the Hospital workers] thought he was," and the hospital's employees began to wonder how much longer Dr. Gomez's practice could endure.

*3 At a "Cardiovascular and Thoracic CPC" meeting on November 1, 2011, Dr. Macris displayed "false data and statements regarding Dr. Gomez's practice and mortality rates of his patients to an entire room filled with Dr. Gomez's professional colleagues, intending that it be thereafter widely disseminated." The presentation "create[d] the appearance that patients were more likely to die in Dr. Gomez's care." Dr. Macris had "manipulated" the presented data, eschewing generally accepted methodologies for proper peer review comparison as well as basic scientific principles. Although the "true" peer review committee at Memorial Hermann[8] intervened and ultimately determined Dr. Macris's comparative data could not be relied upon for any legitimate purpose, the defendants continued to disseminate the manipulated data within the medical community. This spread the false impression of Dr. Gomez's practice. After Dr. Gomez's abilities were assessed in the cardiology section

meeting, his "referral patterns were ruined," and he lost his status as one of the most sought-after surgeons.

At a January 2012 meeting, Mr. Alexander publicly ridiculed Dr. Gomez's skills as a heart surgeon. Mr. Alexander let the physicians, nurses, and administrators in the room "know that he had targeted Dr. Gomez because of his affiliation with Methodist West." Mr. Alexander "made clear ... he would not tolerate physicians taking business to Methodist West." Destroying Dr. Gomez's reputation "served as a preemptive warning" to other physicians considering an affiliation with Methodist West.

Dr. Gomez brought suit on the claims described above and moved to compel the production of certain documents. Memorial Hermann asserted the documents were protected from discovery under the medical committee privilege and the medical peer review committee privilege. Following an in camera inspection, the trial court ordered Memorial Hermann to produce certain documents. After the court of appeals denied Memorial Hermann's petition for writ of mandamus,[9] Memorial Hermann sought mandamus relief in this Court.

## DISCUSSION

### I. Standard of review

"Mandamus is proper when the trial court erroneously orders the disclosure of privileged information because the trial court's error cannot be corrected on appeal."[10] Pleading and producing evidence establishing the existence of a privilege is the burden of the party seeking to avoid discovery.[11] The party asserting the privilege must establish by testimony or affidavit a prima facie case for the privilege.[12] The party need produce "only the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true,' " and tender the documents to the trial court, at which point, "the trial court must conduct an in camera inspection of [the] documents before deciding to compel production."[13]

A reviewing court may not substitute its judgment for that of the trial court regarding "the resolution of fact issues or matters committed to the trial court's discretion."[14] "The scope of discovery and the admission of evidence is principally within the discretion of the trial court."[15] The relator must establish that the trial court failed to reach

the only reasonable conclusion on such matters.[16] A less deferential standard applies to the trial court's determination of the legal principles governing the discovery, however.[17]

## II. The trial court did not abuse its discretion in holding that the "anticompetitive action" exception to the medical peer review committee privilege applied.

### A. Under certain circumstances, the medical peer review committee privilege limits the accessibility of the records of, proceedings of, and communications to a medical peer review committee.

*4 A medical peer review committee includes "a committee of a health care entity [including a hospital licensed under Chapter 241 or 577 of the Health and Safety Code] ... or the medical staff of a health care entity" that (1) "operates under written bylaws" approved by either the policy-making or governing board of the health care entity, and (2) "is authorized to evaluate the quality of medical and health care services or the competence of physicians."[18]

"All proceedings and records of a medical peer review committee are confidential, and all records of, determinations of, and communications to a committee are privileged and are not discoverable, with certain exceptions...."[19] The provision of confidentiality extends to the committee's initial and subsequent credentialing decisions,[20] as well as to documents "generated" by a committee or "prepared by or at the direction of the committee for committee purposes."[21] The minutes and recommendations of the committee as well as the committee's inquiries about a physician to outside sources and responses thereto are also protected.[22] However, "simply passing a document through a peer review committee does not make it privileged."[23] The privilege does not prevent a party from discovering from a nonprivileged source material that has been presented to the committee.[24]

Texas Occupations Code section 160.007's provisions "expressly delineate and limit the circumstances under which the records of and communications to a peer review committee may [or must] be accessed."[25] The committee may disclose its records and proceedings, and communications made by the committee to other medical peer review committees, appropriate governmental agencies, national accreditation bodies, the Texas Medical Board, and another state's board of registration or licensing of

physicians.[26] The committee may disclose to a physician under its review confidential information relevant to the matter without waiving confidentiality.[27] The committee must provide the physician with a written copy of its recommendation and final decision for certain actions, including those that could result in "censure, suspension, restriction, limitation, revocation, or denial of membership or privileges in a health care entity."[28] Certain parties are entitled to use the confidential information in their defense or in rebuttal to such a defense.[29] Otherwise, the records and determinations of a medical peer review committee, as well as communications to the committee, are "not subject to subpoena or discovery and [are] not admissible as evidence in any civil judicial or administrative proceeding without waiver of the privilege of confidentiality executed in writing by the committee."[30]

*5 However, under certain circumstances, the information may not be confidential, in which case it would not be subject to a privilege. For example, the "records made or maintained in the regular course of business by a hospital ... [or] medical organization" are not covered by section 160.007 and therefore are not confidential under that section.[31] In addition, section 160.007(b) provides a limited exception to confidentiality for proceedings, records, or communications that are relevant to an anticompetitive action. The anticompetitive action exception provides in full:

> If a judge makes a preliminary finding that a proceeding or record of a medical peer review committee or a communication made to the committee is relevant to an anticompetitive action, or to a civil rights proceeding brought under 42 U.S.C. Section 1983, the proceeding, record, or communication is not confidential to the extent it is considered relevant.[32]

The parties dispute the applicability of this exception.

**B. The committees at issue are medical peer review committees.**

As an initial matter, Dr. Gomez disputes that Memorial Hermann proved the relevant committees are medical peer review committees. The trial court found "that the anticompetitive exception to the medical peer review committee privilege applies," which inherently implies a finding that the relevant committees were medical peer review committees. Dr. Gomez argues that Memorial Hermann failed to establish that the investigations were performed for the purpose of quality assessment, or that the committee was established by bylaws.

With one exception,[33] the medical peer review committee privilege affords confidential status to the records of, proceedings of, and communications to a medical peer review committee regardless of whether the individual record, proceeding, or communication relates to a peer review action.[34] Memorial Hermann submitted the committees' bylaws as well as affidavits stating that the committees engaged in peer review. Although Dr. Gomez points us to evidence to the contrary, the trial court had sufficient evidence before it to make a reasonable finding that the committees are medical peer review committees. We will not disturb that finding.

**C. An "anticompetitive action" is one that requires proof of a net negative impact on competition within a defined market.**

The trial court found that the documents at issue "are relevant to an anticompetitive action." Before we can resolve the parties' dispute regarding the correctness of this finding, we must first determine the meaning of the statutory phrase "relevant to an anticompetitive action."[35]

Statutory construction is a question of law we review de novo.[36] Our objective is to determine and give effect to the Legislature's intent,[37] and "the truest manifestation of what lawmakers intended is what they enacted."[38] Proper construction requires reading the statute as a whole rather than interpreting provisions in isolation.[39] "[C]ourts should not give an undefined statutory term a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such a construction if standing alone."[40] "We presume that the Legislature chooses a statute's language with care," and we will not ignore the statute's use of a term that carries a "particular meaning."[41] "Privileges are not favored in the law and are strictly construed."[42]

*6 Neither section 160.007 nor any other peer review committee privilege that incorporates the phrase "anticompetitive action" defines the term.[43] Black's Law

Dictionary defines "anticompetitive" as "[h]aving a tendency to reduce or eliminate competition" in contrast to the term procompetitive.[44] Procompetitive is in turn defined as "[i]ncreasing, encouraging, or preserving competition."[45] Competition itself is defined as "[t]he struggle for commercial advantage; the effort or action of two or more commercial interests to obtain the same business from third parties."[46] The dictionary also notes that the term anticompetitive "describes the type of conduct or circumstances generally targeted by antitrust laws,"[47] although the statement is "not purely definitional."[48]

This framework accurately maps out the meaning afforded the term "anticompetitive" in court decisions in the antitrust context. As noted by the Supreme Court of the United States, to restrain competition is the "very essence" of every agreement and regulation of trade.[49] Therefore, regarding restraints of trade, "[t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."[50] As such, an "abbreviated or 'quick-look' analysis" is appropriate only when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."[51] The goal of judicial scrutiny of restraints on trade is to "distinguish[ ] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."[52]

Judicial scrutiny in other areas of antitrust law confirms that the antitrust laws were designed as a "consumer welfare prescription" that requires consideration of both anticompetitive and procompetitive effects.[53] Thus, proof that a firm's dominant position is the "consequence of a superior product, business acumen, or historic accident"—circumstances that either benefit the consumer or are outside the firm's control—will defeat a claim of monopoly.[54] Claims of attempted monopolization require the further showing that the defendant "pose[s] a danger of monopolization," because judging unilateral conduct absent actual potential to achieve a monopoly would "risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur."[55] Similarly, in scrutinizing a proposed merger, the "economic efficiencies produced by the merger must be weighed against anticompetitive consequences in the final determination whether the *net effect* on competition is substantially adverse."[56] Ultimately, the "use of the word 'competition' [is] a shorthand for the invocation of the benefits of a competitive market,"[57] and antitrust law acknowledges that "it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects."[58]

**\*7** We have no trouble holding that the Legislature intended the term "anticompetitive" in section 160.007 to denote an overall substantially adverse effect on competition, rather than the existence of some negative effects. However, we reject Memorial Hermann's characterization of the term "anticompetitive action" as synonymous with "antitrust action." Although we agree that the term anticompetitive "describes the type of conduct or circumstances *generally* targeted by antitrust laws,"[59] the term itself is broader because the law of antitrust does not encompass *all* conduct that could substantially lessen competition in a particular market. For example, certain conduct—regardless of its overall impact on competition—is immune from antitrust law under the state action doctrine,[60] the exemption for political activity,[61] or the exemptions, both implicit and explicit, for labor unions.[62] The terms anticompetitive and antitrust are therefore not inherently coextensive, and we cannot ignore the Legislature's use of the broader term, particularly in juxtaposition to section 160.007(b)'s specificity regarding its application to civil rights proceedings.[63]

However, this does not mean that a litigant may successfully rely on subsection (b) simply by adding a gratuitous allegation that the conduct at issue is anticompetitive. Section 160.007(b) requires a "preliminary finding that a proceeding or record of a medical peer review committee or a communication made to the committee *is relevant to an anticompetitive action*" and provides that "the proceeding, record, or communication is not confidential *to the extent it is considered* relevant."[64] Relevance cannot be determined in isolation of the elements of an asserted cause of action.

**\*8** Dr. Gomez's contrary construction treats the terms action and conduct as synonymous,[65] but as we have previously noted, this Court has "equated 'action' with 'suit.' "[66] Although we have not previously discussed the meaning of the word action in this particular context, we have held that generally the term is "synonymous with 'suit,' which is a

demand of one's rights in court."[67] Had the Legislature intended the focus to be on the defendant's conduct apart from any asserted cause of action, it would have been more natural to say "an anticompetitive act" or "anticompetitive conduct." But the Legislature chose the term "action," which is a well-established legal term of art synonymous with lawsuit.[68] This meaning also better fits the parallelism of the phrases "anticompetitive action"[69] and "a civil rights proceeding"[70] in subsection (b).

At any rate, the exception's reference to relevance confirms that the Legislature intended the term action to refer to a "civil or criminal judicial proceeding."[71] Our rules of evidence provide that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if that "fact is *of consequence* in determining the action."[72] A purely voluntary showing that the defendant's conduct is anticompetitive cannot constitute a fact of consequence in a lawsuit—the limited waiver of confidentiality for proceedings, records, and communications "relevant to an anticompetitive action"[73] can only apply if the plaintiff asserts a cause of action that requires proof of anticompetitive conduct or effects.[74]

In light of the rarity of claims that require proof of a net anticompetitive effect, as a practical matter, our interpretation will not greatly expand the scope of an "anticompetitive action" beyond valid antitrust claims. However, our caselaw has already identified at least one cause of action that potentially falls within the interstice between anticompetitive and antitrust—tortious interference with prospective business relations.[75] As we have previously held, recovery for tortious interference with a prospective business relation requires a plaintiff to "prove that the defendant's conduct was independently tortious or wrongful" as an element of the cause of action.[76] Thus, even without asserting a cause of action under the TFEAA,[77] a plaintiff who asserts that a defendant's conduct is independently wrongful because it violates the laws of antitrust[78] would, as part of proving the violation, be required to show a negative effect on competition.

*9 Such a plaintiff would still need to plead a valid antitrust *violation*, however, he would not need to plead a valid antitrust *claim*.[79] The TFEAA grants a private right of action to bring suit, but only to persons "whose business or property has been injured by reason of any conduct declared unlawful" in the Act.[80] This requires a plaintiff to prove "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[81] Furthermore, permissible recovery is limited to "actual damages sustained" as a result of the unlawful conduct.[82] The damages must "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation"[83]—in other words, "the type of loss that the claimed violations of the antitrust laws would be likely to cause."[84]

In contrast, tortious interference with business relations "provides a remedy for injurious conduct that other tort actions might not reach ... but only for conduct that is already recognized to be wrongful under the common law or by statute."[85] Thus, in *Wal–Mart Stores, Inc. v. Sturges,* we provided the example of "a defendant who threatened a customer with bodily harm if he did business with the plaintiff."[86] We stated that such a defendant would be liable because the defendant's "conduct toward the customer —assault—was independently tortious," even though the plaintiff would not be able to sue the defendant for the assault itself.[87]

In sum, we hold that the exception to the medical peer review committee privilege for anticompetitive actions applies when the plaintiff asserts a cause of action that requires proof that the conduct at issue has "a tendency to reduce or eliminate competition"[88] that is not offset by countervailing procompetitive justifications.[89]

## D. Subsection (b) requires a plaintiff to plead, not present evidence of, an anticompetitive action.

We also reject Memorial Hermann's contention that section 160.007(b) conditions its exception to confidentiality on the plaintiff's satisfaction of an evidentiary burden. The Legislature knows how to provide this type of gatekeeping function,[90] and subsection (b) is devoid of any language indicating intent to do so. The statute does not reference expert reports,[91] affidavits,[92] or categories of evidence to be considered.[93] Significantly, other than requiring a "preliminary finding" that the material be "relevant to an anticompetitive action,"[94] subsection (b) contains no indication of a threshold quantum of proof.[95] Determinations

of potential relevancy or privilege typically do not require a litigant to produce evidence on the merits of his claim—as opposed to the merits of the privilege.[96] Furthermore, it is counter to the notion that "[a]ffording parties full discovery promotes the fair resolution of disputes by the judiciary,"[97] to condition access to documents that could substantiate a plaintiff's claim on the plaintiff's ability to substantiate his claim without the documents' aid.

*10 Although Memorial Hermann's concern that plaintiffs may circumvent the privilege through artful pleading is a compelling one, defendants are not left without protection. First, by permitting defendants to recover costs incurred from defending against frivolous or bad faith pleadings, section 160.008(c) discourages the addition of groundless allegations of injury to competition.[98] Second, nothing in section 160.007 prevents defendants from seeking, as they do in all civil cases, to limit discovery on the grounds that "the discovery sought is unreasonably cumulative or duplicative, or is obtain [able] from some other source that is more convenient, less burdensome, or less expensive."[99] Defendants may also assert that "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case ... the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."[100] Defendants may also seek protective orders to protect themselves "from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights."[101]

Finally, because the statute provides that information "is not confidential *to the extent it is considered relevant,*"[102] the exception's scope is still narrower than the otherwise applicable scope of discovery, which permits discovery of information that "appears reasonably calculated *to lead* to the discovery of admissible evidence."[103] Defendants may further limit the scope of discovery through the judicious use of special exceptions, which are "the appropriate vehicle ... by which an adverse party may force clarification of vague pleadings,"[104] thereby narrowing the range of facts that will be of consequence in the action.[105]

As such, we hold that judges are to determine a subsection (b) "preliminary finding" on the basis of the plaintiff's pleadings. We now turn to the application of subsection (b) to Dr. Gomez's pleadings.

### E. Dr. Gomez pleaded an anticompetitive action.

Dr. Gomez alleged that the defendants intentionally interfered with his "longstanding and continuous relationships with referring physicians in the West Houston and Katy medical community" and that the defendants' acts constituted a "concerted effort ... to restrain competition in and monopolize surgical procedures." Dr. Gomez also asserted that the defendants' acts "constitute illegal monopolization, attempted monopolization, and/or conspiracy to monopolize under applicable Texas law."

Memorial Hermann does not dispute that Dr. Gomez alleged that Memorial Hermann violated the TFEAA, but rather, argues Dr. Gomez failed to plead a valid antitrust claim. Memorial Hermann challenges the sufficiency of Dr. Gomez's allegations, taken as true, to establish (1) a legally cognizable injury to competition, and (2) an adverse effect on competition in the relevant market. The crux of Memorial Hermann's argument is its contention that caselaw overwhelmingly establishes that a claim for an injury to a single physician at a single hospital is insufficient. We disagree with Memorial Hermann's characterization of Dr. Gomez's allegations as well as its characterization of the law.

*11 We "construe the TFEAA in harmony with federal antitrust caselaw to promote competition for consumers' benefit."[106] "Because our own caselaw is limited, we rely heavily on the jurisprudence of the federal courts."[107]

The TFEAA declares that "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful," and that "it is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce."[108] As discussed above, however, the TFEAA does not operate as a *qui tam* provision,[109] but rather limits the ability to bring suit under the TFEAA to persons "whose business or property has been injured by reason of any conduct declared unlawful in Subsection (a), (b), or (c) of Section 15.05 of [the] Act."[110] Thus, courts have held that standing to pursue an antitrust suit exists only if a plaintiff shows (1) injury-in-fact, an injury to the plaintiff proximately caused by the defendant's conduct; (2) antitrust injury; and (3) proper plaintiff status, which assures that other parties are not better situated to bring suit.[111]

On its own, the elimination of a single competitor does not constitute proof of an anticompetitive effect for every

market and context.[112] Claims of improper restraint of trade require a plaintiff to "plead ... a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market."[113] However, it is also well established that the United States Supreme Court has "forb[idden] as a matter of law, a defense based upon a claim that only one small firm, not competition itself, had suffered injury,"[114] because "[m]onopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups."[115]

**\*12** "In order to successfully allege injury to competition, a ... claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably."[116] At a minimum, the claimant must "sketch the outline of the antitrust violation with allegations of supporting factual detail."[117] Whether the practice constitutes an improper restraint of trade will depend upon whether the plaintiff's allegations "suggest[ ] a market in which the removal of [a single competitor] from the pool of competing sellers would adversely and unreasonably affect overall competitive conditions."[118] Under the rule of reason,[119] courts consider "a variety of factors, including 'specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect.'"[120] As such, "the adequacy of a physician's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial."[121]

A successful claim of monopoly requires proof of "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[122] "The term 'relevant market' encompasses notions of geography as well as product use, quality, and description. The geographic market extends to the 'area of effective competition' ... where buyers can turn for alternate sources of supply."[123] Demonstrating attempted monopolization requires proof "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."[124]

Under either claim, it is "necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market."[125] However, the disposition of the question of "a dangerous probability of achieving monopoly power" is "typically one that is not resolved at the pleading stage unless it is clear on the face of the complaint that the 'dangerous probability' standard cannot be met as a matter of law."[126]

**\*13** Here, Dr. Gomez is not complaining that the defendants have prevented him from obtaining privileges at any of the hospitals in the area, but rather that the defendants have prevented him from obtaining referrals.[127] According to Dr. Gomez's petition, the number one source of referrals for a cardiovascular surgeon is a cardiologist, and his ability to compete—regardless of whether he has staff privileges with one hospital or another—is contingent upon his reputation with those cardiologists.[128] The alleged injury to Dr. Gomez's reputation is therefore not confined to a single hospital,[129] particularly if Dr. Gomez is able to show that Memorial Hermann has the capacity to impact a substantial number of the market's cardiologists' willingness to refer patients to him.[130]

Dr. Gomez also alleges that by disseminating false information about his mortality rate, Memorial Hermann cast doubt on robotic heart surgery procedures throughout Houston, inoculating itself from competition from a medical service that Memorial Hermann could no longer offer. The deposition excerpts attached to and quoted in Dr. Gomez's petition suggest that "referral patterns changed" and that Dr. Gomez used to be the "Number One" physician, but that following the conduct at issue, another physician, a Dr. Gibson, received more referrals.[131] Dr. Gomez also suggests in his briefing that Dr. Macris may have improperly benefitted from an increase in patients due to Dr. Gomez's decrease in patients.

Dr. Gomez alleges that as a result of the loss of trust in robotic heart surgery, patients would incur $50,000 or more in medical expenses due to longer hospital stays.[132] Dr. Gomez also disputes the existence of any procompetitive justifications for presenting manipulated mortality data.[133] As Dr. Gomez has not yet had an opportunity to obtain full discovery, we are not in a position to predict whether he will ultimately be able to sustain his burden of proof on these issues, however, his petition sufficiently alleges an injury to competition under the TFEAA.[134]

---

**\*14** As for Memorial Hermann's arguments regarding Dr. Gomez's identification of a relevant market in which the alleged injury to competition occurred, we hold that Dr. Gomez's petition sufficiently pleads viable markets. It may be unlikely that the relevant market for a valid injury to competition can be limited to the market for robotic-assisted heart surgery. For example, if Memorial Hermann does not have a heart surgeon capable of performing those surgeries, then Memorial Hermann could not have hoped to capture the patients who would otherwise have gone to Dr. Gomez. [135] On the other hand, if those patients are willing to substitute traditional heart surgery procedures, then a cross-elasticity of demand between the two types of procedures must exist, in which case review of the competitive impact cannot be limited to robotic-assisted heart procedures. [136]

However, although the trial court noted that Dr. Gomez alleged that Memorial Hermann's actions "impacted the referral market for heart surgeons specializing in robotic-assisted heart surgeries in Houston," the trial court did not base its conclusion that the anticompetitive exception applied on a finding of a particular market. Dr. Gomez's petition alleges multiple service markets, including the market for surgical procedures, the heart surgery market, and the referral market. Precisely because Dr. Gomez alleged so many different potential markets for his claims—as Memorial Hermann itself complains [137]—the flaw at this stage can only be with the state of evidence regarding the relevant market and not with Dr. Gomez's pleadings. The same criticism applies to Memorial Hermann's complaints about Dr. Gomez having alternatively pleaded different geographies for the relevant market for services.

Finally, Dr. Gomez's allegations suggest that Memorial Hermann targeted not only his own ability to compete for surgeries, but also Methodist West's competitive position. Dr. Gomez claims the destruction of his reputation served to deter Memorial Hermann's other physicians from practicing at Methodist West or from referring patients to physicians who are not affiliated with Memorial Hermann. [138] Dr. Gomez's allegations, taken as true, suggest that Memorial Hermann may have attempted to (1) intimidate a number of physicians from making referrals to specialists at Methodist West, thus cutting off Methodist West's patient base, and (2) intimidate other doctors—Methodist West's "supply" for its services—from practicing at Methodist West. [139] Even if Dr. Gomez himself would not have standing to bring a suit under the TFEAA based on antitrust injury to Methodist

West, [140] Dr. Gomez could rely on the violation to show that the interference with his prospective business relations was independently wrongful. [141]

**\*15** We hold that Dr. Gomez's petition presents multiple viable anticompetitive actions.

### F. The trial court did not abuse its discretion in making a preliminary finding that the documents in question are relevant to the anticompetitive actions pleaded by Dr. Gomez.

The trial court ordered Memorial Hermann to produce a number of documents. We review the trial court's preliminary finding of relevance to each set of documents in the sealed record for an abuse of discretion. [142]

Memorial Hermann argues that the various categories of documents are not relevant to Dr. Gomez's alleged anticompetitive action because (1) a number of the documents predate November 2011, which Dr. Gomez identified in his deposition as the relevant time period for the case; (2) Dr. Gomez's action involves the purportedly improper publication of false material through different peer review committees, but he has not alleged that the documents themselves were publicly disseminated; (3) certain documents do not discuss individual or aggregated physician mortality rates, instead focusing on physician volume; (4) certain documents do not refer to Dr. Gomez; and (5) with regard to one particular slide, the slide is not relevant to any actionable antitrust conduct under Texas law. We conclude that the majority of the documents in the sealed record are relevant to essential elements of the anticompetitive causes of actions that Dr. Gomez has asserted.

Before discussing the relevance of otherwise protected documents, however, we note that some of the documents included in the sealed record do not qualify for protection under the medical peer review committee privilege. Any affidavits prepared for and submitted to the trial court are neither records nor proceedings of the committees at issue nor communications to that committee. They therefore receive no protection under either the medical peer review committee privilege or the medical committee privilege. The committee bylaws attached as exhibits to the affidavits also do not qualify as a record of, proceeding of, or communication to the committee, and are therefore not protected. [143] However, the remaining documents in the sealed record are records

or proceedings of the committees, or communications to the committee.

Dr. Gomez alleges that Memorial Hermann manipulated and disseminated data on his mortality rates in order to harm his ability to compete for surgical procedures as well as to intimidate other doctors from defecting to Methodist West. As such, the withheld documents are relevant if they would tend to make more or less probable Dr. Gomez's allegations that Memorial Hermann disseminated manipulated data on Dr. Gomez's mortality rates, that the dissemination caused Dr. Gomez's referral rates to decline, or that other doctors were fearful that they could also be targeted in such a fashion. These fact issues are at the core of Dr. Gomez's claims that Memorial Hermann violated the TFEAA and tortiously interfered with his prospective business relations.

**\*16** A number of the documents at issue are relevant because they either contain data on mortality rates of cardiovascular surgeons, discuss obtaining or direct others to obtain mortality rates of cardiovascular surgeons, establish plans to review mortality data, or reference appropriate parameters for calculating mortality data. Even if Memorial Hermann never published some of the documents that contain data on mortality rates, the data could still be relevant to the veracity of any data that Memorial Hermann did publish, particularly if discrepancies appeared between the different reports of the data. Similarly, evidence establishing that Memorial Hermann did not follow what it knew to be the appropriate parameters for calculating mortality data could support an inference that Memorial Hermann intended to cast doubt on Dr. Gomez's ability as a surgeon.

The documents discussing physician volume are relevant. Memorial Hermann's argument that these documents lack any discussion of Dr. Gomez's mortality rates does not negate the documents' potential relevance to Dr. Gomez's allegations that he suffered a loss of referrals. The documents could also tend to prove or disprove a corresponding increase in referrals to Memorial Hermann's other physicians, which could support Dr. Gomez's allegations that Memorial Hermann violated the TFEAA. Furthermore, although the data on physician volume predates the time period in which Dr. Gomez alleges his referral rate declined, such data could still provide a baseline for measuring the effect of the alleged conduct. Documents relating to referral patterns, either of particular physicians or Memorial Hermann itself, are also relevant for the same reasons.

We note that the data on mortality and physician volume are associated with assigned numbers rather than the names of particular physicians in a number of the documents. However, although Memorial Hermann would be free to present evidence suggesting that the code effectively concealed the physicians' identities, the existing overlap between some of the coded and un-coded documents is sufficient to support a preliminary finding that the presentations' audiences as well as a judicial fact finder would be able to understand which physicians' rates and volumes appear in the documents.

Other documents are relevant because they discuss Memorial Hermann's plans to differentiate itself from other hospitals' cardiovascular surgery departments. This focus could make more or less probable the likelihood that Dr. Gomez's unique services were of sufficient importance to provide the impetus for the alleged improper conduct.

Another category of relevant documents consists of maps that identify the locations of doctors or hospitals in the surrounding geographic area, and maps demarcating the geographic areas from which Memorial Hermann draws its patients. Because they provide a basis for determining the feasibility of alternatives for patients in the area, these documents—in conjunction with expert testimony—could make a particular geographic market for Dr. Gomez's claims under the TFEAA more or less probable.

On the other hand, Exhibit B to E. Leticia Mireles' affidavit, which consists of an email to a number of persons, is not relevant to Dr. Gomez's allegations. The body of the email does not include any information that would make any of Dr. Gomez's allegations more or less probable. Although the email includes an attachment, nothing before us suggests that a record of the sending of this particular attachment to a number of persons would make Dr. Gomez's allegations more or less probable, because the attachment itself does not contain any data about Dr. Gomez or a relevant competitive market. This email, appearing on pages 365–68 of the sealed record, is therefore not relevant to an anticompetitive action, and retains its protection under the medical peer review committee privilege.

**\*17** In addition, the documents appearing on pages 119, 122–23, 129–30, 135, 138, 140, 142, 145, 154–55, 160–61, 166–67, 174–75, 180–81, 188–89, 195–98, and 243 of the sealed record also retain their protection under the medical peer review committee privilege. These documents do not discuss any data on mortality rates, physician volume, or

referral pattern. Nor do they discuss plans to disseminate such data, any staffing concerns of the hospital, or the competitive positions of the hospital or Dr. Gomez. These documents lack any apparent relevance to Dr. Gomez's claims, and we hold the trial court therefore abused its discretion in compelling Memorial Hermann to produce them.

However, the trial court did not abuse its discretion in making a preliminary finding that the other materials in the record are relevant to an anticompetitive action. We therefore turn to whether these documents enjoy any residual protection under the medical committee privilege.

### III. When both are applicable, the anticompetitive exception to the medical peer review committee privilege limits the provision of confidentiality under the medical committee privilege.

This question is contingent on the extent to which overlapping provisions of two different statutes can concurrently operate.[144] To the extent possible, we will construe the different provisions in a way that harmonizes rather than conflicts.[145] When the provisions are irreconcilable, the general rule is that the terms of the later-enacted statute should control.[146] However, conflicts between general and specific provisions favor the specific, and when the literal terms of the two provisions cannot both be true, the terms of the specific provision ordinarily will prevail.[147] We will construe the general provision as controlling only when the manifest intent is that the general provision will prevail and the general provision is also the later-enacted statute.[148]

Section 161.031 of the Health and Safety Code broadly defines a "medical committee" to include "any committee, including a joint committee" of certain types of entities, including "a hospital" or "a medical organization."[149] Medical committees may be "appointed ad hoc to conduct a specific investigation or established ... under the bylaws or rules of the organization or institution."[150]

The records and proceedings of a medical committee are governed by section 161.032 of the Health and Safety Code. With the exception of "records maintained in the regular course of business by a hospital ... [or] medical organization,"[151] medical committees and their members may use the committee's records and proceedings "only in the exercise of proper committee functions."[152] Subject to

the same exception,[153] the "records and proceedings of a medical committee are confidential and are not subject to court subpoena."[154]

**\*18** Section 161.032 of the Health and Safety Code suggests that medical committees are at least potentially distinct from medical peer review committees.[155] However, the definitions of the two committees contain significant overlap. Provided that the other statutory requirements are met,[156] the definition of a medical peer review committee includes committees "of a health care entity, the governing board of a health care entity, or the medical staff of a health care entity."[157] But any "entity ... that provides or pays for medical care or health services" and "follows a formal peer review process to further quality medical care or health care" will be considered a health care entity.[158]

As such, although the committees of some health care entities may not be medical committees,[159] every committee of every entity listed in the definition of a medical committee that "follows a formal peer review process to further quality medical care or health care"[160] will be considered a medical peer review committee—unless the committee does not "operate[ ] under written bylaws approved by the policy-making board or the governing board of the health care entity."[161] By extension, no medical committee that satisfies these two additional provisions necessary to be deemed a medical peer review committee can credibly claim that its records and proceedings are not governed by section 160.007 of the Occupations Code.[162]

**\*19** Here, because Memorial Hermann stipulated that the relevant committees are medical peer review committees, the documents at issue cannot be considered confidential under section 161.032(a) of the Health and Safety Code without ignoring section 160.007 of the Occupations Code. Memorial Hermann's argument that a document should enjoy the combined protection of all applicable privileges relies on our previous references to section 161.032 of the Health and Safety Code and section 160.007 of the Occupations Code as "the medical committee privilege" and "the medical peer review committee privilege," respectively.[163] However, the statutes themselves confer confidentiality on records and proceedings—not the committee itself.[164] Because the records and proceedings here are subject to both sections, both sections' provisions regarding confidentiality apply.

That the records and proceedings of some medical peer review committees may not be considered records and proceedings of a medical committee—or the reverse—has no bearing on the question before us, because such documents would never be subject to both sections.

Because the documents are subject to both sections, any reconcilable provisions will apply in concert.[165] For example, a medical committee that is also a medical peer review committee could not use its records or proceedings in the exercise of improper committee functions simply because section 160.007 does not explicitly forbid it.[166] By the same token, a dual medical committee and medical peer review committee could not rely on the provision of confidentiality in section 161.032(a) to shirk its duty under section 160.007(d) to provide a physician with a written copy of its recommendation to suspend the physician's privileges.[167]

However, a record or proceeding is either confidential or not; it cannot be both. As we have already discussed at length, the majority of the documents that Dr. Gomez seeks are relevant to an anticompetitive action. Because Memorial Hermann has stipulated that those documents are the records and proceedings of a medical peer review committee, section 160.007(b) provides that those documents are "not confidential to the extent [they are] considered relevant."[168] It is impossible to reconcile that provision with a provision stating that the same documents "are confidential and are not subject to court subpoena."[169] Section 160.007 is both the later enacted statute as well as the more specific regarding when records and proceedings are confidential.[170] We therefore hold that the records and proceedings of a dual medical committee and medical peer review committee do not enjoy any greater confidentiality under section 161.032(a) than they do under section 160.007(b).

## CONCLUSION

We hold that the trial court abused its discretion in ordering Memorial Hermann to produce pages 119, 122–23, 129–30, 135, 138, 140, 142, 145, 154–55, 160–61, 166–67, 174–75, 180–81, 188–89, 195–98, 243, and 365–68 of the sealed record. We conditionally grant Memorial Hermann's writ of mandamus, directing the trial court to modify its discovery order insofar as the order compelled production of those documents. We are confident the trial court will comply, and the writ will issue only if it does not. In all other respects, Memorial Hermann's petition for writ of mandamus is denied.

## Footnotes

1    *In re Living Ctrs. of Tex., Inc.,* 175 S.W.3d 253, 258 (Tex.2005).

2    Memorial Hermann Hospital System is a business entity organized under the laws of the State of Texas that controls and manages a number of hospitals, out-patient facilities, and other health care service centers throughout the Houston Metropolitan area, including Memorial Hermann Memorial City Medical Center.

3    Michael P. Macris, M.D., P.A. is a professional association organized under the laws of Texas, and Michael P. Macris, M.D. is its principal officer.

4    Mr. Alexander is the Chief Executive Officer of Memorial Hermann Memorial City Medical Center.

5    Memorial City is one of Memorial Hermann Hospital System's medical campuses.

6    The facts described in this section are drawn from allegations in Dr. Gomez's live petition and attached exhibits. They are presented in the light most favorable to the trial court's finding.

7    At the time of the meeting, Dave Jones was the CEO of Memorial City and Dr. Joel Abramowitz was the Chief of Staff. Shortly after the meeting took place, Mr. Alexander became CEO.

8    Dr. Gomez disputes whether the committee to which Dr. Macris presented the data falls within the definition of a medical peer review committee.

9    *In re Mem'l Hermann Hosp. Sys.,* 2014 WL 866069 (Tex.App.–Houston [1st Dist.] March 4, 2014, orig. proceeding).

10   *In re E.I. DuPont de Nemours & Co.,* 136 S.W.3d 218, 222 (Tex.2004).

11   *State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991); *Jordan v. Court of Appeals for Fourth Supreme Judicial Dist.,* 701 S.W.2d 644, 648–49 (Tex.1985).

12   *In re Living Ctrs. of Tex., Inc.,* 175 S.W.3d at 261; *Lowry,* 802 S.W.2d at 671.

13   *In re E.I. DuPont de Nemours & Co.,* 136 S.W.3d at 222 (quoting *Tex. Tech. Univ. Health Scis. Ctr. v. Apodaca,* 876 S.W.2d 402, 407 (Tex.App.–El Paso 1994, writ denied)).

14   *Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992).

15 *Flores v. Fourth Court of Appeals,* 777 S.W.2d 38, 41 (Tex.1989).

16 *Id.*

17 *Walker,* 827 S.W.2d at 840 ("In determining whether the trial court abused its discretion in the present case, we treat the trial court's erroneous denial of the requested discovery on the sole basis of *Russell* as a legal conclusion to be reviewed with limited deference to the trial court."); *see also Marathon Oil Co. v. Moye,* 893 S.W.2d 585, 589 (Tex.App.–Dallas 1994, orig. proceeding) ("When a trial court's interpretation of discovery law is at issue, we treat the trial court's order as a legal conclusion. We review the legal conclusion with limited deference to the trial court.").

18 TEX. OCC. CODEE § 151.002(a)(8); *see also id.* § 151.002(a)(5) (defining "Health care entity").

19 *In re Univ. of Tex. Health Ctr. at Tyler,* 33 S.W.3d 822, 825 (Tex.2000); *see also* TEX. OCC. CODEE § 160.007(a) ("Except as otherwise provided by this subtitle, each proceeding or record of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged.").

20 *Mem'l Hosp.–The Woodlands v. McCown,* 927 S.W.2d 1, 3–5 (Tex.1996).

21 *Id.* at 10; *see also In re Living Ctrs. of Tex., Inc.,* 175 S.W.3d at 257.

22 *In re Living Ctrs. of Tex., Inc.,* S.W.3d at 257.

23 *Id.*

24 *Id.* at 260; *McCown,* 927 S.W.2d at 10.

25 *Irving Healthcare Sys. v. Brooks,* 927 S.W.2d 12, 16 (Tex.1996).

26 TEX. OCC. CODEE § 160.007(c); *see also id.* § 151.002(a)(1) (" 'Board' means the Texas Medical Board.").

27 *Id.* § 160.007(d).

28 *Id.*

29 *See id.* § 160.007(f).

30 *Id.* § 160.007(e).

31 TEX. HEALTH & SAFETY CODE § 161.032(f). However, the fact that a committee reviewed such records is protected. *See In re Living Ctrs. of Tex.,* 175 S.W.3d at 257 ("The peer review privilege protects the products of the peer review process: reports, records (including those produced for the committee's review as part of the investigative review process), and deliberations."); *Brooks,* 927 S.W.2d at 18.

32 TEX. OCC. CODEE § 160.007(b).

33 *See id.* § 151.002(a)(8)(B).

34 *Compare id.* § 151.002(a)(7) (defining medical peer review) *with id.* § 151.002(a)(8) (defining medical peer review committee).

35 TEX. OCC. CODEE § 160.007(b).

36 *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex.2002).

37 *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 484 (Tex.1998).

38 *Combs v. Roark Amusement & Vending, L.P.,* 422 S.W.3d 632, 635 (Tex.2013).

39 *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004).

40 *Needham,* 82 S.W.3d at 318.

41 *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex.2011).

42 *Jordan,* 701 S.W.2d at 647.

43 *See, e.g.,* TEX. OCC. CODEE §§ 261.051 (dental peer review committee); 202.454(b) (podiatric peer review committee); 564.103(b) (pharmacy peer review committee).

44 BLACK'S LAW DICTIONARY 113 (10th ed. 2014).

45 *Id.* at 1400.

46 *Id.* at 344.

47 *Id.* at 113.

48 *See id.* at xxxii (noting that "[b]ullets are used to separate definitional information (before the bullet) from information that is not purely definitional (after the bullet), such as encyclopedic information or usage notes").

49 *Bd. of Trade of City of Chi. v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

50 *Id.; see also State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' this Court has long recognized that Congress intended to outlaw only unreasonable restraints."); *F.T.C. v. Ind. Fed'n of Dentists,* 476 U.S. 447, 459, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ("Absent some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation

of a market or the provision of goods and services ...—such an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place' cannot be sustained under the Rule of Reason."); *United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290, 342, 17 S.Ct. 540, 41 L.Ed. 1007 (1897) ("The necessary effect of the agreement is to restrain trade or commerce, no matter what the intent was on the part of those who signed it.").

51   *Cal. Dental Ass'n v. F.T.C.,* 526 U.S. 756, 770, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999).

52   *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 886, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007).

53   *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Ok.,* 468 U.S. 85, 107, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (internal quotation marks omitted). *See also* TEX. BUS. & COMM. CODE § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state.").

54   *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

55   *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767–68, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Swift & Co. v. United States,* 196 U.S. 375, 402, 25 S.Ct. 276, 49 L.Ed. 518 (1905) ("Not every act that may be done with intent to produce an unlawful result is unlawful, or constitutes an attempt. It is a question of proximity and degree.").

56   *F.T.C. v. Procter & Gamble Co.,* 386 U.S. 568, 597, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) (emphasis added).

57   *Id.*

58   *Copperweld Corp.,* 467 U.S. at 767–68, 104 S.Ct. 2731.

59   BLACK'S LAW DICTIONARY 113 (10th ed. 2014) (emphasis added).

60   *See, e.g., Cmty. Commc'ns Co. v. City of Boulder, Colo.,* 455 U.S. 40, 48, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) (holding that federal antitrust law does not "prohibit[ ] a State, in the exercise of its sovereign powers, from imposing certain anticompetitive restraints"); *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) ("[W]here a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out."); *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 87 L.Ed. 315 (1943) ( "The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state."). *See also* TEX. BUS. & COMM. CODE § 15.05(g) ("Nothing in this section shall be construed to prohibit activities that are exempt from the operation of the federal antitrust laws ... except that an exemption otherwise available under the McCarran–Ferguson Act ... does not serve to exempt activities under this Act.").

61   *Noerr Motor Freight, Inc.,* 365 U.S. at 136, 81 S.Ct. 523 ("[T]he Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly."); *see also Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972) (extending *Noerr* to "the approach of citizens ... to administrative agencies ... and to courts").

62   *Brown v. Pro Football, Inc.,* 518 U.S. 231, 237, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) ("[T]he implicit exemption recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions."); *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 621–22, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) (holding that certain federal statutes "declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws").

63   *See* TEX. OCC. CODEE § 160.007(b) (limiting the exception's application to "civil rights proceeding[s] brought under 42 U.S.C. Section 1983").

64   *Id.* (emphases added).

65   *See* BLACK'S LAW DICTIONARY 35 (10th ed. 2014) (listing "[t]he process of doing something; conduct or behavior" as one definition of action).

66   *Thomas v. Oldham,* 895 S.W.2d 352, 356 (Tex.1995).

67   *Id.*

68   *See id. See also* BLACK'S LAW DICTIONARY 35 (10th ed. 2014) ("The terms 'action' and 'suit' are nearly if not quite synonymous. But lawyers usually speak of proceedings in courts of law as 'actions,' and those in courts of equity as 'suits.' " (quoting Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3 (2d ed. 1899))).

69   TEX. OCC. CODEE § 160.007(b).

70   *Id.*

71 BLACK'S LAW DICTIONARY 28 (7th ed. 1999), *quoted in Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 564 (Tex.2014) (plurality op.).

72 TEX. R. EVID. 401 (emphasis added).

73 TEX. OCC. CODEE § 160.007(b).

74 As already illustrated in our brief review of the meaning of "anticompetitive," there is no practical difference between the terms anticompetitive conduct and anticompetitive effects as used in the caselaw, because we do not deem conduct anticompetitive unless it has a net anticompetitive effect.

75 Memorial Hermann argues that our decision in *Irving Healthcare Sys. v. Brooks*, 927 S.W.2d 12 (Tex.1996), forecloses argument that section 160.007(b)'s anticompetitive action exception encompasses routine business torts, including interference with prospective business relations. In *Brooks*, we noted that "the statute provides that if a court makes a preliminary finding that a medical peer review committee's proceedings, records, or communications are relevant to an anticompetitive action ... they are not confidential," but that "a similar provision for a libel action in which the plaintiff claims malice" was "[n]oticeably absent from the statute." 927 S.W.2d at 16. We also held that the statute did not "explicitly exclude from its confidentiality provisions any of [the plaintiff's] other causes of action." *Id.*

The plaintiff in *Brooks* sued for libel, slander, "intentional infliction of mental anguish," and interference with business relations. *Id.* at 14–15. The plaintiff alleged that the defendant had "intentionally and maliciously supplied false information, thereby damaging or destroying [the plaintiff's] ability to gain admittance to the medical staffs of the hospitals to which he applied." *Id.* Thus, *Brooks* did not require us to review the applicability of subsection (b), because the trial court never made the required preliminary finding of relevance to an anticompetitive action. Furthermore, although the plaintiff's "other causes of action," included an allegation that the defendant tortiously interfered with prospective business relations, the plaintiff did not allege that the conduct was independently wrongful because the provision of false information had a negative effect on competition and constituted an antitrust violation. Our decision today is therefore consistent with our holding in *Brooks*.

76 *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex.2001).

77 TEX. BUS. & COMM. CODE § 15.01 et seq.

78 *See Sturges*, 52 S.W.3d at 726 ("[A] plaintiff could recover for tortious interference by showing an illegal boycott, although a plaintiff could not recover against a defendant whose persuasion of others not to deal with the plaintiff was lawful.").

79 *See generally* Phillip Areeda, *Antitrust Violations Without Damages Recoveries*, 89 HARV. L. REV.. 1127 (1976) (discussing "three superficially paradoxical possibilities," each of which hypothesizes circumstances under which a plaintiff might be able to prove an antitrust violation, but not be able to recover damages under the antitrust laws).

80 TEX. BUS. & COMM. CODE § 15.21(a)(1).

81 *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389–90 (11th Cir.1990) (" 'The antitrust injury concept ... requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation. This requirement increases the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition.' " (quoting P. Areeda and H. Hovenkamp, *Antitrust Law*, 335.1, at 261 (Supp. 1987)).

82 TEX. BUS. & COMM. CODE § 15.21(a)(1).

83 *Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. 690.

84 *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

85 *Sturges*, 52 S.W.3d at 713.

86 *Id.*

87 *Id. Compare Brunswick Corp.*, 429 U.S. at 488, 97 S.Ct. 690 (rejecting the lower court holding that "once a merger is found to violate [section 7 of the Clayton Act], all dislocations caused by the merger are actionable, regardless of whether those dislocations have anything to do with the reason the merger was condemned").

88 BLACK'S LAW DICTIONARY 113 (10th ed. 2014).

89 *Cf. Ind. Fed'n of Dentists*, 476 U.S. at 459, 106 S.Ct. 2009.

90 *Cf. Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 756 (Tex.2014) (holding the Texas Medical Liability Act "requires claimants asserting health care liability claims to substantiate their claims with an expert report"); *Crosstex Energy Srvs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 387 (Tex.2014) (holding that the certificate of merit statute requires plaintiffs to "file an affidavit ... [that] substantiate[s] the plaintiff's claim on each theory of recovery").

91 *Compare* TEX. CIV. PRAC. & REM. CODEE §§ 74.351(a) ("In a health care liability claim, a claimant shall ... serve on that [defendant] or the [defendant's] attorney one or more expert reports.... "); 128.053(a) ("In a suit against a sport shooting

range ... a claimant shall ... serve on each party or the party's attorney one or more expert reports....."); *see also* TEX. HEALTH & SAFETY CODE § 841.101(b) ("In preparation for a judicial review conducted under Section 841.102, the case manager shall provide a report of the biennial examination to the judge.").

92 *Compare* TEX. CIV. PRAC. & REM. CODEE §§ 14.004(a) ("An inmate who files an affidavit or unsworn declaration of inability to pay costs shall file a separate affidavit or declaration...."); 150.002(a) ("In any action or arbitration proceeding for damages arising out of the provision of professional services by a licensed or registered professional, the plaintiff shall be required to file with the complaint an affidavit of a third-party licensed architect, licensed professional engineer, registered landscape architect, or registered professional land surveyor....").

93 *Compare id.* § 27.006(a) ("[T]he court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based.").

94 TEX. OCC. CODEE § 160.007(b). *Compare Md. Am. Gen. Ins. Co. v. Blackmon,* 639 S.W.2d 455, 457 (Tex.1982) ("We will assume for purposes of this opinion that the information ordered to be disclosed is relevant.").

95 *Compare* TEX. CIV. PRAC. & REM. CODEE § 27.005(c) ("The court may not dismiss a legal action under this standard if the party bringing the legal action establishes by *clear and specific* evidence a prima facie case for each essential element of the claim in question." (emphasis added)); TEX. HEALTH & SAFETY CODE § 841.102(c) ("The judge shall set a hearing if the judge determines at the biennial review that ... *probable cause* exists to believe that the person's behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence." (emphasis added)).

96 *Cf.* TEX. R. CIV. P. 193.4(a) ("The party making the objection or asserting the privilege must present any evidence necessary *to support the objection or privilege.*" (emphasis added)); *see also Lunsford v. Morris,* 746 S.W.2d 471, 473 (Tex.1988) ("Absent a privilege or specifically enumerated exemption, our rules permit discovery of any 'relevant' matter; thus, there is no evidentiary threshold a litigant must cross before seeking discovery.").

97 *See Lowry,* 802 S.W.2d at 673 ("[A]ll of the information sought to be discovered was gathered by the State during the investigation that led to the filing of this antitrust enforcement action. The State has refused to provide materials requested by the insurers that could lead to evidence supporting their defense. It is difficult for the insurers to make a more particularized showing of need for these documents, the contents of which are unknown to them.").

98 *See* TEX. OCC. CODEE § 160.008(c) ("A defendant subject to this section may file a counterclaim in a pending action or may prove a cause of action in a subsequent action to recover defense costs, including court costs, attorney's fees, and damages incurred as a result of the civil action, if the plaintiff's original action is determined to be frivolous or brought in bad faith.").

99 TEX. R. CIV. P. 192.4(a).

100 TEX. R. CIV. P. 192.4(b).

101 TEX. R. CIV. P. 192.6(b).

102 TEX. OCC. CODEE § 160.007(b) (emphasis added).

103 TEX. R. CIV. P. 192.3(a) (emphasis added).

104 *Fort Bend Cnty. v. Wilson,* 825 S.W.2d 251, 253 (Tex.App.–Houston [14th Dist.] 1992, no writ).

105 *See Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982) ("A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense.").

106 *Coca–Cola Co. v. Harmar Bottling Co.,* 218 S.W.3d 671, 688–89 (Tex.2006); *see also* TEX. BUS. & COMM. CODE § 15.04.

107 *Coca–Cola Co.,* 218 S.W.3d at 688–89. *Accord Caller–Times Pub. Co. v. Triad Commc'ns, Inc.,* 826 S.W.2d 576, 580 (Tex.1992) ( "Because section 15.05(b) of the Texas Antitrust Act is comparable to section 2 of the Sherman Antitrust Act, we look to federal law interpreting section 2 of the Sherman Act for guidance in interpreting section 15.05(b) of the Texas Antitrust Act."); *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 687 (Tex.1990) ("Section 15.05 is comparable to, and indeed taken from, section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1988). Accordingly, we look to federal judicial interpretations of section 1 of the Sherman Act in applying section 15.05(a) of our state antitrust law.").

108 TEX. BUS. & COMM. CODE § 15.05(a)–(b).

109 *Cf.* BLACK'S LAW DICTIONARY 1443 (10th ed. 2014) (defining *qui tam* action as "[a]n action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive"). *See, e.g.,* TEX. HUM. RES. CODEE § 36.110.

110 TEX. BUS. & COMM. CODE § 15.21(a)(1).

111 *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.,* 123 F.3d 301, 305 (5th Cir.1997); *but see Levine v. Cent. Fla. Med. Affiliates, Inc.,* 72 F.3d 1538, 1548 (11th Cir.1996) (" 'When a court concludes that no violation has occurred, it has no occasion to consider standing ... An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred.' " (quoting P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 360f, at 202–03 (rev. ed. 1995))).

112 *Austin v. McNamara,* 979 F.2d 728, 739 (9th Cir.1992) (emphasis removed); *see also Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,* 884 F.2d 504, 508 (9th Cir.1989) ("[R]emoval of one or more competing sellers from any market necessarily has an effect on competitive conditions within that market. But removal of one or a few competitors need not equate with injury to competition.").

113 *Les Shockley Racing, Inc.,* 884 F.2d at 508.

114 *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 134–35, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (discussing *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)); *see also Klor's, Inc.,* 359 U.S. at 213, 79 S.Ct. 705 (holding that a group boycott was "not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy").

115 *Klor's Inc.,* 359 U.S. at 213, 79 S.Ct. 705. *Cf. U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 597 (1st Cir.1993) ( "Ultimately the issue turns upon antitrust policy, where a permanent tension prevails between the 'no sparrow shall fall' concept of antitrust ... and the ascendant view that antitrust protects 'competition, not competitors.' ").

116 *Les Shockley Racing, Inc.,* 884 F.2d at 508.

117 *Id.*

118 *Id.* at 509. *Compare Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 7, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (affirming dismissal of the claim where the defendant was only one hospital of several in a large metropolitan area) *with Full Draw Prods. v. Easton Sports, Inc.,* 182 F.3d 745, 754 (10th Cir.1999) (holding that the loss of one or two competitors alleged an injury to competition where "[t]he allegation describes the anticompetitive effect of the boycott to be the loss of competition through the elimination of AMMO's sole archery trade show competitor and the resultant loss in exhibition space output") *and Oltz v. St. Peter's Comm. Hosp.,* 861 F.2d 1440, 1446–47 (9th Cir.1988) (exclusion of a single nurse anesthetist from a single hospital constituted an unreasonable restraint of trade where that hospital "enjoyed the overwhelming majority of the market for general surgery" and "there was no evidence that patients could effectively turn outside [the hospital] for alternate sources of anesthesia services").

119 We note that "[o]nce experience with a particular kind of restraint enables [courts] to predict with confidence that the rule of reason will condemn it, [courts will] appl[y] a conclusive presumption that the restraint is unreasonable." *Arizona v. Maricopa Cnty. Med. Soc.,* 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). Dr. Gomez has not alleged that the conduct at issue falls within a category of behavior deemed unreasonable *per se,* however.

120 *Ginzburg v. Mem'l Healthcare Sys., Inc.,* 993 F.Supp. 998, 1009 (S.D.Tex.1997) (quoting *State Oil Co.,* 522 U.S. at 10, 118 S.Ct. 275).

121 *Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 876 (3d Cir.1995).

122 *Grinnell Corp.,* 384 U.S. at 570–71, 86 S.Ct. 1698.

123 *Oltz,* 861 F.2d at 1446.

124 *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

125 *Id.*

126 *Brader,* 64 F.3d at 876; *see also Oltz,* 861 F.2d at 1446 ("Defining the relevant market is a factual inquiry ordinarily reserved for the jury.").

127 *See Brader,* 64 F.3d at 877 ("[T]he type of injury alleged by Brader (the loss of income due to an inability to practice in the relevant market area) is directly related to the illegal activity in which the defendant allegedly engaged: a conspiracy to exclude Brader from the relevant market.").

128 *See, e.g., Fuentes v. S. Hills Cardiology,* 946 F.2d 196, 202 (3d Cir.1991) ("Fuentes alleges that the defendants acted in concert to deny Fuentes, a provider of cardiological services, access to the Pittsburgh cardiological market. Consequently, Fuentes asserts, that by eliminating him as a competitor, the boycott successfully reduced competition for the defendants' cardiological services."). *Compare BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n,* 36 F.3d 664, 668 (7th Cir.1994) ("The plaintiffs can practice at Passavant or elsewhere–they are not disabled from practicing wherever they choose.").

129 *Cf. Bolt v. Halifax Hosp. Med. Ctr.,* 891 F.2d 810, 820 (11th Cir.1990) ("[A]s the defendants' own arguments suggest, a negative decision at one hospital could affect the decision at another hospital; therefore ... a negative decision by one hospital could be tantamount to excluding a doctor from the profession as a whole." (internal quotation marks omitted)),

*overruled in part on other grounds by City of Columbia v. Omni Outdoor Adver.,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991).

130 *Compare Coca-Cola Co.,* 218 S.W.3d at 688 (reversing a jury verdict where "there is only evidence of harm in relatively isolated instances and no evidence of substantial foreclosure or anti-competitive effect in any relevant market").

131 *Compare id.* ("There must be evidence of demonstrable economic effect, not just an inference of *possible* effect." (internal quotation marks omitted)).

132 *Cf. Leegin Creative Leather Prods., Inc.,* 551 U.S. at 886, 127 S.Ct. 2705 (holding that the goal of judicial scrutiny is to "distinguish[ ] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest").

133 We note that there may be procompetitive justifications for allowing the presentation of even misleading data, such as allowing for freer and more informed discussions—particularly in light of procedures available to physicians to challenge the peer review process. For example, ensuring that the data cannot be challenged might delay the hospital's ability to respond to concerns raised by the data. It may be that such increased responsiveness is of greater value than the interim damage to a physician's reputation.

> As we have already discussed, the inclusion and wording of the anticompetitive exception to the medical peer review committee privilege does not condition the exception on a pre-determination that the behavior at issue is indeed anticompetitive. It requires only that the action seeks to establish that the behavior is anticompetitive. This case presents itself to us at the discovery phase rather than summary judgment. The procompetitive value of allowing for the presentation of false data is a factual determination—one likely requiring the aid of expert reports—and it is not a determination that we can make as a matter of law.

134 *See Brader,* 64 F.3d at 876.

135 *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 598, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[A]s presumably rational businesses, petitioners had every incentive *not* to engage in the conduct with which they are charged, for its likely effect would be to generate losses for petitioners with no corresponding gains."). *But see Boczar v. Manatee Hosps. & Health Sys., Inc.,* 993 F.2d 1514, 1518 (11th Cir.1993) ("The jury could believe that the hospital would benefit economically by securing its pre-existing ob/gyn staff and revenues....").

136 *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 393, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) ("Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another.").

137 We note that Memorial Hermann filed special exceptions regarding Dr. Gomez's allegations of the relevant market. Memorial Hermann has not requested relief regarding the trial court's denial of those special exceptions, however, and we do not consider whether pleading these markets in the alternative provides Memorial Hermann with "information sufficient to enable [it] to prepare a defense." *See Roark,* 633 S.W.2d at 810.

138 *See Boczar,* 993 F.2d at 1517 ("When Dr. Boczar joined its staff, Manatee Hospital had suffered defections by members of its ob/gyn staff and feared still more ob/gyn departures to a competing hospital.").

139 *Cf. Brown Shoe Co. v. United States,* 370 U.S. 294, 323–24, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) ("The primary vice of a vertical merger *or other arrangement* tying a consumer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a 'clog on competition.' " (emphasis added)); *Klor's, Inc.,* 359 U.S. at 209, 79 S.Ct. 705 ("The concerted refusal to deal with Klor's has seriously handicapped its ability to compete and has already caused it a great loss of profits, goodwill, reputation and prestige.").

140 *See Doctor's Hosp. of Jefferson, Inc.,* 123 F.3d at 305 (holding that standing to bring suit for antitrust requires "proper plaintiff status, which assures that other parties are not better situated to bring suit").

141 *See Sturges,* 52 S.W.3d at 713.

142 All page references in this section are to the sealed record.

143 *See Brownwood Reg'l Hosp. v. Eleventh Court of Appeals,* 927 S.W.2d 24, 27 (Tex.1996) (holding "the bylaws, rules, and regulations of [the hospital's] medical staff or Board of Trustees ... are not records, reports, or proceedings of a hospital or medical peer review committee, nor do they reveal communications to such a committee").

144 *See City of Waco v. Lopez,* 259 S.W.3d 147, 153 (Tex.2008).

145 TEX. GOV'T CODE §§ 311.025, 311.026(a); *Tex. Indus. Energy Consumers v. CenterPoint Energy Hous. Elec., LLC,* 324 S.W.3d 95, 107 (Tex.2010).

146 TEX. GOV'T CODE § 311.025(a); *Jackson v. State Office of Admin. Hearings,* 351 S.W.3d 290, 297 (Tex. 2011).

147 TEX. GOV'T CODE § 311.026(b); *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns,* 397 S.W.3d 173, 181 (Tex.2013).

148 TEX. GOV'T CODE § 311.026(b); *Lopez,* 259 S.W.3d at 153.

149 TEX. HEALTH & SAFETY CODE § 161.031(a). The other categories of entities include university medical schools and health science centers, health maintenance organizations licensed under Chapter 843 of the Insurance Code, extended care facilities, hospital districts, and hospital authorities. *Id.* § 161.031(a)(3)–(7).

150 *Id.* § 161.031(b).

151 *Id.* § 161.032(f).

152 *Id.* § 161.032(d).

153 *Id.* § 161.032(f).

154 *Id.* § 161.032(a).

155 *See id.* § 161.032(b)(1) (proving that "a proceeding of a medical peer review committee ... or medical committee" may be held in a closed meeting (emphasis added)); *id.* § 161.032(b)(2) (providing for closed meetings of the governing board of certain hospitals or health maintenance organizations if at the meeting, "the governing body receives records, information, or reports provided by a medical committee [or] medical peer review committee"); *id.* § 161.032(c) (providing that the "[r]ecords, information, or reports of a medical committee [or] medical peer review committee" as well as "records, information or reports provided by a medical committee [or] medical peer review committee ... to the governing board of a public hospital, hospital district, or hospital authority" are exempt from the disclosure provisions of Chapter 552 of the Government Code).

156 In order to be considered a medical peer review committee, the committee must (1) "operate[ ] under written bylaws approved by the policy-making board or the governing board of the health care entity" and (2) be "authorized to evaluate the quality of medical and health care services or the competence of physicians." TEX. OCC. CODEE § 151.002(a)(8).

157 *Id.*

158 *Id.* § 151.002(a)(5).

159 By way of example, "a health care collaborative certified under Chapter 848, Insurance Code" is specifically designated as a health care entity, TEX. OCC. CODEE § 151.002(a)(5)(E), but such entities would not fall neatly within any of the entity categories listed in the definition of a medical committee. *Compare id. with* TEX. HEALTH & SAFETY CODE § 161.031(a)(1)–(8). *But see Brooks,* 926 S.W.2d at 20 ("[T]he statutory definition of "medical committee" is broad ... That definition encompasses a medical peer review committee....").

160 TEX. OCC. CODEE § 151.002(a)(5)(B)(ii).

161 *Id.* § 151.002(a)(8). In other words, any medical committee that both "operates under written bylaws" approved by either its policy-making or governing board, and follows a formal peer review process will also be considered a medical peer review committee. *Id.*

162 There is only one potential exception to this rule, and that exception applies to the records and proceedings of governing bodies of "public hospital[s] owned or operated by a governmental entity, ... hospital authorit[ies] created under Chapter 262 or 264, Health and Safety Code, ... [or] hospital district[s] created under Article IX, Texas Constitution." TEX. OCC. CODEE § 151.002(a)(8)(B). These governing bodies are considered to be medical peer review committees only in relation to their evaluation of the quality of the medical and health care services they provide or a physician's competence—and only "to the extent that the evaluation ... involves discussions or records that specifically or necessarily identify an individual patient or physician." *Id.* § 151.002(a)(8)(B)(i)–(ii). Thus, none of the governing bodies' records or proceedings that does not "specifically or necessarily identify an individual patient or physician," *id.* § 151.002(a)(8)(ii), would be subject to section 160.007 of the Occupations Code, although they would still enjoy the protections of section 161.032 of the Health and Safety Code.

163 *See, e.g., In re Living Ctrs. of Tex., Inc.,* 175 S.W.3d at 256.

164 *See* TEX. HEALTH & SAFETY CODE § 161.032(a) ("*The records and proceedings* of a medical committee are confidential and are not subject to court subpoena." (emphasis added)); TEX. OCC. CODEE § 160.007(a) ( "Except as otherwise provided by this subtitle, *each proceeding or record* of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged." (emphasis added)).

165 *See Lopez,* 259 S.W.3d at 153.

166 *See* TEX. HEALTH & SAFETY CODE § 161.032(d).

167 *See* TEX. OCC. CODEE § 160.007(d).

168 *Id.* § 160.007(b).

169 TEX. HEALTH & SAFETY CODE § 161.032(a).

170 *See* TEX. GOV'T CODE §§ 311.025(a); 311.026(b).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB NO. 16

# *In re Lipsky*

Supreme Court of Texas

December 4, 2014, Argued; April 24, 2015, Opinion Delivered

NO. 13-0928

**Reporter**

460 S.W.3d 579; 2015 Tex. LEXIS 350; 58 Tex. Sup. J. 707; 45 ELR 20082; 43 Media L. Rep. 1793

IN RE STEVEN LIPSKY, RELATOR

**Prior History:** *Lipsky v. Range Prod. Co., 2012 Tex. App. LEXIS 7059 (Tex. App. Fort Worth, Aug. 23, 2012)*

## Core Terms

specific evidence, defamation, disparagement, court of appeals, contamination, defamatory, pet, circumstantial evidence, motion to dismiss, damages, trial court, reputation, essential element, defamation per se, prima facie case, operations, argues, cases, evidentiary standard, defamation claim, general damages, aquifer, no evidence, pleadings, drilling, defeat, interlocutory appeal, special damage, inferences, remarks

## Case Summary

### Overview

HOLDINGS: [1]-In determining whether there was clear and specific evidence to establish plaintiffs' prima facie case and avoid dismissal pursuant to *Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)* of the Texas Citizens Participation Act (TCPA), *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, relevant circumstantial evidence could be considered; [2]-The Supreme Court of Texas accordingly disapproved those cases that interpreted the TCPA to require direct evidence of each essential element of the underlying claim to avoid dismissal; [3]-A gas well driller's defamation counterclaim against a property owner was properly not dismissed because clear and specific evidence showed the owner's statements were defamatory per se, as they reflected on the driller's fitness and abilities as a natural gas producer, and proof of particular damage was not required.

### Outcome

Requested writ of mandamus denied.

## LexisNexis® Headnotes

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Evidence > Burdens of Proof > Clear & Convincing Proof

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Relevance > Relevant Evidence

*HN1* The Texas Citizens Participation Act protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them. *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*. The protection consists of a special motion for an expedited consideration of any suit that appears to stifle the defendant's communication on a matter of public concern. *Tex. Civ. Prac. & Rem. Code Ann. § 27.003*. In reviewing that motion, the trial court is directed to dismiss the suit unless "clear and specific evidence" establishes the plaintiffs' "prima facie case." *Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)*. Some courts hold that only direct evidence is relevant when considering a motion to dismiss under the Act, while others have concluded that relevant circumstantial evidence must also be considered. The Supreme Court of Texas agrees that clear and specific evidence under the Act includes relevant circumstantial evidence.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

*HN2* An interlocutory appeal is permitted from any interlocutory order denying a motion to dismiss under the Texas Citizens Participation Act, Tex. Civ. Prac. & Rem. Code Ann. *§§ 27.001-27.011. Tex. Civ. Prac. &*

*Rem. Code Ann.* § 51.014(a)(12).

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Evidence > Burdens of Proof > Burden Shifting

Evidence > Burdens of Proof > Clear & Convincing Proof

Evidence > Burdens of Proof > Preponderance of Evidence

*HN3* The Texas Citizens Participation Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, protects citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern. The Act provides a special procedure for the expedited dismissal of such suits. A two-step process is initiated by motion of a defendant who believes that the lawsuit responds to the defendant's valid exercise of First Amendment, *U.S. Const. amend. I*, rights. Under the first step, the burden is initially on the defendant-movant to show "by a preponderance of the evidence" that the plaintiff's claim is based on, relates to, or is in response to the movant's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association. *Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)*. If the movant is able to demonstrate that the plaintiff's claim implicates one of these rights, the second step shifts the burden to the plaintiff to establish by clear and specific evidence a prima facie case for each essential element of the claim in question. *§ 27.005(c)*.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

*HN4* The "right of free speech," as used in *Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)*, refers to communications related to "a matter of public concern" which is defined to include an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace. *Tex. Civ. Prac. & Rem. Code Ann. § 27.001(3), (7)(A)-(E)*.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom to Petition

*HN5* The "right to petition," as used in *Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)*, refers to a wide range of communications relating to judicial, administrative, or other governmental proceedings. *Tex. Civ. Prac. & Rem. Code Ann. § 27.001(4)*.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

*HN6* The "right of association," as used in *Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)*, refers to people collectively expressing, promoting, pursuing, or defending common interests. *Tex. Civ. Prac. & Rem. Code Ann. § 27.001(2)*.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Evidence > Burdens of Proof > Allocation

*HN7* In determining whether a plaintiff's claim under the Texas Citizens Participation Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, should be dismissed, the court is to consider the pleadings and any supporting and opposing affidavits. *Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a)*. Moreover, the motion to dismiss ordinarily suspends discovery, *Tex. Civ. Prac. & Rem. Code Ann. § 27.003(c)*, although the statute leaves the possibility for a court to order limited discovery for "good cause" as it relates to the motion itself. *§ 27.006(b)*. Within defined time limits, the court must then rule on the motion and must dismiss the plaintiff's claim if the defendant's constitutional rights are implicated and the plaintiff has not met the required showing of a prima facie case. *Tex. Civ. Prac. & Rem. Code Ann. § 27.005*. The determination is to be made promptly, ordinarily within 150 days of service of the underlying legal action. *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003(b), 27.004(a), 27.005(a)*.

Evidence > Burdens of Proof > Clear & Convincing Proof

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits

Against Public Participation

Evidence > Types of Evidence > Circumstantial Evidence

*HN8* Some courts, focusing on the requirement of "clear and specific evidence," have interpreted *Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)* of the Texas Citizens Participation Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, to require a heightened evidentiary standard, unaided by inferences. Implicit in these decisions is the assumption that circumstantial evidence is not sufficiently "clear and specific" to satisfy the statutory burden. Other courts, focusing on the prima-facie-case language, have concluded that the statute permits the court to draw rational inferences from circumstantial evidence when determining whether the plaintiff has met its threshold factual burden.

Evidence > Burdens of Proof > Clear & Convincing Proof

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

*HN9* *Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)* does not define "clear and specific evidence."

Evidence > Inferences & Presumptions > Inferences

Evidence > Types of Evidence > Circumstantial Evidence

Torts > ... > Fraud & Misrepresentation > Actual Fraud > Elements

*HN10* Intent to defraud is not susceptible to direct proof and invariably must be proven by circumstantial evidence. Fraud could not be inferred from the "vague, indefinite, and inconclusive" testimony of interested witnesses.

Evidence > Inferences & Presumptions > Inferences

Evidence > Admissibility > Circumstantial & Direct Evidence

*HN11* Circumstantial evidence can be vague, indefinite, or inconclusive, but it is not so by definition. Rather, it is simply indirect evidence that creates an inference to establish a central fact. It is admissible unless the connection between the fact and the inference is too weak to be of help in deciding the case. *Tex. R. Evid. 401-402*. The common law has developed several distinct evidentiary standards, but none of these standards categorically rejects the use of circumstantial evidence.

Evidence > Burdens of Proof > General Overview

*HN12* The applicable evidentiary standard is generally determined by the nature of the case or particular claim. Criminal cases require proof beyond a reasonable doubt, a near certainty, whereas civil cases typically apply the preponderance-of-the-evidence standard, that is, a fact-finder's determination that the plaintiff's version of the events is more likely than not true. Some civil claims, including some defamation claims, elevate the evidentiary standard to require proof by clear-and-convincing evidence. This standard requires that the strength of the plaintiff's proof produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations.

Evidence > Burdens of Proof > General Overview

Evidence > Burdens of Proof > Clear & Convincing Proof

Evidence > Admissibility > Circumstantial & Direct Evidence

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

*HN13* Clear and specific evidence is not a recognized evidentiary standard. Although it sounds similar to clear and convincing evidence, the phrases are not legally synonymous. The Legislature well understands the clear-and-convincing-evidence standard and uses that standard when it so intends. But even were courts to assume that the Legislature intended to apply the clear-and-convincing standard in the Texas Citizens Participation Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, it would still not exclude circumstantial evidence.

Evidence > Burdens of Proof > Clear & Convincing Proof

Evidence > Admissibility > Circumstantial & Direct Evidence

Evidence > Relevance > Relevant Evidence

Governments > Legislation > Interpretation

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN14* All evidentiary standards, including clear and convincing evidence, recognize the relevance of circumstantial evidence. In fact, courts have acknowledged that the determination of certain facts in particular cases may exclusively depend on such evidence. Circumstantial evidence may be used to prove one's case-in-chief or to defeat a motion for directed verdict, and so it would be odd to deny its use to defeat a preliminary motion to dismiss under the

Texas Citizens Participation Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*. That the statute should create a greater obstacle for the plaintiff to get into the courthouse than to win its case seems nonsensical. Courts interpret statutes to avoid an absurd result.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Evidence > Burdens of Proof > Clear & Convincing Proof

*HN15* The purpose of the Texas Citizens Participation Act (TCPA), *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, is to identify and summarily dispose of lawsuits designed only to chill First Amendment, *U.S. Const. amend. I*, rights, not to dismiss meritorious lawsuits. *Tex. Civ. Prac. & Rem. Code Ann. § 27.002* balances the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law against the rights of a person to file meritorious lawsuits for demonstrable injury. To accomplish its purpose, the TCPA endorses a summary process, requiring judicial review of the pleadings and limited evidence, typically within 150 days following service. *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003(b)*, *27.004(a)*, *27.005(a)*. To defeat an appropriate TCPA motion to dismiss, the opponent must establish by clear and specific evidence a prima facie case for each essential element of the claim in question. *§ 27.005(c)*.

Evidence > Burdens of Proof > Clear & Convincing Proof

Governments > Legislation > Interpretation

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

*HN16* Neither the Texas Citizens Participation Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, nor the common law provides a definition for "clear and specific evidence." Words and phrases that are not defined by statute and that have not acquired a special or technical meaning are typically given their plain or common meaning. The words "clear" and "specific" in the context of the Act have been interpreted respectively to mean, for the former, "unambiguous," "sure," or "free from doubt" and, for the latter, "explicit" or "relating to a particular named thing."

Constitutional Law > ... > Fundamental

Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Evidence > Burdens of Proof > Clear & Convincing Proof

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Evidence > Inferences & Presumptions > Inferences

*HN17* The Texas Citizens Participation Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, requires not only "clear and specific evidence" but also a "prima facie case." In contrast to "clear and specific evidence," a "prima facie case" has a traditional legal meaning. It refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted. It is the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.

Evidence > Burdens of Proof > Clear & Convincing Proof

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN18* The direction of the Texas Citizens Participation Act (TCPA), *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, that a claim should not be dismissed if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question describes the clarity and detail required to avoid dismissal. *Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)*. Courts are further directed to make that determination early in the proceedings, typically on the basis of the pleadings and affidavits. But pleadings that might suffice in a case that does not implicate the TCPA may not be sufficient to satisfy the TCPA's "clear and specific evidence" requirement.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Evidence > Burdens of Proof > Clear & Convincing Proof

In re Lipsky

**HN19** Texas procedural rules merely require that the pleadings provide fair notice of the claim and the relief sought such that the opposing party can prepare a defense. *Tex. R. Civ. P. 45* and *47*. Even the omission of an element is not fatal if the cause of action may be reasonably inferred from what is specifically stated. Moreover, under notice pleading, a plaintiff is not required to set out in his pleadings the evidence upon which he relies to establish his asserted cause of action. But the Texas Citizens Participation Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, requires that on motion the plaintiff present "clear and specific evidence" of "each essential element."

Evidence > Burdens of Proof > Clear & Convincing Proof

Torts > ... > Defamation > Elements > General Overview

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN20** Fair notice of a claim under the Texas procedural rules may require something less than "clear and specific evidence" of each essential element of the claim. Because the Texas Citizens Participation Act (TCPA), *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, requires more, mere notice pleading - that is, general allegations that merely recite the elements of a cause of action - will not suffice. Instead, a plaintiff must provide enough detail to show the factual basis for its claim. In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Evidence > Burdens of Proof > Allocation

Evidence > Types of Evidence > Circumstantial Evidence

**HN21** Though the Texas Citizens Participation Act (TCPA), *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, initially demands more information about the underlying claim, the TCPA does not impose an elevated evidentiary standard or categorically reject circumstantial evidence. In short, it does not impose a higher burden of proof than that required of the plaintiff at trial. The Supreme Court of Texas accordingly disapproves those cases that interpret the TCPA to require direct evidence of each essential element of the underlying claim to avoid dismissal.

Torts > Intentional Torts > Defamation > General Overview

Torts > Business Torts > Trade Libel > General Overview

**HN22** Business disparagement and defamation are similar in that both involve harm from the publication of false information. The respective torts, however, serve different interests. Whereas defamation actions chiefly serve to protect the personal reputation of an injured party, a business disparagement claim protects economic interests. Business disparagement or injurious falsehood applies to derogatory publications about the plaintiff's economic or commercial interests. The tort does not seek to redress dignitary harms to the business owner, but rather redresses aspersions cast on the business's commercial product or activity that diminishes those interests.

Torts > Business Torts > Trade Libel > General Overview

Torts > Intentional Torts > Defamation > General Overview

**HN23** A corporation or other business entity that asserts a claim for defamation may assert an additional or alternative claim for business disparagement if it seeks to recover economic damages for injury to the business. Impugning one's reputation is possible without disparaging its commercial interests and vice versa. Depending on the circumstances, then, a plaintiff may have a claim for defamation, or for business disparagement, or both.

Torts > Business Torts > Trade Libel > General Overview

**HN24** A number of examples of commercial disparagement or trade libel that are not strictly speaking defamatory in the sense of dignitary harm include: A publication that says the defendant's product is poisonous and contaminates the land or one that says the plaintiff's wood products are inferior and will not stand up. A false statement that the ratings of the plaintiff's radio show are too low to justify continuing the show. A publication falsely stating the price the plaintiff

charges for his goods or that the plaintiff is no longer carrying on a business or has insufficient funds to continue in business.

Torts > Business Torts > Trade Libel > Elements

Evidence > Burdens of Proof > Allocation

Evidence > Burdens of Proof > Clear & Convincing Proof

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN25* To defend against a dismissal motion, a plaintiff's burden under the Texas Citizens Participation Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, is to establish by clear and specific evidence a prima facie case for each essential element of the claim in question. *Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)*. To prevail on a business disparagement claim, a plaintiff must establish that: (1) the defendant published false and disparaging information about it; (2) with malice; (3) without privilege; (4) that resulted in special damages to the plaintiff.

Torts > ... > Defamation > Remedies > Damages

Torts > Remedies > Damages > Types of Damages

*HN26* Special damages are synonymous with economic damages and are distinguishable from general damages. General damages are recoverable under a defamation claim for non-economic losses, such as loss of reputation and mental anguish.

Evidence > Burdens of Proof > Clear & Convincing Proof

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

*HN27* Bare, baseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the Texas Citizens Participation Act (TCPA), *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*. General averments of direct economic losses and lost profits, without more, do not satisfy the minimum requirements of the TCPA.

Torts > Intentional Torts > Defamation > General Overview

Torts > Business Torts > Trade Libel > General Overview

*HN28* Corporations and other business entities have reputations that can be libeled apart from the businesses they own, and such entities can prosecute an action for defamation in their own names. Moreover, a corporation or other business entity asserting a claim for business disparagement may also assert additional or alternative claims for defamation to recover non-economic general damages such as injury to reputation that are not recoverable on a business-disparagement claim.

Torts > ... > Defamation > Elements > General Overview

Torts > Intentional Torts > Defamation > Procedural Matters

Torts > ... > Defamation > Public Figures > Actual Malice

*HN29* Defamation's elements include: (1) the publication of a false statement of fact to a third party; (2) that was defamatory concerning the plaintiff; (3) with the requisite degree of fault; and (4) damages, in some cases. The status of the person allegedly defamed determines the requisite degree of fault. A private individual need only prove negligence, whereas a public figure or official must prove actual malice. "Actual malice" in this context means that the statement was made with knowledge of its falsity or with reckless disregard for its truth. Finally, the plaintiff must plead and prove damages, unless the defamatory statements are defamatory per se.

Torts > Intentional Torts > Defamation > Procedural Matters

Torts > Intentional Torts > Defamation > Defamation Per Se

Torts > ... > Defamation > Remedies > Damages

Evidence > Inferences & Presumptions > Presumptions > Effects

*HN30* Defamation per se refers to statements that are so obviously harmful that general damages may be presumed. General damages include non-economic losses, such as loss of reputation and mental anguish. Special damages, on the other hand, are never presumed as they represent specific economic losses that must be proven. And even though Texas law presumes general damages when the defamation is per se, it does not presume any particular amount of damages beyond nominal damages. Any award of general damages that exceeds a nominal sum is thus reviewed for evidentiary support.

Torts > ... > Defamation > Elements > General Overview

Torts > Intentional Torts > Defamation > Procedural Matters

*HN31* It is well settled that the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements.

> Torts > Intentional Torts > Defamation > Defamation Per Se
>
> Torts > Intentional Torts > Defamation > Procedural Matters

*HN32* When an offending publication qualifies as defamation per se, a plaintiff may recover general damages without proof of any specific loss.

> Torts > Intentional Torts > Defamation > Defamation Per Quod
>
> Torts > Intentional Torts > Defamation > Defamation Per Se
>
> Torts > Intentional Torts > Defamation > Procedural Matters

*HN33* The common law distinguishes defamation claims as either per se or per quod. Defamation per se refers to statements that are so obviously harmful that general damages, such as mental anguish and loss of reputation, are presumed. Defamation per quod is defamation that is not actionable per se. Defamation per se is itself broken down into separate categories of falsehoods. Accusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se. Remarks that adversely reflect on a person's fitness to conduct his or her business or trade are also deemed defamatory per se. And whether a statement qualifies as defamation per se is generally a question of law. The common law distinction between defamation per se and per quod has been criticized as anachronistic and has been abandoned in some jurisdictions, but Texas has not abandoned this distinction.

> Torts > Intentional Torts > Defamation > Defamation Per Se

*HN34* To qualify as defamation per se under the category of injuring one in his business, the disparaging words must affect the plaintiff in some manner that is peculiarly harmful to the plaintiff's trade, business, or profession and not merely upon the plaintiff's general characteristics.

> Torts > Intentional Torts > Defamation > Defamation Per Se
>
> Torts > ... > Defamation > Elements > General Overview
>
> Torts > Intentional Torts > Defamation > Procedural Matters
>
> Evidence > Inferences & Presumptions > Presumptions > Effects

*HN35* As defamation per se, damages to one's reputation are presumed, although the presumption alone will support only an award of nominal damages. Pleading and proof of particular damage is not required to prevail on a claim of defamation per se, and thus actual damage is not an essential element of the claim to which the burden under the Texas Citizens Participation Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011*, of clear and specific evidence might apply.

**Judges:** [**1] JUSTICE DEVINE delivered the opinion of the Court.

**Opinion by:** John P. Devine

# Opinion

[*584] ON PETITION FOR WRIT OF MANDAMUS

JUSTICE DEVINE delivered the opinion of the Court.

*HN1* The Texas Citizens Participation Act (TCPA)[1] protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them. *Tex. Civ. Prac. & Rem. Code §§ 27.001-.011*. The protection consists of a special motion for an expedited consideration of any suit that appears to stifle the defendant's communication on a matter of public concern. *Id. § 27.003*. In reviewing that motion, the trial court is directed to dismiss the suit unless "clear and specific evidence" establishes the plaintiffs' "prima facie case." *Id. § 27.005(c)*. When applying the Act's requirement for clear and specific evidence, however, the courts of appeals disagree about the role of circumstantial evidence.

Some courts hold that only direct evidence is relevant when considering a motion to dismiss under the Act, while others have concluded that relevant circumstantial evidence must also be considered. The court of appeals [**2] here considered circumstantial evidence, and we agree that clear and specific evidence under the Act includes relevant circumstantial evidence. *411 S.W.3d 530, 546 (Tex. App.—Fort Worth 2013)*. We further agree, generally, with the court of appeals's disposition of the proceedings below and accordingly deny all relief requested here.

---

[1] *See* Act of May 18, 2011, 82nd Leg., R.S., ch. 341, § 1, 2011 Tex. Gen. Laws 961 (stating that "Act may be cited as the Citizens Participation Act").

## I. Background and Procedural History

Steven and Shyla Lipsky own several acres in Weatherford, Texas. In 2005 they drilled a well on their property to a depth of about two hundred feet to provide water to a cabin and boathouse. In 2009 they finished a house on the property, connecting the well to their new home. That same year, Range Resources Corporation and Range Production Company drilled two gas wells about a half-mile from the Lipskys' property.

A few months after moving into their new home, the Lipskys experienced mechanical problems with their well. They contacted a well-servicing company, which identified the problem as "gas locking," a condition typically associated with an excess of natural gas in the ground water. A submersible pump's ability to transport water from a well can be affected when too much gas is in the water.

[*585] Concerned about the gas in their well water, the Lipskys contacted local [**3] health officials who referred them to Alisa Rich, an environmental consultant with Wolf Eagle Environmental. After tests, Rich confirmed the presence of methane and other gases in the well. About this time, Lipsky made a video of himself lighting gas escaping from a garden hose attached to his well. To produce this effect, Lipsky connected the hose to a vent on his water well. He shared his video with the Environmental Protection Agency (EPA) and the media, which reported on the flammable nature of Lipsky's water well. He also complained about the gas in his well to the Texas Railroad Commission. Lipsky's own investigation led him to believe that Range, the oil and gas operator closest to his property, had some responsibility for contaminating his ground water.

Both the EPA and Railroad Commission began investigating Lipsky's complaints. The EPA initially concluded that Range's production activities had contributed to the gas in the Lipskys' well water and that the situation could be hazardous to health and safety. The federal agency ordered Range to provide the Lipskys potable water and to install explosivity meters at their property.

The Railroad Commission completed its investigation [**4] a few months later. Although invited to participate in the Commission's evidentiary hearing, the Lipskys declined. The Commission thereafter concluded that Range's operations in the area were not the source of the contamination. Lipsky immediately denounced the Railroad Commission's decision in the media and continued to blame Range, pointing to the EPA's action and his expert's opinions.

The Lipskys thereafter sued Range and others involved in developing their residential area. As to Range, they alleged that its fracking operations near their property were negligent, grossly negligent, and a nuisance. They asserted that Range's operations contaminated their water well, causing the water to become flammable and their home uninhabitable. Range answered the suit and moved to dismiss all claims as an improper collateral attack on the Railroad Commission's ruling. Range also filed a counterclaim against the Lipskys and a third-party claim against Rich (the Lipskys' environmental consultant) alleging defamation, business disparagement, and a civil conspiracy. The Lipskys and Rich responded by moving to dismiss Range's counter-attack as an improper attempt to suppress their First Amendment rights guaranteed [**5] under the Constitution and protected by the Texas Citizens Participation Act. _Tex. Civ. Prac. & Rem. Code § 27.005_.

The trial court granted Range's motion to dismiss, agreeing that the Lipskys' claims were an improper collateral attack on the Commission's determination. The court also declined to dismiss Range's claims against the Lipskys and Rich by denying their motions to dismiss under the Texas Citizens Participation Act. The Lipskys and Rich attempted an interlocutory appeal from this latter ruling, but the court of appeals dismissed the appeal for want of jurisdiction.[2] See _Lipsky v. Range [*586] Prod. Co., No. 02-12-00098-CV, 2012_

---

[2] At the time, the courts of appeals disagreed about whether the Texas Citizens Participation Act granted an interlocutory appeal from a signed order denying dismissal. _Compare Jennings v. WallBuilder Presentations, Inc., 378 S.W.3d 519, 524-29 (Tex. App.—Fort Worth 2012, pet. denied)_ (rejecting interlocutory appeal), with _San Jacinto Title Servs. of Corpus Christi, LLC. v. Kingsley Props., LP., 452 S.W.3d 343, 349 (Tex. App.—Corpus Christi 2013, pet. denied)_ (accepting interlocutory appeal); see also [**6] Justice Nora Longoria & Nathaniel Beal, _"What Is A SLAPP Case?" Interlocutory Appeals and the Texas Citizens' Participation Act, 26 APP. ADVOC. 390, 395-96 (2014)_. The Legislature has since clarified that HN2 an interlocutory appeal is permitted from any interlocutory order denying a motion to dismiss under the TCPA. See _Tex. Civ. Prac. & Rem. Code § 51.014(a)(12)_; see also _Miller Weisbrod, L.L.P. v. Llamas-Soforo, ___ S.W.3d ___, 2014 Tex. App. LEXIS 12745, 2014 WL 6679122, at *6 (Tex. App.—El Paso 2014, no pet.)_. Although an interlocutory appeal is clearly the appropriate remedy going forward, we nevertheless consider the issues presented here in the context of the original mandamus proceedings filed in this Court.

*Tex. App. LEXIS 7059, 2012 WL 3600014, at \*1 (Tex. App.—Fort Worth Aug. 23, 2012*, pet. denied) (mem. op.). The court, however, allowed the challenge to proceed as an original proceeding. *411 S.W.3d at 536*. Meanwhile, the EPA withdrew its administrative order against Range without explanation. *See* Joint Stipulation of Dismissal Without Prejudice, *United States v. Range Prod. Co.*, No. 3:11-CV-00116-F (N.D. Tex. Mar. 30, 2012).

The court of appeals thereafter determined that the Texas Citizens Participation Act required the dismissal of Range's claims against Lipsky's wife, Shyla, and his environmental consultant, Rich, and that the trial court had accordingly abused its discretion in not dismissing those claims. *411 S.W.3d at 554*. The court further determined that the TCPA did not similarly require dismissal of all of Range's claims against Lipsky.[3] *Id. at 546*. The court of appeals granted mandamus relief to Lipsky's wife and consulant, while denying similar relief to Lipsky, prompting both Lipsky and Range to seek mandamus relief in this Court. In their respective petitions, Lipsky argues that the TCPA required the trial court to dismiss all claims [\*\*7] against him also, while Range argues that the TCPA did not require the dismissal of any claims. The Lipsky petition accordingly concludes that the trial court abused its discretion in failing to grant his TCPA motion. The Range petition, on the other hand, concludes that the court of appeals abused its discretion in granting mandamus relief to Lipsky's wife, his environmental consultant, and Lipsky himself (in part) because the TCPA did not require it.

## II. The Texas Citizens Participation Act

As already mentioned, *HN3* the Texas Citizens Participation Act or TCPA protects citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern. *See* House Comm. on Judiciary & Civil Jurisprudence, Bill Analysis, Tex. H.B. 2973, 82nd Leg., R.S. (2011). The Act provides a special procedure for the expedited dismissal of such suits. A two-step process is initiated by motion of a defendant who believes that the lawsuit responds to the defendant's valid exercise of First Amendment rights. Under the first step, [\*\*8] the burden is initially on the defendant-movant to show "by a preponderance of the

evidence" that the plaintiff's claim "is based on, relates to, or is in response to the [movant's] exercise of: (1) the right of free speech;[4] (2) the right to petition;[5] or (3) the right of association."[6] [\*587] *Tex. Civ. Prac. & Rem. Code § 27.005(b)*. If the movant is able to demonstrate that the plaintiff's claim implicates one of these rights, the second step shifts the burden to the plaintiff to "establish[] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id. § 27.005(c)*.

*HN7* In determining whether the plaintiff's [\*\*9] claim should be dismissed, the court is to consider the pleadings and any supporting and opposing affidavits. *Id. § 27.006(a)*. Moreover, the motion to dismiss ordinarily suspends discovery, *id. § 27.003(c)*, although the statute leaves the possibility for a court to order limited discovery for "good cause" as it relates to the motion itself, *id. § 27.006(b)*. Within defined time limits, the court must then rule on the motion and must dismiss the plaintiff's claim if the defendant's constitutional rights are implicated and the plaintiff has not met the required showing of a prima facie case. *Id. § 27.005*. The determination is to be made promptly, ordinarily within 150 days of service of the underlying legal action. *See id. §§ 27.003(b), .004(a), .005(a)*.

In this proceeding, only the second step is at issue—the question being whether the plaintiff has met its burden of "establish[ing] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id. § 27.005(c)*. The parties disagree about the evidentiary burden this language imposes. Lipsky argues that the phrase "clear and specific evidence" elevates the evidentiary standard, requiring Range to produce direct evidence as to each element of its claim. Range, on the other [\*\*10] hand, argues that

---

[3] The court of appeals concluded that the trial court should have dismissed the civil conspiracy and aiding and abetting claims against all defendants, including Steven Lipsky. *Id. at 551-52*.

[4] *HN4* The "right of free speech" refers to communications related to "a matter of public concern" which is defined to include an issue related to: "(A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." *Id. § 27.001(3), (7)(A)—(E)*.

[5] *HN5* The "right to petition" refers to a wide range of communications relating to judicial, administrative, or other governmental proceedings. *Id. § 27.001(4)*.

[6] *HN6* The "right of association" refers to people "collectively express[ing], promot[ing], pursu[ing], or defend[ing] common interests." *Id. § 27.001(2)*.

circumstantial evidence and rational inferences may be considered by the court in determining whether clear and specific evidence exists and that the TCPA's prima-facie-case requirement does not impose a higher or unique evidentiary standard. The dispute mirrors a similar disagreement among the courts of appeals.

*HN8* Some courts, focusing on the requirement of "clear and specific evidence," have interpreted the statute to require a heightened evidentiary standard, unaided by inferences. *See Shipp v. Malouf, 439 S.W.3d 432, 439 (Tex. App.—Dallas 2014, pet. denied); Young v. Krantz, 434 S.W.3d 335, 342-43 (Tex. App.—Dallas 2014, no pet.); KBMT Operating Co. v. Toledo, 434 S.W.3d 276, 282 (Tex. App.—Beaumont 2014, pet. granted); Farias v. Garza, 426 S.W.3d 808, 814 (Tex. App.—San Antonio 2014, pet. filed); Rio Grande H2O Guardian v. Robert Muller Family P'ship, Ltd., No. 04-13-00441-cv, 2014 Tex. App. LEXIS 915, 2014 WL 309776, at \*2 (Tex. App.—San Antonio Jan. 29, 2014, no pet.) (mem op.); Sierra Club v. Andrews Cnty., Tex., 418 S.W.3d 711, 715 (Tex. App.—El Paso 2013, pet. filed); Alphonso v. Deshotel, 417 S.W.3d 194, 198 (Tex. App.—El Paso 2013, no pet.); Fitzmaurice v. Jones, 417 S.W.3d 627, 632 (Tex. App.—Houston [14th Dist.] 2013, no pet.); Rehak Creative Servs., Inc. v. Witt, 404 S.W.3d 716, 726 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).* Implicit in these decisions is the assumption that circumstantial evidence is not sufficiently "clear and specific" to satisfy the statutory burden. Other courts, focusing on the prima-facie-case language, have concluded that the statute permits the court to draw rational inferences from circumstantial evidence when determining whether the plaintiff has met its threshold factual burden. *See Schimmel [\*588] v. McGregor, 438 S.W.3d 847, 855 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); Combined Law Enforcement Ass'ns of Tex. v. Sheffield, No. 03-13-00105-CV, 2014 Tex. App. LEXIS 1098, 2014 WL 411672, at \*10 (Tex. App.—Austin Jan. 31, 2014, pet. filed) (mem. op.); Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd., 416 S.W.3d 71, 80 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); In re Lipsky, 411 S.W.3d at 539.*

*HN9* The statute does not define "clear and specific evidence," but the courts that [\*\*11] have interpreted the phrase to impose a heightened evidentiary standard have purportedly found support in the case law. Those courts invariably rely on two cases predating the Act for the proposition that "clear and specific evidence" means "evidence unaided by presumptions, inferences or intendments." *See, e.g., Sierra Club, 418 S.W.3d at 715* (citing *McDonald v. Clemens, 464 S.W.2d 450, 456*

*(Tex. Civ. App.—Tyler 1971, no writ)* and *S. Cantu & Son v. Ramirez, 101 S.W.2d 820, 822 (Tex. Civ. App.—San Antonio 1936, no writ)); Rehak Creative Servs., 404 S.W.3d at 726* (relying on same two cases).

Both cases involved fraud claims. In *McDonald,* the trial court granted summary judgment on the fraud claim, and the appellate court affirmed, concluding no material fact issue existed as to one or more of the claim's essential elements. *McDonald, 464 S.W.2d at 456.* The court noted that the summary judgment could not be reversed on the presumption of fraud but rather required the existence of a fact issue raised by more than mere conjecture:

> As to appellants' claim of fraud, the burden was upon them to raise a fact issue as to its existence by competent evidence. This burden could not be discharged in the absence of a showing that all of the elements of actionable fraud were present. *Mere conjecture or evidence which does not necessarily tend to that conclusion is insufficient. Charges of fraud must be established by clear and specific evidence unaided by presumptions, [\*\*12] inferences or intendments.* Until or unless fraud is proved, the presumption is in favor of the fairness of a transaction and specific acts of fraud must be both alleged and proved by appellants in response to appellee's motion for summary judgment.

*Id.* (emphasis added).

The context establishes that the court was not attempting to define "clear and specific evidence" to exclude circumstantial evidence or to require only direct evidence to create a fact question. Such a definition would, of course, have been erroneous "[s]ince *HN10* intent to defraud is not susceptible to direct proof [and] invariably must be proven by circumstantial evidence." *Spoljaric v. Percival Tours, Inc., 708 S.W.3d 432, 435 (Tex. 1986).* Similarly, the court in *S. Cantu & Son* did not define "clear and specific evidence" to exclude circumstantial evidence but instead said that fraud could not be inferred from the "vague, indefinite, and inconclusive" testimony of interested witnesses.[7]

---

[7] The court wrote:

> Charges of fraud must be established by clear and specific evidence, which may not be aided by presumptions or inferences, or intendment. The evidence and findings of the representations complained of in this

*HN11* Circumstantial evidence can, of course, be vague, indefinite, or inconclusive, but it is not so by definition. Rather, [*589] it is simply indirect evidence that creates an inference to establish a central fact. *See Felker v. Petrolon, Inc., 929 S.W.2d 460, 463-64 (Tex. App.— Houston [1st Dist.] 1996, writ denied)*. It is admissible unless the connection between the fact and the inference is too weak to be of help in deciding the case. *Tex. R. Evid. 401-02*. The common law has developed several distinct evidentiary standards, but none of these standards categorically rejects the use of circumstantial evidence.

*HN12* The applicable evidentiary standard is generally determined by the nature of the case or particular claim. Criminal cases require proof beyond a reasonable doubt, a near certainty, whereas civil cases typically apply the preponderance-of-the-evidence standard, that is, a fact-finder's determination that the plaintiff's version of the events is more likely than not true. Some civil claims, including some defamation claims, elevate the evidentiary standard to require proof by clear-and-convincing evidence. *Bentley v. Bunton, 94 S.W.3d 561, 596 (Tex. 2002)*. This standard requires that the [**14] strength of the plaintiff's proof produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations. *Id. at 597*.

*HN13* Clear and specific evidence is not a recognized evidentiary standard. Although it sounds similar to clear and convincing evidence, the phrases are not legally synonymous. The Legislature well understands the clear-and-convincing-evidence standard and uses that standard when it so intends. *See, e.g., Tex. Civ. Prac. & Rem. Code §§ 18.033(c), 41.001(2), 41.003(b), (c), 134A.004(b), 147.122*.[8] But even were we to assume that the Legislature intended to apply the clear-and-convincing standard in this statute, the statute would still not exclude circumstantial evidence.

---

case are vague, indefinite, and inconclusive, and, moreover, are so qualified by the testimony [**13] of appellee and her sister-in-law, upon which her case rests, as to rob them of the implications of active fraud necessary to destroy a written contract.

*S. Cantu & Sons, 101 S.W.2d at 822*.

[8] The phrase "clear and specific evidence" appears in only three statutes. *See Tex. Civ. Prac. & Rem. Code §§ 22.025, 27.005(c); Tex. Code Crim Proc. art. 38.11, §6*. "Clear and specific showing" appears in two others. *See Tex. Civ. Prac. & Rem. Code § 22.024; Tex. Code Crim. Proc. art. 38.11, §§ 4(a), (c), 5(a)*.

*HN14* All evidentiary standards, including clear and convincing evidence, recognize the relevance of circumstantial evidence. In fact, we have acknowledged that the determination of certain facts in particular cases may exclusively depend on such evidence. *See, e.g., Bentley, 94 S.W.3d at 596* (noting, in a defamation case, that claims involving an element of a defendant's [**15] state of mind "must usually [] be proved by circumstantial evidence"). Circumstantial evidence may be used to prove one's case-in-chief or to defeat a motion for directed verdict, and so it would be odd to deny its use here to defeat a preliminary motion to dismiss under the TCPA. That the statute should create a greater obstacle for the plaintiff to get into the courthouse than to win its case seems nonsensical. *See Carreras v. Marroquin, 339 S.W.3d 68, 73 (Tex. 2011)* (noting that we "interpret statutes to avoid an absurd result").

*HN15* The TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits. *See Tex. Civ. Prac. & Rem. Code § 27.002* (balancing "the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law" against "the rights of a person to file meritorious lawsuits for demonstrable injury"). To accomplish its purpose, the Act endorses a summary process, requiring judicial review of the pleadings and limited evidence, typically within 150 days following service. *Tex. Civ. Prac. & Rem. Code §§ 27.003(b)*, [*590] *.004(a)*, *.005(a); Jennings, 378 S.W.3d at 526*. To defeat an appropriate TCPA motion to dismiss, the opponent must establish [**16] "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Tex. Civ. Prac. & Rem. Code § 27.005(c)*.

As discussed, *HN16* neither the Act nor the common law provides a definition for "clear and specific evidence."[9] Words and phrases that are not defined by statute and that have not acquired a special or technical meaning are typically given their plain or common meaning. *FKM P'ship, Ltd. v. Bd. of Regents of Univ. of Hous. Sys., 255 S.W.3d 619, 633 (Tex. 2008)*. The words "clear" and "specific" in the context of this statute

---

[9] Before the TCPA's enactment, the phrase appeared in two reported cases. *See McDonald, 464 S.W.2d at 456; S. Cantu & Son, 101 S.W.2d at 822*. Since its enactment, the phrase has appeared in over thirty reported cases tied to a discussion of the statute.

have been interpreted respectively to mean, for the former, "'unambiguous,' 'sure,' or 'free from doubt'" and, for the latter, "'explicit' or 'relating to a particular named thing.'" See *KTRK Television, Inc. v. Robinson, 409 S.W.3d 682, 689 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)* (quoting BLACK'S LAW DICTIONARY 268, 1434 (8th ed. 2004)).

*HN17* The statute, however, requires not only "clear and specific evidence" but also a "prima facie case." In contrast to "clear and specific evidence," a "prima facie case" has a traditional legal meaning. It refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted [**17] or contradicted. *Simonds v. Stanolind Oil & Gas Co., 134 Tex. 348, 136 S.W.2d 207, 209 (Tex. 1940)*. It is the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re E.I. DuPont de Nemours & Co., 136 S.W.3d 218, 223 (Tex. 2004)* (per curiam) (quoting *Tex. Tech Univ. Health Scis. Ctr. v. Apodaca, 876 S.W.2d 402, 407 (Tex. App.—El Paso 1994, writ denied))*.

*HN18* The TCPA's direction that a claim should not be dismissed "if the party bringing the legal action establishes by *clear and specific evidence a prima facie case* for each essential element of the claim in question" thus describes the clarity and detail required to avoid dismissal. *Tex. Civ. Prac. & Rem. Code § 27.005(c)* (emphasis added). Courts are further directed to make that determination early in the proceedings, typically on the basis of the pleadings and affidavits. But pleadings that might suffice in a case that does not implicate the TCPA may not be sufficient to satisfy the TCPA's "clear and specific evidence" requirement.

*HN19* Our procedural rules merely require that the pleadings provide fair notice of the claim and the relief sought such that the opposing party can prepare a defense. See *Tex. R. Civ. P. 45* & *47*. Even the omission of an element is not fatal if the cause of action "may be reasonably inferred from what is specifically stated." *Boyles v. Kerr, 855 S.W.2d 593, 601 (Tex. 1993)*. Moreover, under notice pleading, a plaintiff is not required to "set out in his pleadings the [**18] evidence upon which he relies to establish his asserted cause of action." *Paramount Pipe & Supply Co. v. Muhr, 749 S.W.2d 491, 494-95 (Tex. 1988)*. But the TCPA requires that on motion the plaintiff present "clear and specific evidence" of "each essential element."

*HN20* Fair notice of a claim under our procedural rules thus may require something less than "clear and specific

evidence" of each essential element of the claim. Because the Act requires more, mere notice pleading—that is, general allegations that merely recite the elements of [*591] a cause of action—will not suffice. Instead, a plaintiff must provide enough detail to show the factual basis for its claim. In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss.

*HN21* Though the TCPA initially demands more information about the underlying claim, the Act does not impose an elevated evidentiary standard or categorically reject circumstantial evidence. In short, it does not impose a higher burden of proof than that required of the plaintiff at trial. We accordingly disapprove those cases that interpret the TCPA [**19] to require direct evidence of each essential element of the underlying claim to avoid dismissal. With that understanding of the Act's requirements, we turn to pleadings and evidence in this case.

### III. Steven Lipsky's Petition

Range sued Steven Lipsky, alleging defamation, business disparagement, and civil conspiracy. The court of appeals found no evidence of a civil conspiracy, but some evidence of the other claims, concluding "that the trial court did not abuse its discretion by denying Steven Lipsky's motion to dismiss Range's defamation and business disparagement claims." *411 S.W.3d at 547*. Contrary to the court of appeals's opinion, Lipsky argues that no clear and specific evidence shows he defamed Range or disparaged its business. He concludes then that the trial court should have granted his motion to dismiss pursuant to the TCPA.

*HN22* Business disparagement and defamation are similar in that both involve harm from the publication of false information. *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc., 434 S.W.3d 142, 155 (Tex. 2014)*. The respective torts, however, serve different interests. Whereas "defamation actions chiefly serve to protect the personal reputation of an injured party, [] a business disparagement claim protects economic interests." *Forbes Inc. v. Granada Biosciences, Inc., 124 S.W.3d 167, 170 (Tex. 2003)*. Business disparagement or "injurious [**20] falsehood applies to derogatory publications about the plaintiff's economic or commercial interests." 3 DAN B. DOBBS, PAUL T. HAYDEN & ELLEN M. BUBLICK, THE LAW OF TORTS § 656, at 615 (2d ed. 2011).

The tort does not seek to redress dignitary harms to the business owner, but rather redresses aspersions cast on the business's commercial product or activity that diminishes those interests. *Hurlbut v. Gulf Atl. Life Ins. Co., 749 S.W.2d 762, 766-67 (Tex. 1987).*

*HN23* A corporation or other business entity that asserts a claim for defamation may assert an additional or alternative claim for business disparagement if it seeks to recover economic damages for injury to the business. *Burbage v. Burbage, 447 S.W.3d 249, 261 n.6 (Tex. 2014).* Impugning one's reputation is possible without disparaging its commercial interests and vice versa. Depending on the circumstances, then, a plaintiff may have a claim for defamation, or for business disparagement, or both.[10]

[*592] *A. Business Disparagement (Injurious Falsehood)*

*HN25* To defend against Lipsky's dismissal motion, Range's burden under the TCPA was to "establish[] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Tex. Civ. Prac. & Rem. Code § 27.005(c).* "To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages[11] to the plaintiff." *Forbes, 124 S.W.3d at 170* (citing *Hurlbut, 749*

---

[10] Professor Dobbs offers *HN24* a number of examples of commercial disparagement or trade libel that are not strictly speaking defamatory in the sense of dignitary harm:

> [A] publication that says the defendant's product is poisonous and contaminates the land or [] one that says the plaintiff's wood products are inferior and will not stand up. . . . A false statement that the ratings [**21] of the plaintiff's radio show are too low to justify continuing the show . . . . [A] publication falsely stating the price the plaintiff charges for his goods [or] that the plaintiff is no longer carrying on a business or has insufficient funds to continue in business.

3 DAN B. DOBBS, PAUL T. HAYDEN & ELLEN M. BUBLICK, THE LAW OF TORTS § 656, at 618-19 (2d ed. 2011) (footnotes omitted).

[11] *HN26* Special damages are synonymous with economic damages and are distinguishable from general damages. [**22] General damages are recoverable under a defamation claim for non-economic losses, such as loss of reputation and mental anguish. *Hancock v. Variyam, 400 S.W.3d 59, 65 (Tex. 2013).*

*S.W.2d at 766).* Lipsky contends that the trial court should have dismissed Range's business-disparagement claim because no evidence established that his remarks caused Range any special or economic damages.

The court of appeals disagreed. It concluded that an affidavit from Range's senior vice president was sufficient proof of Range's damages, at this stage, to defeat Lipsky's motion to dismiss. *See 411 S.W.3d at 547* (noting that the affidavit "provided the trial court with minimum but sufficient facts, at this stage in the litigation, to raise a rational inference, and therefore serve as prima facie proof" of Range's losses).

Range's vice president averred in general terms that Lipsky's statements caused Range to suffer "direct pecuniary and economic losses and costs, lost profits, loss of its reputation, and loss of goodwill in the communities in which it operates . . . in excess of three million dollars."[12] The court of appeals concluded that the affidavit, "by stating that Range had suffered direct economic losses and 'lost profits,'" was sufficient "to raise a rational inference . . . that Range lost 'trade or other dealings' as a result of statements made by Steven Lipsky." *Id.* (quoting *Hurlbut, 749 S.W.2d at 767).*

Lipsky argues, however, that the affidavit is conclusory

---

[12] The court of appeals quoted from the vice president's affidavit as indicated below: [**23]

> As a direct and proximate result and consequence of the . . . false, disparaging, and defamatory public statements made by Steven Lipsky . . . regarding Range and its operations, Range's business and reputation have been harmed . . . . The numerous false, disparaging, and defamatory public statements made by Mr. Lipsky . . . have caused Range to be associated in the public as a polluter of water and the environment, and nothing could be further from the truth.
>
> . . . As a direct and proximate result and consequence of the false, disparaging, and defamatory statements made by Mr. Lipsky . . ., *Range has suffered direct pecuniary and economic losses and costs, lost profits, loss of its reputation, and loss of goodwill in the communities in which it operates.* To date, the damages suffered by Range as a direct and proximate result and consequence of the conspiracy and . . . defamatory public statements made by Lipsky and Rich are in excess of three million dollars.

*411 S.W.3d at 546-47* (omissions in original).

and therefore insufficient to satisfy the TCPA's requirement of "clear and specific evidence," and we agree. *HN27* Bare, baseless opinions do not create [**24] fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA. *See Elizondo v. [*593] Krist, 415 S.W.3d 259, 264 (Tex. 2013)* ("Conclusory statement[s] . . . [are] insufficient to create a question of fact to defeat summary judgment."); *City of San Antonio v. Pollock, 284 S.W.3d 809, 816 (Tex. 2009)* (holding conclusory, baseless testimony to be no evidence). Opinions must be based on demonstrable facts and a reasoned basis. *Elizondo, 415 S.W.3d at 265*. We accordingly disagree with the court of appeals that general averments of direct economic losses and lost profits, without more, satisfy the minimum requirements of the TCPA. Although the affidavit states that Range "suffered direct pecuniary and economic losses," it is devoid of any specific facts illustrating how Lipsky's alleged remarks about Range's activities actually caused such losses. *See, e.g., Burbage, 447 S.W.3d at 262* (noting that a jury could not reasonably infer that cancellations for a funeral home business were caused by defamation when any number of reasons could have caused the cancellations).

Range, however, asserted not only business disparagement but also defamation. *HN28* Corporations and other business entities have reputations that can be libeled apart from the businesses they own, and such entities can prosecute [**25] an action for defamation in their own names. *See Waste Mgmt. of Tex., 434 S.W.3d at 147, 150-51* & n.35 (recognizing that a corporation, as owner of a business, may sue for defamation that injures its reputation). Moreover, a corporation or other business entity asserting a claim for business disparagement may also assert additional or alternative claims for defamation to recover non-economic general damages such as injury to reputation that are not recoverable on a business-disparagement claim. *Id. at 155-156 & n.81*. We turn then to Range's defamation claim and Lipsky's complaint that the trial court should have also dismissed it.

## B. Defamation

*HN29* Defamation's elements include (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases. *WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998); see also Waste Mgmt. of Tex., 434 S.W.3d*

at 146 n.7. The status of the person allegedly defamed determines the requisite degree of fault. A private individual need only prove negligence, whereas a public figure or official must prove actual malice. *WFAA-TV, Inc., 978 S.W.2d at 571*. "Actual malice" in this context means that the statement was made with knowledge of its falsity or with reckless disregard for its truth. *Huckabee v. Time Warner Entm't Co., 19 S.W.3d 413, 420 (Tex. 2000)*. Finally, the plaintiff must plead and [**26] prove damages, unless the defamatory statements are defamatory per se. *Waste Mgmt. of Tex., 434 S.W.3d at 162 n.7*.

*HN30* Defamation per se refers to statements that are so obviously harmful that general damages may be presumed. *Hancock, 400 S.W.3d at 63-64*. General damages include non-economic losses, such as loss of reputation and mental anguish. *Id*. Special damages, on the other hand, are never presumed as they represent specific economic losses that must be proven. *Id. at 65-66*. And even though Texas law presumes general damages when the defamation is per se, it does not "presume any particular amount of damages beyond nominal damages." *Salinas v. Salinas, 365 S.W.3d 318, 320 (Tex. 2012)* (per curiam). Any award of general damages that exceeds a nominal sum is thus reviewed for evidentiary support. *Burbage, 447 S.W.3d at 259*; *see also Bentley, 94 S.W.3d at 606-07* (criticizing award of mental anguish damages in defamation per [*594] se case because it was excessive and beyond any figure the evidence supported).

### (1) The Falsehoods

Lipsky complains that the trial court should have dismissed the defamation claim against him because Range failed to establish the defamatory nature of his alleged statements. The court of appeals listed the following published statements as potentially defamatory to Range:

· Range's drilling went under the Lipskys house while omitting that Range's wellbore [**27] was over a mile below the surface;

· the Lipskys' well no longer pumped water (when it actually could);

· the Lipskys had found unnatural detergents in the water;

· the Lipskys could not live in their home (although they continued to do so);

· Range would eventually "own" the Lipskys' home (which implied that Range was responsible for contaminating the Lipskys' water source and would be liable for doing so);

· Range was politically powerful and had prevailed with the Railroad Commission through corruption, even though the Railroad Commission had considered extensive evidence to support its decision and the Lipskys had not participated in the Railroad Commission's hearing;

· the Lipskys could literally light their water on fire, and the water was unsafe to drink;

· Range's drilling operations contaminated the water (even though the Railroad Commission had found that the operations had not); and

· Range treated the Lipskys like "criminals."

*411 S.W.3d at 545* (footnotes omitted). Lipsky argues that these statements are not defamatory either because they are true, do not explicitly refer to Range, are unverifiable statements of opinion, or are statements subject to a bona fide scientific dispute. Lipsky made these [**28] statements to the media and to his family and friends, as well as to the EPA, the Parker County Appraisal Review Board, and the Texas Railroad Commission.

*HN31* "It is well settled that the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Bentley, 94 S.W.3d at 579* (internal quotation marks omitted). While some of the statements may, in isolation, not be actionable, in looking at the entirety of Lipsky's publications the gist of his statements were that Range was responsible for contaminating his well water and the Railroad Commission was unduly influenced to rule otherwise.

The Commission's investigation coincided with the EPA's, beginning in August 2010, after Lipsky complained to the Abilene District Office about gas in his water well. That month, the Commission collected water and gas samples from the Lipskys' well, asked Range to test the mechanical integrity of its wells, and further obtained a gas analysis from Range's operations for comparison with the gas in the Lipskys' well. After comparing the respective gas samples, the Abilene District Office found them to have "distinct [**29] characteristics," but the Commission

nevertheless continued its investigation.

Meanwhile, the EPA decided that Range's two gas wells were an "imminent and substantial endangerment to a public drinking water aquifer," and issued an Emergency Administrative Order to that effect on December 7, 2010. The next day, [*595] the Commission issued its Notice of Hearing, inviting the EPA and the Lipskys to participate in an evidentiary hearing on the cause of the aquifer's contamination. Neither the EPA nor the Lipskys chose to participate, however.

After hearing testimony on the groundwater investigation and Range's operations in the area, as well as expert testimony on geology, hydrogeology, microseismic analysis, hydraulic fracturing, geochemical gas fingerprinting, and petroleum engineering, the Commission's hearing examiners concluded that Range's gas wells had not contributed to the contamination of any domestic water wells. The examiners concluded instead that the Strawn formation was the most likely source of the gas in the Lipskys' well.

The Strawn is a shallow formation, lying directly beneath the Trinity aquifer at a depth of 200 to 400 feet. There had been gas production from the Strawn in [**30] the mid-1980s about a mile from Range's current wells. Range's two wells, however, did not produce from the Strawn. They were instead completed in the Barnett Shale, a formation lying more than a mile below the aquifer. And although Range used hydraulic fracturing of the Barnett Shale to extract its gas, the examiners found that this caused no communication with the aquifer, as nearly a mile of rock remained between the highest fracture point and the aquifer. The examiners further confirmed the mechanical integrity of Range's wells, finding its production casings properly cemented and in compliance with the Texas Commission on Environmental Quality's recommendations for water quality protection. The examiners noted that gas contamination in water wells throughout the county had occurred since at least 2003, several years before Range drilled the two wells in question.

Adopting the examiners' findings and conclusions, the Railroad Commission signed its final order on March 22, 2011. Afterward, Lipsky was quoted in news articles to state that the Commission's decision was "ridiculous," the product of a "corrupt system," and that "it was kind of sad." Although he had not participated in [**31] the hearing, he referenced the earlier EPA order and his own expert, who suspected that the contamination resulted from Range's nearby drilling. Thus, despite the

Commission's conclusions to the contrary, Lipsky continued to maintain that Range was responsible for contaminating the aquifer and his domestic water well. The court of appeals concluded that there was some evidence of a defamatory statement concerning Range sufficient to defeat Lipsky's TCPA motion to dismiss, and we agree. His statements were not presented as opinion but were "sufficiently factual to be susceptible of being proved true or false." *Milkovich v. Lorain Journal Co., 497 U.S. 1, 21, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).*

## (2) The Damages

Lipsky also argues that the trial court should have dismissed Range's defamation claim because no evidence established that his remarks caused the company specific damages. The court of appeals again disagreed. It concluded that the affidavit from Range's senior vice president, which discussed Range's losses in very general terms, was sufficient to defeat Lipsky's TCPA motion to dismiss. *See 411 S.W.3d at 547.* As we have already determined, the vice president's affidavit was insufficient proof of Range's special damages for purposes of the TCPA.

Range argues, however, that it did [**32] not have to submit proof of special damages as part of its defamation claim because Lipsky's statements were defamatory [*596] per se. *HN32* When an offending publication qualifies as defamation per se, a plaintiff may recover general damages without proof of any specific loss. *Hancock, 400 S.W.3d at 63-64.* Thus, if Lipsky's remarks concerning Range are actionable per se, then any failure in proof as to special damages is irrelevant. In other words, if such losses are not an essential element of Range's defamation claim, they can have no bearing on Lipsky's dismissal motion under the TCPA. *See Tex. Civ. Prac. & Rem. Code § 27.005(c).*

*HN33* The common law distinguishes defamation claims as either per se or per quod.[13] *Hancock, 400 S.W.3d at 63.* Defamation per se refers to statements that are so obviously harmful that general damages, such as mental anguish and loss of reputation, are presumed. *Id. at 63-64.* Defamation per quod is defamation that is not actionable per se. *Id. at 64.* Defamation per se is

itself broken down into separate categories of falsehoods. Accusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se. *Moore v. Waldrop, 166 S.W.3d 380, 384 (Tex. App.— Waco 2005, no pet.).* Remarks that adversely reflect on a person's fitness to conduct his or her business [**33] or trade are also deemed defamatory per se. *Hancock, 400 S.W.3d at 66.* And whether a statement qualifies as defamation per se is generally a question of law. *Id.*

Range argues that Lipsky's remarks in this case were defamatory per se because they reflected on Range's fitness and abilities as a natural gas producer. *HN34* To qualify as defamation per se under this category the disparaging words must affect the plaintiff in some manner that is peculiarly harmful to the plaintiff's trade, business, or profession and not merely upon the plaintiff's general characteristics. *See id. at 66-67* (noting that a statement injures one in his profession when it would "adversely affect his fitness for the proper conduct" of the business). Range submits that by being falsely branded as a polluter and a threat to public health and safety, Lipsky has portrayed Range as incompetent, even reckless, as a gas producer, thereby injuring the company's reputation.

Environmental responsibility is an attribute particularly important to those in [**34] the energy industry—none more so than natural gas producers, such as Range, who employ horizontal drilling and hydraulic fracturing in their business. Accusations that Range's fracking operations contaminated the aquifer thus adversely affect the perception of Range's fitness and abilities as a natural gas producer. *HN35* As defamation per se, damages to its reputation are presumed, although the presumption alone will support only an award of nominal damages. *Salinas, 365 S.W.3d at 320.* Pleading and proof of particular damage is not required to prevail on a claim of defamation per se, and thus actual damage is not an essential element of the claim to which the TCPA's burden of clear and specific evidence might apply. Although Range's affidavit on damages may have been insufficient to substantiate its claim to special damages, it was not needed to defeat Lipsky's dismissal motion because Range's defamation claim was actionable per se. The trial court accordingly did not abuse its discretion in denying Lipsky's motion to dismiss.

## IV. Range's Petition

---

[13] The common law distinction between defamation per se and per quod has been criticized as anachronistic and has been abandoned in some jurisdictions, but Texas has not abandoned this distinction. *See Waste Mgmt. of Tex., 434 S.W.3d at 146 & nn.8-9.*

In re Lipsky

The court of appeals concluded that the TCPA required the dismissal of [*597] Range's business-disparagement and defamation claims against Shyla Lipsky and Alisa Rich because no [**35] evidence showed that either party published any false statements about Range concerning contamination of the aquifer in general or the Lipsky well in particular. *411 S.W.3d at 547-49*. The court also concluded that the TCPA required the dismissal of Range's civil conspiracy claim because no evidence established that the Lipskys and Rich agreed to defame Range, an essential element of Range's civil-conspiracy claim as pled. *Id. at 551*. In its petition, Range seeks reinstatement of its defamation and business-disparagement claims against Shyla Lipsky, as well as reinstatement of its civil-conspiracy claim against all defendants.

Range complains that the court of appeals failed to give it the benefit of rational inferences drawn from the voluminous evidence it presented. It argues that Rich had a history of publicly blaming drilling, in general—and Range in particular—for contaminating the environment and that she devised a "strategy" to get the EPA to investigate the Lipsky contamination claim, which she documented in an email to the Lipskys. Range further complains that Rich played a role in the distribution of Lipsky's "misleading" garden hose video in furtherance of the conspiracy to defame and disparage Range. [**36]

The court observed, however, that Rich, although mentioning Lipsky's video to the EPA, had not used it to mislead the agency but rather explained that the hose had been attached to the well vent. *411 S.W.3d at 551*. The court found no evidence that Rich participated in distributing the video to the media or contributed to media reports about "water being lit on fire." *Id.* The court of appeals considered the evidence of Rich's alleged predisposition but concluded it was not clear and specific evidence that "Rich had conspired with the Lipskys to blame Range on this occasion." *Id.* The court further considered the email documenting Rich's "strategy," but found it to be no evidence of a conspiracy to defame or disparage Range. Instead, the court observed that the email focused "on the contamination of the Lipksys' well and on executing a plan to trigger an investigation into the contamination rather than on blaming Range or pursuing an action against Range for the contamination." *Id.*

We agree that no clear and specific evidence establishes a prima facie case that Shyla Lipsky or Alisa Rich published any defamatory remarks concerning Range or conspired with Steven Lipsky "to publicly blame Range for the contamination." [**37] *Id.* The court of appeals accordingly did not abuse its discretion in holding that the TCPA required the dismissal of Range's claims against Steven Lipsky's wife and environmental consultant and Range's conspiracy claim against all parties.

* * *

The respective petitions filed in this Court by Steven Lipsky and by Range Production Co. and Range Resources Corp. are denied.

John P. Devine

Justice

Opinion Delivered: April 24, 2015

End of Document

# TAB NO. 17


# City of Dallas v. Sanchez

Supreme Court of Texas

July 1, 2016, Opinion Delivered

NO. 15-0094

**Reporter**

494 S.W.3d 722; 2016 Tex. LEXIS 615; 59 Tex. Sup. J. 1540

CITY OF DALLAS, PETITIONER, v. DIANE SANCHEZ, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF MATTHEW SANCHEZ, DECEASED, AND ARNOLD SANCHEZ, RESPONDENTS

**Prior History:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS.

*City of Dallas v. Sanchez, 449 S.W.3d 645, 2014 Tex. App. LEXIS 11755 (Tex. App. Dallas, 2014)*

## Core Terms

malfunction, proximate cause, dispatcher, responders, emergency, pleadings, phone, governmental immunity, causing injury, disconnected, telephone, immunity, overdose, waived

## Case Summary

### Overview

HOLDINGS: [1]-An alleged defect in a city's 9-1-1 telephone system was not the proximate cause of a drug overdose victim's death because the defect did not actually cause the victim's death, nor was his death hastened or exacerbated by a telephone malfunction; the malfunction was merely one of a series of factors that contributed to the victim not receiving timely medical assistance; [2]-The victim's death was caused by drugs, the passage of time, and misinterpretation of information by dispatchers and emergency responders, who had received two 9-1-1 calls ten minutes apart, both seeking assistance for a drug-overdose victim in the same apartment complex; [3]-Because public property did not cause the victim's death, city immunity was not waived under *Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2)*, and dismissal under *Tex. R. Civ. P. 91a* was proper.

### Outcome

Court of appeals' judgment reversed; judgment rendered *dismissing* the case.

## LexisNexis® Headnotes

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims Acts > Construction & Interpretation

*HN1* *Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2)* provides a limited waiver of governmental immunity arising from the condition or use of tangible personal property.

Civil Procedure > ... > Defenses, Demurrers & Objections > *Motions to Dismiss* > Failure to State Claim

*HN2* *Tex. R. Civ. P. 91a* authorizes dismissal of a cause of action that has no basis in law or fact.

Civil Procedure > ... > Defenses, Demurrers & Objections > *Motions to Dismiss* > Failure to State Claim

*HN3* Dismissal is appropriate under *Tex. R. Civ. P. 91a* if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought, or no reasonable person could believe the facts pleaded. *Tex. R. Civ. P. 91a*.1. Whether the dismissal standard is satisfied depends solely on the pleading of the cause of action. *Tex. R. Civ. P. 91a*.6.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses, Demurrers & Objections > *Motions to Dismiss* > Failure to State Claim

*HN4* An appellate court reviews the merits of a *Tex. R. Civ. P. 91a motion* de novo because the availability of a remedy under the facts alleged is a question of law, and

the rule's factual-plausibility standard is akin to a legal-sufficiency review.

Civil Procedure > ... > Defenses, Demurrers & Objections > *Motions to Dismiss* > Failure to State Claim

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN5* The dismissal grounds under *Tex. R. Civ. P. 91a* have been analogized to a plea to the jurisdiction, which requires a court to determine whether the pleadings allege facts demonstrating jurisdiction. Whether a pleader has alleged facts affirmatively demonstrating the existence of subject-matter jurisdiction is a question of law reviewed de novo. In a suit against a government entity claiming immunity, to determine whether dismissal under *Rule 91a* is required, an appellate court considers whether the pleadings, liberally construed, allege sufficient facts to invoke a waiver of governmental immunity under the Tort Claims Act.

Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review

*HN6* The Supreme Court of Texas has jurisdiction over a petition for review if the court of appeals' decision is inconsistent with prior Supreme Court decisions. *Tex. Gov't Code Ann. §§ 22.001(a)(2)*, *(e)*, *22.225(b)*, *(c)*, *(e)*, 51.014(a)(8).

Torts > ... > Elements > Causation > Proximate Cause

Torts > Public Entity Liability > Immunities > Qualified Immunity

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims Acts > Construction & Interpretation

*HN7* The Texas Tort Claims Act waives governmental immunity from suit for personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law. *Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2)*. For immunity to be waived under *§ 101.021(2)*, personal injury or death must be proximately caused by a condition or use of tangible personal or real property.

Governments > Local Governments > Claims By & Against

Torts > Public Entity Liability > Immunities > Qualified Immunity

Torts > ... > Liability > State Tort Claims Acts > Construction & Interpretation

Torts > ... > Causation > Proximate Cause > Foreseeability

of Harm

Torts > ... > Elements > Causation > Causation in Fact

*HN8* Proximate cause requires both cause in fact and foreseeability. For a condition of public property to be a cause in fact so that governmental immunity is waived under *Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2)*, the condition must serve as a substantial factor in causing the injury and without which the injury would not have occurred. When a condition or use of property merely furnishes a circumstance that makes the injury possible, the condition or use is not a substantial factor in causing the injury. To be a substantial factor, the condition or use of the property must actually have caused the injury. Thus, the use of property that simply hinders or delays treatment does not actually cause the injury and does not constitute a proximate cause of an injury.

**Counsel:** For City of Dallas, Petitioner: Barbara E. Rosenberg, James B. Pinson, Patricia Medrano De La Garza, Assistant City Attorney, Dallas TX; Warren M.S. Ernst, Dallas City Attorney, Dallas TX.

For Arnold Sanchez, Diane Sanchez, Respondents: Charles (Chad) E. Baruch, Johnston Tobey Baruch, P.C., Dallas TX; Michael Brett Anthony, Anthony & Peterson, L.L.P, Corpus Christi TX.

## Opinion

**[*724] PER CURIAM**

Hours before Matthew Sanchez died from a drug overdose, a 9-1-1 operator dispatched an ambulance to his apartment complex. Once on scene, however, emergency personnel provided assistance to a different drug-overdose victim at the same complex and then left the premises without aiding Sanchez, erroneously concluding that two closely timed 9-1-1 calls concerning overdose victims at the same locale were redundant. In a wrongful-death suit against the City of Dallas, Sanchez's parents allege the 9-1-1 telephone system malfunctioned and disconnected Sanchez's call before the responders could establish the overdose reports were not duplicative.

The issue in this *Rule 91a* dismissal proceeding is whether the Texas Tort Claims Act waives the City's [**2] immunity from suit based on allegations in the wrongful-death suit that a condition of the City's telephone system proximately caused Sanchez's death by preventing him from receiving potentially life-saving medical care. See *HN1* *Tex. Civ. Prac. & Rem. Code §*

101.021(2) (providing a limited waiver of governmental immunity arising from the "condition or use" of tangible personal property); *HN2* *Tex. R. Civ. P. 91a* (authorizing dismissal of a cause of action that has no basis in law or fact). We hold governmental immunity is not waived and dismissal is required because the requisite causal nexus between the alleged condition and Sanchez's injury is lacking. *See* *Dallas County v. Posey, 290 S.W.3d 869, 872 (Tex. 2009)* (the alleged condition must actually have caused the injury to invoke the Tort Claims Act's immunity waiver; mere involvement of property is not sufficient). We therefore reverse the court of appeals' judgment and render judgment *dismissing* the case.

*HN3* Dismissal is appropriate under *Rule 91a* "if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought . . . [or] no reasonable person could believe the facts pleaded." *Tex. R. Civ. P. 91a.1*. Whether the dismissal standard is satisfied depends "solely on the pleading of the cause of action." *Tex. R. Civ. P. 91a.6*. *HN4* We review [**3] the merits of a *Rule 91a motion* de novo because the availability of a remedy under the facts alleged is a question of law and the rule's factual-plausibility standard is akin to a legal-sufficiency review. *See* *Wooley v. Schaffer, 447 S.W.3d 71, 75-76 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)*; *cf.* *Marsh USA Inc. v. Cook, 354 S.W.3d 764, 768 (Tex. 2011)* (application of the law to undisputed facts is reviewed *de novo*); *City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005)* ("[L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.").

*HN5* The dismissal grounds under *Rule 91a* have been analogized to a plea to the [*725] jurisdiction, which requires a court to determine whether the pleadings allege facts demonstrating jurisdiction. *See* *Wooley, 447 S.W.3d at 75*. In this case, the analogy is particularly apt because the City's *Rule 91a motion* challenges the trial court's subject-matter jurisdiction on the pleaded facts. Whether a pleader has alleged facts affirmatively demonstrating the existence of subject-matter jurisdiction is a question of law reviewed *de novo*. *See* *Tex. Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004)*; *see also* *Ryder Integrated Logistics, Inc. v. Fayette County, 453 S.W.3d 922, 927 (Tex. 2015)* (per curiam) ("We review jurisdiction and pleading sufficiency *de novo*."). To determine whether dismissal under *Rule 91a* is required in this case, we thus consider whether the pleadings, liberally construed, allege sufficient facts to invoke a waiver of governmental [**4] immunity under the Tort Claims Act.

*Miranda, 133 S.W.3d at 226*; *see also* *Ryder Integrated, 453 S.W.3d at 926*.

In the early hours of November 16, 2012, City of Dallas 9-1-1 dispatchers received two 9-1-1 calls within approximately ten minutes of one another. Both calls originated from the same apartment complex and both requested assistance for a drug-overdose victim; however, the calls were placed from different phone numbers and concerned different residents.

This wrongful-death and survival action arises from the second 9-1-1 call, which was placed at 2:55 a.m. on Matthew Sanchez's behalf. The 9-1-1 dispatcher acquired information regarding the nature of the emergency and Sanchez's address, including the apartment number, and informed the caller that emergency responders were en route. The call was subsequently disconnected and not reestablished. After emergency responders arrived at the apartment complex to assist the subject of the first 9-1-1 call, they erroneously concluded that the two 9-1-1 calls were redundant and that a single individual was the subject of both calls. Consequently, the emergency responders never went to Sanchez's apartment to provide aid. Sanchez died at approximately 8:40 a.m.

Sanchez's parents sued the City of Dallas [**5] for negligence alleging: (1) the City's 9-1-1 dispatcher misused the phone system by hanging up before emergency responders arrived to assist Sanchez, or in the alternative, the 9-1-1 phone system malfunctioned, causing the call to disconnect prematurely; (2) the 9-1-1 dispatcher failed to follow proper procedure and violated various federal, state, and local laws and regulations by either disconnecting the call or failing to redial after the call disconnected; and (3) if the emergency responders had located Sanchez before leaving the premises, they "would have most likely saved [his] life."

In a *Rule 91a motion to dismiss* asserting governmental immunity from suit, the City argued the allegations in the lawsuit did not invoke a waiver of immunity under the Tort Claims Act because (1) the allegations complained about communication of information and the failure to dispatch an ambulance, not a condition or misuse of tangible property, and (2) Sanchez's death was caused by a drug overdose, not the 9-1-1 telephone system. *See* *Tex. Civ. Prac. & Rem. Code § 101.021(2)*. Alternatively, to the extent immunity might otherwise be waived under the Tort Claims Act, the City asserted the pleadings failed to overcome a statutory exception making [**6] the Act inapplicable to 9-1-1 emergency services, except for actions that "violate[] a statute or ordinance applicable to the action."

*Id.* § 101.062(b).

The trial court granted the City's ***motion to dismiss*** as to all claims except the allegation [*726] that the 9-1-1 phone system failed or malfunctioned. On interlocutory appeal, the court of appeals affirmed, holding Sanchez's parents (1) sufficiently alleged a defect in the phone system proximately caused his death and (2) adequately pleaded a violation of a statute or ordinance as an exception to *section 101.062*'s waiver exclusion.[1] *449 S.W.3d 645, 653-54*.

*HN6* We have jurisdiction over the City's petition for review because the court of appeals' decision is inconsistent with our decisions in *Dallas County v. Posey, 290 S.W.3d 869 (Tex. 2009)*, and *Texas Department of Criminal Justice v. Miller, 51 S.W.3d 583 (Tex. 2001)*. See *Tex. Gov'T Code §§ 22.001(a)(2), (e), 22.225(b), (c), (e), 51.014(a)(8)*; see also *Austin State Hosp. v. Graham, 347 S.W.3d 298, 300 (Tex. 2011)*.

*HN7* The Texas Tort Claims Act waives governmental immunity from suit for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." *Tex. Civ. Prac. & Rem. Code § 101.021(2)*. For immunity to be waived under *section 101.021(2)*, "personal injury or death must be proximately [**7] caused by a condition or use of tangible personal or real property." *Dallas Cty. Mental Health & Mental Retardation v. Bossley, 968 S.W.2d 339, 342-43 (Tex. 1998)*. To establish a waiver of the City's immunity under *section 101.021(2)*, we must therefore determine whether the phone's condition was a proximate cause of Sanchez's death.

*HN8* Proximate cause requires both "cause in fact and foreseeability." *Ryder, 453 S.W.3d at 929*. For a condition of property to be a cause in fact, the condition must "serve[] as 'a substantial factor in causing the injury and without which the injury would not have occurred.'" *Id.* (quoting *Del Lago Partners, Inc. v. Smith, 307 S.W.3d 762, 774 (Tex. 2010)*). When a condition or use of property merely furnishes a circumstance "that makes the injury possible," the condition or use is not a substantial factor in causing the injury. *Bossley, 968 S.W.2d at 343*. To be a substantial factor, the condition or use of the property "must actually have caused the injury." *Posey, 290 S.W.3d at 872* ("This nexus requires

---

[1] The court of appeals also affirmed dismissal of the Sanchezes' negligent use/misuse claim, but they have not appealed that ruling.

more than mere involvement of property; rather, the condition must actually have caused the injury."). Thus, the use of property that simply hinders or delays treatment does not "actually cause[] the injury" and does not constitute a proximate cause of an injury. See *Miller, 51 S.W.3d at 588*.

In *Miller*, prison staff misdiagnosed a prisoner's meningitis and provided treatment—including pain-relievers, anti-nausea medicine, and fluids—that [**8] masked the symptoms and made it more difficult to correctly diagnose the meningitis. *Id.* We concluded the treatment was not a proximate cause of the prisoner's death because it "did not actually cause his death." *Id.* Instead, the prisoner's death was caused by meningitis, "the passage of time[,] and an alleged error in medical judgment." *Id.*

Even construing the pleadings liberally, see *Miranda, 133 S.W.3d at 226*, the alleged telephone-system malfunction was not a proximate cause of Sanchez's death. Between the alleged malfunction and Sanchez's death, emergency responders erroneously concluded separate 9-1-1 calls [*727] were redundant and left the apartment complex without checking the specific apartment unit the dispatcher had provided to them. Moreover, approximately six hours passed between the phone malfunction and Sanchez's death, further attenuating the causal connection. Although disconnection of the telephone call may have contributed to circumstances that delayed potentially life-saving assistance, the malfunction was too attenuated from the cause of Sanchez's death—a drug overdose—to be a proximate cause. See *Bossley, 968 S.W.2d at 343* (use of property is not a proximate cause when it is too attenuated from the injury). The alleged [**9] defect did not actually cause Sanchez's death nor was his death "hastened or exacerbated" by a telephone malfunction. See *Posey, 290 S.W.3d at 872*; *Miller, 51 S.W.3d at 588*. The malfunction was merely one of a series of factors that contributed to Sanchez not receiving timely medical assistance. See *Miller, 51 S.W.3d at 588*. Sanchez's death was caused by drugs, the passage of time, and misinterpretation of information. See *id.* (concluding the death was caused by meningitis, time, and an alleged error in judgment, not by symptom-masking treatment). Accordingly, the pleadings do not establish a defect in the 9-1-1 telephone system was a proximate cause of Sanchez's death as required to establish a waiver of governmental immunity under the Tort Claims Act.

Without hearing oral argument, we reverse the court of appeals' judgment and render judgment ***dismissing*** the

case. *See Tex. R. App. P. 59.1*.

**OPINION DELIVERED:** July 1, 2016